11.3   Publicity.  Borrower and Lender agree not to (orally or in writing) publicly disclose or issue any press release or make any other public statement, or otherwise communicate with the media, concerning the existence of the Loan Documents or the subject matter hereof or thereof, without the prior written approval of each party hereto, except to the extent that Lender or Borrower (based upon the reasonable advice of its counsel) is required by applicable law to make any public disclosure or filing with respect to the Loan Documents or the subject matter hereof or thereof.

12.  Miscellaneous.

12.1   No Waiver.  No failure or delay on the part of Lender in exercising any right or remedy hereunder, and no course of dealing between Borrower and Lender shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy hereunder.  The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which Lender would otherwise have.  No notice to or demand on Borrower hereunder shall entitle Borrower to any other or further notice or demand in any similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand.

12.2   Counterparts.  This Agreement may be executed in any number of counterparts, and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

12.3   Governing Law; Waiver of Jury Trial; Jurisdiction.

12.3.1. Governing Law.  This Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, without regard to conflicts of laws principles thereof (other than Section 5-1401 of the New York General Obligations Law).

12.3.2. Consent to Jurisdiction.  Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against Borrower or its properties in the courts of any jurisdiction.

12.3.3. Venue.  Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which Borrower may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in Section 12.3.2.  Borrower hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum for the maintenance of such action or proceeding in any such court.

12.3.4. Service of Process.  Borrower irrevocably consents to service of process in the manner provided for notices in Section 12.10.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

12.3.5. JURY TRIAL WAIVER.  EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY DISPUTE ARISING UNDER OR IN ANY WAY RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

12.4 **Captions**. The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall in no way affect the meaning or construction of any provision of this Agreement.

12.5 **Severability**. If any part of any provision of this Agreement shall be invalid or unenforceable under applicable law, said part shall be ineffective to the extent of such invalidity only, without in any way affecting the remaining parts of said provision or the remaining provisions.

12.6 **Resolution of Drafting Ambiguities**. Borrower acknowledges that it was represented by counsel in connection with the Loan Documents and that it and its counsel reviewed and participated in the preparation and negotiation hereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation thereof.

12.7 **Modification**. Any amendment of any provision of this Agreement shall be effective only if made or given in a written agreement duly executed and delivered by Lender and Borrower. Any waiver or consent to any departure by Borrower from any provision of this Agreement shall be effective only if made or given in a written agreement duly executed and delivered by Lender and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

12.8 **Survival of Representations**. All covenants contained herein or made in writing by Borrower in connection herewith shall survive the execution and delivery of this Agreement, and any and all other documents and writings relating to or arising out of any of the foregoing or any of the Obligations and shall terminate only upon the Discharge of Obligations.

12.9 **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto; provided, however, that Borrower may not assign or transfer any of its rights or obligations hereunder, and any purported assignment or transfer by Borrower without such consent shall be void. Lender may, without the consent of Borrower, (a) assign or pledge all or any portion of its rights and obligations under this Agreement and the other Loan Documents (including all or a portion of the Loans, the Commitment and other Obligations and Liens) to one or more Persons, each of which shall, to the extent of the rights and obligations so assigned, shall become the "Lender" under this Agreement and the other Loan Documents and (b) sell participations in all or any portion of its rights and obligations under this Agreement and the other Loan Documents (including all or a portion of the Loans, the Commitment, the Obligations and the Liens) to one or more Persons.

12.10 **Notices**. All notices, requests and other communications to any party hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified mail or registered mail, as follows: in the case of Borrower at the mailing address set forth in Schedule 4.11.1, and in the case of Lender c/o Athena Art Finance Corp., 400 Park Avenue, 12th Floor, New York, New York 10022, Attention: Cynthia Sachs, or such other address as Borrower or Lender designates in writing as its address for notices from time to time. All such notices and other communications shall be deemed to be given when received.

