**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ATHENA ART FINANCE CORP.,

　　　　　　　*Plaintiff*,

　　　-against-

that

CERTAIN ARTWORK BY JEAN-MICHEL
BASQUIAT ENTITLED HUMIDITY, 1982,
*In Rem*,

　　　　　　　*Defendant*,

SATFINANCE INVESTMENT LIMITED and
DELAHUNTY LIMITED d/b/a DELAHUNTY
FINE ART,

　　　　　　　*Interested Parties.*

---

Case No.  20-cv-4669(GBD)

Hon. George B. Daniels

---

SATFINANCE INVESTMENT LIMITED,

　　　　　　　*Intervenor-Plaintiff*,

　　　-against-

ATHENA ART FINANCE CORP. and
that CERTAIN ARTWORK BY JEAN-MICHEL
BASQUIAT ENTITLED HUMIDITY, 1982,
*In Rem*,

　　　　　　　*Intervenor-Defendants.*

---

## <u>COMPLAINT-IN-INTERVENTION BY SATFINANCE INVESTMENT LIMITED</u>

　　　　Interested Party and Intervenor-Plaintiff Satfinance Investment Limited ("SIL"), by and

through its undersigned attorneys, for its Complaint-in-Intervention against Plaintiff Athena Art

Finance Corp. ("Athena") and the *In Rem* Defendant Certain Artwork by Jean-Michel Basquiat,

entitled "Humidity," 1982 (the "Painting"), states as follows, on knowledge as to itself and on information and belief as to all other matters, which are likely to have evidentiary support after a reasonable opportunity for discovery:

### INTRODUCTION

1.     This action arises out of a property-ownership dispute involving a valuable Painting by world-renowned artist Jean-Michel Basquiat.

2.     SIL acquired full title to the Painting in August 2016 for $12.2 million, and has never sold, transferred, or otherwise disposed of any part of its ownership interest.

3.     In connection with this acquisition, SIL was fraudulently induced into an agreement with Inigo Philbrick Limited ("IPL")—an entity owned and controlled by Inigo Philbrick, then a 29-year-old up-and-coming art dealer, now indicted for perpetrating a massive art-fraud scheme—to market and sell the Painting.

4.     Under the agreement with IPL, SIL acquired "full title" to the Painting—IPL and Philbrick did not acquire even partial title—and IPL would receive a percentage of any profits for its efforts in trying to sell the work.

5.     Not long after taking physical possession of the Painting under the agreement, Philbrick stole it from SIL; he purported to transfer ownership to a Jersey entity he controlled; and then, through that sham transaction, he purported to pledge the Painting as collateral on a multimillion-dollar art-backed loan (the "Loan") from Plaintiff Athena, at the time a struggling art-financing company.

6.     As a direct result of Philbrick's conduct involving this Painting—and similar conduct involving other artworks, including a different artwork owned by SIL—the United States Government arrested Philbrick, and he has been indicted on federal charges of wire fraud

and aggravated identity theft.  *See United States v. Philbrick*, Case No. 20-cr-351(SHS) (S.D.N.Y.) (Complaint attached as Exhibit A; Indictment attached as Exhibit B).

7.      Notwithstanding the revelation of Philbrick's fraudulent scheme and the criminal charge that Philbrick lied about the ownership of the Painting, Athena has refused to return SIL's Painting, and instead it filed this action seeking an "immediate sale" of SIL's stolen property.

8.      Rendering Athena's refusal to return SIL's stolen Painting even more troubling, facts have emerged demonstrating that Athena was not a victim, but rather an enabler of Philbrick's fraud.  Indeed, the criminal Complaint alleges that Athena *encouraged* Philbrick to assume control over the Jersey entity to effectuate the sham transfer of SIL's Painting.  (*See* Ex. A ¶ 5(c).)  And Athena went so far as to draft the documents facilitating this sham transfer from one Philbrick-controlled entity to the other.

9.      Athena knew, or should have known, that IPL did not own the $30 million of artworks, including the Painting, that it was purporting to pledge as collateral.  Athena's shoddy due diligence prior to originating the Loan demonstrates its willingness to ignore this major "red flag" to secure the sizable (and profitable) Loan and grow its struggling book of business.

