**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ATHENA ART FINANCE CORP.,

               *Plaintiff*,

        -against-

that

CERTAIN ARTWORK BY JEAN-MICHEL
BASQUIAT ENTITLED HUMIDITY, 1982, *in
Rem*,

            *Defendants,*

SATFINANCE INVESTMENT LIMITED and
DELAHUNTY LIMITED d/b/a DELAHUNTY
FINE ART,
            *Interested Parties*.

---

SATFINANCE INVESTMENT LIMITED
            *Intervenor-Plaintiff*,

        -against-

ATHENA ART FINANCE CORP. and
that CERTAIN ARTWORK BY JEAN-MICHEL
BASQUIAT ENTITLED HUMIDITY, 1982,
*In Rem*,

            *Intervenor-Defendants*.

---

Case No. 20-cv-4669(GBD)

Hon. George B. Daniels, USDJ

---

### PLAINTIFF ATHENA ART FINANCE CORP.'S MEMORANDUM OF LAW
### IN OPPOSITION TO SIL'S MOTION FOR A PRELIMINARY INJUNCTION

Wendy J. Lindstrom
**MAZZOLA LINDSTROM LLP**
1350 Avenue of the Americas, 2nd Floor
New York, NY 10019
Telephone: (646) 216-8440
wendy@mazzolalindstrom.com

Sharon Cohen Levin
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10003
Telephone: (212) 558-4000
levinsc@sullcrom.com

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT.................................................................................................1

BACKGROUND ....................................................................................................................4

    SIL'S Sham Acquisition Documents .................................................................................4

    Athena's Extensive Due Diligence and Loan Documentation.................................................6

PROCEDURAL HISTORY.....................................................................................................11

ARGUMENT .......................................................................................................................12

    I.    SIL HAS NOT AND CANNOT DEMONSTRATE IRREPARABLE HARM ............................13

        a.    The London Court Already Rejected SIL's "Irreparability" Argument When It Dissolved An Injunction Nine Months Ago ..........................................................................14

        b.    SIL's Investment Contract Called For The "Quick Sale" Of The Painting, So By Definition Any Damages Are Compensable With A Monetary Award................................................15

    II.    SIL FAILED TO DEMONSTRATE ITS LIKELY SUCCESS ON THE MERITS......................17

        a.    SIL's Implausible Theory of Liability Lacks Evidentiary Support ............................17

        b.    Athena Is A Judgment Creditor With A First Priority Perfected Security Interest....................18

    III.    ATHENA'S HARDSHIP INCREASES WITH EACH PASSING DAY AND THE BALANCE OF EQUITIES FAVORS A DENIAL OF INJUNCTIVE RELIEF ......................................22

        a.    The Basquiat Market is Very Strong; This Is An Ideal Time to Sell the Collateral ..................23

    IV.    SIL SHOULD BE REQUIRED TO POST A SUBSTANTIAL BOND....................................24

CONCLUSION....................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Capstone Logistics Holdings, Inc. v. Navarrete,* 736 F.App'x 25 (2d Cir. 2018) .......................... 12

*Christie's Inc. v. Davis*, 247 F. Supp. 2d 414 (S.D.N.Y, 2002) ....................................... 18

*Gerald Modell Inc. v. Morgenthau*, 764 N.Y.S.2d 779 (Sup. Ct. N.Y. Cty. May 21, 2003) ............ 17

*Gov't Employees Ins Co. v. Moshe*, 2020 WL 3503176 (E.D.N.Y. June 29, 2020)......................... 24

*Hessel v. Christie's Inc.,* 399 F. Supp. 2d 506, 2005 U.S. Dist. LEXIS 27814 (S.D.N.Y. November

10, 2005)..................................................................................................... 15, 16

*Kozar v. Christie's Inc.,* 31 Misc. 3d 1228(A); 929 N.Y.S.2d 200; 2011 N.Y. Misc. LEXIS 2350

(N.Y. Sup. Ct. Westchester Co., May 18, 2011) ................................................ 16, 18

*Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232 (S.D.N.Y. 2020, Daniels J.) ......................... 13

*Oliver v. N.Y. State Police*, 2019 U.S. Dist. LEXIS 76272 (N.D.N.Y., May 6, 2019) .................. 13

*Pearson Educ, Inc. v. Labos*, 19 Civ. 487 (CM), 2019 U.S. Dist. LEXIS 72342 (S.D.N.Y. April 23,

2019)...................................................................................................................... 15

*Rand's Disc. Co. v. Universal C.I.T. Credit Corp.*, 10 A.D.2d 240, 198 N.Y.S.2d 341 (1960) ..... 21

*Robins v. Zwirner*, 713 F. Supp. 2d 367 (S.D.N.Y. 2010) ................................................... 16

*Sampson v. Murray*, 415 U.S. 61 (1974)................................................................................... 13

*Trump v. Deutsche Bank AG,* 943 F.3d 627 (2d Cir. 2019) ......................................................... 13

*Vision v. Lens*, 2020 U.S. Dist. LEXIS 186403, 2020 WL 5899879 (E.D.N.Y. February 28,

2020)............................................................................................................... 3, 12

*Warren Corp. v. Goldwert Textile Sales, Inc.,* 581 F. Supp. 897 (S.D.N.Y. 1984) ....................... 13

**Statutes**

N.Y. U.C.C. § 1-201 ....................................................................................................... 18

N.Y. U.C.C. § 2-403....................................................................................................... 18

N.Y. U.C.C. § 9-203 .................................................................................................................. 19

N.Y. U.C.C. § 9-203 .................................................................................................................. 20

N.Y. U.C.C. § 9-601(a)(1) ......................................................................................................... 18

NY U.C.C. § 9-202 ..................................................................................................................... 19

**Other Authorities**

11 C. Wright & Miller, Federal Practice and Procedure, § 2948 at 431 (1973)............................. 13

3A Anderson U.C.C. § 2-403:58 (3d. ed.) ..................................................................................... 20

4 White, Summers, & Hillman, Uniform Commercial Code § 31:9 (6th ed.) ................................ 22

8A Part II Anderson U.C.C. § 9-203:200 (3d. ed.) ........................................................................ 22

8A Part II Anderson U.C.C. § 9-203:202 (3d. ed.) ........................................................................ 21

**Rules**

FRCP 65 ....................................................................................................................................... 24

## PRELIMINARY STATEMENT

More than nine months ago, an English High Court *reversed* and *dissolved* the same

injunction that movant Satfinance Investment Limited ("SIL") now urgently seeks from this Court.

