UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ATHENA ART FINANCE CORP.,

            *Plaintiff*,

    -against-

 that

CERTAIN ARTWORK BY JEAN-MICHEL BASQUIAT ENTITLED HUMIDITY, 1982, *in Rem*,

            *Defendants,*

SATFINANCE INVESTMENT LIMITED and DELAHUNTY LIMITED d/b/a DELAHUNTY FINE ART,

            *Interested Parties*.

---

SATFINANCE INVESTMENT LIMITED
            *Intervenor-Plaintiff*,

    -against-

ATHENA ART FINANCE CORP. and that CERTAIN ARTWORK BY JEAN-MICHEL BASQUIAT ENTITLED HUMIDITY, 1982, *In Rem*,

            *Intervenor-Defendants.*

---

Case No. 20-cv-4669(GBD)

Hon. George B. Daniels, USDJ

---

**DECLARATION OF CYNTHIA E. SACHS IN OPPOSITION TO
<u>SATFINANCE'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

I, Cynthia E. Sachs, hereby declare under penalty of perjury as follows:

1.      I am the Chief Investment Officer of plaintiff Athena Art Finance Corp. ("Athena").

2.      I state the following facts upon personal knowledge, and based upon my review and familiarity with the transaction documents related to Athena's $13.5 million loan to 18 Boxwood Green Limited ("Boxwood"), which documents include the Loan and Security Agreement, amendments, guarantees, schedule of collateral, confirmations of transfers of funds, confirmations of receipt of collateral, among other loan documents ("LSA") executed by Boxwood, Inigo Philbrick ("Philbrick"), and Inigo Philbrick Limited ("IPL") (collectively, the "Loan Obligors").

3.      I have also reviewed the documents upon which Satfinance Investment Limited ("SIL") bases its claims regarding *Humidity* by Jean-Michel Basquiat, 1982 (the "Painting").

4.      SIL claims that it jointly purchased the Painting with Inigo Philbrick personally (not his eponymous U.K. gallery, IPL) for $18.4 million pursuant to a *homemade* "Bill of Sale" that identified the "Seller" of this important and valuable artwork as "SKH Management Corp.," a local grocery and garden center in Amish country, Pennsylvania which listed 1875 Lexington Avenue in Manhattan as its address (which, in fact, as Pesko subsequently realized is home to the "Healthy Harlem RX Pharmacy.") On information and belief, a true and correct copy of the first August 10, 2016 Bill of Sale from SKH Management to Inigo Philbrick is attached hereto as Exhibit "A".

5.      SIL pointed out the discrepancies to Philbrick, who sent along a *replacement* "Agreement of Sale" and *different* homemade "Bill of Sale" for the same Painting, for the same $18.4 million on the same day – this time listing the "Seller's" address as an address in Lititz,

1

Pennsylvania. On information and belief, a true and correct copy of the August 10, 2016 Agreement between SKH Management Corp. and IPL is attached hereto as Exhibit "B".

6. Pursuant to the March 31, 2017 LSA, Athena initially extended a $10 million loan commitment to Boxwood, which was collateralized by certain artworks listed on Schedule A thereto, and guaranteed by Inigo Philbrick Limited and Inigo Philbrick. (A true and correct copy of the LSA is attached hereto as Exhibit "C"). Boxwood immediately drew down $6.75 million of the $10 million loan principal.

7. The same day Athena filed a UCC-1 statement in the District of Columbia against "all assets of [Boxwood] and all proceeds thereof." (A true and correct copy of the UCC-1 Statement is attached hereto as Exhibit "D").

8. Athena properly filed in the District of Columbia given Boxwood's status as a foreign borrower incorporated under the laws of the Channel Island of Jersey.

9. The purpose of lending to a special purpose vehicle ("SPV"), such as Boxwood, is precisely to ensure that a lender is lending against assets that are wholly owned by the borrower and that there are no other creditors or third parties who claim any interest in the assets belonging to the SPV or any other contingent liabilities. This structure is a very common in asset-based lending transactions.

10. In asset-based lending transactions such as this art loan, lenders conduct financial due diligence to ensure, for example, that the borrower has the ability to service the interest payments and is generally credit-worthy, but the primary source of principal repayment and thus its recourse in the event of a default is expected from the sale of the collateral, therefore the primary underwriting focus is on the underlying art collateral securing the loan

11. It's important to note, that prior to the Boxwood loan, in July 2016 and March 2017, Athena made a total of $8 million in loans to IPL, which performed as agreed and were ultimately repaid in full from the sale of the respective artwork collateral pieces securing each loan. In this way, Philbrick had established a solid track record with Athena prior to it making the Boxwood loan.

12. Athena also made inquiries about Philbrick's reputation in the art world. Prior to starting his own business, Philbrick was head of secondary market sales at the White Cube, a top contemporary art gallery in London, and director of its affiliate Modern Collections in Mayfair. As a result of IPL's significant growth, Philbrick had hired Robert Newland ("Newland") of ARCO Advisory, to help manage the financial, administrative and logistical aspects of his business. Newland was a former McKinsey & Co. consultant and Christie's business manager who founded his own advisory firm to target art market professionals. Newland become Athena's main business contact, handling all loan requests, due diligence, documentation and art related logistics and worked closely with the Athena team to provide responses and submission of corporate materials.