12.11 **Interest Rate Limitation**. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Loans, together with all fees, charges and other amounts which are treated as interest on the Loans under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by Lender in accordance with applicable law, the rate of interest payable in respect of the Loans hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of the Loans but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to Lender in respect of the Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount shall have been received by Lender.

12.12 **Terms Generally**. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or

with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities. The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (and, if applicable, executors, administrators, personal representatives, heirs and legatees) (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, unless expressly stated that such Articles, Sections, Exhibits and Schedules are contained in an Annex, Exhibit or Schedule attached hereto, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Words of any gender in this Agreement shall be deemed to include any other gender.

12.13  **Agent for Service of Process.**  Borrower shall at all times maintain an agent for service of process. Such agent shall be Brebners (130 Shaftesbury Ave., London, UK W1D 5AR; 020.7734.2244; london@brebners.com) and any claim form, judgment or other notice of legal process shall be sufficiently served on the Borrower if delivered to such agent at its address for the time being. The Borrower irrevocably undertakes not to revoke such appointment without notifying Lender of the appointment of a replacement agent for service. It shall be effective service for Lender to serve the process upon the last known address in the U.S. of the last known agent for the Borrower notified to Lender notwithstanding that such process agent is no longer found at such address or has ceased to act. If, for any reason, Lender requests the Borrower to revoke the appointment, the Borrower shall promptly appoint another such agent with an address in the U.S. and advise Lender. If, following such a request, the Borrower fails to appoint another agent, the Lender shall be entitled to appoint one on behalf of the Borrower at the expense of the Borrower.

12.14  **Judgment Currency.**  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in U.S. Dollars into another currency, the rate of exchange used shall be that at which, in accordance with normal banking procedures, Lender could purchase U.S Dollars with such other currency on the Business Day preceding that on which final judgment is given. The obligations of Borrower in respect of any such sum due from it to Lender hereunder or under the other Loan Documents shall, notwithstanding any judgment in any currency other than U.S. Dollars (the "**Judgment Currency**"), be discharged only to the extent that on the Business Day following receipt by Lender of any sum adjudged to be so due in such Judgment Currency, Lender may in accordance with normal banking procedures purchase U.S. Dollars with such Judgment Currency. If the amount of U.S. Dollars so purchased is less than the sum originally due to Lender from Borrower in U.S. Dollars, Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify Lender or the Person to whom such obligation was owing against such loss. If the amount of U.S Dollars so purchased is greater than the sum originally due to the Lender in U.S. Dollars, Lender agrees to return the amount of any excess to Borrower (or to any other Person who may be entitled thereto under applicable Requirement of Law). For purposes of determining any rate of exchange for this Section 12.14, such amounts shall include any premium and costs payable in connection with the purchase of U.S. Dollars.

[Remainder of Page Left Intentionally Blank]

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

BORROWER:
18 BOXWOOD GREEN LIMITED

By: /s/
Name: JOSEPH BETTS
Title: DIRECTOR

LENDER:
ATHENA ART FINANCE CORP.

By: _____
Name:
Title:

[Signature page to Loan and Security Agreement]

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

BORROWER:
18 BOXWOOD GREEN LIMITED

By: _____
Name:
Title:


LENDER:
ATHENA ART FINANCE CORP.

By: *[signature]*
Name: Rebecca L. Fine
Title: General Counsel

[Signature page to Loan and Security Agreement]

# ANNEX A

## DEFINITIONS

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person

"**Agreement**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Applicable LIBOR Rate**" means, for any day, the rate per annum determined by Lender by reference to the London Interbank Offered Rate administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate or a similar rate) for U.S. Dollar deposits for delivery on the date in question for a three-month term beginning on that date, *provided that*, the rate of interest will be adjusted automatically as of the first day of each calendar month (each such day, a "LIBOR Reset Date") and the rate of interest as of such LIBOR Reset Date shall be the "Applicable LIBOR Rate" until the next succeeding LIBOR Reset Date, *provided however*, if a LIBOR Reset Date is not a LIBOR Business Day, the "Applicable LIBOR Rate" for such LIBOR Reset Date will be determined as of the first LIBOR Business Day preceding such LIBOR Reset Date.