10.     Indeed, prior to Athena's Loan, IPL and Philbrick sought financing from at least one highly regarded art lender who rejected out of hand the loan request based on their total lack of any credible proof of ownership of the proposed collateral.

11.     Philbrick himself has admitted that Athena's due diligence was dismal.  After his fraud unraveled, when asked what steps Athena had undertaken to verify that this young art dealer actually owned outright the tens-of-millions of dollars of artwork he purported to pledge as collateral, Philbrick furnished two pages of his hand-written loan application:  "Emailed you the financial disclosure document.  You will die[.]"

12.     Where there is no dispute that IPL never held title to the Painting, and that Philbrick obtained the Loan—and therefore that Athena wrongfully took possession of the Painting—"by means of materially false and fraudulent pretenses, representations and promises," there is no good-faith basis for Athena's refusal to return SIL's stolen artwork.  (Ex. A ¶ 1.)

13.     Even now, despite Philbrick's arrest and indictment for his criminal conduct concerning *this Painting*, Athena still refuses to return SIL's stolen property.  (*See* Ex. A at ¶ 6.) Rather than acknowledge SIL's indisputable rights, Athena has doubled down and asked this Court to proceed "immediately" with the sale of SIL's Painting.

14.     SIL files this Complaint-in-Intervention seeking, among other things, a declaration that SIL has full title to the Painting, and an Order that Athena must immediately return the Painting to SIL, its rightful owner.

## PARTIES, JURISDICTION, AND VENUE

15.     Satfinance Investment Limited is a company incorporated in the British Virgin Islands.  Aleksandar Pesko, a UK citizen, acts as SIL's adviser and agent.

16.     Athena Art Finance Corp. is a Delaware corporation, with its principal place of business located 300 Park Avenue, 15th Floor, New York, New York 10022.  Athena is a specialty lending company engaged in the business of providing loans secured by fine-art assets. (*See* Ex. A ¶ 5(a).)

17.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     Venue in this District is proper under 28 U.S.C § 1391 because Athena's principal place of business is in this District.

## STATEMENT OF FACTS

**SIL Acquires Full Title to the Painting.**

19.     In July 2016, Inigo Philbrick approached SIL with a proposal to purchase the Painting:  SIL would acquire "full title" to the work, and the parties would share profits, commensurate with their financial contributions, upon any resale.

20.     On August 10, 2016, Philbrick sent SIL a signed Bill of Sale for the Painting, reflecting that the Painting was being purchased for $18.4 million "from a Pennsylvania-based company" called SKH Management Corp. ("SKH") (the "SKH Bill of Sale").  (Ex. A ¶ 6(b).)

21.     The SKH Bill of Sale stated that "title shall remain with [SKH] . . . [u]ntil payment is received by [SKH]," and the "full payment of the purchase price ($18,400,000)" was due "by COB Monday August 15, 2016[.]"

22.     Based on Philbrick's representations and the SKH Bill of Sale, SIL entered into an agreement (the "Agreement") with IPL to purchase the Painting for $18.4 million, "with a target of completed sale within 1 year of purchase."

23.     The Agreement expressly provided that only SIL would hold title to the work: "For the avoidance of doubt[,] [SIL] shall hold full title to the artwork."

24.     Under the Agreement, the parties would obtain a beneficial interest commensurate with their contributions to the purchase price:  "Satfinance will contribute 50% of the purchase price or $9,200,000[,]" Philbrick "will contribute $6,200,000[,]" and SIL would grant a loan to Philbrick of $3 million, which would be "secured against the artwork and will be senior to IP's $6,200,000 equity contribution."

25.     The parties agreed that "[a]ll profits above the purchase price of $18,400,000 USD will be shared equally between the two parties[,]" reflecting the parties' ostensibly coequal contributions to the purported purchase price.

26.     The $3 million loan from SIL to IPL (the "IPL Loan") would be senior to IPL's equity contribution and would earn "annual interest of 8% . . . [i]n the event the [Painting] remains in shared ownership for longer than 12 months[.]"