According to the High Court of Justice of England and Wales:

> *"I do not consider that [Satfinance] is able to show that the sale of the painting would necessarily cause it irremediable harm.  The purpose of acquiring the painting was for it to be sold."*

Chief Master Marsh, High Court of Justice of England and Wales, June 2, 2020.[1]

This was the holding of the High Court when it reversed its prior improper injunction on

the ability of Athena Art Finance Corp. ("Athena"), an institutional lender, to sell a portion of its

loan collateral – a 1982 painting by the famed artist Jean-Michel Basquiat entitled *Humidity* (the

"Painting") – in which it holds a first priority perfected security interest.  Just as the London court

held, SIL is not entitled to injunctive relief, where it has not – and cannot by the very terms of its

agreement – prove irreparable harm.

SIL conspicuously fails to disclose in its moving papers to this Court that it actually

litigated and lost "irreparability" nine months ago.[2]  Nor is there any basis for this Court to

conclude that today SIL suddenly faces some new, different and/or greater urgency that it failed to

raise last time.  If anything, since the High Court's June 2, 2020 ruling, circumstances have

changed that further militate against any such injunction.  Most notably, Athena's interest in the

Painting is now squarely at issue in the since-unsealed criminal complaint against the now-indicted

art dealer, Inigo Philbrick ("Philbrick"), Athena's loan guarantor and the owner of the borrower, 18

---

[1] *See* paragraph 18 of the June 2, 2020 Judgment, a true and correct copy of which is attached to the Declaration of Wendy J. Lindstrom, Esq. ("Lindstrom Decl.") as Exhibit A.

[2] SIL's failure to even acknowledge the High Court's explicit irreparability finding at the time it dissolved its own injunction is particularly conspicuous because SIL selectively and extensively soundbites other portions of the record from that proceeding.

Boxwood Green Limited ("Boxwood"), triggering unanswered questions about the potential impact of SIL's re-requested injunction on the United States' prosecution of Philbrick and any potential criminal forfeiture proceedings. Putting aside the dissolution of the prior injunction and delay in seeking a new one, SIL comes nowhere close to discharging its heavy burden to obtain such "drastic relief" under Rule 65 and Second Circuit precedent.

Specifically, SIL has failed to meet its burden of proving irreparable harm.  To the contrary, the record before the Court forecloses any notion that whatever harm SIL may hope to prove on the merits (itself hypothetical) could not be redressed by an award of monetary damages (further assuming that SIL's claim would ever reach trial and prevail). Although SIL presents itself as the alleged "title holder" of an "inherently unique work of fine art," in reality, SIL and its principal, Aleksandar Pesko ("Pesko"), made a *partial investment* in a *fractional share* of the Painting in contemplation of a "quick sale" scheme,[3] (i.e., a speedy flip to resale) and expected high return on his investment.[4]  That is even if SIL ultimately were to prevail on the merits, SIL/Pesko's admittedly bogus contract with Philbrick shows that at most, SIL acquired a 50% *financial interest* in the Painting.

In reality, as the Declaration of Cynthia E. Sachs ("Sachs Decl.") demonstrates, Philbrick's U.K. art gallery, Inigo Philbrick Limited ("IPL") actually purchased the Painting from Phillips Auctioneers LLC ("Phillips") solely in its own name and paid for the Painting with funds solely from its own bank account, thus IPL acquired 100% legal title to the Painting. That is why SIL

---

[3] Athena notes that interested party and counterclaim plaintiff Delahunty Limited ("Delahunty") has been silent with respect to SIL's application.  While Delahunty did indicate in a letter to the Court dated January 25, 2021 (DE 49) that it "supports SIL's application for a temporary injunction preventing Athena from selling, transferring, or physically moving the Painting until the claims are fully resolved," to the extent that Delahunty also claims to have purchased only a 12.75% percent interest in the artwork, the same argument barring SIL from injunctive relief apply equally to Delahunty. Should Delahunty make any substantive submission, Athena hereby requests leave to submit a response.

[4] Significantly, since 2014, Pesko had been investing in numerous artworks with Philbrick for an average return of 20% profit within six months.

continues to pursue an English action for damages against Philbrick, IPL and Boxwood for breach of contract and fraud. (Pesko Decl. at ¶25.).

Simply put, although the Painting is a unique chattel (in the sense that artworks are generally unique), it can be valued, sold and monetized.  And, significantly, not wholly owned by *any* of the parties before this Court (*e.g.*, Athena only has a first priority perfected security interest in the Painting), meaning that SIL cannot claim to have some non-economic, unquantifiable interest in an artwork that it also never possessed. Therefore, its sale will not cause irreparable harm just as the London High Court ruled on June 2, 2020.  SIL's unreasonable delay in seeking reinstatement of an injunction that the London court previously lifted provides an additional basis upon which it should be denied.[5]

Finally, SIL does not address why its renewed request for injunctive relief could be warranted in light of the current posture of the criminal case pending in this Court against Philbrick. As a victim, Athena has just received a notice and a request for information about its claims for restitution. The Court should not issue an injunction where there is a pending, parallel criminal case which may ultimately involve disposition and resolution of these issues involving the same borrower, the same asset and the same victims.

---

[5] SIL waited far too long – specifically, nine months -- to seek an injunction since the London Court dissolved its earlier one.  "It is well established that an unreasonable delay in seeking injunctive relief can undermine an allegation of irreparable harm." *Vision v. Lens*, 2020 U.S. Dist. LEXIS 186403, *31, 2020 WL 5899879 (E.D.N.Y. February 28, 2020).  The English Court vacated the injunction against Athena on June 2, 2020 and the judge denied SIL's request for permission to appeal.  (Lindstrom Decl. at ¶3.)  Since June 2, 2020, there has been no injunction in place.  (*Id.*)  SIL filed a request to appeal on June 22, 2020, which permission was granted on August 21, 2020. (*Id.*)  During the pendency of the appeal, SIL made an application to the London court for an injunction. (*Id.*) The request for an injunction made on October 5, 2020 was adjourned on October 16, 2020, when Athena provided a voluntary confirmation agreeing not to sell the Basquiat during the pendency of the appeal. (*Id.*)  However, Athena again prevailed on appeal on December 21, 2020. (*Id.*)  SIL informed Athena on January 14, 2021 that it would not seek a further appeal. (*Id.*)

## BACKGROUND

**SIL'S Sham Acquisition Documents**

SIL's claims to the Painting are based on a set of outlandish documents – starting with the claim that it jointly purchased the Painting with Philbrick personally (not his eponymous U.K. gallery, IPL) for $18.4 million pursuant to a *homemade* "Bill of Sale" that identified the "Seller" of this important and valuable artwork as "SKH Management Corp.," a local grocery and garden center in Amish country, Pennsylvania that listed 1875 Lexington Avenue in Manhattan as its address (which, in fact, as Pesko subsequently realized is home to the "Healthy Harlem RX Pharmacy.") (Sachs Decl. at ¶4).  Even SIL recognized this absurdity, and pointed out the discrepancies to Philbrick, who sent along a *replacement* "Agreement of Sale" and *different* homemade "Bill of Sale" for the same Painting, for the same $18.4 million on the same day – this time listing the "Seller's" address as an address in Lititz, Pennsylvania. (Sachs Decl. at ¶5).[6]