13. Among the due diligence conducted on the borrower and the guarantors, Athena first performed thorough "Know Your Customer" checks on Philbrick by obtaining his passport and running it through Refinitiv World-Check, a world-class risk intelligence database (formerly known as Reuters), reviewed and analyzed the financial statements of the corporate guarantor, IPL, prepared by Brebners Chartered Accountants in London for the fiscal year ending April 30, 2016, an updated IPL balance sheet as of December 31, 2016, and Philbrick's self-reported net worth statements.

14. Athena also received and analyzed IPL's financial statements for the nine-months ended January 31, 2017, showing that IPL generated a healthy $64 million in revenues and $3.5 million in EBITDA for the period, and a recent bank statement from bank Santander indicating a pro forma $1.7 million cash balance as of March 15, 2017.

15. Through its secured lending counsel with extensive experience in art lending, specifically, Herrick, Feinstein LLP in New York and Constantine Cannon in London, Athena conducted searches of liens, bankruptcy, judgments and litigations in England, where IPL was registered and where Philbrick was resident, and Athena's secured lending counsel in Jersey, Dickinson Gleeson, conducted searches of Jersey Financial Services Commission and Bankruptcy/Insolvency, where Boxwood was registered.  All searches were clear.

16. Athena obtained documentation from the Boxwood directors, including lists of the Register of Directors, Articles of Association, Memorandum of Association, Certificates of Incorporation and Share Certificates, among others.

17. Athena also conducted searches of liens, bankruptcy, judgments and litigations in England, where IPL was registered and where Philbrick was resident, and Jersey, where Boxwood was registered, and searched public registries such as The Companies House.  Athena found no evidence of any liens, charges or encumbrances, notwithstanding Pesko's alleged $3,000,000 "loan" to Philbrick.  In fact, SIL never presented itself to Athena as a claimant on the Painting until *after* Philbrick stopped making interest payments to Athena and fled to the South Pacific.

18. Athena conducted extensive diligence of the artwork collateral. With respect to the Painting, Athena verified the July 27, 2016 Bill of Sale for the Painting from Phillips Auctioneers LLC ("Phillips") to IPL for $12,500,000 (a true and correct copy of which is attached hereto as

Exhibit "E"); the wire transfer payments dated July 29, 2016 ($2,500,000), September 15, 2016 ($5,000,000) and October 11, 2016 ($5,000,000) totaling $12,500,000 from IPL's bank account to Phillips for purchase of the Painting (true and correct copies of which are attached hereto as Exhibit "F"); and through personal confirmation via telephone with the Chief Financial Officer of Phillips confirming that Phillips sold the Painting to IPL and received as payment, the $12,500,000 in three wire transfers as detailed above from IPL's bank account.

19. Athena also performed provenance research at the Metropolitan Museum of Art and MOMA libraries on April 3, 2017, and confirmed the exhibit history of the Painting.

20. Further, Athena searched the Art Loss Register Database to ensure that none of the artwork collateral in the pool were reported lost, stolen or had been claimed in any way by an unknown third-party.

21. Specifically, through an Art Loss Register search on April 7, 2017, Athena verified that the Painting had not been reported lost or stolen and subsequently registered the Painting with the ALR, such that if any third party had registered an interest in the Painting, Athena would have been notified of such. (A true and correct copy of Athena's April 7, 2017 Art Loss Register search for the Painting is attached hereto as Exhibit "G").

22. Athena backstopped its careful diligence with contractual protections. In Section 4.3 of the LSA (Exhibit "C" hereto), for example, the Borrower represented that it had full ownership and title and was not aware of any challenges to provenance or third-party claims:

> 4.3.2 Borrower is the sole and absolute lawful and beneficial owner of all Borrower Collateral. The Borrower Collateral is free and clear of all Liens . . ."
>
> 4.3.3 Borrower has the authority to sell and/or transfer good and marketable title to all Borrower Collateral.
>
> 4.3.5. No Provenance Claim has been made with respect to any Artwork Collateral Piece, and (iii) no Person has raised, by any other means, any adverse allegation or question with

respect to the authenticity of any Artwork Collateral Piece, the provenance of any Artwork Collateral Piece or Borrower's title to any Artwork Collateral Piece, and . . . (iv) Borrower has no basis for concern that any adverse claim may exist with respect to the . . . provenance of any Artwork Collateral Piece or Borrower's title to any Artwork Collateral Piece . . .

4.3.6 Borrower has not received any third-party claim, and to the best knowledge of Borrower there are no third-party claims, that would prevent any seller, assignee or purchaser of any Artwork Collateral Piece from receiving any payments or proceeds in respect thereof, without defense, counterclaim, setoff, right of recoupment, abatement or other claim or determination whatsoever.

23. After conducting exhaustive due diligence, Athena perfected its first priority security interest pursuant to a number of steps, including extensive loan and security documentation (which included representations and warranties of 100% ownership and title to the Artwork Collateral), the filing of a UCC-1 statement and taking full physical possession of the Painting into Athena's fine art storage facility in New York. (A true and correct copy of the April 7, 2017 Bill of Lading transferring possession of the Painting to Athena is attached hereto as Exhibit "H").