"**Applicable Margin**" means the percentage set forth in Annex B hereto under the heading "Applicable Margin."

"**Approved Storage Facility**" means the storage facility ████████████████████ (the "**Approved Storage Facility Bailee**")

"**Approved Storage Facility Bailee**" has the meaning set forth in the definition of "Approved Storage Facility."

"**Artwork Collateral Pieces**" means an artwork owned by Borrower and identified on Schedule A attached hereto (as such Schedule A may be amended, amended and restated or supplemented from time to time in accordance with the terms of this Agreement).

"**Artwork Collateral Piece Value**" means, with respect to any Artwork Collateral Piece, (i) initially, the value of such Artwork Collateral Piece determined by Lender (in its sole discretion) on the basis of the Initial Appraisals with respect to such Artwork Collateral Piece, as reflected on Schedule A, and (ii) after an adjustment of the Artwork Collateral Piece Value of such Artwork Collateral Piece pursuant to Section 1.4.2(a) of Annex C hereto, the value of such Artwork Collateral Piece determined by Lender (in its sole discretion) in accordance with Section 1.4.2(a) of Annex C hereto.

"**Artwork Collateral Value**" means the aggregate Artwork Collateral Piece Values of all Artwork Collateral Pieces that satisfy the Eligibility Criteria.

"**Available Loan Amount**" means, as of any date, an amount equal to (x) the lesser of the Borrowing Base and the Commitment minus (y) the Outstanding Amount, in each case, as of such date.

"**Borrower**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Borrower Collateral**" has the meaning set forth in Section 3.1.

"**Borrowing Base**" ████████████████████████████████████████

**64**

i

HF 10678817v.5 #17926/0012

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Jersey are authorized or required by law to remain closed.

"**Charges**" has the meaning set forth in Section 12.11.

"**Closing Date**" means the date of this Agreement.

"**Collateral Addition**" has the meaning set forth in Section 3.4.

"**Collateral Administration Fee**" has the meaning set forth in Section 1.9.3 of Annex C.

"**Collateral Disposition Costs**" has the meaning set forth in the definition of "Lender Expenses."

"**Collateral Insurance Policies**" has the meaning set forth in Section 5.4.2.

"**Collateral Insurer**" has the meaning set forth in Section 5.4.1.

"**Collateral Substitution**" has the meaning set forth in Section 3.4.

"**Commitment**" means the commitment of Lender to make Loans to Borrower up to an aggregate principal amount outstanding at any time not to exceed the amount set forth in Annex B under the heading "Commitment."

"**Commitment Fee Rate**" means the rate set forth in Annex B under the heading "Commitment Fee Rate."

"**Conservator**" means a fine art conservator approved by Lender in its sole discretion.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Corporate Guarantor**" means Inigo Philbrick, Ltd., a limited liability company registered in England and Wales (09053929).

"**Corporate Guaranty**" means the Corporate Guaranty, dated as of the date hereof, executed by the Corporate Guarantor in favor of the Lender.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States, any state thereof or any other applicable jurisdictions from time to time in effect.

"**Default**" means an event which, with the passage of time, giving of notice, or both, would become an Event of Default.

"**Default Rate**" means the rate set forth in Annex B under the heading "Default Rate."

"**Direction Letter**" means that certain Direction Letter, dated as of the date hereof, delivered by Borrower to (and acknowledged and agreed by) Lender, Corporate Guarantor and Individual Guarantor

"**Discharge of Obligations**" means (i) the indefeasible payment in full in cash in US dollars of all Obligations and (ii) the termination or expiration of the Commitment.

"**Disposition**" means any sale, lease, license, consignment, transfer, grant or declaration of a trust by any Person with respect to, or any other disposition of, any Borrower Collateral. "**Dispose**" has the meaning correlative thereto.