27.     Philbrick would "retain possession of the [P]ainting, and cover all associated costs of insurance, storage, shipping and marketing etc."  The Painting would "be kept in [Philbrick]'s storage in London or Zurich, and [would] not be otherwise moved without [SIL's] formal agreement[.]"

28.     The respective beneficial interests in the Painting would "not be diluted, transferred, or otherwise encumbered during the duration of this agreement," and the Agreement would be "terminated only upon the completed sale of the [Painting]."  (*See* Ex. A ¶ 6(e).)

29.     Contemporaneously with the parties' execution of the Agreement, IPL issued an invoice to SIL for a "66% share in" the Painting for $12.2 million (the "Invoice").  The Invoice expressly incorporated by reference the terms of the Agreement.

30.     On August 11, 2016, Philbrick emailed the Invoice, confirming that "[f]ull title [will] be transferred from Inigo Philbrick Limited to Satfinance upon receipt of the above balance."

31.     SIL timely paid the full purchase price to IPL, remitting $10.5 million on August 12, 2016, and $1.7 million on September 6, 2016.  (*See id.* at ¶ 6(f).)

32.     There is no question that SIL acquired full title to the Painting by no later than September 6, 2016, and that at that time IPL did not hold even partial title: "For the avoidance of doubt, Satfinance shall hold full title to the [Painting]."

**Philbrick Defrauds SIL and Steals the Painting.**

33.     Philbrick lied to SIL about the terms of the purchase.  "[IPL's] contract with [SKH] was fake," and the purported SKH seller "did not sign the contract for sale of the [Painting]."  Indeed, this purported seller "had never heard of the artist Jean-Michel Basquiat, Philbrick, or [IPL]."   (Ex. A ¶ 6(c).)

34.     In reality, Philbrick was not buying the Painting from SKH at an $18.4 million purchase price.  Rather, Philbrick acquired the work—using SIL's $12.2 million payment—from Phillips auction house for $12.5 million under a private-sale agreement.  (*Id.* at ¶ 6(d).)

35.     In other words, SIL funded virtually the entire acquisition—98% of the total purchase price—whereas IPL contributed a mere $300,000.

36.     After defrauding SIL in connection with the initial acquisition and Agreement, Philbrick stole the Painting, and then almost immediately began exploring the possibility of securing financing to fund his insolvent art business through art-backed loans, fraudulently pledging as collateral other people's artworks, including the Painting.

**Athena Provides a Loan to a Philbrick-Controlled Shell Company;**
**Athena Fails to Perform Good-Faith Due Diligence to Verify Ownership of the Painting.**

37.     In the years leading up to Philbrick's fraudulent scheme, numerous scandals cast a spotlight on the pitfalls of the art-lending business.[1]

---

[1]     *See, e.g.*, ARTnews, *Untangling the Salander Mess*, https://www.artnews.com/art-news/market/untangling-the-salander-mess-317/ ("Salander admitted to submitting a fraudulent loan application to Bank of America for a $2 million personal loan in which he pledged artworks he didn't own as collateral.") (dated July 1, 2010).

38.     In the wake of these highly publicized scandals, responsible lenders enhanced their due-diligence and "know your customer" protocols.  Among other things, lenders more closely scrutinized ownership of collateral—particularly in the case of art dealers, whose business involves holding high-value artworks on behalf of wealthy clients—by examining bank records, balance sheets, accounts payable and receivable, and supporting documentation to verify the ownership of artwork.

39.     It is against this backdrop of significant risks associated with art-backed loans that at least one reputable art lender rejected Philbrick's loan application immediately because there was a complete lack of credible evidence supporting his ownership claims.

40.     Athena, in contrast, anxious to obtain this sizable loan at a time when its business was struggling, took none of these critical steps before originating the Loan.

41.     Especially where Athena knew that Philbrick was an art dealer whose business involved taking artwork on consignment from the actual owners, Athena had a duty to undertake thorough diligence to verify IPL's ownership claims.  It did not.

42.     Philbrick himself has admitted that Athena did virtually nothing to verify his source of funds and net worth, a crucial measure of his ability to own the works in the collateral pool, commenting that "You will die" when you see Athena's bare-bones financial-disclosure requests.