The August 11, 2016 "agreement" that allegedly memorializes SIL's shared "ownership" of the Painting (although it was entered into personally by Pesko, not SIL) also makes no sense. The essential terms of the agreement are, *inter alia*, as follows:

> Aleksandar Pesko and Inigo Philbrick intend to *jointly purchase* an artwork by Jean-Michel Basquiat.
> * * *
> SatFinance will contribute 50% of the purchase price or $9,200,000 and IP will contribute $6,200,000.  Further SatFinance will grant IP with a loan of $3,000,000.  This loan will be secured against the artwork and will be senior to IP's $6,200,000 equity contribution.
> * * *
> AP and IP will *jointly own the work*. IP will *retain possession* of the painting, and cover all associated costs of insurance, storage, shipping and marketing etc.
> * * *
> All profits above the purchase price of $18,400.000 USD will be shared equally between the two parties. AP and IP will *share equally in any loss* from the purchase price.

---

[6] That is, the principal difference between the first and second homemade "Bills of Sale" is that the second contrivance listed an address in Pennsylvania where, at least according to Google, there exists purported grocery store.

For the avoidance of doubt Satfinance shall hold full title to the artwork.

* * *

The spirit of the partnership is the *quick sale* of the artwork, with a *target of completed sale within 1 year of purchase.*

(Lindstrom Decl. at ¶4, emphasis added).

SIL invents something called a "spirit of [] partnership" whereby it pretends to have received "full title" to the Painting for only "50% of the purchase price" (*i.e.* the $18.4 million that was supposedly paid to a food purveyor somehow in possession of a rare 1982 Basquiat at a Harlem pharmacy or in rural Pennsylvania.) The reality: Philbrick and Pesko, and their respective families and companions in Italy, London and elsewhere, share a long recreational history. However tabloid-worthy, their social and business relationships did not involve the acquisition of the Painting. That is why SIL *never* once had possession, custody or control of the Painting, *never* registered its purported interest in a public registry like The Companies House in the UK or the global Art Loss Register ("ALR") Database, and *never* conducted any due diligence whatsoever. (Sachs Decl. at ¶17).  In fact, SIL never presented itself to Athena as a claimant on the Painting until *after* Philbrick stopped making interest payments to Athena and fled to the South Pacific. (*Id.*).

Philbrick also sent Pesko an invoice for a "66% share" in the Painting for $12.2 million (Lindstrom Decl. at ¶5), representing Pesko's $9.2 million payment and a $3 million "loan" to Philbrick, for which Pesko would charge an annual interest rate of 8% according to their agreement. Notably, despite submitting a six-page narrative declaration, Pesko fails to declare that he actually paid Philbrick for his share in the work, fails to attach any evidence of his alleged payment and fails to attach any promissory note in connection with the purported "loan."  Instead, in order to prove this crucial point, counsel for SIL refers to the criminal complaint against Philbrick which states "[i]n or about August and September 2016, [SIL] wired a total of $12.2

million to a bank account for [IPL] as payment for the [Painting]." (Grossman Decl. at ¶6). It is unclear whether the Court intends to require SIL to produce witnesses and evidence in support of its motion, but Athena would request that it do so.

The agreement further provided that Philbrick would retain possession of the Painting at all times, making Philbrick – an art dealer – an "entrustee" of the Painting, who could convey good title to the Painting according to the provisions of the U.C.C. Indeed, it appears that SIL still absurdly trusts Philbrick, making several refutable claims in its papers based on Philbrick's "word," including the demonstrably false assertion that Athena failed to undertake meaningful due diligence.

**Athena's Extensive Due Diligence and Loan Documentation**

On March 31, 2017, Athena entered into a Loan and Security Agreement ("LSA"), pursuant to which it extended a loan commitment to Boxwood in the amount of $10 million, collateralized with certain artworks and guaranteed both by IPL (as corporate guarantor) and Philbrick personally. (*See* Sachs Decl. at ¶ 6.) The same day, Athena filed a UCC-1 statement in the District of Columbia against "all assets of [Boxwood] and all proceeds thereof." (*Id.* at ¶7.) Athena properly filed in the District of Columbia given Boxwood's status as a foreign borrower incorporated under the laws of the Channel Island of Jersey.[7] (*Id.* at ¶8.)

In asset-based lending transactions such as this art loan, lenders conduct financial due diligence to ensure, for example, that the borrower has the ability to service the interest payments and is generally credit-worthy, but the primary source of principal repayment and thus its recourse in the event of a default is expected from the sale of the collateral, therefore the primary

---

[7] The purpose of lending to a special purpose vehicle (SPV), such as Boxwood, is precisely to ensure that a lender is lending against assets that are wholly owned by the borrower and that, *inter alia,* there are no other creditors or third parties who claim any interest in the assets belonging to the SPV and that there are no contingent liabilities. This is a very common loan structure in asset-based lending transactions. (*See id.* at ¶ 9)

underwriting focus is on the underlying art collateral securing the loan. (*Id.* at ¶10.)  It's important

to note, that prior to the Boxwood loan, in July 2016 and March 2017, Athena made a total of $8

million in loans to IPL, which performed as agreed and were ultimately repaid in full from the sale

of the respective artwork collateral pieces securing each loan, respectively.  (*Id.* at ¶11.)  In this

way, Philbrick had established a solid track record with Athena prior to it making the Boxwood

loan.  (*Id.*)  Athena also made inquiries about Philbrick's reputation in the art world.[8] (*Id.* at ¶ 12.)