24. On April 7, 2017, in connection with the loan, IPL transferred the Painting from IPL to Boxwood for full consideration of $12,500,000 and pursuant to Section 3.4 of the LSA, the Painting was added to the pool of loan collateral. (A true and correct copy of the transfer document and invoice from IPL to Boxwood is attached hereto as Exhibit "I").

25. The transfer of the Painting from IPL to Boxwood was overseen by Boxwood's independent board of directors who signed all the loan documentation and confirmed to Athena that Boxwood paid for the Painting and had 100% ownership and title to the Painting.

26. Athena also required the loan parties to enter into an Agreement of Subordination and Assignment to ensure that any intercompany loans from the corporate guarantor or the

individual guarantor used to service the interest payments for the loan were subordinated to the senior secured loan from Athena.

27. In addition, on the same date and pursuant to Section 3.5 of the LSA and as confirmed by Athena in writing, Schedule A to the LSA was amended to include an updated description of all loan collateral, including the Painting. (A true and correct copy of the writing confirming amendment to Schedule A of the LSA is attached hereto as Exhibit "J").

28. Athena's fully-documented financing transaction and strictly documented right to possession is also why Athena was able to direct the early return of the Painting to New York following its exhibition in Japan. There was nothing surreptitious or improper about Athena's behavior, as SIL implies, given Athena's clear rights and first priority perfected security interest in the Painting.

29. On May 28, 2018, the loan commitment was increased by $3.5 million permitting a total principal amount of up to $13.5 million.

30. On October 1, 2019, Boxwood failed to make its monthly interest payment of $102,590.00, representing thirty days of accrued interest from September 1, 2019 through September 30, 2019.

31. On October 4, 2019, Athena notified Boxwood that it had failed to make the interest payment due on October 1, 2019, which failure Boxwood did not remedy within the thirty-day grace period, as required by the LSA, and has never been paid to date.

32. Athena served a notice of default upon all of Boxwood, IPL, and Philbrick on October 14, 2019 based on other breaches of the LSA relating to a title claim on a different artwork.

33. Pursuant to Section 8.3 of the LSA, Athena then directed the organizers of the Japanese exhibition, where the Painting was then being exhibit in Tokyo, pursuant to a proper Bailment Agreement and Japanese law security agreement, to immediately return the Painting to Athena in New York, as clearly stipulated in the Japanese documentation.

34. On October 29, 2019, after the Painting was safely back in Athena's fine art storage account, Athena was notified that SIL had brought an action in London. (A true and correct copy of the October 29, 2019 Letter from Signature Litigation LLP to Athena Art Finance Corp. is attached hereto as Exhibit "K").

35. As of October 31, 2019, Boxwood's failure to pay interest constituted a further event of default under the LSA. Athena thus chose to exercise its rights under the LSA, "declar[ing] the outstanding principal of the Loans, all interest thereon and all other Obligations to be forthwith due and payable," and subjecting the entire outstanding amount to the default interest rate and late fees as of October 31, 2019.

36. The aggregate outstanding amount of the loan is increasing by over $150,000 per month.

37. Under Section 8.2 of the LSA, in the event of a default, Athena has the absolute right, unilaterally, to sell the collateral at public or private sale. As the loan is indeed in default, as demonstrated rather conclusively by a Judgment dated March 2, 2020, Athena has the right to sell the Painting.

38. Athena recently became aware of an upcoming March 23, 2021 sale through Christie's Hong Kong of another 1982 Basquiat painting entitled *Warrior*. Like *Humidity*, *Warrior* is a large Basquiat work dating from his seminal year of creation, 1982. The pre-auction estimate provided by Christies for *Warrior* stands currently at $31,000,000 - $41,000,000, and includes a third-party guarantee.

39. A true and correct copy of a February 12, 2021 article in <u>The Art Newspaper</u> by Anna Brady, entitled "*Jean-Michel Basquiat's Warrior could become the most expensive Western work of art ever sold at auction in Asia*" is attached hereto as Exhibit "L". In this article, Christian Albu, Christie's co-head of post-war and contemporary was quoted as saying with regard to the upcoming sale, "This—1981-1982—is the best period for Basquiat, undoubtedly. . . . If you look at the top ten records, nine out of ten are from 1981 to 1982. The energy of his work was at its peak. And it is a rare to have a large one like this."

40. *Warrior's* dimensions are 72 x 48 inches, while *Humidity's* dimensions are an even larger 96 x 72 inches.

41. A true and correct copy of a February 11, 2021 article in <u>ARTnews</u> by Angelica Villa, entitled "*$31 M. Basquiat Poised to Become Most Expensive Western Work Auctioned in Asia*" is attached hereto as Exhibit "M". As Mr. Albu further commented in this article with regard to the scarcity of large Basquiat paintings from this desirable period, "Each year they become rarer and rarer," he said. "Most of them now are in museums or private foundations."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: March 8, 2021

_____
Cynthia E. Sachs