"**Draw Request**" means a notice substantially in the form set out in Exhibit C (Draw Request) hereto.          **65**

"**Eligibility Criteria**" means, with respect to an Artwork Collateral Piece, the following:

(i) Lender has a first priority perfected security interest in such Artwork Collateral Piece, subject to no other Lien whether junior, senior or equal in priority to Lender's Lien;

(ii) such Artwork Collateral Piece is not located at any place other than the Approved Storage Facility, or another location approved in writing by Lender;

(iii) such Artwork Collateral Piece is owned, legally and beneficially, 100% by Borrower;

(iv) such Artwork Collateral Piece is not subject to any provision prohibiting its assignment, pledge or Disposition, or requiring notice of or consent thereto by any Person;

(v) such Artwork Collateral Piece is maintained and insured as required under this Agreement;

(vi) such Artwork Collateral Piece is a museum quality, fine artwork and is acceptable to Lender in its sole discretion; and

(vii) no Provenance Claim with respect to such Artwork Collateral Piece is pending.

"**Engagement Fee**" has the meaning set forth in Section 1.9.1 of Annex C.

"**Equity Interests**" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, any interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, the issuing Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"**Event of Default**" has the meaning set forth in Section 7.

"**Existing Corporate Guarantor Credit Agreement**" means that certain Loan and Security Agreement, dated as of January 20, 2017, by and between Corporate Guarantor and Lender.

"**Facility**" has the meaning set forth in the Recitals.

"**Facility Year**" means each one-year period commencing on the Closing Date and each numerically corresponding date in each subsequent calendar year, and ending, as to each such Facility Year, on the date that is one day prior to the numerically corresponding date in the subsequent calendar year.

"**Final Maturity Date**" means the date set forth in Annex B under the heading "Final Maturity Date."

"**GAAP**" means generally accepted accounting principles in the United States of America as in effect from time to time.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether federal, state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Indebtedness**" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid or accrued, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured

by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all guarantees by such Person of Indebtedness of others, (h) all capital lease obligations of such Person, (i) all swap obligations of such Person, (j) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guarantee, (k) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, and (l) all earn-out obligations. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"**Indemnified Person**" has the meaning set forth in Section 9.

"**Individual Guarantor**" means Inigo Philbrick, an individual.

"**Individual Guaranty**" means that certain Individual Guaranty, dated as of the date hereof, executed by the Individual Guarantor in favor of the Lender, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Information**" has the meaning set forth in Section 11.1.

"**Initial Appraisals**" means, (i) with respect to each Artwork Collateral Piece constituting Borrower Collateral on the Closing Date, the Qualified Art Appraisals of such Artwork Collateral Piece conducted prior to the Closing Date and provided to Lender in connection with this Agreement and (ii) with respect to each Artwork Collateral Piece added to the Borrower Collateral after the Closing Date pursuant to Section 3.4, the Qualified Art Appraisal(s) of such Artwork Collateral Piece conducted prior to the effective date of the Collateral Addition or Collateral Substitution (as the case may be) of such Artwork Collateral Piece pursuant to Section 3.4.

"**Judgment Currency**" has the meaning set forth in Section 12.14.

"**Lender**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Lender Expenses**" means, collectively, (i) all expenses incurred by Lender, including the fees, charges and disbursements of counsel for Lender, in connection with the preparation, negotiation, execution, delivery and administration of the Loan Documents or any amendments, modifications or waivers of the provisions of any of the Loan Documents (whether or not any transactions contemplated hereby or thereby shall be consummated) or any consents required under any Loan Document, (ii) all Qualified Art Appraiser, Conservator and authenticator fees and expenses, insurance premiums, transportation expenses, taxes, filing fees, documentation fees, fees and expenses for storage of the Borrower Collateral (including Storage Costs), and (iii) all costs incurred by Lender including the fees, charges and disbursements of counsel for Lender, in connection with the enforcement, collection, or protection of its rights in connection with the Loan Documents, including its rights under Section 1.9 of Annex C, or in connection with the Loans, including all such expenses incurred during any workout, restructuring or negotiations in respect of the Loans and the Obligations, and in connection with any collection, custody, preservation or sale of any of the Borrower Collateral (the costs described in this clause (iii) shall be referred to collectively as "**Collateral Disposition Costs**").