43.     Athena went so far as to "encourage[]," indeed it required, Philbrick to "assume[] control of a Jersey-based corporate vehicle for the purpose of holding title to certain art assets that would be used as collateral."  (Ex. A ¶ 5(c).)  And as a result of Athena's "encouragement" and insistence, Philbrick became the "sole beneficial shareholder of that entity," 18 Boxwood Green Limited ("Boxwood"), in furtherance of his fraudulent scheme.  (*Id.*)

44.     Had Athena performed even minimal diligence, such as reviewing bank statements to verify the source of funds for the purchase of the works in the collateral pool, Athena would have exposed IPL's fraud and discovered that SIL, not IPL, provided virtually the entire purchase price for the Painting.

| Standard Lender Due Diligence | Athena's Due Diligence |
|---|---|
| Borrower's certified balance sheets, statements of income and statements of cash flows | None |
| Bank statements showing "evidence of payment" for the Painting from IPL, on IPL's own account | None |
| Bank statements showing "evidence of payment" for the Painting from Boxwood to IPL | None |
| Individual guarantor's tax returns and certified statement of total assets, total liabilities, liquid net worth and total net worth | None |
| Supporting documentation reflecting intercompany accounts between IPL and Boxwood | None |

45.     In contrast to industry practice, Athena merely requested that Philbrick fill out two one-page "Financial disclosure document[s]," for himself and for IPL, without undertaking any third-party verification.  As Philbrick himself admitted, these bare-bones requests were laughable.

46.     Philbrick handwrote that he personally had "~1.2 m USD" in "Gross Annual Income," "~35.0m USD (ART)" in "Business Investments," and "~4.0m USD" in "Other Contractual Obligations."  And Philbrick handwrote that IPL had "GBP 25.2m" in "Art Inventory," "GBP 4.7m (client share)" in "Secured Debt," and "GBP 4.4m" in "inter-co." obligations.  Philbrick provided no other information; and Athena, for its part, did not ask for anything to corroborate these bare claims.

47.    Any responsible lender acting in good faith would have required more than this art dealer's back-of-the-napkin approximations before lending millions of dollars secured by $30 million of artwork in Philbrick's possession.

48.    But Athena, desperate to grow its book of business, bypassed all these critical measures and agreed to provide a $10 million "revolving USD loan facility" to Boxwood—the Jersey entity it helped Philbrick acquire for purposes of the sham artwork transfer from IPL—purportedly secured by well over $20 million of artwork.

49.    Between March 2017 and the fall of 2019, Philbrick "sought and received permission from [Athena] to add and remove various artworks from the Collateral Pool" (*id.* at ¶ 5(e)), and, at the beginning of April 2017, Philbrick "told [Athena] that [he] would like to add the [Painting] to the Collateral Pool." (Ex. A ¶ 6(h).)

50.    But Athena took no meaningful steps to verify IPL's ownership claims.  Athena merely took Philbrick at his word, rather than reviewing crucial documents, such as bank records, that would have been essential to any proper diligence protocol.  Indeed, when Philbrick identified himself, rather than Mr. Pesko, as "the English collector" on the "list of provenance and exhibition history for the [Painting]," Athena accepted this bare claim *even though Philbrick is American, not English*.

51.    In furtherance of his fraudulent plan, after stealing the Painting from SIL, Philbrick—abetted by Athena—purported to sell the Painting from IPL to Boxwood.

52.    In fact, Athena drafted the "Transfer of Title" document for the purpose of facilitating this sham transfer to Boxwood so that the Painting could be added to Boxwood's loan collateral.

53.     On April 7, 2017, Philbrick, on behalf of IPL, executed the one-paragraph "Transfer of Title" that Athena had prepared, accompanied by an invoice from IPL to Boxwood, stating that, "[f]or good and valuable consideration[,] receipt and sufficiency of which is hereby acknowledged[,] all right, title and interest to and in the painting. . . is transferred from IPL to Boxwood."

54.     Remarkably, though, as any reputable lender would, Athena never sought to verify that Boxwood ever paid IPL for the Painting, which of course would have been a condition precedent to the purported sale.  The entire transfer was a sham, intended to create a (non-existent) security interest in collateral that Athena never took appropriate steps to verify was ever owned by IPL.