Among the due diligence conducted on the borrower, the guarantors and the artwork

collateral, Athena first performed thorough "Know Your Customer" checks on Philbrick by

obtaining his passport and running it through Refinitiv World-Check, a world-class risk

intelligence database (formerly known as Reuters), reviewed and analyzed the financial statements

of the corporate guarantor, IPL, prepared by Brebners Chartered Accountants in London for the

fiscal year ending April 30, 2016, and also an updated balance sheet as of December 31, 2016 in

addition to Philbrick's self-reported net worth statements. (*Id.* at ¶13.) Athena also received and

analyzed IPL's financial statements for the nine-months ended January 31, 2017 showing that IPL

generated a healthy $64 million in revenues and $3.5 million in EBITDA for the period, and a

recent bank statement from bank Santander indicating a pro forma $1.7 million cash balance as of

March 15, 2017. (*Id.* at ¶14.) Through its secured lending counsel with extensive experience in art

lending, specifically, Herrick, Feinstein LLP in New York and Constantine Cannon in London,

Athena conducted searches of liens, bankruptcy, judgments and litigations in England, where IPL

---

[8] Prior to starting his own business, Philbrick was head of secondary market sales at the White Cube, a top contemporary art gallery in London, and director of its affiliate Modern Collections in Mayfair.  (*Id.* at ¶12.)   As a result of IPL's significant growth, Philbrick had hired Robert Newland ("Newland") of ARCO Advisory, to help manage the financial, administrative and logistical aspects of his business. (*Id.*) Newland was a former McKinsey & Co. consultant and Christie's business manager who founded his own advisory firm to target art market professionals. (*Id.*) Newland become Athena's main business contact, handling all loan requests, due diligence, documentation and art related logistics and worked closely with the Athena team to provide responses and submission of corporate materials. (*Id.*)

was registered and where Philbrick was resident, and Athena's secured lending counsel in Jersey,

Dickinson Gleeson, conducted searches of Jersey Financial Services Commission and

Bankruptcy/Insolvency, where Boxwood was registered. (*Id.* at ¶15.)  All searches were clear. (*Id.*)

Athena obtained documentation from the Boxwood directors, including lists of the Register of

Directors, Articles of Association, Memorandum of Association, Certificates of Incorporation and

Share Certificates, among others.  (*Id.* at ¶16.)

Athena conducted extensive diligence of the artwork collateral. With respect to the

Painting, Athena not only verified that IPL had acquired the Painting from Phillips through a July

27, 2016 Bill of Sale and proof of payments by IPL to Phillips as evidenced in IPL's bank

statements (*id.* at ¶18), but it also independently confirmed with the Chief Financial Officer of

Phillips that it had received wire payments from IPL's bank account for the purchase of the

Painting and that title had thereby passed to IPL. (*Id.*)  Athena also performed provenance research

at the Metropolitan Museum of Art and MOMA libraries on April 3, 2017 and confirmed the

exhibition history of the Painting.  (*Id.* at ¶19.)  Further, Athena searched the Art Loss Register

("ALR") Database to ensure that none of the artwork collateral in the pool were reported lost,

stolen or had been claimed in any way by an unknown third-party.  (*Id.* at ¶20.)  Through an Art

Loss Register search on April 7, 2017, Athena verified that the Painting had not been reported lost

or stolen and subsequently registered the Painting with the ALR, such that if any third party

registered an interest in the Painting, Athena would have been notified of such. (*Id.* at ¶21.)

Athena backstopped its careful diligence with contractual protections.  In Section 4.3 of

the LSA, for example, the Borrower represented that it had full ownership and title and was not

aware of any challenges to provenance or third-party claims:

> 4.3.2 Borrower is the sole and absolute lawful and beneficial owner of all Borrower
> Collateral. The Borrower Collateral is free and clear of all Liens  . . ."

> 4.3.3 Borrower has the authority to sell and/or transfer good and marketable title to all Borrower Collateral.
>
> 4.3.5. No Provenance Claim has been made with respect to any Artwork Collateral Piece, and (iii) no Person has raised, by any other means, any adverse allegation or question with respect to the authenticity of any Artwork Collateral Piece, the provenance of any Artwork Collateral Piece or Borrower's title to any Artwork Collateral Piece, and . . . (iv) Borrower has no basis for concern that any adverse claim may exist with respect to the . . . provenance of any Artwork Collateral Piece or Borrower's title to any Artwork Collateral Piece . . .
>
> 4.3.6 Borrower has not received any third-party claim, and to the best knowledge of Borrower there are no third-party claims, that would prevent any seller, assignee or purchaser of any Artwork Collateral Piece from receiving any payments or proceeds in respect thereof, without defense, counterclaim, setoff, right of recoupment, abatement or other claim or determination whatsoever.

(*See id.* at ¶ 22). The unsealed criminal complaint details further the requests from Athena specifically on the issue of ownership and the responses that were provided to Athena (*See* Exhibit "D" to Lindstrom Decl. at ¶6(h)(i)-(iii).)

After conducting exhaustive due diligence, Athena perfected its security interest pursuant to a number of steps, including extensive loan and security documentation (which included 100% ownership representations and warranties from Philbrick), the filing of a UCC-1 statement and taking full physical possession of the Painting into its fine art storage facility in New York. (Sachs Decl. at ¶23). On April 7, 2017, in connection with the loan, IPL transferred the Painting from IPL to Boxwood for full consideration of $12,500,000 and pursuant to Section 3.4 of the LSA, the Painting was added to the pool of loan collateral. (*Id.* at ¶24.) The transfer of the Painting from IPL to Boxwood was overseen by Boxwood's independent board of directors who signed all the loan documentation and confirmed to Athena that Boxwood paid for the Painting. (*Id.* at ¶25.)

Athena also required the loan parties to enter into an Agreement of Subordination and Assignment to ensure that any intercompany loans from the corporate guarantor or the individual

guarantor used to service the interest payments were subordinated to the senior secured loan from Athena. (*Id.* at ¶26.)   In addition, on the same date and pursuant to Section 3.5 of the LSA and as confirmed by Athena in writing, Schedule A to the LSA was amended to include an updated description of all loan collateral, including the Painting. (*Id.* at ¶27.)  Athena's fully-documented financing transaction and strictly documented right to possession is also why Athena was able to direct the return of the early Painting to New York following its exhibition in Japan. (*Id.* at ¶28.) There was nothing surreptitious or improper about Athena's behavior, as SIL implies, given Athena's clear rights and first priority perfected security interest in the Painting.  (*Id.*)  On May 28, 2018, the loan commitment was increased by $3.5 million permitting a total principal amount of up to $13.5 million. (*Id.* at ¶29.)

On October 1, 2019, Boxwood failed to make its monthly interest payment of $102,590.00, representing thirty days of accrued interest from September 1, 2019 through September 30, 2019. (*Id.* at ¶ 30.)  On October 4, 2019, Athena notified Boxwood that it had failed to make the interest payment due on October 1, 2019, which failure Boxwood did not remedy within the thirty-day grace period, as required by the LSA, and has never been paid to date. (*Id.* at ¶31.)

Athena served a notice of default upon all of Boxwood, IPL, and Philbrick on October 14, 2019 based on other breaches of the LSA relating to a title claim on a different artwork. (*Id.* at ¶32.)  Pursuant to Section 8.3 of the LSA, Athena then directed the organizers of the Japanese exhibition, where the Painting was then being exhibit in Tokyo, pursuant to a proper Bailment Agreement and Japanese law security agreement, to immediately return the Painting to Athena in New York as clearly stipulated in the Japanese documentation.  (*Id.* at ¶33.)  On October 29, 2019, after the Painting was safely back in Athena's fine art storage account, Athena was notified that SIL had brought an action in London.  (*Id.* at ¶34.)