"**LIBOR Business Day**" means a day, other than a Saturday or Sunday, on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

"**Liens**" means any claim, mortgage, deed of trust, hypothecation, assignment (as security), deposit arrangement, lien (statutory or other), levy, charge, pledge, security interest or other encumbrance of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease), in each case whether voluntarily incurred or arising by operation of law, or otherwise.

"**Loan**" has the meaning set forth in Section 2.1.1.

"**Loan Closing Date**" means, with respect to each Loan, the date upon which the Lender pays the proceeds of such Loan to Borrower pursuant and subject to the terms hereof.

HF 10678817v.5 #17926/0012

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Note, (c) the Individual Guaranty, (d) the Corporate Guaranty, (e) the Subordination Agreement, (f) the Payoff Letter, (g) the Direction Letter and (h) all other documents, instruments and certificates executed in connection with this Agreement and the foregoing documents described in clauses (b) - (g) from time to time.

"**Loan Origination Fee**" means a fee payable by Borrower to Lender on the Closing Date in the amount set forth in Annex B under the heading "Loan Origination Fee."

"**Loan Parties**" means, collectively, Borrower, Corporate Guarantor and Individual Guarantor.

"**Make Whole Prepayment Fee**" means the fee set forth in Annex B under the heading "Make Whole Prepayment Fee."

"**Material Adverse Change**" means (a) a material and adverse impairment of the ability of any Loan Party to perform any of its obligations under any of the Loan Documents to which it is a party, (b) a material impairment of the legality, validity, binding effect or enforceability against any Loan Party of any of the Loan Documents to which it is a party, (c) a material impairment of the rights of or benefits or remedies available to Lender under any of the Loan Documents, to the extent such occurrence described in this clause (c) adversely affects the ability of Lender to (x) enforce any of its rights or remedies under this Agreement with respect to the Borrower Collateral or (y) effect a sale, collection or other realization upon all or any part of the Borrower Collateral , or (d) a material adverse effect on the Liens in favor of Lender on the Borrower Collateral or the priority of such Liens, to the extent such occurrence described in this clause (d) adversely affects the ability of Lender to (x) enforce any of its rights or remedies under this Agreement with respect to the Borrower Collateral or (y) effect a sale, collection or other realization upon all or any part of the Borrower Collateral.

"**Maturity Date**" has, with respect to each Loan, the meaning set forth in Annex B under the heading "Maturity Date."

"**Maximum Rate**" has the meaning set forth in Section 12.11.

"**Net Cash Proceeds**" means, with respect to any Sale/Loss the cash proceeds received by Borrower in respect of such Sale/Loss, minus the sum of (a) any reasonable and customary expenses or costs incurred by Borrower in connection with such sale, including sales brokerage commissions or buyer's premium (or any similar fee or commission charged by any gallery, auction house, or other Person retained by Borrower to sell any Artwork Collateral Piece), plus (b) any reasonable and customary transportation costs incurred by Borrower in connection with such sale (including, without limitation, costs incurred for packing and insurance).

"**Note**" means the Promissory Note, dated the Closing Date, made by Borrower and payable to the order of Lender, evidencing the Loans, substantially in the form attached hereto as Exhibit A.

"**Obligations**" means the obligations of each Loan Party at all times arising under or in respect of the due and punctual payment of (i) the principal of and interest (including interest accruing during the pendency of any proceeding under any Debtor Relief Laws regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any proceeding under any Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding), of each Loan Party under this Agreement and the other Loan Documents, in each case, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

"**One-Year Anniversary Date**" means, with respect to each Loan, the date that is 365 days from the Loan Closing Date of such Loan.