55.     Although Boxwood admittedly had not yet paid IPL any consideration for the Painting, and obviously lacked the means to pay IPL anything close to the full purchase price, at Philbrick's urging, Athena hurriedly approved the addition of the Painting to the loan collateral pool and disbursed $3,245,000 to Boxwood.  (*See* Ex. A ¶ 5(i).)

**Athena Refuses to Return the Stolen Painting After Philbrick's Fraud is Revealed.**

56.     Of course, Philbrick concealed all his fraudulent conduct from SIL at the time. Instead, he continued to misrepresent to SIL his efforts to market and sell the work.

57.     As part of those purported efforts, Philbrick requested and fraudulently obtained SIL's permission to loan the Painting to the Mori Arts Centre in Tokyo in the fall of 2019 for a major Basquiat exhibition (the "Tokyo Exhibition").

58.     In October 2019, while the Painting was on display at the Tokyo Exhibition, Philbrick tearfully confessed to his massive fraud, including the Athena Loan.

59.     On October 18, 2019, SIL notified Athena that it owned the Painting outright, and demanded that Athena "(i) [] not take any steps to purport to sell, transfer, pledge, mortgage, dissipate or in any way deal with the [Painting] without giving [SIL] fourteen days' notice in writing . . . and (ii) [] immediately inform [the Tokyo Exhibition] to retain the [Painting] in safe custody pending further instructions."

60.     But Athena rejected this request, and instead—without notice to SIL—instructed the head of the Tokyo Exhibition to remove the Painting before the exhibition's scheduled end date and to secretly deliver the work immediately to Athena's New York art-storage facility.

61.     SIL has repeatedly demanded that Athena return its Painting.  Yet despite all the evidence that SIL furnished to Athena demonstrating its full title and ownership—now corroborated by the Criminal Complaint and the Indictment—Athena has refused to do so.

62.     In mid-June 2020, federal authorities unsealed a criminal Complaint against Philbrick, charging him with wire fraud and aggravated identity theft, alleging that Philbrick (i) "obtained funds by means of interstate and foreign wire transfer from collectors, investors, and financial lenders by providing false information and false documents regarding the sale, ownership and provenance of artworks," (Ex. A ¶ 1), and (ii) "used and aided and abetted the use of the name and signature of an officer of a Pennsylvania-based company [*i.e.*, SKH] to create a false and fraudulent art sale contract," (*id.* at ¶ 2; *see also* Ex. B at 1-2).

63.     United States Marshalls arrested Philbrick in the South Pacific island nation of Vanuatu on or about June 12, 2020, and he appeared in federal court in Guam on June 15, 2020, before his transfer to the Southern District of New York, where his preliminary hearing took place on July 14, 2020.  He is currently in custody, and has been denied bail.

## PROCEDURAL HISTORY

64.     On October 30, 2019, shortly after the public revelation of Philbrick's fraud and Athena's refusal to immediately return SIL's stolen Painting, SIL commenced proceedings against Philbrick, IPL, Boxwood and Athena in London, England, seeking a declaration as to its legal and beneficial title to the Painting, as well as an injunction enjoining the sale or disposition of the Painting.  *See Satfinance Investment Ltd. v. Philbrick, et al.*, [2019] EWHC 1998 (the "English Proceedings").

65.     In connection with the English Proceedings, another party, Delahunty Limited ("Delahunty"), alleged that it had acquired "a 12.5% beneficial interest in the Painting" from IPL on or about November 1, 2016, months after SIL acquired full title to the Work.[2]

66.     On November 4, 2019, following a hearing on SIL's motion for a preliminary injunction, the English Court ordered that "[u]ntil after judgment in this action or further order in the meantime, . . . [t]he Defendants must not sell, pledge, purport to sell or pledge or otherwise deal with or dispose of or cause to be dealt with or disposed of any legal, beneficial or security interest, or any other interest or purported interest of any kind in the painting entitled 'Humidity,' by Jean-Michel Basquiat."

67.     Additionally, the English Court ordered Athena to make the Painting available for SIL's inspection, yet Athena is refusing to make the work available for this purpose.