10

As of October 31, 2019, Boxwood's failure to pay interest constituted a further event of default under the LSA. (*Id.* at ¶35.)  Athena thus chose to exercise its rights under the LSA, "declar[ing] the outstanding principal of the Loans, all interest thereon and all other Obligations to be forthwith due and payable," and subjecting the entire outstanding amount to the default interest rate and late fees as of October 31, 2019. (*Id.*)

Athena brought a New York State Supreme Court action against Boxwood, IPL and individual guarantor Inigo Philbrick (collectively, the "Loan Obligors"), *Athena Art Finance Corp. v. 18 Boxwood Green Limited, et al*., New York County Index No. 657322/19 (Ostrager, J.). Having failed to appear and answer, a default judgment was ultimately entered against the Loan Obligors for $14,306,800.47.  (Lindstrom Decl. at ¶ 7.)   As set forth in the Judgment, the loan is subject to the contractual default rate of 14.0701% per annum plus the late fee of 2%, and other fees, costs and penalties. (*See id.* at ¶ 8.)  The aggregate outstanding amount of the loan is increasing by more than $150,000 per month. (Sachs Decl. at ¶36.)

Under Section 8.2 of the LSA, in the event of a default, Athena has the absolute right, unilaterally, to sell the collateral at public or private sale. As the loan is indeed in default, as demonstrated rather conclusively by the default judgment, Athena has the right to sell the Painting. (*Id.* at ¶ 37.)

## **PROCEDURAL HISTORY**

On October 29, 2019, Athena learned that SIL had commenced an English action against Philbrick, IPL, Boxwood and Athena.  (Sachs Decl. at ¶34.)  On November 1, 2019, Satfinance obtained a restraining order from a London court that temporarily barred Athena from selling the Basquiat. The London court, however, dismissed all claims against Athena on May 26, 2020, and

thereafter vacated the injunction on June 2, 2020. (Lindstrom Decl. at ¶ 9.)  The very same day, Athena filed the instant *in rem* action, which SIL removed to this Court. (*Id.* at ¶10.)

On June 2, 2020, the London judge also denied SIL's immediate request for permission to appeal.  (*Id.* at ¶11.)  SIL therefore filed a further request to appeal on June 22, 2020, which permission was granted on August 21, 2020.  (*Id.* at ¶12.)  However, Athena again prevailed on December 21, 2020 and SIL informed Athena on January 14, 2021 that it would not seek a further appeal. (*Id.*)

Since June 12, 2020, when Philbrick was arrested on the Pacific island of Vanuatu and extradited back to the United States to face unsealed criminal charges in the Southern District of New York, Philbrick has been in federal custody.  (*Id.* at ¶13.)  The criminal action continues in this Court.  (*Id.* at ¶14.)   On February 25, 2021, as a recognized victim of Philbrick's crimes, Athena was contacted by the government to provide information regarding Athena's claims for restitution.  (*Id.*)

## ARGUMENT

"A 'preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion.'" *Vision v. Lens*, 2020 U.S. Dist. LEXIS 186403, 2020 WL 5899879 (S.D.N.Y., Feb. 28, 2020) (emphasis in original) *quoting Capstone Logistics Holdings, Inc. v. Navarrete,* 736 F.App'x 25, 26 (2d Cir. 2018) (internal citation omitted). The law in the Second Circuit is clear that any party "seeking such relief must demonstrate irreparable harm in the absence of a preliminary injunction, and, in addition, must meet either of two standards: '(a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor.'" *Id., quoting Trump v. Deutsche*

*Bank AG,* 943 F.3d 627, 635 (2d Cir. 2019) (citation and internal quotation marks omitted), *cert. granted,* 140 S.Ct. 660 (2019).

## I.     SIL HAS NOT AND CANNOT DEMONSTRATE IRREPARABLE HARM

"It is generally acknowledged that irreparable injury is at once 'perhaps the single most important prerequisite for the issuance of a preliminary injunction'" *Warren Corp. v. Goldwert Textile Sales, Inc.,* 581 F. Supp. 897, 901 (S.D.N.Y. 1984) *quoting* 11 C. Wright & Miller, Federal Practice and Procedure, § 2948 at 431 (1973); *see also Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232 (S.D.N.Y. 2020, Daniels J.) ("A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.  To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.") (citation and internal quotation marks omitted).

SIL's irreparability argument distills down to the superficial assumption that, because the Painting is one of a kind, it necessarily is "irreplaceable" and, thus, an award of money damages could never suffice if SIL somehow were to win at trial.  *Sampson v. Murray*, 415 U.S. 61, 64 (1974) ("The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.") (internal citation omitted); *see also Oliver v. N.Y. State Police*, 2019 U.S. Dist. LEXIS 76272 at *18-19 (N.D.N.Y., May 6, 2019).

That is the *same* "art is unique" argument that the High Court flatly rejected last June. SIL's argument runs afoul of the substantially similar American precedent, which draws the critical distinction between those who claim sole ownership and possession of fine art and, by contrast, financial investors, like SIL, who never had possession of the art, but instead claim a partial percentage economic interest in a chattel intended for sale.  Here the question is not even close: because SIL claims an interest in a (supposed) contract calling for a "quick sale" of the Painting, any supposed contractual breach could be remedied by monetary damages.

### a. The London Court Already Rejected SIL's "Irreparability" Argument When It Dissolved An Injunction Nine Months Ago

SIL omits entirely from its moving papers that the London Court has already ruled that even if the Painting were to be sold, and even if SIL ultimately could and did prove resulting harm, such an injury could be fully and fairly remedied with an award of monetary damages.  Although the High Court's interlocutory ruling may not be *res judicata*, the rationale rests on the very factual predicate now before this Court.

Specifically, on June 2, 2020, the London Court lifted and deemed improper a prior injunction which had enjoined Athena from selling, transferring or otherwise disposing of the Painting Looking specifically at the question of irreparable harm, the London court found that:

> *I do not consider that the Claimant is able to show that the sale of the painting would necessarily cause it irremediable harm.  The purpose of acquiring the painting was for it to be sold and, as far as I am aware, there is no evidence whatever that Athena is not good for a monetary judgment that the Claimant might be able to obtain if it transpires that the Claimant has better title to the painting than Athena.*
>
> It is, therefore, not necessary for me to consider whether the court should exercise its discretion to grant a stay because *the Claimant is not able to establish irremediable harm.*

(Lindstrom Decl., Exhibit "A" at ¶¶18-19) (emphasis added.)