"**Organizational Documents**" means, with respect to any Person, (a) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (b) in the case of any limited liability company, the certificate or articles of formation and operating agreement (or similar documents) of such Person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such Person,

HF 10678817v.5 #17926/0012

(e) in the case of any trust, the settlement or trust agreement of such Person, (f) in any other case, the functional equivalent of the foregoing, and (g) any shareholder, voting trust or similar agreement between or among any holders of Equity Interests in such Person.

"**Outstanding Amount**" means, as of any date, the principal amount of the Loans outstanding on such date.

"**Payoff Letter**" means that certain Payoff Letter, dated as of the date hereof, delivered by Lender to (and acknowledged and agreed by) Corporate Guarantor and Individual Guarantor.

"**Person**" means any individual, sole proprietorship, limited or general partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, Governmental Authority or other entity.

"**Proposed Artwork Piece**" has the meaning set forth in Section 3.4.

"**Provenance Claim**" means a claim by any Person with respect to the authenticity, title, attribution or provenance of any Artwork Collateral Piece.

"**Qualified Art Appraisal**" means an appraisal of an artwork Collateral Piece performed by a fine art appraiser of national or international standing, approved by Lender in its sole and absolute discretion ("**Qualified Art Appraiser**"), following physical inspection of such Artwork Collateral Piece by such Qualified Art Appraiser, in form and substance satisfactory to Lender in its sole discretion.

"**Qualified Art Appraiser**" has the meaning set forth in the definition of "Qualified Art Appraisal."

"**Recourse Trigger Event**" means the occurrence of any of the following:

(i) voluntary commencement by any Loan Party of a bankruptcy proceeding or the occurrence of any other event described in Section 7.5.3 hereof or any steps are taken towards the Borrower being declared "bankrupt", as defined in the Interpretation (Jersey) Law 1954;

(ii) fraud by any Loan Party or any of its representatives, employees, advisors or agents with respect to any Loan;

(iii) any breach by Borrower of the covenants set forth in Section 6 of this Agreement if such breach adversely affects (i) the ability of Lender to (x) enforce any of its rights or remedies under the Loan Documents with respect to the Borrower Collateral or (y) effect a sale, collection or other realization upon all or any part of the Borrower Collateral or (ii) the value or marketability of any Artwork Collateral Piece;

(iv) an affirmative act of Borrower resulting in a sale, lease, exchange, conveyance, transfer, mortgage, assignment, Lien, adverse claim on any right, title or interest of any Borrower or Lender in and to the Collateral or any portion thereof;

(v) any misrepresentation made by any Loan Party under any Loan Document regarding the Borrower Collateral;

(vi) any material misrepresentation made by any Loan Party under any Loan Document if such misrepresentation adversely affects (i) the ability of Lender to (x) enforce any of its rights or remedies under the Loan Documents with respect to the Borrower Collateral or (y) effect a sale, collection or other realization upon all or any part of the Borrower Collateral or (ii) the value or marketability of any Artwork Collateral Piece;

(vii) any Loan Party contesting the validity or enforceability of any Loan Document and/or assertion by any Loan Party of any defense which is determined by a court or other Governmental Authority to be frivolous or in bad faith, for the purpose or delaying, hindering or otherwise impairing Lender's rights and remedies under the Loan Documents;

(viii)   any casualty damage or other event or circumstance occurs (e.g., an act of terrorism, war, nuclear disaster, or damage or loss due to repair, restoration or retouching) with respect to any Artwork Collateral Piece which is not fully covered by a Collateral Insurance Policy or as to which the Collateral Insurer disputes coverage;

(ix)   (a) any Provenance Claim is made with respect to any Artwork Collateral Piece which is determined by Lender in its sole discretion to be credible or (b) any filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority with respect to, or the raising or discovery by any other means of, any adverse allegation or question with respect to (i) the authenticity, attribution or provenance of any Artwork Collateral Piece or (ii) the title of Borrower or of any of its predecessors in interest in or to any Artwork Collateral Piece, in each case, which is determined by Lender in its sole discretion to be credible;