68.     On June 2, 2020, the English Court determined that Athena does not fall under the jurisdiction of the English courts.[3]

---

[2] Delahunty does not claim to own full or even partial title.  To the extent that it obtained any beneficial interest from IPL, such interest would be limited to IPL's beneficial interest, commensurate with its minimal contribution to the actual purchase price.

69.     Athena immediately commenced proceedings in New York Supreme Court by filing a Summons with Notice. *See Athena Art Finance Corp. v. Certain Artwork by Jean-Michel Basquiat Entitled Humidity, 1982, In Rem*, Index No. 652258/2020.

70.     On June 17, 2020, Athena filed an Order to Show Cause (which was never signed) seeking to "immediately sell" the Painting.  The following day, SIL removed the action to this Court.  Athena has since renewed its application for an order "[p]ermitting the immediate sale of" SIL's stolen Painting.

## FIRST CAUSE OF ACTION
## DECLARATORY RELIEF UNDER 28 U.S.C. §§ 2201 AND 2202

71.     SIL repeats and realleges all the foregoing allegations as if fully set forth herein.

72.     Under 28 U.S.C. § 2201, this Court has authority to decide actual controversies within its jurisdiction.

73.     A justiciable controversy exists between SIL, on the one hand, and Athena, on the other hand, concerning title to and right to possess the Painting, and as to their respective rights with respect to the Painting, and any proceeds of any future sale of the Painting.

74.     SIL acquired full title to the Painting in 2016 and more than 98% of the beneficial interest for good and valuable consideration and has never sold, gifted, or otherwise transferred title to the Painting to anyone.

75.     SIL has full title to and possessory rights and interest in the Painting.

76.     SIL's title to and rights and interest in the Painting are superior to any such purported rights asserted by Athena.

---

[3] SIL is applying for leave to appeal the English Court's decision.  This Complaint is being filed without prejudice to SIL's claim that Athena and all relevant parties are subject to the English Court's jurisdiction.

77.     The Painting is now in New York, under the control of Athena, who has refused to return SIL's property, notwithstanding SIL's repeated demands.

78.     Declaratory relief from this Court will resolve this controversy.

79.     As alleged herein, a real, substantial and immediate controversy is presented regarding title to, right to possession of, and rights with respect to proceeds of a future sale of, the Painting, and SIL hereby seeks a declaratory judgment under 28 U.S.C. § 2201, *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure declaring that (i) SIL is the rightful owner of the Painting, (ii) SIL has a right to immediately possess the Painting, and (iii) SIL has no obligation (contractual or otherwise) to share with Athena any proceeds of any future sale of the Painting.

**SECOND CAUSE OF ACTION**
**<u>REPLEVIN</u>**

80.     SIL repeats and realleges all the foregoing allegations as if fully set forth herein.

81.     SIL has full title to and possessory rights and interest in the Painting.

82.     SIL's title to and rights and interest in the Painting are superior to any such purported rights asserted by Athena.

83.     Athena is in wrongful possession of the Painting.

84.     SIL has demanded that Athena return the Painting, but Athena has refused to do so.

85.     Accordingly, Athena is liable to SIL for replevin and is required to return forthwith to SIL the Painting.

86.     In the alternative, even if the Court were to determine that Athena has some partial ownership interest in the Painting, SIL would nevertheless be entitled to judgment on a replevin cause of action against a co-owner to recover possession of the Painting, where, as here,

Athena's possession amounts to such a hostile appropriation of the Painting as to exclude, destroy, or ignore SIL's interest in it.

**THIRD CAUSE OF ACTION**
**<u>CONVERSION</u>**

87.    SIL repeats and realleges all the foregoing allegations as if fully set forth herein.

88.    SIL has full title to and possessory rights and interest in the Painting.

89.    SIL's title to and rights and interest in the Painting are superior to any such purported rights asserted by Athena.

90.    Athena is in wrongful possession of the Painting.

91.    SIL has demanded that Athena return the Painting to SIL.  Athena refuses to return the Painting or to recognize SIL's superior rights and interest in the Painting.