On the same day as the English Court dismissed Athena from the case and lifted its injunction (June 2, 2020), Athena filed this *in rem* action, which SIL then removed to Federal court. (*Id*. at ¶10.)  As set forth below, SIL's legal theory remains precisely the same – that it has a pecuniary interest in the Painting under a "partnership agreement" that, on its face, contemplated the Painting's "quick sale" –i.e., a sale and monetization which SIL now claims would be constitute irreparable injury.

**b.   SIL's Investment Contract Called For The "Quick Sale" Of The Painting, So By Definition Any Damages Are Compensable With A Monetary Award**

SIL's motion for a preliminary injunction rests on the false theory that damages somehow are always irreparable in every ownership dispute involving fine art – simply because every painting is unique.  There is, however, no fine art exemption under Rule 65, nor any precedent that assumes or presumes "irreparability" for art cases.  To the contrary,

> [t]he court must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm . . . . Instead, the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury.

*Pearson Educ, Inc. v. Labos*, 19 Civ. 487 (CM)*, 2019 U.S. Dist. LEXIS 72342 at * 10 (S.D.N.Y. April 23, 2019) (internal citation omitted.)

In *Hessel v. Christie's Inc.,* 399 F. Supp. 2d 506, 519, 2005 U.S. Dist. LEXIS 27814, *38 (S.D.N.Y. November 10, 2005), for example, the Court declined to issue a preliminary injunction where a successful bidder at auction had made substantial, but not complete, payment for certain artworks, in derogation of Christie's terms of sale. In denying the plaintiff's motion for injunctive relief with respect to the paintings – which unlike SIL, the *Hessel* plaintiff had intended to fully own and enjoy upon completion of the transaction – the Court noted that despite the paintings

being unique chattels, "[d]ashing Hessel's hope to own paintings that he does not actually own does not constitute irreparable harm." *Id*. Likewise, dashing SIL's hope to own a Painting that it does not actually own does not and cannot constitute irreparable harm -- and just because this Painting, like the *Hessel* paintings and like *every* painting, is "unique chattel" does not automatically qualify this case as ripe for injunctive relief.

Here, SIL's irreparability claim is foreclosed by its *own* theory of liability – it claims to have made a partial investment in contemplation of a "quick sale." The contract was clear that the Painting would be "jointly own[ed]" and that Philbrick (not Pesko or SIL) would retain possession of the Painting at all times.

Thus, although SIL's Memorandum of Law in support of its motion ("Memo.") relies on cases where monetary damages could not sufficiently compensate for the "loss" of the use and enjoyment of "an irreplaceable chattel," (Memo. at p. 8), here, SIL never had possession (much less use and enjoyment) of the Painting, but only a partial (allegedly, one half) interest in the Painting under a contract that expressly called for a pecuniary profit to be made upon the "quick sale."

For this reason, the cases SIL cites are inapposite. For example, SIL's interest in the proceeds of the contemplated "quick sale" of the Painting that it never had any right to possess is nothing like *Kozar v. Christie's Inc.,* 31 Misc. 3d 1228(A); 929 N.Y.S.2d 200; 2011 N.Y. Misc. LEXIS 2350 (N.Y. Sup. Ct. Westchester Co., May 18, 2011), where the plaintiff claimed sole ownership of a painting that had been in her family for over 60 years, and which she recalled first seeing at age thirteen. None of the other cases upon which SIL relies involved a circumstance where the plaintiff claimed no more than a partial economic interest in art it never possessed.[9]

---

[9] *See, e.g., Robins v. Zwirner*, 713 F. Supp. 2d 367 (S.D.N.Y. 2010) (in which injunctive relief was denied for failure to demonstrate a likelihood of success on the merits), *Gerald Modell Inc. v. Morgenthau*, 764 N.Y.S.2d 779 (Sup. Ct. N.Y.

II.   **SIL FAILED TO DEMONSTRATE ITS LIKELY SUCCESS ON THE MERITS**

   a.  **SIL's Implausible Theory of Liability Lacks Evidentiary Support**

SIL claims to have "demonstrated that it acquired 'full title' to the Painting and that it never

sold, transferred, or otherwise disposed of any part of its ownership interest in the Painting" and

"therefore is likely to succeed in the merits of its claim for the Painting." (Memo. at p. 10).  SIL's

own conclusion that it will achieve future success on the merits collapses under the implausibility

of its own pleading and the conspicuous absence of an evidentiary record on key elements of its

claim.  First, SIL claims to have obtained an interest in the Painting under a supposed contract

that called for it to have a 50% interest to be liquidated upon "quick sale," and thus not full

economic interest or possession.

   Second, SIL fails to explain how any payments allegedly made to IPL would entitle SIL to

an ownership interest in the Painting (let alone to being declared its "rightful owner," (*see* SIL

Intervenor-Complaint at DE 30, ¶79), given that SIL admits IPL deceived SIL about *all* material terms

of their transaction (viz., the identity of the seller, the purchase price, and the fact that IPL

purchased the painting from Phillips in its sole name with funds from its own bank account).  This

is why SIL's true action for monetary damages for fraud and breach of contract lies in the London,

against Philbrick and IPL.

   Third, even if SIL had cleared this hurdle, the six-page Pesko Declaration is conspicuously

silent as to SIL's alleged payment to IPL, with counsel's declaration instead referring to hearsay

statements in the criminal complaint.  SIL's failure of proof is not curable on reply.  In sum, while

SIL's barely plausible allegations may pass muster as a matter of pleading under Rules 8 and

---

Cty. May 21, 2003) (injunction granted where jeweler's possession of the goods in question was their sole legal basis for
claiming relief).

12(b), SIL is required to actually meet its evidentiary burden under Rule 65 if it claims entitlement to the extraordinary and drastic remedy of injunctive relief.  SIL simply has not met its burden.

**b.   Athena Is A Judgment Creditor With A First Priority Perfected Security Interest**

SIL also cannot establish a likelihood of success on the merits because it cannot overcome Athena's superior rights as a secured lender with a first priority lien and as a judgment creditor.  As a matter of settled law and in accordance with the terms of the loan and security agreement, Athena is entitled to sell the Painting, and receive the first right of repayment for all accrued and unpaid principal, interest, fees and expenses of which it is rightfully owed.

Specifically, New York U.C.C. is clear that "a secured party 'may reduce a claim to judgment, foreclose, or otherwise enforce the claim [or] security interest … by any available judicial procedure.'" *Christie's Inc. v. Davis*, 247 F. Supp. 2d 414, 419 (S.D.N.Y, 2002) *citing* N.Y. U.C.C. § 9-601(a)(1) (McKinney 2002).  Because Philbrick retained possession under the terms of the agreement with Pesko, Philbrick/IPL became an "entrustee," with power under New York law to transfer good title to the Painting to a good faith purchaser for value.