(x)   any forfeiture of, or material impairment of any material right under, any Artwork Collateral Piece, in each case, as a result of or in connection with conduct by any Loan Party which is (a) criminal activity, or (b) violation of the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) and other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices, related to the subject matter of the Patriot Act, including Executive Order 13224 effective September 24, 2001, or (c) a violation of the rules and regulations of the U.S. Department of Treasury's Office of Foreign Assets Control; or

(xi)   this Agreement shall at any time after its execution and delivery for any reason cease to create a valid and perfected first priority Lien in and to the Borrower Collateral or any part thereof.

"**Requirement of Law**" means, as to any Person, any treaty, law, statute, ordinance, code, rule, regulation or order or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Sale/Loss**" means (a) the sale of any Artwork Collateral Piece and (b) any loss or damage to any Artwork Collateral Piece.

"**Solvent**" means, with respect to Borrower, (i) Borrower will be able to pay its debts as they mature, (ii) the fair market value of the property of Borrower is greater than the total amount of liabilities, including contingent liabilities, of Borrower, and (iii) Borrower is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which the property of Borrower (after giving effect to the Obligations) would be insufficient to fully repay the Obligations.

"**Specified Collateral Event**" has the meaning set forth in Section 5.7.

"**Specified Lender Expenses**" means, collectively, (i) costs of Qualified Art Appraisals, (ii) costs of insurance, (iii) costs of storage (including Storage Costs), (iv) other costs and expenses related to preservation of the Borrower Collateral and Lender's first priority security interest in the Borrower Collateral, and (v) Collateral Disposition Costs.
"**Storage Costs**" has the meaning set forth in Section 5.5.

"**Subordination Agreement**" means that certain Subordination Agreement, dated as of the date hereof, by and between Borrower, Lender, Individual Guarantor and Corporate Guarantor (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time).

"**Subsidiary**" means with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association, trust or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, Controlled or held by the parent or one or more subsidiaries of the parent.

"**Third Party Claimant**" has the meaning set forth in Section 5.6.

70

HF 10678817v.5 #17926/0012

"**Transactions**" means collectively, (a) the execution, delivery and performance by each Loan Party of each Loan Document to which it is a party, (b) the borrowing of the Loans hereunder, (c) the use of the proceeds of the Loans, and (d) the pledge and grant of security interests in the Borrower Collateral under this Agreement.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"**USPAP**" means Uniform Standards of Professional Approved Practice.

HF 10678817v.5 #17926/0012

ANNEX B

LOAN DETAILS

| | |
|---|---|
| **Commitment:** | $10,000,000.00 |
| **Maturity Date:** | With respect to any Loan, the "Maturity Date" set forth by Borrower on the Draw Request (and approved by Lender) in respect of such Loan, *provided that*, such Maturity Date shall be a date on or after the One-Year Anniversary Date of such Loan (or the Final Maturity Date, if the Final Maturity Date is before such One-Year Anniversary Date) |
| **Final Maturity Date:** | March 31, 2020 |
| **Applicable Margin:** | 8.0% |
| **Commitment Fee Rate:** | 1.0% |
| **Loan Origination Fee:** | $50,000.00 |
| **Engagement Fee:** | $10,000.00 |
| **Default Rate:** | A rate per annum which is five (5) percentage points per annum above the interest rate that is otherwise applicable to the Loan under this Agreement |
| **Collateral Administration Fee:** | 3.0% of the gross proceeds received in either a public or private sale in respect of a liquidation of Borrower Collateral by Lender following an Event of Default. |
| **Make Whole Prepayment Fee:** | With respect to any portion of the Loan prepaid before the One-Year Anniversary Date of such Loan (the "Prepaid Amount"), an amount equal to all interest that would have otherwise accrued on the Prepaid Amount from the date of such prepayment to the One-Year Anniversary Date of such Loan, as reasonably determined by the Lender. |

HF 10678817v.5 #17926/0012