92.    Athena is liable to SIL for conversion and is required to pay damages to SIL.

93.    In the alternative, even if the Court were to determine that Athena has some partial ownership interest in the Painting, SIL would nevertheless be entitled to judgment on a conversion cause of action for damages against a co-owner to recover the value of its share of the Painting, particularly where, as here, Athena's possession amounts to such a misappropriation of the Painting as to exclude, destroy, or ignore SIL's interest in it.

**FOURTH CAUSE OF ACTION**
**FRAUDULENT CONVEYANCE**
**<u>NEW YORK DEBTOR AND CREDITOR LAW §§ 273 & 276</u>**

94.    SIL repeats and realleges all the foregoing allegations as if fully set forth herein.

95.    Beginning in 2016, SIL was a holder of certain claims against IPL, as described in the Invoice and the Agreement.  These claims consisted of full title to the Painting, a $3 million loan payable to SIL with an "annual interest of 8% . . . [i]n the event the [Painting] remains in

shared ownership for longer than 12 months," and a "66% share in" any profits from the sale of the Painting.

96.     Philbrick, at Athena's "encouragement," for purposes of effectuating a fraudulent loan, "assumed control of a Jersey-based corporate vehicle [(*i.e.*, Boxwood)] for the purpose of holding title to certain art assets that would be used as collateral on loans."  (Ex. A ¶ 5(c).) Philbrick became the "sole beneficial shareholder of that entity."  (*Id.*)

97.     In April 2017, Philbrick purported to transfer ownership of the Painting from IPL to Boxwood (the "Fraudulent Conveyance"), in an effort to immediately (that same day) pledge it to Athena as collateral under the Loan and Security Agreement.

98.     Philbrick purported to transfer title from IPL to Boxwood with the actual intent to hinder, delay or defraud SIL and reasonably should have known that by purporting to transfer title to the Painting, IPL would incur debts to SIL that it would be unable to pay, including the return of the Painting, to which SIL still held full title, as well as repayment of the $3 million loan from SIL to IPL.

99.     By virtue of (i) the red flags and other highly unusual circumstances surrounding the Fraudulent Conveyance, and (ii) Athena's intimate involvement in the Fraudulent Conveyance, Athena knew or should have known that IPL and Boxwood entered into the Fraudulent Conveyance in bad faith and with the actual intent to hinder, delay or defraud creditors of IPL and/or Philbrick.  At bare minimum, Athena should have conducted a reasonable investigation to verify IPL's ownership of the Painting and whether Boxwood had paid or was capable of paying IPL fair and adequate consideration in return for title to the Painting.  Instead, Athena facilitated and participated in the Fraudulent Conveyance, and then accepted the Painting as collateral, without further investigation.

100.    SIL has been damaged by the Fraudulent Conveyance, and, without the return of its Painting, SIL will suffer irreparable injury for which there is no adequate remedy at law.  SIL therefore seeks an avoidance of IPL's purported transfer to Boxwood of title to the Painting and an injunction against the further disposition of the Painting by Athena.

### FIFTH CAUSE OF ACTION (IN THE ALTERNATIVE ONLY)<br>INJUNCTIVE RELIEF AND DAMAGES UNDER N.Y. U.C.C. § 9-625

101.    SIL repeats and realleges all the foregoing allegations as if fully set forth herein, except that it pleads this claim in the alternative.

102.    Under the New York Uniform Commercial Code, even if Athena had acquired some security interest in the Painting—it did not—Athena would have a non-waivable duty to act in a commercially reasonable manner in its disposition of the Painting.  N.Y. U.C.C. § 9-610(b).  Athena has stated its intent to breach that duty by "immediately" selling the Painting during the pendency of this lawsuit, under circumstances in which it is clear that any potential buyer would be taking a significant risk that it would not acquire full title to and rights and interest in the Painting.

103.    To account for that risk, any such potential buyer would undoubtedly agree to acquire the Painting only at a price far below its value.  In other words, if Athena seeks to sell the Painting before SIL's claim to the Painting is fully adjudicated, Athena will necessarily be selling the Painting at a fire-sale price.