New York law further provides that Athena, as a "good faith purchaser for value," may obtain a security interest in the Painting even if, as SIL alleges, SIL was defrauded by IPL with respect to their partnership agreement.  Under § 2-403, "A person with voidable title has power to transfer a good title to a good faith purchaser for value."  N.Y. U.C.C. § 2-403.[10]  New York law is clear that ownership procured by fraud creates a "voidable title". *Kozar,* 2011 N.Y. Misc. LEXIS 2350 at *20-22 (N.Y. Sup. Ct. Westchester Co., May 18, 2011). [11]

---

[10] "Purchase" is statutorily defined to include, among other things "negotiation, mortgage, pledge, lien, [or] security interest" N.Y. U.C.C. § 1-201(b)(29).

[11] As a leading treatise on the U.C.C. puts it, "A swindler who induces a victim through fraud to voluntarily deliver goods acquires voidable title. Having voidable title, the swindler could confer good title upon a good faith purchaser for value." 3A Anderson U.C.C. § 2-403:47 (3d. ed.)  Voidable title is distinguished from void title, such as that of a true thief who enters a premises and absconds with a work.

Here, even assuming SIL's alleged narrative, IPL was vested with voidable title under

U.C.C. § 2-403.7, and Athena was a good faith purchaser for value under New York law.  See 3A

Anderson U.C.C. § 2-403:58 (3d. ed.) ("As 'purchaser' includes a creditor claiming a security

interest in goods, a secured creditor of the buyer holding under a voidable title has an interest that

is superior to the buyer's seller when the secured creditor acted in good faith and gave value for the

security interest.").

The creation of security interests under New York law is governed by Article 9 of the

U.C.C., and specifically by N.Y. U.C.C. § 9-203, which provides in relevant part:

> a security interest is enforceable against the debtor and third parties with
> respect to the collateral only if:
>     (1) value has been given;
>     (2) the debtor has rights in the collateral or the power to transfer rights in
> the collateral to a secured party; and
>     (3) one of the following conditions is met:
>         (A) the debtor has authenticated a security agreement that provides a
> description of the collateral . . .

Here, Athena plainly gave value for the security interest by issuing loan proceeds, and the

debtor authenticated a security agreement that provided a description of the collateral.  SIL appears

to contend that IPL or Boxwood did not possess "rights in the collateral or the power to transfer

rights in the collateral to a secured party" because SIL retained "full title" to the painting.  But

under New York law, a party does not need to have formal title or full ownership to have "rights in

the collateral or the power to transfer rights in the collateral to a secured party."  *See also* NY

U.C.C. § 9-202 Cmt. 2 ("The rights and duties of parties to a secured transaction and affected third

parties are provided in this Article without reference to the location of 'title' to the collateral.").

Indeed, the official comments to § 9-203 explicitly explain that "A debtor's limited rights in

_____

collateral, short of full ownership, are sufficient for a security interest to attach."  N.Y. U.C.C. § 9-203 Cmt. 6.  As the Anderson treatise explains:

> The debtor may have rights in the collateral even though the debtor lacks title to the collateral. The question of ownership is irrelevant to whether the debtor has rights in the collateral. Article 9 is only concerned with whether the debtor 'has acquired sufficient rights in the collateral for the security interest to attach' and is not concerned with the title to the collateral.

8A Part II Anderson U.C.C. § 9-203:202 (3d. ed.)

Neither Athena nor Boxwood's independent directors had any knowledge of the fraud. Although SIL appears to contend that Athena's loan was prohibited by the terms of its agreement with Philbrick, New York law is clear that such prohibitions are not effective against third parties who are not aware of the restriction.  As set forth in the unsealed criminal complaint, having repeatedly asked and been told that the artwork collateral was solely and lawfully owned by the Borrower, (*see also* Ex. "C" to Sachs Decl. at 4.3.3 et seq.) and having so confirmed through extensive due diligence, documentary evidence and independent confirmation, Athena was a good faith purchaser for value when it made the loan and took possession of the Painting.

Second, assuming arguendo that IPL had sold some share of the Painting under the terms of the agreement with Pesko, IPL had "sufficient rights in the collateral" to transfer and pledge a security interest in its share of the Painting.  A leading U.C.C. treatise makes clear that joint ownership constitutes "sufficient rights in the collateral" to enable joint owners to "convey a security in its share:"

> The debtor's rights to which the security interest attaches can, of course, be far less than full ownership. In other words, a lessee can convey a security interest in its partial ownership interest; a joint owner of an asset can convey a security in its share. Nothing in Article 9 shows any intention to limit the power of a debtor to convey a security interest in any rights held by the debtor, however slight.

4 White, Summers, & Hillman, Uniform Commercial Code § 31:9 (6th ed.).

The fact that IPL's agreement with SIL may have contractually prohibited IPL from encumbering its share is not enforceable against third parties such as Athena. *See id*. ("The debtor may have sufficient rights despite "retention of title" clauses (or clauses retaining documents of title), or clauses restricting the debtor's right to encumber or dispose of the property."). Indeed, SIL did *exactly nothing* to prevent IPL from pledging the Painting.

Third, SIL is estopped from disputing the validity of Athena's security interest.  8A Part II Anderson U.C.C. § 9-203:200 (3d. ed.) ("When the true owner is estopped from showing that a security interest is not valid, the debtor has rights in the collateral for the purposes of U.C.C. § 9-203."). Under New York law, "as between two innocent victims of the fraud, the one who made possible the fraud on the other should suffer." *Rand's Disc. Co. v. Universal C.I.T. Credit Corp*., 10 A.D.2d 240, 242, 198 N.Y.S.2d 341 (1960).[12]

So too here. SIL never conducted any diligence with respect to the acquisition of the Painting, and clothed IPL with "ample indicia of unfettered title" by allowing IPL to retain possession of the Painting in New York. Nor did SIL file any record of its interest in the painting— either by registering its 50% ownership interest in the painting with the ALR, disclosing a legal and proper promissory note, or by perfecting its $3,000,000 loan security interest to IPL.  And SIL, by its own admission, ignored multiple red flags that something was afoot with IPL, including by taking at face value Philbrick's hasty substitution of a new bill of sale for the Painting after it pointed out errors in the original bill of sale.  In such circumstances, New York law will estop a more culpable party such as SIL from asserting even its valid title against a less culpable party such

---

[12] (It is not stipulated or suggested that plaintiff had actual or constructive notice of the defendant's reservation of title under a conditional sales contract. Nor could plaintiff have discovered such reservation by a usual search of record, since the defendant did not file the contract or any notice of it. At defendant's instance, when plaintiff placed the chattel mortgages here relied upon by the plaintiff, Lazzaro had ample indicia of unfettered title,—*i. e.,* possession, proof of purchase, and a regular course of business in the sale of cars,—and no public record of adverse title, lien, or encumbrance existed. . . .  In such circumstances the defendant is chargeable with creating the conditions which constitute an estoppel to assert title as against the plaintiff.)

as Athena, who conducted thorough and exhaustive diligence – both as to the borrower and the Painting. For all of these reasons, Athena is likely to succeed on the merits of its claims and no injunction should be issued.