104.    New York's Uniform Commercial Code provides that, "[i]f it is established that a secured party is not proceeding in accordance with this article, a court may . . . restrain . . . disposition of collateral on appropriate terms and conditions," and award damages.  N.Y. U.C.C. Law § 9-625.

105.   SIL is entitled to seek to restrain such an unreasonable disposition of collateral and to seek damages, both as the rightful owner of the Painting, and as the holder of its own security interest in the Painting under the terms of the Agreement.

## SIXTH CAUSE OF ACTION (IN THE ALTERNATIVE ONLY) CONSTRUCTIVE TRUST

106.   SIL repeats and realleges all the foregoing allegations as if fully set forth herein except that it pleads this claim in the alternative.

107.   If this Court concludes that IPL somehow obtained some partial share of title to or rights or interest in the Painting, any such interest should be limited to an amount commensurate with the actual amount of IPL's contribution to the purchase price paid to acquire the Painting. In other words, because IPL contributed at most only $300,000, or 2.4%, of the true purchase price of $12.5 million its purported interest in the Painting would be limited to a maximum of 2.4%.

108.   A confidential and fiduciary relationship existed between IPL and SIL by virtue of their joint venture as memorialized in the Agreement.

109.   IPL fraudulently represented to SIL that it was acquiring the Painting for $18.4 million, and falsified documents reflecting that material misrepresentation.

110.   In reliance on IPL's representations, as memorialized in the Agreement, SIL paid IPL $12.2 million and agreed to share profits and losses with IPL commensurate with the parties' respective contributions.

111.   In reality, IPL paid at most only 2.4% of the actual purchase price for the Painting, while defrauding SIL into believing that IPL was contributing a far greater share of the purchase price to fraudulently obtain a greater beneficial interest.   That is, IPL fraudulently

induced SIL to contribute 97.6% of the purchase price while simultaneously inducing SIL to agree to share equally with IPL in the profits of any resale.

112.     It would be plainly inequitable to conclude that IPL should be entitled to any partial title to or rights or interest in the Painting greater than its 2.4% contribution.   Thus, a constructive trust should be imposed for the benefit of SIL on the remainder of the beneficial interest in the Painting.

113.     A beneficiary of a constructive trust may trace the trust property into the hands of another party unless that party is a bona fide purchaser for value.

114.     Here, Boxwood was not a bona fide purchaser for value or a buyer in the ordinary course of business, where it was on notice of the fraud giving rise to the constructive trust.

115.     Likewise, Athena was not a bona fide purchaser for value or a buyer in the ordinary course of business, where it was on constructive notice of the fraud giving rise to the constructive trust.

116.     Thus, to the extent that IPL obtained any title or ownership interest in the Painting, that ownership interest is subject to a constructive trust in favor of SIL, and that constructive trust can be traced into the hands of Athena.

117.     Thus, should the Court determine that Athena obtained any valid interest in the Painting, that interest should be held subject to a constructive trust over at least a 97.6% interest in the Painting for the benefit of SIL.

## **PRAYER FOR RELIEF**

WHEREFORE, SIL respectfully requests that the Court enter a judgment:  (1) declaring that SIL holds full title to the Painting, has a right to immediately possess the Painting, and has no obligation (contractual or otherwise) to share with Athena any proceeds of any future sale of

the Painting; (2) ordering the immediate return of the Painting to SIL; (3) requiring Athena to

pay compensatory damages; and (4) awarding any other and further relief as the Court may deem

just and proper.

Dated: July 30, 2020
      New York, New York

              **GROSSMAN LLP**

          By: *Judd Grossman*
              Judd B. Grossman, Esq.
              Lindsay E. Hogan, Esq.
              Sarah E. Schuster, Esq.
              745 Fifth Avenue, 5th Floor
              New York, New York 10151
              Telephone:  (646) 770-7445
              Facsimile:  (646) 417-7997

              -and-

              **HUGHES HUBBARD & REED LLP**
              Derek J.T. Adler, Esq.
              Webster D. McBride, Esq.
              One Battery Park Plaza, 12th Floor
              New York, New York 10004
              Telephone:  (212) 837-6000
              Facsimile:  (212) 422-4726

              *Attorneys for Interested Party and Intervenor-*
              *Plaintiff Satfinance Investment Limited*