## III.   ATHENA'S HARDSHIP INCREASES WITH EACH PASSING DAY AND THE BALANCE OF EQUITIES FAVORS A DENIAL OF INJUNCTIVE RELIEF

SIL argues in the alternative that if it has not met the burden of proving a likelihood of success on the merits (and it has not), it has "[a]t the very least" raised "sufficiently serious questions going to the merits to make them a fair ground for litigation,' which is enough for the injunction where Athena cannot demonstrate any 'hardship' caused by a temporary injunction." (Memo. at p. 11).  This is demonstrably false.

As a lender with unpaid interest and fees accruing daily, Athena is suffering material damages, and the remaining residual equity (which could be available to Philbrick's victims after a sale) is eroding daily (i.e., more than $150,000 of interest is accruing monthly). Thus, the balance of the equities weighs in favor of a complete denial of injunctive relief.  SIL cites the inapposite *Kozar* – a case in which the plaintiff was claiming full ownership of a family heirloom she first saw at age thirteen - for the proposition that mere delay in a party's ability to sell a painting "does not tip the balance of equities in favor of the non-movant where denial of injunctive relief would be extremely prejudicial." (Memo. at p. 13).  However, unlike the art gallery defendant enjoined from selling a painting in *Kozar*, where the passage of time would likely have no effect should it prevail, Athena is a secured lender whose outstanding debt continues to balloon with each passing day.  In addition, as the debt balance grows, Athena becomes increasingly less likely to recover outstanding principal and interest on the Boxwood loan. By contrast, as a partial investor in the Painting at most, SIL can be made whole with monetary damages whereas the *Kozar* plaintiff

would potentially have lost her family heirloom forever. The balance of the equities thus tip decidedly in Athena's favor and injunctive relief should be denied.

### a.   <u>The Basquiat Market is Very Strong; This Is An Ideal Time to Sell the Collateral</u>

SIL further admits that the Basquiat market is "robust" (Memo. at p. 13) and a similar Basquiat work entitled *Warrior* from the same year (1982) and of smaller dimensions is set to be auctioned at Christie's Hong Kong in March 2021 with an estimate of $31,000,000 to $41,000,000, which includes a third-party guarantee.  (*See* Sachs Decl. at ¶38).  As Christian Albu, Christie's co-head of post-war and contemporary art was recently quoted as saying with regard to the upcoming sale, "This—1981-1982—is the best period for Basquiat, undoubtedly. . . . If you look at the top ten records, nine out of ten are from 1981 to 1982. The energy of his work was at its peak. And it is a rare to have a large one like this." (*See id.* at ¶39). *Warrior's* dimensions are 72 x 48 inches, while *Humidity's* dimensions are an even larger 96 x 72 inches.  (*See id.* at ¶40). As Mr. Albu further commented with regard to the scarcity of large Basquiat paintings from this desirable period, "Each year they become rarer and rarer," he said. "Most of them now are in museums or private foundations." (*See id.* at ¶41.)

Athena will thus be irreparably harmed if it is enjoined from selling the Painting at this record-breaking time for 1982 Basquiat paintings.  SIL cites *U.S. v. Dally* for the proposition that injunctive relief should be granted where its denial may create cloud over title, but reference to the *Dally* case is unavailing, as it involved U.S. federal land and the Court's main reason for granting injunctive relief was that its proposed sale "could interfere with the orderly operation of business at this military installation." There is no such danger in this case, and any damages incurred by SIL as a result of any sale would be curable with the payment of money.  For this additional reason, injunctive relief should be denied.

Athena is entitled to be repaid all outstanding interest and fees; the remaining proceeds (*i.e.*, whatever equity of the borrower remains after loan repayment) either would be paid to the interested parties or forfeited to the United States subject to restitution claims of third-parties, and there is no guarantee that the Basquiat market will continue to climb or that a sale price achievable now could be achievable in the future.  This is yet another reason that should the Court decide to enjoin Athena from selling the Painting, SIL should be required to post a significant bond to protect Athena from the risk that Basquiat sale prices will decline in the future.

## IV.    SIL SHOULD BE REQUIRED TO POST A SUBSTANTIAL BOND

If the Court decides to enter an injunction, SIL should be required to post a significant undertaking to protect Athena as it is both a secured lender and a judgment creditor. Pursuant to FRCP 65(c), "the court may issue a preliminary injunction or a temporary restraining order *only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained*." (emphasis added.)  While SIL cites cases for the proposition that no undertaking is necessary where the non-movant has not shown a likelihood of harm, Athena's outstanding debt for which the Painting is secured collateral is mounting and Athena has therefore made a *prima facie* showing of hardship. In *Kozar* (the family heirloom case), the Court ordered plaintiff to post a bond for 50% of the artwork value.  In light of the upcoming action of a similar (smaller) Basquiat with an estimate of $31,000,000 - $41,000,000, Athena requests that the court order SIL to post a bond of at least $10,000,000 to protect Athena from a wrongful injunction.[13]

---

[13] SIL cites to *Gov't Employees Ins Co. v. Moshe*, 2020 WL 3503176 at *4 (E.D.N.Y. June 29, 2020) for the proposition that an undertaking is not necessary where the movant "undoubtedly has the ability to pay if [the non-movant] prevail[s]" and states that "there is no proof that [SIL] is undercapitalized."  However, it is worth noting that Pesko, not SIL, posted the bond in the London action, and SIL has provided no proof of its financial status.

## CONCLUSION

As another Court has already found, SIL simply cannot meet the burden of proving irreparable harm should its request for injunctive relief be denied.  Athena, not SIL, is likely to succeed on the merits of its claims, and the equities tip in favor of denying SIL's request for injunctive relief given Athena's mounting debts and the fact that SIL true claims lie in the English action against Inigo Philbrick and his entities.  SIL's request for a preliminary injunction should be denied, and in the alternative, there should be an evidentiary hearing and SIL should be required to post a bond of no less than $10 million in order to protect Athena's interest should the Court decide to grant injunctive relief.

Dated:  New York, New York
        March 8, 2021

MAZZOLA LINDSTROM, LLP

By: *Wendy J. Lindstrom*

Wendy J. Lindstrom
Richard E. Lerner
1350 Avenue of the Americas, 2nd Floor
New York, NY 10019
Telephone: (646) 216-8440
wendy@mazzolalindstrom.com

-and-

Sharon Cohen Levin
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
levinsc@sullcrom.com

*Attorneys for Athena Art Finance Corp.*