EXHIBIT "C"

*Execution Copy*

## LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (as amended, amended and restated, supplemented, or otherwise modified from time to time, this "**Agreement**") made and entered into as of March 31, 2017, by and among ATHENA ART FINANCE CORP., a Delaware corporation, with offices located at 400 Park Avenue, 12th Floor, New York, New York 10022 ("**Lender**") and 18 BOXWOOD GREEN LIMITED, a limited liability company incorporated under the laws of Jersey (company number 119821) having a registered office at First Floor, 7 Esplanade, St Helier, Jersey JE2 3QA, ("**Borrower**").

### RECITALS

WHEREAS, Borrower has requested Lender to make available to Borrower a revolving USD loan facility (the "Facility") in an aggregate amount not to exceed the Commitment (as defined below), and Lender is willing to make the Facility available to Borrower on the terms and conditions set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the terms, covenants, provisions and conditions herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender, intending to be legally bound, hereby agree as follows:

1.    Definitions. All capitalized terms and not otherwise defined shall have the meanings assigned to such terms in Annex A attached hereto. Terms defined in the UCC which are not otherwise defined in this Agreement are used herein as defined in the UCC.

2.    Loan and Terms of Payment

2.1    Loan Commitment; Utilization.

2.1.1.  Subject to the terms and conditions of this Agreement, Lender agrees to make loans (each, a "Loan" and collectively, the "Loans") to Borrower from time to time during the period commencing on the Closing Date and ending on the earlier of (a) the Maturity Date and (b) the termination of the Commitment, in an aggregate principal amount that will not result in the Outstanding Amount at any time exceeding the lesser of (x) the Commitment and (y) the Borrowing Base. The Loans shall be evidenced by the Note.

2.1.2.  The obligation of Lender to make a Loan to Borrower on any date under this Agreement shall be subject to the following:

(a)    each of the conditions set forth on Annex D attached hereto are satisfied to the satisfaction of Lender in its sole discretion as of such date;

(b)    no Default or Event of Default has occurred and is continuing as of such date or would exist after giving immediate effect to such Loan;

(c)    all representations and warranties made by the Loan Parties in any Loan Document are true and correct in all material respects as of such date and immediately after giving effect to such Loan;

(d)    Lender has determined that (as of such date), immediately after giving effect to such Loan, the Outstanding Amount will not exceed the lesser of (1) the Borrowing Base and (2) the Commitment; and

(e)    Borrower has delivered (no later than 10 Business Days prior to the proposed date of such Loan) a Draw Request to Lender.

1

2.1.3.   Each proposed Loan under a Draw Request shall (i) be in an amount not less than $1,000,000 (or the Available Loan Amount as of the date of such Draw Request if the Available Loan Amount is less than $1,000,000 as of such date), (ii) have a Maturity Date on or after the One-Year Anniversary Date of such Loan (or the Final Maturity Date if the Final Maturity Date is before such One-Year Anniversary Date) and (iii) be funded by the Lender (subject to the terms and conditions hereof) on or after the date that is 10 Business Days from the date of such Draw Request.

2.1.4.   Within the foregoing limits and subject to the terms and conditions set forth herein, Borrower may borrow, prepay and reborrow Loans.

2.2      Loan Mechanics; Interest; Prepayments; Reserve Account; Etc.  Certain provisions relating to, among other things, borrowing and other loan mechanics, prepayments, and the reserve account are set forth in Annex C attached hereto.

2.3      Qualified Art Appraisals.

2.3.1.   On or about the last day of each Facility Year, Lender may request, or obtain or cause to be obtained, or conduct or cause to be conducted, a Qualified Art Appraisal of the Artwork Collateral Pieces (or any one or combination of them).  Borrower shall bear the costs and expenses of any Qualified Art Appraisal conducted in accordance with this Section 2.3.1.  Promptly after Lender's receipt of any Qualified Art Appraisal conducted in accordance with this Section 2.3.1, Lender shall deliver to Borrower a written notice, substantially in the form attached hereto as Exhibit B, showing, as of the date of such Qualified Art Appraisal, calculations of the Borrowing Base, and attaching thereto supporting information in connection therewith.

2.3.2.   At any time, Lender may request, or obtain or cause to be obtained, or conduct or cause to be conducted, additional Qualified Art Appraisals of the Artwork Collateral Pieces (or any combination of them).  Lender shall bear the costs and expenses of any Qualified Art Appraisal conducted in accordance with this Section 2.3.2, provided, that if any Qualified Art Appraisal is conducted at any time that an Event of Default has occurred and is continuing, Borrower shall bear the costs and expenses of all such Qualified Art Appraisals.

2.3.3.   In connection with any Qualified Art Appraisal conducted in accordance with Section 2.3, (i) Lender shall engage Qualified Art Appraisers directly to perform each Qualified Art Appraisal and (ii) Borrower shall indemnify each Qualified Art Appraiser pursuant to Section 9.

2.4      ACKNOWLEDGMENTS   BY   BORROWER.   BORROWER   HEREBY ACKNOWLEDGES AND AGREES THAT BORROWER HAS NOT BEEN PRESSURED, COERCED OR FORCED BY LENDER, ANY OF LENDER'S AFFILIATES, OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, MEMBERS, SHAREHOLDERS, REPRESENTATIVES, COUNSEL OR AGENTS, OR ANY OTHER PERSON, TO ENTER INTO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS OR TO OBTAIN THE LOAN EVIDENCED HEREBY.  BORROWER HEREBY ACKNOWLEDGES THAT LENDER HAS ADVISED BORROWER TO SEEK INDEPENDENT LEGAL ADVICE FROM COUNSEL OF ITS OWN SELECTION IN ORDER TO BE FULLY INFORMED OF ITS LEGAL RIGHTS AND OBLIGATIONS WITH RESPECT TO THE SUBJECT MATTER OF THE LOAN DOCUMENTS.   BORROWER HEREBY ACKNOWLEDGES AND CONFIRMS THAT (I) BORROWER HAS OBTAINED SUCH INDEPENDENT LEGAL ADVICE OR (II) BORROWER HAS CHOSEN TO NOT OBTAIN SUCH INDEPENDENT LEGAL ADVICE.  BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY DEFENSE BORROWER MAY HAVE (NOW OR IN THE FUTURE) TO THE ENFORCEMENT OF ANY OBLIGATIONS OF BORROWER UNDER ANY LOAN DOCUMENT BY REASON OF OR IN CONNECTION WITH BORROWER'S INDEPENDENT LEGAL ADVICE OR BORROWER'S FAILURE TO OBTAIN SUCH INDEPENDENT LEGAL ADVICE.   BORROWER ACKNOWLEDGES THAT LENDER'S COUNSEL IS REPRESENTING ONLY LENDER IN THIS TRANSACTION.

3.      Creation of Security Interest; Other Collateral Provisions

3.1      Grant of Security Interests.  Borrower hereby pledges, assigns and grants to Lender, a security interest in all of its right, title and interest in, to and under all property of Borrower, wherever located, and

2

whether now owned or existing or hereafter owned, acquired or arising from time to time (collectively, the "**Borrower Collateral**"), to secure the prompt and complete payment and performance of all the Obligations, including, without limitation: (a) all Artwork Collateral Pieces; (b) all negotiable and non-negotiable documents of title and invoices covering the Artwork Collateral Pieces and all Accounts (as defined in the UCC), contract rights (as defined in the UCC), Chattel Paper (as defined in the UCC), Documents (as defined in the UCC), warehouse receipts, and General Intangibles (as defined in the UCC) and other obligations of any kind, now or hereafter existing, in each case solely arising from or with respect to all or any of the Artwork Collateral Pieces; (c) all cash or non-cash Proceeds (as defined in the UCC) of any of the foregoing, including, without limitation (i) all rights under warranties and insurance contracts, covering any of the foregoing, (ii) any causes of action (including all tort claims and liquidation claims) relating to any of the foregoing, and (iii) all proceeds (including insurance proceeds) from the sale, destruction, loss or other Disposition of any of the foregoing and sums due from a third-party who has damaged or destroyed any of the foregoing or from that party's insurer, whether due in judgment, settlement, or other process; and (d) all books, data and records pertaining to the foregoing, whether in the form of a writing, photograph, microfilm or electronic media, including, but not limited to, any computer-readable memory and any computer hardware or software necessary to process such memory.

3.2     Authorization to File Financing Statements; Ratification.  Borrower authorizes Lender, counsel and other representatives, at any time and from time to time, to file or record financing statements, amendments to financing statements, and other filing or recording documents or instruments with respect to the Borrower Collateral in such form and in such offices appropriate to perfect (and to continue) the security interest of Lender under this Agreement in the Borrower Collateral and to maintain such security interest as a first priority perfected security interest in the Borrower Collateral.  Borrower hereby ratifies its authorization for Lender to file in any relevant jurisdiction any financing statements relating to the Borrower Collateral if filed prior to the Closing Date.

3.3     Continuing Security Interest.  This Agreement shall create a continuing security interest in the Borrower Collateral and shall (i) remain in full force and effect until the Discharge of Obligations, or, with respect to any Borrower Collateral, Lender's written agreement to release such Borrower Collateral, (ii) be binding upon Lender and Borrower and each of its successors and assigns and (iii) inure together with the rights and remedies of Lender hereunder, to the benefit of Lender and its successors, transferees and assigns.

3.4     Addition of Artwork Collateral Pieces.     At any time and from time to time, Borrower may add artwork(s) to the then existing pool of Borrower Collateral (each, a "**Collateral Addition**") or substitute other artwork(s) for any Artwork Collateral Piece that is subject to the Lien granted by this Agreement (each, a "**Collateral Substitution**" and each such additional or other artwork being referred to as, the "**Proposed Artwork Piece**"), provided that, any such Collateral Addition or Collateral Substitution is approved in writing by Lender in its sole discretion prior to such Collateral Addition or Collateral Substitution, as the case may be, and such approval may be conditioned upon the satisfaction of certain conditions precedent prescribed by Lender, including, without limitation: (a) Borrower shall have notified Lender of its intention to effect a Collateral Addition or Collateral Substitution at least fifteen (15) days prior to the proposed effective date of such Collateral Addition or Collateral Substitution, (b) both immediately before and after giving effect to such Collateral Addition or Collateral Substitution, no Default or Event of Default shall have occurred and be continuing, (c) before and after giving effect to such Collateral Addition or Collateral Substitution, the Outstanding Amount shall not exceed the Borrowing Base, (d) the Proposed Artwork Piece shall satisfy all Eligibility Criteria, (e) Borrower shall have provided Lender with all items set forth in Annex I (Artwork Collateral Diligence) of Annex D hereof with respect to the Proposed Artwork Piece and (f) the Proposed Artwork Piece shall have been delivered to the Approved Storage Facility in a condition fully satisfactory to the Lender.

3.5     Amendments to Schedule A.     If, in connection with any Collateral Addition or Collateral Substitution in accordance with Section 3.4, any Artwork Collateral Piece is released from the Borrower Collateral or any Proposed Artwork Piece is added to the Borrower Collateral, Schedule A shall be deemed to be automatically amended by Lender to reflect such changes and Borrower hereby approves each such unilateral amendment. All reasonable costs and expenses incurred by Lender in connection with any of the foregoing shall be the sole responsibility of Borrower.

4.  Representations and Warranties. Borrower hereby represents and warrants to Lender that:

4.1  Organization; Powers. Borrower is duly organized, registered or incorporated, as the case may be, validly existing and in good standing under the laws of the jurisdiction of its organization, registration or incorporation, as the case may be, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change, is qualified to do business, and is in good standing in, every jurisdiction where such qualification is required.

4.2  Authorization; Enforceability. The Transactions are within Borrower's organizational powers and have been duly authorized by all necessary organizational actions of Borrower, and, if required, all stockholders' or other equity holders' actions on the part of Borrower. This Agreement and each other Loan Document to which Borrower is party have been duly executed and delivered by Borrower and constitute legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, subject to applicable Debtor Relief Laws.

4.3  Borrower Collateral.

4.3.1.  No financing statement, security agreement, instrument or other document purporting to cover any interest in all or any portion of the Borrower Collateral which has not lapsed or been terminated, naming Borrower (or any Affiliate of Borrower or, to the best knowledge of Borrower, any other Person) as debtor has been filed or is of record in any jurisdiction, except (i) financing statements filed or to be filed in respect of and covering the security interests granted hereby and (ii) those set forth on Schedule 4.3.1 hereto.

4.3.2.  Borrower is the sole and absolute lawful and beneficial owner of all Borrower Collateral. The Borrower Collateral is free and clear of all Liens (other than those contemplated by clauses (i) and (ii) of Section 4.3.1).

4.3.3.  Borrower has the authority to sell and/or transfer good and marketable title to all Borrower Collateral.

4.3.4.  The Disposition of all or any part of the Borrower Collateral by Lender following an Event of Default in accordance with applicable law and the terms of this Agreement shall not require the consent of any Person and shall not constitute a breach or default under any agreement to which Borrower is a party or is bound by or to which its property is subject.

4.3.5.  (i) No Provenance Claim has been made with respect to any Artwork Collateral Piece, and (ii) no action, suit or proceeding by or before any arbitrator or Governmental Authority has been commenced or is pending regarding the authenticity of any Artwork Collateral Piece, the provenance of any Artwork Collateral Piece or Borrower's title to any Artwork Collateral Piece, (iii) no Person has raised, by any other means, any adverse allegation or question with respect to the authenticity of any Artwork Collateral Piece, the provenance of any Artwork Collateral Piece or Borrower's title to any Artwork Collateral Piece, and (iv) Borrower has no basis for concern that any adverse claim may exist with respect to the authenticity of any Artwork Collateral Piece, the provenance of any Artwork Collateral Piece or Borrower's title to any Artwork Collateral Piece.

4.3.6.  Borrower has not received any third-party claim, and to the best knowledge of Borrower there are no third-party claims, that would prevent any seller, assignee or purchaser of any Artwork Collateral Piece from receiving any payments or proceeds in respect thereof, without defense, counterclaim, setoff, right of recoupment, abatement or other claim or determination whatsoever.

4.3.7.  Borrower has not signed any legally binding agreement, contract or option to sell any Artwork Collateral Piece.

4.3.8.  If any Artwork Collateral Piece was imported to the United States, each such Artwork Collateral Piece has been permanently exported from its country of origin and/or country where it was located immediately prior to its importation into the United States ("**Country of Exportation**") in accordance with

all applicable laws of both its country of origin (if applicable), Country of Exportation and of the United States, all required declarations upon the export and import of such Artwork Collateral Piece have been properly made, and all duties and taxes on such export and import have been paid. Borrower further represents and warrants that Borrower has delivered to Lender, prior to the Closing Date, true, correct and complete copies of all documents and instruments pertaining to such export and import (including, without limitation, all import and export licenses, customs forms and bills of lading), and all other relevant information pertaining to such export and import, to demonstrate the accuracy of the representation and warranty contained in the immediately preceding sentence.

4.3.9.   Each Artwork Collateral Piece is authentic and was created by the artist indicated on Schedule A hereto, and the attribution, provenance, exhibition history and description of each Artwork Collateral Piece is as set forth in Schedule A hereto. Borrower further represents and warrants that the bill of sale (or other proof of ownership) and all documents and information with respect to each Artwork Collateral Piece delivered by Borrower to Lender on or prior to the Closing Date is authentic and accurately reflects all of the information in the foregoing sentence, to the extent applicable. To the knowledge of Borrower, the Collateral was not confiscated by any Governmental Authority at any time.

4.3.10. This Agreement creates in favor of Lender a legal, valid, continuing and enforceable security interest in the Borrower Collateral. Upon either (or both) of the delivery of possession of the Artwork Collateral Pieces to the Approved Storage Facility and/or the filing of a Uniform Commercial Code financing statement naming Borrower as debtor and Lender as Secured Party and describing the Borrower Collateral, Lender will have a fully perfected first priority security interest in each Artwork Collateral Piece (including without limitation the proceeds of such Borrower Collateral), in each case being prior and superior in right to any Lien or any other Person.

4.3.11. Each Artwork Collateral Piece shall be delivered to the Approved Storage Facility on or prior to the date that such Artwork Collateral Piece becomes Borrower Collateral under this Agreement.

4.4     No Consents.  The Transactions (a) do not and will not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other Person, except (i) such as have been obtained or made and are in full force and effect and (ii) filings and registrations necessary to perfect the Liens created hereunder; (b) do not and will not violate any applicable Requirements of Law; (c) do not and will not violate or result in a default under any indenture, agreement or other instrument binding upon Borrower or any of its assets, or give rise to a right thereunder to require any payment to be made by Borrower; (d) do not and will not result in the creation or imposition of any Lien on any asset of Borrower, except the Liens created hereunder, and (e) do not and will not violate or result in a default under any Organizational Documents.

4.5     Taxes.  Borrower has filed all United States federal and other income tax returns and all other tax returns (federal, state, local and foreign) required to be filed by Borrower and has paid all taxes shown as due on such returns, assessments and governmental charges and levies thereon, in each case due and payable by Borrower, including interest and penalties, except for taxes being contested in good faith by appropriate proceedings and for which appropriate reserves are maintained.

4.6     Litigation.  There are no actions or proceedings pending or, to the knowledge of Borrower, threatened against Borrower or any of Borrower's assets before any court, Governmental Authority or arbitrator, except as set forth in Schedule 4.6.

4.7     Solvency.  Immediately after the consummation of the Transactions, Borrower will be Solvent. None of the Transactions will, or have been made with an intent to, hinder, delay or defraud any present or future creditor of Borrower, and Borrower has received reasonably equivalent value in exchange for its respective obligations under the Loan Documents.

4.8     Accuracy of Information, Etc.  No written representation, warranty or other statement of Borrower in any Loan Document, affidavit, certificate or statement given by or on behalf of Borrower to Lender, for use in connection with the transactions contemplated by the Loan Documents, when taken as a whole, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading.

4.9     Compliance with Laws. Borrower is in compliance with all Requirements of Law binding or applicable upon Borrower or the property of Borrower.

4.10    [RESERVED].

4.11    Certain Information With Respect to Borrower.

4.11.1. Schedule 4.11.1 sets forth the following information with respect to Borrower: (i) its exact legal name of, as such name appears in its Organizational Documents; (ii) its jurisdiction of organization, incorporation or formation, as the case may be; (iii) the type of entity it is; (iv) whether it is a registered organization; (v) its organizational identification number, if any, if it registered organizations; (vi) the addresses where its registered office and place of businesses is located; (vii) its mailing address; and (viii) the addresses where all books and records relating to any Borrower Collateral is located. Except as set forth on Schedule 4.11.1, Borrower (i) has not changed its name, jurisdiction of organization, registered office or sole place of business or its corporate or organizational structure in any way (e.g., by merger, consolidation, change in corporate form or otherwise) or (ii) has not done business under any other name, in each case, within the past five (5) years immediately prior to the date of this Agreement.

4.11.2. Set forth on Schedule 4.11.2 is a true, correct and complete organizational structure chart of Borrower and its Affiliates and Subsidiaries, including each owner of each class of Borrower's Equity Interests and the percentage ownership of each such owner.

4.12    Investment Company Status. Borrower is not an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended. Borrower is not subject to regulation under any Requirement of Law that limits its ability to incur indebtedness.

All representations and warranties contained herein or made in writing by Borrower in connection herewith shall survive the execution and delivery of this Agreement and any and all other Loan Documents or any of the Obligations and shall terminate only upon the Discharge of Obligations.

5.      Affirmative Covenants. Until the Discharge of Obligations, Borrower agrees as follows:

5.1     Additional Information. Borrower shall furnish to Lender promptly, but in any event no later than five (5) days following any request therefor, such information regarding (i) Borrower, (ii) Borrower's compliance with the terms of any Loan Document, and (iii) the Borrower Collateral, in each case as Lender may request from time to time.

5.2     Compliance with Laws; Payment of Obligations. Borrower will comply with all Requirements of Law applicable to it and its properties, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change. Borrower will comply with all its payment obligations, including, without limitation, liabilities in respect of Taxes that, if not paid, could reasonably be expected to result in a Material Adverse Change before the same shall become delinquent or in default, except where (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, and (ii) Borrower has set aside on its books (if any) adequate reserves with respect thereto. To the extent Borrower defers payment of any contested Taxes, Borrower shall (i) notify Lender in writing of the commencement of, and any material development in, the Tax determent proceedings, and (ii) post bonds or take any other steps required to prevent the Governmental Authority levying such contested Taxes from obtaining a Lien upon any of the Borrower Collateral.

5.3     Solvency. Borrower shall at all times remain Solvent.

5.4     Maintain Collateral Insurance.

5.4.1. Borrower shall, at Borrower's own expense, maintain and keep in full force and effect at all times with respect to each Artwork Collateral Piece, a stand-alone "all risk", worldwide fine art insurance policy with a worldwide geographic territory covering each Artwork Collateral Piece, including coverage against fire, damage, theft and such other risks and extended coverages (including windstorm coverage and hurricane

coverage) and containing no exclusions for mysterious disappearance, terrorism, flood or earthquake coverage; (i) issued by financially sound and reputable insurance companies acceptable to Lender and having a Best's Financial Strength Rating of "A" or higher and a Financial Size Category rating of "VII" or higher, as determined or otherwise as rated by A.M. Best Company, Inc. (and any successor thereto) (the "**Collateral Insurer**"); (ii) in form, amounts, coverages and basis satisfactory to Lender; provided, however, that, with respect to each Artwork Collateral Piece, the aggregate insurance coverage, net of any deductible amount, shall equal at all times at least 100% of the Fair Market Value, as defined by USPAP, of such Artwork Collateral Piece; (iii) require losses to be paid on an agreed value basis; (iv) name Lender as an additional insured and loss payee thereunder, via an endorsement to such insurance policy in form acceptable to Lender, with Lender's rights not to be affected by any act or neglect of Borrower; (v) provide that Lender be copied on all correspondence with the Collateral Insurer and insurance brokers, and cause the Collateral Insurer and insurance broker, to be so notified; and (vi) provide that at least thirty (30) days' prior written notice of cancellation, expiration, nonrenewal or substantial modification, and the opportunity to cure any failure by Borrower to pay premiums for such Collateral Insurance Policy, as defined below, shall be given to Lender.

5.4.2.   Borrower shall deliver, or cause to be delivered, to Lender copies of all policies required to be maintained under Section 5.4.1 (collectively, the "**Collateral Insurance Policies**"), as well as all endorsements, amendments and schedules thereto and certificates concerning the same (i) prior to the Closing Date, (ii) upon renewal or modification thereof.  Borrower shall, within (5) Business Days after request by Lender, deliver to Lender originals of all Collateral Insurance Policies with respect to any Artwork Collateral Piece as Lender may request.

5.4.3.   In the event that Borrower at any time or times shall fail to obtain or maintain any of the Collateral Insurance Policies required hereby or to pay any premium in whole or part relating thereto, Lender may in its sole discretion, without waiving or releasing any obligation or liability of Borrower hereunder or any Event of Default, obtain and maintain such Collateral Insurance Policies and pay such premiums and take any other actions with respect thereto as Lender deems necessary to maintain the Borrower Collateral.  In the event Lender pays any insurance premiums pursuant to this Section 5.4.3, Borrower shall reimburse Lender on demand for all out-of-pocket expenses of Lender in respect thereof.

5.4.4.   Borrower irrevocably makes, constitutes and appoints Lender (and all officers, employees or agents designated by Lender) as Borrower's true and lawful agent (and attorney in fact) for the purpose of making, settling and adjusting claims in respect of the Borrower Collateral, endorsing the name of Borrower on any check, draft, instrument or other item of payment for the proceeds of such Collateral Insurance Policies and for making all determinations and decisions with respect thereto.

5.5     Location of Artwork Collateral Pieces.  All Artwork Collateral Pieces shall at all times be located at the Approved Storage Facility.  Lender shall contract directly with the Approved Storage Facility Bailee.  The Approved Storage Facility Bailee shall act as Lender's agent (and not Borrower's Agent) with respect to possession of the Artwork Collateral Pieces and, after the Closing Date, shall only accept instructions from Lender with respect to the Artwork Collateral Pieces.  Borrower shall pay Lender for all storage fees and other costs and expenses for all Artwork Collateral Pieces (collectively, "**Storage Costs**").  On the first day of each calendar quarter, Borrower shall pay to Lender in advance for all storage costs for such calendar quarter.  In the event Borrower fails to timely pay any Storage Costs, Lender may (but shall not be obligated to) pay such Storage Costs directly to the Approved Storage Facility Bailee.  In the event Lender directly pays any Storage Costs pursuant to this Section 5.5, Borrower shall reimburse Lender on demand for all out-of-pocket expenses of Lender in respect thereof.

5.6     Preservation of Collateral.  Borrower will (at Borrower's expense) defend and enforce on a timely basis Borrower's and Lender's right, title and interest in and to the Borrower Collateral against any adverse claims and demands of any third-party.  Borrower shall take any and all actions necessary to (i) preserve the Borrower Collateral, (ii) defend and enforce on a timely basis, to the fullest extent permitted by applicable law, Borrower's and Lender's right, title and interest in and to the Borrower Collateral against any adverse claims and demands, (iii) defend the Lien on the Borrower Collateral granted by it to Lender and the priority thereof against any other Lien and all other claims and demands, (iv) timely pay all costs necessary to preserve, defend and enforce the Borrower Collateral, including, but not limited to, taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Lender's security interest in such Borrower Collateral.  In the event that any such

7

Borrower Collateral is attached or levied, or if any Lien is imposed on any such Borrower Collateral in favor of any Person other than Lender (a "**Third Party Claimant**"), Borrower shall pay, discharge or bond the underlying obligation or cause the release of the affected Borrower Collateral from such Lien, attachment or levy, no later than five (5) days after Borrower's obtaining knowledge of any such attachment, levy or Lien, but in any event before such Third Party Claimant has the right to defeat Borrower's right to bond, contest or redeem.

        5.7      Claims With Respect to Artwork Collateral Pieces. If at any time Lender shall become aware of a Provenance Claim with respect to any Artwork Collateral Piece (a "**Specified Collateral Event**") whether as a result of notice from Borrower or otherwise, then Borrower (i) shall, within five (5) Business Days after notice by Lender, provide such information as Lender may request regarding any Specified Collateral Event and (ii) may provide such other information as Borrower wishes to provide for Lender's consideration regarding the Specified Collateral Event. Lender shall have the right to engage one (1) or more Qualified Art Appraisers, experts and/or other examiners as it deems appropriate, in its sole discretion, to evaluate the Specified Collateral Event and the merits thereof and any potential impact on such Specified Artwork Collateral Piece's status in respect of the Eligibility Criteria and on its Artwork Collateral Value. After the occurrence of any such Specified Collateral Event, Lender shall be permitted to notify Borrower in writing that, as a result of such Specified Collateral Event, Lender (x) has determined that the Artwork Collateral Piece no longer satisfies the Eligibility Criteria or (y) has reduced the Artwork Collateral Piece Value of such Artwork Collateral Piece, whereupon the Borrowing Base shall immediately be adjusted as provided in such notice. If, as a result of the adjustment of the Artwork Collateral Piece Value of such Artwork Collateral Piece due to the Specified Collateral Event, the Borrowing Base exceeds the Outstanding Amount, Borrower shall, within ten (10) days provide additional collateral and/or repay the Loans in accordance with Section 1.4.2(b) of Annex C. Any reasonable costs and expenses incurred by Lender in connection with its examination and evaluation of any Specified Collateral Event, including any reasonable fees, costs and expenses of any Qualified Art Appraisers, attorneys, experts and other examiners, shall be borne solely by Borrower, and shall be payable by Borrower to Lender on demand.

        5.8      Notices of Material Changes. Within five (5) Business Days of any of the following events, Borrower shall furnish to Lender written notice:

        (a)      of the occurrence of any Event Default, or any event that with the passage of time, giving of notice or both, would become an Event of Default;

        (b)      of the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting Borrower or any of its properties that, if adversely determined, could be expected to result in a Material Adverse Change;

        (c)      of any damage to or impairment of any Artwork Collateral Piece (such notice to include a detailed description regarding the same and whether or not the same is covered by an insurance policy);

        (d)      of any theft, destruction or loss of any Artwork Collateral Piece (such notice to include a detailed description regarding the same and whether or not the same is covered by an insurance policy);

        (e)      that any Provenance Claim has been made by any Person with respect to any Artwork Collateral Piece; or of any filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority with respect to, or the raising or discovery by any other means of, any adverse allegation or question with respect to (i) the authenticity, attribution or provenance of any Artwork Collateral Piece or (ii) the title of Borrower or of any of its predecessors in interest in or to any Artwork Collateral Piece;

        (f)      that any Artwork Collateral Piece does not satisfy any of the Eligibility Criteria; and

        (g)      of any other development or event that could reasonably be expected to result in a Material Adverse Change.

Each notice delivered under this Section shall be accompanied by a statement of Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

5.9     Further Assurances.  Borrower will execute and deliver, or cause to be executed and delivered, to Lender such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements and other documents), which may be required by law or which Lender may, from time to time, request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure the validity, perfection and priority of the Liens created or intended to be created by this Agreement, all at the expense of Borrower.

5.10     Use of Proceeds.  Borrower shall use the proceeds of the Loans (i) for general corporate purposes, (ii) to pay fees and expenses in connection with the Transactions and (iii) as consideration for the purchase, from the Corporate Guarantor, of the Artwork Collateral Pieces set forth on Schedule A on the Closing Date, to refinance the Existing Corporate Guarantor Credit Agreement.  Borrower shall not use the proceeds of the Loans directly or indirectly (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Requirements of Law applicable to Borrower from time to time concerning or relating to bribery or corruption or (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with (a) any Person listed in any sanctions related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, or any Person directly or indirectly owned 25% or more, by any such Persons, (b) any Person operating, organized or resident in a country or territory that is, or whose government is, the subject or target of any sanctions or (c) an agency or instrumentality of, or an entity owned or controlled by, the government of a country, territory that is or whose government is, the subject or target of any sanctions.

5.11     Access/Inspection Rights.  Borrower will permit any representatives and/or agents designated by Lender, upon reasonable prior notice, to (i) visit and inspect its properties, to examine and make extracts from its books and records, and to discuss the quality, quantity, value, condition and status of, or any other matters relating to, the Borrower Collateral, in each case with Borrower and its employees, (if applicable) officers, and independent accountants, and (ii) conduct audits and inspections of the Borrower Collateral, in each case, at such reasonable times and as often as requested, at the sole expense of Borrower.

5.12     Financial Reporting.

5.12.1. Annual Financial Reporting.        Borrower shall furnish to Lender, as soon as available and, in any event, within 120 days after the close of each fiscal year, annual financial statements for the Borrower, including, without limitation, a balance sheet of the Borrower as of the close of such fiscal year and statements of income, expenses, retained earnings, and cash flows for the year then ended together with all supporting schedules.

5.12.2. Quarterly Financial Reporting.        Borrower shall furnish to Lender, as soon as available and, in any event, within sixty (60) days after the end of each calendar quarter, quarterly financial statements for the Borrower, including, without limitation, a balance sheet of the Borrower as of the close of such calendar quarter and statements of income, expenses, retained earnings, and cash flows for the calendar quarter then ended together with all supporting schedules.

6.     Negative Covenants.  In addition to the other undertakings in this Agreement, until the Discharge of Obligations, Borrower hereby covenants to Lender that, without obtaining prior written consent of Lender, which consent shall be in Lender's sole and absolute discretion:

6.1     Liens.  Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of its assets, whether now owned or hereafter acquired (other than Liens in favor of the Lender under the Loan Documents).

6.2     Disposition of Collateral by Borrower.  Borrower shall not sell any Artwork Collateral Piece unless: (a) Borrower provides at least fifteen (15) days prior written notice to Lender of such sale, accompanied by a fully executed sale contract acceptable to Lender in its reasonable discretion; (b) the sale price (net of all third-party commissions and fees) for such Artwork Collateral Piece shall be at least equal to the Artwork Collateral Piece Value of such Artwork Collateral Piece at such time (or such lesser amount as agreed by Lender in writing in its sole

discretion); (c) after giving effect to such sale, the Outstanding Amount shall not exceed the Borrowing Base; and (d) Borrower repays the Obligations in accordance with Section 1.4.2(c) of Annex C. No Artwork Collateral Piece shall be released by Lender from the Approved Storage Facility until the amount due to Lender in accordance with Section 1.4.2(c) of Annex C has been paid in full.

6.3     Cleaning, Repairs, Restorations Etc. Borrower shall not cause or permit any Artwork Collateral Piece to be cleaned, repaired, restored or otherwise altered in any way, without the prior written consent of Lender (which consent shall be in Lender's sole discretion), except in the case of an emergency when the absence of immediate intervention would result in serious damage.

6.4     Legal Name, Etc. Borrower will not change its (i) legal name, (ii) the location of its registered office or principal places of business as set forth, (iii) identity or organizational structure, (iv) organizational identification number, if any, or (v) jurisdiction of organization or formation (as the case may be) (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (a) it shall have given Lender not less than 10 days' prior written notice (in the form of an officers' certificate executed by an authorized officer of Borrower), or such lesser notice period as agreed to by Lender, of its intention to do so, clearly describing such change and providing such other information in connection therewith as Lender may request; and (b) it shall have taken all action demanded by Lender to maintain the perfection and priority of the security interest of Lender in the Borrower Collateral. Borrower shall promptly provide Lender with certified Organizational Documents reflecting any of the changes described in the preceding sentence.

6.5     Fundamental Changes. Borrower shall not merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired), or liquidate, wind-up or dissolve (or suffer any liquidation, winding up or dissolution).

6.6     Nature of Business. Borrower shall not engage (to any material extent) in any business other than businesses of the type conducted by Borrower on the date hereof and businesses reasonably similar or related thereto.

6.7     Amendments to Organizational Documents. Borrower shall not amend, modify, supplement, restate, replace, waive or change, or permit the amendment, modification, supplement, restatement, replacement, waiver or change of, any provision of any of its Organizational Documents, if any such amendment, modification, supplement, restatement, replacement, waiver or change would be adverse to the interests of Lender.

6.8     Creation of Subsidiaries. Borrower will not establish, form, create or acquire any Subsidiaries.

6.9     Indebtedness. Borrower shall not create, incur, assume or suffer to exist any Indebtedness other than: (a) the Obligations, (b) any unsecured Indebtedness of Borrower incurred for the purchase of Artwork Collateral Pieces or (c) any unsecured Indebtedness of Borrower incurred for general corporate purposes or for the purpose of servicing the Obligations hereunder, provided that, any Indebtedness under clause (b) or (c) of this Section 6.9 may only be provided to Borrower by Individual Guarantor or Corporate Guarantor and only if the payment of such Indebtedness is fully and unconditionally subordinated to the Obligations pursuant to the Subordination Agreement.

6.10     Special Purpose Entity Covenants. Borrower shall not, without the prior written consent of Lender:

    (a)     engage in any business other than activities related to the acquisition, ownership, selling or otherwise transferring of artworks;

    (b)     acquire or own any material asset other than artworks and such incidental personal property as may be necessary or advisable for the ownership thereof;

10

(c)     merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, or change its legal structure;

(d)     fail to preserve its existence as a limited company duly organized, validly existing and in good standing (if applicable) under the Companies (Jersey) Law 1991, as amended;

(e)     amend, modify, terminate or fail to comply with the provisions of the Borrower's Organizational Documents;

(f)     own any Subsidiary or make any investment in or acquire the obligations or Equity Interests of any other Person;

(g)     commingle its assets with the assets of any of its shareholders, partners, members, principals, equity holders, or any other Person, or transfer any material assets to any such Person, other than a purchaser pursuant to a bona-fide sale of an Artwork Collateral Piece permitted hereunder;

(h)     incur any indebtedness except as permitted pursuant to Section 6.9 hereof;

(i)     allow any Person, other than the Individual Guarantor, to pay its debts or liabilities, or fail to pay its own (Borrower's) debts and liabilities solely from its own assets;

(j)     fail to maintain its records, books of account and bank accounts separate and apart from those of the shareholders, partners, members, equity holders and Affiliates of Borrower or any other Person, or fail to prepare and maintain its own financial statements in accordance with sound accounting principles;

(k)     enter into any contract or agreement with any shareholder, partner, member, principal, equity holder or Affiliate;

(l)     seek dissolution or winding up, in whole or in part;

(m)     fail to correct any known misunderstandings regarding the independent and separate identity of Borrower;

(n)     hold itself out to be responsible for, or pledge its assets or creditworthiness to support indebtedness of another Person, or allow any Person to hold itself out to be responsible or pledge its assets or creditworthiness for indebtedness of Borrower (except pursuant to the Loan Documents);

(o)     make any dividends, loans or advances to any third- party, including any shareholder, principal or Affiliate of Borrower, or any shareholder, partner, member, principal, equity holder or Affiliate thereof;

(p)     fail to file its own tax returns or to use separate contracts, purchase orders, stationery, invoices and checks;

(q)     fail either to hold itself out to the public as a legal entity, separate and distinct from any other Person, or to conduct its business solely in its own name in order not (i) to mislead others as to the entity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the indebtedness of any third-party (including any shareholder, partner, member, principal, equity holder or Affiliate of Borrower), except pursuant to the Loan Documents;

(r)     fail to allocate fairly and reasonably among Borrower and any third-parties any overhead for common employees, shared office space or other overhead and administrative expenses;

(s)     allow any Person to pay the salaries of Borrower's employees, if any;

11

(t)      file a voluntary petition or otherwise initiate proceedings seeking liquidation, reorganization or other relief under any Federal, state or foreign Debtor Relief Laws, for Borrower, or consent to the institution of, or fail to contest in a timely and appropriate manner, a proceeding or petition under Debtor Relief Laws against Borrower, or file a petition seeking or consenting to reorganization or similar relief of Borrower, or seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of Borrower or all or any substantial part of the properties and assets of Borrower, or make any general assignment for the benefit of creditors of Borrower, or admit in writing the inability of Borrower to pay its debts generally as they become due or declare or effect a moratorium on Borrower's debt, or take any action in furtherance of any such action;

(u)      share any common logo with or hold itself out as or be considered as a department or division of (x) any shareholder, partner, member, principal, equity holder or Affiliate of Borrower, (y) any Affiliate of a shareholder, partner, member, principal, equity holder or Affiliate of Borrower, or (z) any other Person; or allow any Person to identify Borrower as a department or division of that Person; or

(v)      conceal assets from any creditor, or enter into any transaction with the intent to hinder, delay or defraud creditors of Borrower or the creditors of any other Person.

7.      Events of Default. Each of the following events or conditions shall constitute an "**Event of Default**" (whether it shall be voluntary or involuntary or come about or be effected by any law or otherwise):

7.1      Failure to Pay. Borrower shall fail to pay any principal, interest, fee or other amount payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue un-remedied for a period of thirty (30) days from the due date thereof.

7.2      Breach of Covenants.

7.2.1.  Breach of any covenant made by Borrower in this Agreement or any Loan Document to which Borrower is a party;

7.2.2.  Breach of any covenant made by Individual Guarantor in the Individual Guaranty or any Loan Document to which Individual Guarantor is a party;

7.2.3.  Breach of any covenant made by Corporate Guarantor in the Corporate Guaranty or any Loan Document to which Corporate Guarantor is a party

7.3      Misrepresentations. Any representation, warranty or certification made by any Loan Party on or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or wavier hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, shall prove to have been false or misleading in any material respect when made or deemed made.

7.4      Occurrence of Material Adverse Change. There occurs, in the good faith judgment of Lender, a Material Adverse Change.

7.5      Bankruptcy; Insolvency.

7.5.1.  Any Loan Party is unable to, or admits in writing its inability to, pay its debts as they become due.

7.5.2.  An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (A) liquidation, reorganization or other relief in respect of any Loan Party, or the debts of any Loan Party, or of a substantial part of the assets of Borrower or Individual Guarantor, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, or (B) the appointment of a receiver,

trustee, custodian, sequestrator, conservator or similar official for any Loan Party, or for a substantial part of the assets of any Loan Party, and, in any such case, such proceeding or petition shall continue un-dismissed for thirty (30) days or an order or decree approving or ordering any of the foregoing shall be entered.

7.5.3. Any Loan Party shall (i) voluntarily commence any proceeding or file any petition seeking reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to, or acquiesce in, the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 7.5.2, (iii) apply for, consent to, or acquiesce in, the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party, or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing.

7.5.4. Any steps are taken towards the Borrower being declared "bankrupt", as defined in the Interpretation (Jersey) Law 1954.

7.6     Validity of Loan Documents. (a) Any provision of any Loan Document ceases for any reason to be valid, binding and in full force and effect, other than as expressly permitted hereunder or thereunder; (b) any Loan Party contests in any manner the validity or enforceability of any material provision of any Loan Document; (c) any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document (other than the Discharge of Obligations) or purports to revoke, terminate or rescind any provision of any Loan Document; or (d) this Agreement shall at any time after its execution and delivery for any reason cease to create a valid and perfected first priority Lien in and to the Borrower Collateral.

7.7     Death/Incapacity. Individual Guarantor (x) becomes incapacitated or incompetent, as determined by a court of competent jurisdiction or (y) dies unless, within thirty (30) days of such death or determination (as the case may be), either (i) in the case of any determination of incapacity or incompetency, a guardian is appointed by such court for Individual Guarantor and Lender has received assurance acceptable to Lender in its sole discretion that Individual Guarantor will continue to be bound by, and will continue to satisfy his obligations under the Individual Guarantee, or (ii) all liabilities, covenants and other obligations of Individual Guarantor under the Individual Guarantee are assumed by (x) in the case of death, the estate of the Individual Guarantor and/or (y) one or more Persons who are acceptable to Lender in its sole discretion, in each case with respect to the foregoing clauses (i) and (ii), pursuant to definitive documentation that is acceptable to Lender in form and substance.

7.8     Change in Control. Individual Guarantor shall fail to directly own 100% of the issued and outstanding Equity Interest in each of Borrower and Corporate Guarantor, free and clear of all Liens or other encumbrances.

8.     Remedies of Lender. If an Event of Default occurs and is continuing:

8.1     Remedies Generally. Lender may, by notice to Borrower, (a) declare the outstanding principal of the Loans, all interest thereon and all other Obligations to be forthwith due and payable, whereupon the Loans, all such interest and all other Obligations shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Borrower, (b) terminate the Commitment, whereupon the Commitment shall terminate immediately and (c) exercise and pursue such rights and remedies available under the Loan Documents, at law and/or in equity; provided, however, that, in the case of an Event of Default referred to in Section 7.5, the Commitment shall terminate automatically, the Loans, all interest thereon and all other Obligations shall be immediately due and payable, and the Default Rate shall immediately take effect with respect to all unpaid Obligations, all without notice, presentment, demand, protest or other formalities of any kind, all of which are hereby expressly waived by Borrower.

8.2     Disposition of Collateral. Lender may from time to time without notice, except as specified in this Agreement, assign or otherwise Dispose of the Borrower Collateral or any Artwork Collateral Piece in one or more parcels at public or private sale or sales (which sales may be adjourned or continued from time to time with or without notice and may take place at any of Lender's premises or elsewhere), for cash, or credit or for future delivery, and upon such other terms as are commercially reasonable. Lender may comply with any applicable state or federal

law requirements in connection with a Disposition of the Borrower Collateral or any Artwork Collateral Piece and compliance shall not be considered to adversely affect the commercial reasonableness of any sale of the Borrower Collateral or any Artwork Collateral Piece. Lender or any of its Affiliates or designees shall have the right upon any such public sale or sales and, to the extent permitted by law, to purchase for its own benefit, the whole or any part of the Borrower Collateral so sold, free of any right of equity of redemption, which equity of redemption Borrower hereby expressly releases.

        8.3    <u>Right to Take Possession</u>. Lender shall have the right to take possession of any Borrower Collateral not already in its possession.

        8.4    <u>Receiver/Custodian</u>. Lender may, if it so elects, seek the appointment of a receiver or custodian to take possession of the Borrower Collateral or any portion thereof and to enforce any of Lender's remedies, with respect to such appointment without prior notice or hearing as to such appointment.

        8.5    <u>Limitation of Lender's Duties Generally</u>. Notwithstanding anything in any of the Loan Documents to the contrary, Lender shall not be required to (i) make any demand upon, or pursue or exhaust any of its rights or remedies against, Borrower, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Obligations, or to pursue or exhaust any of its rights or remedies with respect to any Borrower Collateral or any direct or indirect guarantee thereof, (ii) marshal the Borrower Collateral or any guarantee of the Obligations, or to resort to the Borrower Collateral or any such guarantee in any particular order, or (iii) effect a public sale of any Borrower Collateral.

        8.6    <u>Private Sales</u>. Borrower recognizes that Lender may be unable to effect a public sale of any or all the Borrower Collateral and may be compelled to resort to one or more private sales thereof in accordance with Section 8.2. Borrower also acknowledges that any private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of such sale being private.

        8.7    <u>Limitation of Lender's Duties With Respect to Dispositions</u>. Notwithstanding anything to the contrary contained in this Agreement, in connection with any Disposition of Borrower Collateral pursuant to this Section 8: (i) Lender may in its sole discretion, but shall not be under any obligation to, engage an auction house for the purpose of selling any of the Artwork Collateral Pieces; (ii) Lender may set a commercially reasonable (in light of current market conditions) reserve or minimum bid price (whether disclosed or undisclosed) below which any referenced Artwork Collateral Piece may not be sold at such auction, and Lender may purchase any Artwork Collateral Piece at such price if no bids satisfactory to Lender for the same are received; (iii) notice of any sale of any Artwork Collateral Piece may be given by publishing during the period commencing ten (10) days prior to the date of the sale an advertisement describing such Artwork Collateral Piece (to be sold) by artist, title and medium (which advertisement need not make any reference to Lender, to any Loan Documents, or to the foreclosure or other circumstances surrounding the sale), which may be published in the New York Times or in such other publication as may be reasonably selected by the auction house, and it is agreed that such notice shall constitute adequate and reasonable notice to Borrower and the public of any such auction or other sale; and (iv) any such Artwork Collateral Piece may be pictured and described to the extent deemed desirable by the auction house in any catalogue(s) produced by it with respect to the proposed sale, provided that any license for such depiction and description required to be obtained from any Person with intellectual property rights in such Artwork Collateral Piece (other than Borrower) shall have been obtained.

        8.8    <u>Proceeds of Collateral Sale</u>. All cash proceeds received by Lender in respect of any sale, collection from, or other realization upon all Borrower Collateral or any Artwork Collateral Piece shall be applied in whole or in part by Lender against all or any part of any Obligations in such order as Lender shall elect in its sole discretion. After all Obligations are paid in full, all remaining excess cash proceeds in respect of any sale, collection from, or other realization upon any Borrower Collateral shall be refunded to Borrower.

        8.9    <u>Waivers</u>. Borrower hereby waives notice of the time and place of any public sale or the time after which any private sale or other Disposition of any part of the Borrower Collateral may be made. To the extent such notice may not be waived under applicable law any notice made shall be deemed reasonable if sent to

Borrower, addressed as set forth in Section 12.10, at least fifteen (15) days prior to (i) the date of any such public sale, or (ii) the time after which any such private sale or other Disposition may be made.  To the maximum extent permitted by applicable law, Borrower waives all claims, damages, and demands against Lender and all other Indemnified Persons arising out of the lawful repossession, retention or sale of the Borrower Collateral including any Artwork Collateral Piece, except, as to Lender or any other Indemnified Person, as applicable, such as arise solely out of the gross negligence, or willful misconduct, of Lender or such Indemnified Person, as finally determined by a court of competent jurisdiction.  To the extent it may lawfully do so, Borrower absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against Lender, any claim or demand on account of any valuation, stay, appraisal, extension, moratorium, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any Borrower Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Agreement, or otherwise.

8.10    Limitation of Lender's Duties With Respect to Collateral Maintenance.  Lender shall have no obligation to restore or otherwise prepare the Borrower Collateral for sale.  Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Borrower Collateral in its possession if such Borrower Collateral is accorded treatment substantially equivalent to that which Lender, in its own capacity, accords its own property of a similar nature and value, it being understood that Lender shall have no responsibility for taking any necessary steps to preserve rights against any Person with respect to any Borrower Collateral.  Lender shall not have any other duty as to any Borrower Collateral in its possession or control or in the possession or control of any agent or nominee of Lender, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.  To the extent that applicable law imposes duties on Lender to exercise remedies in a commercially reasonable manner, Borrower acknowledges and agrees that it is commercially reasonable for Lender: (i) to fail to incur expenses (including for the removal of Liens) deemed material relative to the value of the Borrower Collateral by Lender in its sole discretion to prepare Borrower Collateral for Disposition; or (ii) to disclaim Disposition warranties, such as title, attribution, provenance, authenticity, possession or quiet enjoyment.  Borrower acknowledges that a purpose of this Section is to provide non-exhaustive indications of the kinds of actions and omissions by Lender would be commercially reasonable in Lender's exercise of remedies against the Borrower Collateral or any Artwork Collateral Piece.

8.11    No Duty to Mitigate Damages.  Lender shall not be required to do any act whatsoever or exercise any due diligence whatsoever to mitigate any damages if any Event of Default shall occur and be continuing.

8.12    Cumulative Rights.  All rights and remedies specified herein are cumulative and are in addition to such other rights and remedies as are otherwise available to Lender.

8.13    Power of Attorney.  Effective upon the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably makes, constitutes and appoints Lender and any of its officers, agents or designees, its true and lawful attorney in fact, with full power and authority in the stead of Borrower and in the name of Borrower or otherwise to do any and all acts necessary or proper to carry out the intent of this Agreement.  The authorization contained in this Section shall not relieve Borrower of any of its obligations under this Agreement or any other Loan Document.  All acts of said attorney in fact or designee(s) in accordance with this Section are hereby ratified and approved.  The powers conferred on Lender under this Section are solely to protect Lender's interests in the Borrower Collateral and shall not impose any duty upon Lender to exercise any such powers.

8.14    Collateral Administration Fee.  If Lender liquidates the Borrower Collateral following an Event of Default, Borrower shall pay a Collateral Administration Fee in accordance with Section 1.9.3 of Annex C.

9.    Indemnification.  Borrower shall indemnify Lender and its Affiliates, and their respective directors, officers, employees, managers, members, partners, attorneys, agents (including, without limitation, all Qualified Art Appraisers, other appraisers, Conservators, authenticators, provenance researchers, third party due-diligence researchers, any third party engaged by Lender in connection with a Disposition or otherwise engaged by Lender in connection with this Agreement) (each such Person being called an "**Indemnified Person**") against, and hold each Indemnified Person harmless from, any and all losses, actions, claims, demands, suits, judgments, damages, fines, penalties, liabilities, costs, disbursements and related expenses, including the fees, charges and disbursements of any counsel for any Indemnified Person, incurred by or asserted against any Indemnified Person arising out of, in

15

connection with, or as a result of (i) the preparation, negotiation, execution, delivery, performance or administration of any Loan Document, or any other agreement, instrument or other document contemplated by any of the Loan Documents, the performance by any Loan Party of its obligations thereunder, or the consummation of the Transactions or any other transactions contemplated hereby or thereby, (ii) the enforcement of any Loan Document, or any other agreement, instrument or other document contemplated by any of the Loan Documents, (iii) the Loans or the use of the proceeds therefrom, or (iv) any actual or prospective suit, claim, litigation, dispute, inquiry, investigation or proceeding, or the preparation of any defense thereto, arising out of or relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnified Person is a party thereto; provided, that, such indemnity and hold harmless agreement shall not, as to any Indemnified Person, be available to the extent that any such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnified Person. To the fullest extent permitted by applicable law, Borrower hereby agrees not to assert, and hereby unconditionally and irrevocably waives, any claim against any Indemnified Person, on any theory of liability, for special, exemplary, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, the Loans or the use of proceeds thereof. This Section shall survive the termination of this Agreement.

10.     Taxes. Borrower shall pay to Lender the amount of all taxes assessed upon Lender with respect to any amount payable by Borrower to Lender under any Loan Document (other than income or franchise taxes). In the event that any Taxes are imposed with respect to or deducted from the payment of any amounts required payable under this Agreement, Borrower shall increase and add to the amount payable under this Agreement in amounts necessary so that the net amount actually received by Lender after the imposition or deduction of Taxes will equal the amount that would have been received by Lender had such Taxes not been imposed or deducted.

11.     Confidentiality and Publicity.

        11.1    Confidentiality of Borrower Information. Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed: (a) to Lender's Affiliates and any of its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors involved in the Transactions (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to any of the Loan Documents, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) with Borrower's prior written consent and, (g) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or participant in, or sub-participant of any such participant, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Borrower or its obligations hereunder, or (h) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section, or (B) becomes available to Lender on a non-confidential basis from a source other than a Loan Party. As used herein, "**Information**" means the Loan Documents and all information received from Borrower relating to any Loan Party, other than any such information that is available to Lender on a non-confidential basis prior to disclosure by the applicable Loan Party. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. In no event shall Lender or any other Person that holds Information be obligated to return or destroy such Information.

        11.2    Confidentiality of Loan Documents. Borrower agrees to maintain the confidentiality of the existence of the Loan Documents and the terms and other subject matter thereof, except such information may be disclosed (a) to Borrower's advisors and agents, including accountants and legal counsel, involved in the Transaction in connection with the Loans and the Transactions (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential), (b) to the extent requested by any Governmental Authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process and (d) with the prior written consent of Lender.

11.3    Publicity. Borrower and Lender agree not to (orally or in writing) publicly disclose or issue any press release or make any other public statement, or otherwise communicate with the media, concerning the existence of the Loan Documents or the subject matter hereof or thereof, without the prior written approval of each party hereto, except to the extent that Lender or Borrower (based upon the reasonable advice of its counsel) is required by applicable law to make any public disclosure or filing with respect to the Loan Documents or the subject matter hereof or thereof.

12.    Miscellaneous.

12.1    No Waiver. No failure or delay on the part of Lender in exercising any right or remedy hereunder, and no course of dealing between Borrower and Lender shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy hereunder. The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which Lender would otherwise have. No notice to or demand on Borrower hereunder shall entitle Borrower to any other or further notice or demand in any similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand.

12.2    Counterparts. This Agreement may be executed in any number of counterparts, and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

12.3    Governing Law; Waiver of Jury Trial; Jurisdiction.

12.3.1. Governing Law. This Agreement shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, without regard to conflicts of laws principles thereof (other than Section 5-1401 of the New York General Obligations Law).

12.3.2. Consent to Jurisdiction. Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against Borrower or its properties in the courts of any jurisdiction.

12.3.3. Venue. Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which Borrower may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in Section 12.3.2. Borrower hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum for the maintenance of such action or proceeding in any such court.

12.3.4. Service of Process. Borrower irrevocably consents to service of process in the manner provided for notices in Section 12.10. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

12.3.5. JURY TRIAL WAIVER. EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY DISPUTE ARISING UNDER OR IN ANY WAY RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

12.4    Captions.  The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall in no way affect the meaning or construction of any provision of this Agreement.

12.5    Severability.  If any part of any provision of this Agreement shall be invalid or unenforceable under applicable law, said part shall be ineffective to the extent of such invalidity only, without in any way affecting the remaining parts of said provision or the remaining provisions.

12.6    Resolution of Drafting Ambiguities.  Borrower acknowledges that it was represented by counsel in connection with the Loan Documents and that it and its counsel reviewed and participated in the preparation and negotiation hereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation thereof.

12.7    Modification.  Any amendment of any provision of this Agreement shall be effective only if made or given in a written agreement duly executed and delivered by Lender and Borrower. Any waiver or consent to any departure by Borrower from any provision of this Agreement shall be effective only if made or given in a written agreement duly executed and delivered by Lender and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

12.8    Survival of Representations.  All covenants contained herein or made in writing by Borrower in connection herewith shall survive the execution and delivery of this Agreement, and any and all other documents and writings relating to or arising out of any of the foregoing or any of the Obligations and shall terminate only upon the Discharge of Obligations.

12.9    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto; provided, however, that Borrower may not assign or transfer any of its rights or obligations hereunder, and any purported assignment or transfer by Borrower without such consent shall be void. Lender may, without the consent of Borrower, (a) assign or pledge all or any portion of its rights and obligations under this Agreement and the other Loan Documents (including all or a portion of the Loans, the Commitment and other Obligations and Liens) to one or more Persons, each of which shall, to the extent of the rights and obligations so assigned, shall become the "Lender" under this Agreement and the other Loan Documents and (b) sell participations in all or any portion of its rights and obligations under this Agreement and the other Loan Documents (including all or a portion of the Loans, the Commitment, the Obligations and the Liens) to one or more Persons.

12.10    Notices.  All notices, requests and other communications to any party hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified mail or registered mail, as follows: in the case of Borrower at the mailing address set forth in Schedule 4.11.1, and in the case of Lender c/o Athena Art Finance Corp., 400 Park Avenue, 12th Floor, New York, New York 10022, Attention: Cynthia Sachs, or such other address as Borrower or Lender designates in writing as its address for notices from time to time. All such notices and other communications shall be deemed to be given when received.

12.11    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Loans, together with all fees, charges and other amounts which are treated as interest on the Loans under applicable law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by Lender in accordance with applicable law, the rate of interest payable in respect of the Loans hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of the Loans but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to Lender in respect of the Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount shall have been received by Lender.

12.12    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or

with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities. The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (and, if applicable, executors, administrators, personal representatives, heirs and legatees) (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, unless expressly stated that such Articles, Sections, Exhibits and Schedules are contained in an Annex, Exhibit or Schedule attached hereto, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Words of any gender in this Agreement shall be deemed to include any other gender.

12.13   Agent for Service of Process.      Borrower shall at all times maintain an agent for service of process. Such agent shall be Brebners (130 Shaftesbury Ave., London, UK W1D 5AR; 020.7734.2244; london@brebners.com) and any claim form, judgment or other notice of legal process shall be sufficiently served on the Borrower if delivered to such agent at its address for the time being. The Borrower irrevocably undertakes not to revoke such appointment without notifying Lender of the appointment of a replacement agent for service. It shall be effective service for Lender to serve the process upon the last known address in the U.S. of the last known agent for the Borrower notified to Lender notwithstanding that such process agent is no longer found at such address or has ceased to act. If, for any reason, Lender requests the Borrower to revoke the appointment, the Borrower shall promptly appoint another such agent with an address in the U.S. and advise Lender. If, following such a request, the Borrower fails to appoint another agent, the Lender shall be entitled to appoint one on behalf of the Borrower at the expense of the Borrower.

12.14   Judgment Currency.      If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in U.S. Dollars into another currency, the rate of exchange used shall be that at which, in accordance with normal banking procedures, Lender could purchase U.S Dollars with such other currency on the Business Day preceding that on which final judgment is given. The obligations of Borrower in respect of any such sum due from it to Lender hereunder or under the other Loan Documents shall, notwithstanding any judgment in any currency other than U.S. Dollars (the "**Judgment Currency**"), be discharged only to the extent that on the Business Day following receipt by Lender of any sum adjudged to be so due in such Judgment Currency, Lender may in accordance with normal banking procedures purchase U.S. Dollars with such Judgment Currency. If the amount of U.S. Dollars so purchased is less than the sum originally due to Lender from Borrower in U.S. Dollars, Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify Lender or the Person to whom such obligation was owing against such loss. If the amount of U.S Dollars so purchased is greater than the sum originally due to the Lender in U.S. Dollars, Lender agrees to return the amount of any excess to Borrower (or to any other Person who may be entitled thereto under applicable Requirement of Law). For purposes of determining any rate of exchange for this Section 12.14, such amounts shall include any premium and costs payable in connection with the purchase of U.S. Dollars.

[Remainder of Page Left Intentionally Blank]

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

BORROWER:
18 BOXWOOD GREEN LIMITED

By:
Name:       JOSEPH BETTS
Title:      DIRECTOR

LENDER:
ATHENA ART FINANCE CORP.

By:
Name:
Title:

[Signature page to Loan and Security Agreement]

20

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

BORROWER:
18 BOXWOOD GREEN LIMITED

By:                        _____
Name:
Title:

LENDER:
ATHENA ART FINANCE CORP.

By:
Name:        Rebecca J. Fine
Title:        General Counsel

[Signature page to Loan and Security Agreement]

ANNEX A

DEFINITIONS

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person

"**Agreement**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Applicable LIBOR Rate**" means, for any day, the rate per annum determined by Lender by reference to the London Interbank Offered Rate administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate or a similar rate) for U.S. Dollar deposits for delivery on the date in question for a three-month term beginning on that date, *provided that*, the rate of interest will be adjusted automatically as of the first day of each calendar month (each such day, a "LIBOR Reset Date") and the rate of interest as of such LIBOR Reset Date shall be the "Applicable LIBOR Rate" until the next succeeding LIBOR Reset Date, *provided however*, if a LIBOR Reset Date is not a LIBOR Business Day, the "Applicable LIBOR Rate" for such LIBOR Reset Date will be determined as of the first LIBOR Business Day preceding such LIBOR Reset Date.

"**Applicable Margin**" means the percentage set forth in Annex B hereto under the heading "Applicable Margin."

"**Approved Storage Facility**" means the storage facility ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "**Approved Storage Facility Bailee**") ▮▮▮▮▮▮▮▮▮

"**Approved Storage Facility Bailee**" has the meaning set forth in the definition of "Approved Storage Facility."

"**Artwork Collateral Pieces**" means an artwork owned by Borrower and identified on Schedule A attached hereto (as such Schedule A may be amended, amended and restated or supplemented from time to time in accordance with the terms of this Agreement).

"**Artwork Collateral Piece Value**" means, with respect to any Artwork Collateral Piece, (i) initially, the value of such Artwork Collateral Piece determined by Lender (in its sole discretion) on the basis of the Initial Appraisals with respect to such Artwork Collateral Piece, as reflected on Schedule A, and (ii) after an adjustment of the Artwork Collateral Piece Value of such Artwork Collateral Piece pursuant to Section 1.4.2(a) of Annex C hereto, the value of such Artwork Collateral Piece determined by Lender (in its sole discretion) in accordance with Section 1.4.2(a) of Annex C hereto.

"**Artwork Collateral Value**" means the aggregate Artwork Collateral Piece Values of all Artwork Collateral Pieces that satisfy the Eligibility Criteria.

"**Available Loan Amount**" means, as of any date, an amount equal to (x) the lesser of the Borrowing Base and the Commitment minus (y) the Outstanding Amount, in each case, as of such date.

"**Borrower**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Borrower Collateral**" has the meaning set forth in Section 3.1.

"**Borrowing Base**" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Jersey are authorized or required by law to remain closed.

"**Charges**" has the meaning set forth in Section 12.11.

"**Closing Date**" means the date of this Agreement.

"**Collateral Addition**" has the meaning set forth in Section 3.4.

"**Collateral Administration Fee**" has the meaning set forth in Section 1.9.3 of Annex C.

"**Collateral Disposition Costs**" has the meaning set forth in the definition of "Lender Expenses."

"**Collateral Insurance Policies**" has the meaning set forth in Section 5.4.2.

"**Collateral Insurer**" has the meaning set forth in Section 5.4.1.

"**Collateral Substitution**" has the meaning set forth in Section 3.4.

"**Commitment**" means the commitment of Lender to make Loans to Borrower up to an aggregate principal amount outstanding at any time not to exceed the amount set forth in Annex B under the heading "Commitment."

"**Commitment Fee Rate**" means the rate set forth in Annex B under the heading "Commitment Fee Rate."

"**Conservator**" means a fine art conservator approved by Lender in its sole discretion.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Corporate Guarantor**" means Inigo Philbrick, Ltd., a limited liability company registered in England and Wales (09053929).

"**Corporate Guaranty**" means the Corporate Guaranty, dated as of the date hereof, executed by the Corporate Guarantor in favor of the Lender.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States, any state thereof or any other applicable jurisdictions from time to time in effect.

"**Default**" means an event which, with the passage of time, giving of notice, or both, would become an Event of Default.

"**Default Rate**" means the rate set forth in Annex B under the heading "Default Rate."

"**Direction Letter**" means that certain Direction Letter, dated as of the date hereof, delivered by Borrower to (and acknowledged and agreed by) Lender, Corporate Guarantor and Individual Guarantor

"**Discharge of Obligations**" means (i) the indefeasible payment in full in cash in US dollars of all Obligations and (ii) the termination or expiration of the Commitment.

"**Disposition**" means any sale, lease, license, consignment, transfer, grant or declaration of a trust by any Person with respect to, or any other disposition of, any Borrower Collateral. "**Dispose**" has the meaning correlative thereto.

"**Draw Request**" means a notice substantially in the form set out in Exhibit C (Draw Request) hereto.

"**Eligibility Criteria**" means, with respect to an Artwork Collateral Piece, the following:

(i)      Lender has a first priority perfected security interest in such Artwork Collateral Piece, subject to no other Lien whether junior, senior or equal in priority to Lender's Lien;

(ii)     such Artwork Collateral Piece is not located at any place other than the Approved Storage Facility, or another location approved in writing by Lender;

(iii)    such Artwork Collateral Piece is owned, legally and beneficially, 100% by Borrower;

(iv)    such Artwork Collateral Piece is not subject to any provision prohibiting its assignment, pledge or Disposition, or requiring notice of or consent thereto by any Person;

(v)     such Artwork Collateral Piece is maintained and insured as required under this Agreement;

(vi)    such Artwork Collateral Piece is a museum quality, fine artwork and is acceptable to Lender in its sole discretion; and

(vii)   no Provenance Claim with respect to such Artwork Collateral Piece is pending.

"**Engagement Fee**" has the meaning set forth in Section 1.9.1 of Annex C.

"**Equity Interests**" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, any interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, the issuing Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"**Event of Default**" has the meaning set forth in Section 7.

"**Existing Corporate Guarantor Credit Agreement**" means that certain Loan and Security Agreement, dated as of January 20, 2017, by and between Corporate Guarantor and Lender.

"**Facility**" has the meaning set forth in the Recitals.

"**Facility Year**" means each one-year period commencing on the Closing Date and each numerically corresponding date in each subsequent calendar year, and ending, as to each such Facility Year, on the date that is one day prior to the numerically corresponding date in the subsequent calendar year.

"**Final Maturity Date**" means the date set forth in Annex B under the heading "Final Maturity Date."

"**GAAP**" means generally accepted accounting principles in the United States of America as in effect from time to time.

 "**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether federal, state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Indebtedness**" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid or accrued, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured

by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all guarantees by such Person of Indebtedness of others, (h) all capital lease obligations of such Person, (i) all swap obligations of such Person, (j) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guarantee, (k) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, and (l) all earn-out obligations. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"**Indemnified Person**" has the meaning set forth in Section 9.

"**Individual Guarantor**" means Inigo Philbrick, an individual.

"**Individual Guaranty**" means that certain Individual Guaranty, dated as of the date hereof, executed by the Individual Guarantor in favor of the Lender, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time.

"**Information**" has the meaning set forth in Section 11.1.

"**Initial Appraisals**" means, (i) with respect to each Artwork Collateral Piece constituting Borrower Collateral on the Closing Date, the Qualified Art Appraisals of such Artwork Collateral Piece conducted prior to the Closing Date and provided to Lender in connection with this Agreement and (ii) with respect to each Artwork Collateral Piece added to the Borrower Collateral after the Closing Date pursuant to Section 3.4, the Qualified Art Appraisal(s) of such Artwork Collateral Piece conducted prior to the effective date of the Collateral Addition or Collateral Substitution (as the case may be) of such Artwork Collateral Piece pursuant to Section 3.4.

"**Judgment Currency**" has the meaning set forth in Section 12.14.

"**Lender**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Lender Expenses**" means, collectively, (i) all expenses incurred by Lender, including the fees, charges and disbursements of counsel for Lender, in connection with the preparation, negotiation, execution, delivery and administration of the Loan Documents or any amendments, modifications or waivers of the provisions of any of the Loan Documents (whether or not any transactions contemplated hereby or thereby shall be consummated) or any consents required under any Loan Document, (ii) all Qualified Art Appraiser, Conservator and authenticator fees and expenses, insurance premiums, transportation expenses, taxes, filing fees, documentation fees, fees and expenses for storage of the Borrower Collateral (including Storage Costs), and (iii) all costs incurred by Lender including the fees, charges and disbursements of counsel for Lender, in connection with the enforcement, collection, or protection of its rights in connection with the Loan Documents, including its rights under Section 1.9 of Annex C, or in connection with the Loans, including all such expenses incurred during any workout, restructuring or negotiations in respect of the Loans and the Obligations, and in connection with any collection, custody, preservation or sale of any of the Borrower Collateral (the costs described in this clause (iii) shall be referred to collectively as "**Collateral Disposition Costs**").

"**LIBOR Business Day**" means a day, other than a Saturday or Sunday, on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

"**Liens**" means any claim, mortgage, deed of trust, hypothecation, assignment (as security), deposit arrangement, lien (statutory or other), levy, charge, pledge, security interest or other encumbrance of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease), in each case whether voluntarily incurred or arising by operation of law, or otherwise.

"**Loan**" has the meaning set forth in Section 2.1.1.

"**Loan Closing Date**" means, with respect to each Loan, the date upon which the Lender pays the proceeds of such Loan to Borrower pursuant and subject to the terms hereof.

HF 10678817v.5 #17926/0012

"**Loan Documents**" means, collectively, (a) this Agreement, (b) the Note, (c) the Individual Guaranty, (d) the Corporate Guaranty, (e) the Subordination Agreement, (f) the Payoff Letter, (g) the Direction Letter and (h) all other documents, instruments and certificates executed in connection with this Agreement and the foregoing documents described in clauses (b) - (g) from time to time.

"**Loan Origination Fee**" means a fee payable by Borrower to Lender on the Closing Date in the amount set forth in Annex B under the heading "Loan Origination Fee."

"**Loan Parties**" means, collectively, Borrower, Corporate Guarantor and Individual Guarantor.

"**Make Whole Prepayment Fee**" means the fee set forth in Annex B under the heading "Make Whole Prepayment Fee."

"**Material Adverse Change**" means (a) a material and adverse impairment of the ability of any Loan Party to perform any of its obligations under any of the Loan Documents to which it is a party, (b) a material impairment of the legality, validity, binding effect or enforceability against any Loan Party of any of the Loan Documents to which it is a party, (c) a material impairment of the rights of or benefits or remedies available to Lender under any of the Loan Documents, to the extent such occurrence described in this clause (c) adversely affects the ability of Lender to (x) enforce any of its rights or remedies under this Agreement with respect to the Borrower Collateral or (y) effect a sale, collection or other realization upon all or any part of the Borrower Collateral , or (d) a material adverse effect on  the Liens in favor of Lender on the Borrower Collateral or the priority of such Liens, to the extent such occurrence described in this clause (d) adversely affects the ability of Lender to (x) enforce any of its rights or remedies under this Agreement with respect to the Borrower Collateral or (y) effect a sale, collection or other realization upon all or any part of the Borrower Collateral.

"**Maturity Date**" has, with respect to each Loan, the meaning set forth in Annex B under the heading "Maturity Date."

"**Maximum Rate**" has the meaning set forth in Section 12.11.

"**Net Cash Proceeds**" means, with respect to any Sale/Loss the cash proceeds received by Borrower in respect of such Sale/Loss, minus the sum of (a) any reasonable and customary expenses or costs incurred by Borrower in connection with such sale, including sales brokerage commissions or buyer's premium (or any similar fee or commission charged by any gallery, auction house, or other Person retained by Borrower to sell any Artwork Collateral Piece), plus (b) any reasonable and customary transportation costs incurred by Borrower in connection with such sale (including, without limitation, costs incurred for packing and insurance).

"**Note**" means the Promissory Note, dated the Closing Date, made by Borrower and payable to the order of Lender, evidencing the Loans, substantially in the form attached hereto as Exhibit A.

"**Obligations**" means the obligations of each Loan Party at all times arising under or in respect of the due and punctual payment of (i) the principal of and interest (including interest accruing during the pendency of any proceeding under any Debtor Relief Laws regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any proceeding under any Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding), of each Loan Party under this Agreement and the other Loan Documents, in each case, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

"**One-Year Anniversary Date**" means, with respect to each Loan, the date that is 365 days from the Loan Closing Date of such Loan.

"**Organizational Documents**" means, with respect to any Person, (a) in the case of any  corporation, the certificate of incorporation and by-laws (or similar documents) of such Person, (b) in the case of any limited liability company, the certificate or articles of formation and operating agreement (or similar documents) of such Person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such Person,

v

(e) in the case of any trust, the settlement or trust agreement of such Person, (f) in any other case, the functional equivalent of the foregoing, and (g) any shareholder, voting trust or similar agreement between or among any holders of Equity Interests in such Person.

"**Outstanding Amount**" means, as of any date, the principal amount of the Loans outstanding on such date.

"**Payoff Letter**" means that certain Payoff Letter, dated as of the date hereof, delivered by Lender to (and acknowledged and agreed by) Corporate Guarantor and Individual Guarantor.

"**Person**" means any individual, sole proprietorship, limited or general partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, Governmental Authority or other entity.

"**Proposed Artwork Piece**" has the meaning set forth in Section 3.4.

"**Provenance Claim**" means a claim by any Person with respect to the authenticity, title, attribution or provenance of any Artwork Collateral Piece.

"**Qualified Art Appraisal**" means an appraisal of an artwork Collateral Piece performed by a fine art appraiser of national or international standing, approved by Lender in its sole and absolute discretion ("**Qualified Art Appraiser**"), following physical inspection of such Artwork Collateral Piece by such Qualified Art Appraiser, in form and substance satisfactory to Lender in its sole discretion.

"**Qualified Art Appraiser**" has the meaning set forth in the definition of "Qualified Art Appraisal."

"**Recourse Trigger Event**" means the occurrence of any of the following:

(i)     voluntary commencement by any Loan Party of a bankruptcy proceeding or the occurrence of any other event described in Section 7.5.3 hereof or any steps are taken towards the Borrower being declared "bankrupt", as defined in the Interpretation (Jersey) Law 1954;

(ii)    fraud by any Loan Party or any of its representatives, employees, advisors or agents with respect to any Loan;

(iii)   any breach by Borrower of the covenants set forth in Section 6 of this Agreement if such breach adversely affects (i) the ability of Lender to (x) enforce any of its rights or remedies under the Loan Documents with respect to the Borrower Collateral or (y) effect a sale, collection or other realization upon all or any part of the Borrower Collateral or (ii) the value or marketability of any Artwork Collateral Piece;

(iv)    an affirmative act of Borrower resulting in a sale, lease, exchange, conveyance, transfer, mortgage, assignment, Lien, adverse claim on any right, title or interest of any Borrower or Lender in and to the Collateral or any portion thereof;

(v)     any misrepresentation made by any Loan Party under any Loan Document regarding the Borrower Collateral;

(vi)    any material misrepresentation made by any Loan Party under any Loan Document if such misrepresentation adversely affects (i) the ability of Lender to (x) enforce any of its rights or remedies under the Loan Documents with respect to the Borrower Collateral or (y) effect a sale, collection or other realization upon all or any part of the Borrower Collateral or (ii) the value or marketability of any Artwork Collateral Piece;

(vii)   any Loan Party contesting the validity or enforceability of any Loan Document and/or assertion by any Loan Party of any defense which is determined by a court or other Governmental Authority to be frivolous or in bad faith, for the purpose or delaying, hindering or otherwise impairing Lender's rights and remedies under the Loan Documents;

HF 10678817v.5 #17926/0012

(viii)   any casualty damage or other event or circumstance occurs (e.g., an act of terrorism, war, nuclear disaster, or damage or loss due to repair, restoration or retouching) with respect to any Artwork Collateral Piece which is not fully covered by a Collateral Insurance Policy or as to which the Collateral Insurer disputes coverage;

(ix)    (a) any Provenance Claim is made with respect to any Artwork Collateral Piece which is determined by Lender in its sole discretion to be credible or (b) any filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority with respect to, or the raising or discovery by any other means of, any adverse allegation or question with respect to (i) the authenticity, attribution or provenance of any Artwork Collateral Piece or (ii) the title of Borrower or of any of its predecessors in interest in or to any Artwork Collateral Piece, in each case, which is determined by Lender in its sole discretion to be credible;

(x)     any forfeiture of, or material impairment of any material right under, any Artwork Collateral Piece, in each case, as a result of or in connection with conduct by any Loan Party which is (a) criminal activity, or (b) violation of the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) and other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices, related to the subject matter of the Patriot Act, including Executive Order 13224 effective September 24, 2001, or (c) a violation of the rules and regulations of the U.S. Department of Treasury's Office of Foreign Assets Control; or

(xi)    this Agreement shall at any time after its execution and delivery for any reason cease to create a valid and perfected first priority Lien in and to the Borrower Collateral or any part thereof.

"**Requirement of Law**" means, as to any Person, any treaty, law, statute, ordinance, code, rule, regulation or order or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Sale/Loss**" means (a) the sale of any Artwork Collateral Piece and (b) any loss or damage to any Artwork Collateral Piece.

"**Solvent**" means, with respect to Borrower, (i) Borrower will be able to pay its debts as they mature, (ii) the fair market value of the property of Borrower is greater than the total amount of liabilities, including contingent liabilities, of Borrower, and (iii) Borrower is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which the property of Borrower (after giving effect to the Obligations) would be insufficient to fully repay the Obligations.

"**Specified Collateral Event**" has the meaning set forth in Section 5.7.

"**Specified Lender Expenses**" means, collectively, (i) costs of Qualified Art Appraisals, (ii) costs of insurance, (iii) costs of storage (including Storage Costs), (iv) other costs and expenses related to preservation of the Borrower Collateral and Lender's first priority security interest in the Borrower Collateral, and (v) Collateral Disposition Costs. "**Storage Costs**" has the meaning set forth in Section 5.5.

"**Subordination Agreement**" means that certain Subordination Agreement, dated as of the date hereof, by and between Borrower, Lender, Individual Guarantor and Corporate Guarantor (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time).

"**Subsidiary**" means with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association, trust or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, Controlled or held by the parent or one or more subsidiaries of the parent.

"**Third Party Claimant**" has the meaning set forth in Section 5.6.

"**Transactions**" means collectively, (a) the execution, delivery and performance by each Loan Party of each Loan Document to which it is a party, (b) the borrowing of the Loans hereunder, (c) the use of the proceeds of the Loans, and (d) the pledge and grant of security interests in the Borrower Collateral under this Agreement.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"**USPAP**" means Uniform Standards of Professional Approved Practice.

viii

ANNEX B

LOAN DETAILS

| | |
|---|---|
| **Commitment:** | $10,000,000.00 |
| **Maturity Date:** | With respect to any Loan, the "Maturity Date" set forth by Borrower on the Draw Request (and approved by Lender) in respect of such Loan, *provided that*, such Maturity Date shall be a date on or after the One-Year Anniversary Date of such Loan (or the Final Maturity Date, if the Final Maturity Date is before such One-Year Anniversary Date) |
| **Final Maturity Date:** | March 31, 2020 |
| **Applicable Margin:** | 8.0% |
| **Commitment Fee Rate:** | 1.0% |
| **Loan Origination Fee:** | $50,000.00 |
| **Engagement Fee:** | $10,000.00 |
| **Default Rate:** | A rate per annum which is five (5) percentage points per annum above the interest rate that is otherwise applicable to the Loan under this Agreement |
| **Collateral Administration Fee:** | 3.0% of the gross proceeds received in either a public or private sale in respect of a liquidation of Borrower Collateral by Lender following an Event of Default. |
| **Make Whole Prepayment Fee:** | With respect to any portion of the Loan prepaid before the One-Year Anniversary Date of such Loan (the "Prepaid Amount"), an amount equal to all interest that would have otherwise accrued on the Prepaid Amount from the date of such prepayment to the One-Year Anniversary Date of such Loan, as reasonably determined by the Lender. |

ANNEX C

LOAN MECHANICS; INTEREST; PREPAYMENTS; LATE FEE; ETC.

1.      Loan and Terms of Payment

        1.1     Procedure for Borrowing.  To request a Loan, Borrower shall notify Lender of such request by submitting a Draw Request, duly executed by Borrower, not later than 10 Business Days prior to the proposed funding date of such Loan.  On each Loan Closing Date, Lender shall, by wire transfer of U.S. Dollars, pay the proceeds of the applicable Loan, net of all Lender Expenses (including, fees of Qualified Art Appraisers and Conservators, Art Loss Register searches, provenance research, due diligence research, UCC and other search fees and filing costs, and all fees and disbursements of Lender's counsel) incurred by Lender in respect of such Loan Closing Date; provided, that, on the Closing Date, the proceeds of the Loan made on the Closing Date shall also be funded net of the Loan Origination Fee.

        1.2     Promise to Pay; Repayment of Loan; Late Fee.  In addition to any other payment obligations under the Loan Documents, Borrower hereby unconditionally promises to pay to Lender the outstanding principal amount of each Loan, the accrued and unpaid interest thereon, and the accrued and unpaid Lender Expenses, as and when due and payable in accordance with this Agreement.  The aggregate principal amount of each Loan outstanding, together with any accrued and unpaid interest in respect of such Loan and Lender Expenses ascribed by Lender to such Loan, shall be payable by Borrower to Lender on the Maturity Date in respect of such Loan in full and in cash in U.S. Dollars.  To the extent not previously repaid, all unpaid Loans shall be payable in full in cash in U.S. Dollars, together with all accrued but unpaid interest, on the Final Maturity Date.  If Borrower fails to make any payment of principal or interest on any Loan within seven (7) days after the same becomes due, whether by reason of maturity, acceleration or otherwise, in addition to other rights and remedies (if any) of Lender under this Agreement and at law or in equity, Borrower shall pay Lender (upon demand with respect to each such late payment) a late fee in an amount equal to two percent (2%) of such unpaid amount.

        1.3     Evidence of Debt.  Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of Borrower to Lender resulting from the Loans, including the amounts of principal and interest payable and paid to Lender from time to time under this Agreement.  Such records of Lender shall be presumptively correct.

        1.4     Voluntary Prepayments; Mandatory Prepayments.

                1.4.1.  Voluntary Prepayments.

                (a)     Subject to the Make Whole Prepayment Fee set forth in Section 1.4.1(b) of this Annex C and the notice requirement set forth in Section 1.4.1(c) of this Annex C, Borrower may prepay the Loans, in whole or in part, at any time and from time to time.

                (b)     If Borrower prepays any Loan (in whole or in part) prior to the One-Year Anniversary Date of such Loan pursuant to Section 1.4.1(a) of this Annex C, Borrower shall pay to Lender (on the date of such prepayment) the Makewhole Prepayment Fee with respect to each such prepayment.

                (c)     Borrower shall notify Lender in writing of any voluntary prepayment no later than five (5) Business Days prior to any proposed prepayment date.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount to be prepaid.

                (d)     Each prepayment made under this Section 1.4.1 shall be (i) in an amount that is an integral multiple of $100,000 and not less than $100,000 and (ii) accompanied by accrued and unpaid interest on the amount being prepaid through the date of prepayment.

i

1.4.2.   Mandatory Prepayments.

(a)      Readjustment of Artwork Collateral Value.  Lender shall have the right to adjust the Artwork Collateral Piece Value of any Artwork Collateral Piece based upon (i) any Specified Collateral Event pursuant to Section 5.7, (ii) any Qualified Art Appraisal performed in accordance with Section 2.3.1 or (iii) any Qualified Art Appraisal performed in accordance with Section 2.3.2 at any time that (x) a material adverse art market event has occurred (as determined by Lender in its sole discretion) since the most current Qualified Art Appraisal or (y) an Event of Default has occurred and is continuing.

(b)      Mandatory Prepayment Upon Collateral Devaluation.  If, after the adjustment of the Artwork Collateral Value pursuant to Section 1.4.2(a) of this Annex C, Lender determines that the Borrowing Base is less than the Outstanding Amount, then Borrower shall, within thirty (30) days of Borrower's receipt of written notice from Lender of such shortfall, either (A) provide additional unencumbered collateral, satisfactory to Lender in its sole discretion, with sufficient value (as determined by Lender in its sole discretion) to increase the Borrowing Base to an amount equal to or greater than the Outstanding Amount, (B) repay the Outstanding Amount such that the Outstanding Amount shall not exceed the Borrowing Base or (C) any combination of the foregoing that will result in the Borrowing Base being equal to or greater than the Outstanding Amount, provided that, if such adjustment of the Artwork Collateral Value occurs pursuant to clause (ii) or (iii)(x) of Section 1.4.2(a) of this Annex C, Borrower shall not be required to effect any of the actions described in clauses (A), (B) or (C) above unless the Artwork Collateral Value has decreased by more than ten percent (10%) since the Closing Date.

(c)      Mandatory Prepayment Upon Collateral Sale/Loss.  If, in connection with any Artwork Collateral Piece, Borrower receives Net Cash Proceeds, Borrower shall (on the date it receives such Net Cash Proceeds) repay the Outstanding Amount in an amount such that the Outstanding Amount is less than the Borrowing Base, *provided that*, in connection with the sale of any Artwork Collateral Piece, Borrower shall direct the purchaser of such Artwork Collateral Piece to remit all of the gross sale proceeds in respect of such sale directly to such account of Lender as Lender shall specify, and Lender shall (x) apply a portion of such gross sale proceeds to the Obligations in the amount required under this Section 1.4.2(c) for application in accordance with Section 1.4.3 of this Annex C and (y) remit any excess amount to Borrower.  If Borrower prepays any Loan (in whole or in part) on or before the One-Year Anniversary Date of such Loan pursuant to this Section 1.4.2(c), Borrower shall pay Lender (on the date of such prepayment) the Makewhole Prepayment Fee with respect to such prepayment.

1.4.3.   Application of Voluntary Prepayments and Mandatory Prepayments.   Each prepayment or repayment in accordance with Section 1.4.1 or 1.4.2 of this Annex C shall be applied (A) first to any Lender Expenses, (B) second to any accrued and unpaid interest due on the amount prepaid, and (C) third to principal of the Loan in such manner as Lender in its sole discretion shall determine.

1.5      Interest.

1.5.1.   Interest Rate.  Each Loan shall bear interest on the outstanding principal amount thereof at a floating daily rate equal to the sum of (i) Applicable Margin plus (ii) the higher of (x) the Applicable LIBOR Rate and (y) 0.75%.

1.5.2.   Default Rate.  Notwithstanding anything herein to the contrary, immediately upon the occurrence and during the continuance of any Event of Default, at the option of Lender, the entire Outstanding Amount shall bear interest at the Default Rate.  Interest accruing under this Section 1.5.2 shall be payable on demand. Payment or acceptance of the Default Rate provided in this Section 1.5.2 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Lender.

1.5.3.   Interest Payments; Interest and Fee Computation.  Accrued interest on each Loan through the last day of the prior calendar month shall be due and payable in arrears, (i) on the first day of each calendar month (commencing on May 1, 2017), (ii) on the Maturity Date and (iii) on the date of any repayment or prepayment of the Loans.  Interest on the Loans and fees payable under this Agreement shall be computed on the basis of a 360-day year for the actual number of days elapsed.  In computing interest, (x) all payments received after 2:00 p.m. New York City time on any day shall be deemed received at the opening of business on the next Business Day, and (y) the day on which such Loan is made shall be included and the day on which all or any portion of such

ii

Loan is paid shall be excluded. When a payment is due on a day that is not a Business Day, the payment shall be due on the next Business Day. Each determination by Lender of an interest rate under the Loan Documents shall be conclusive and binding for all purposes, absent manifest error. All interest payments due with respect to the Loans under this Agreement shall be made without setoff, deduction or counterclaim before 2:00 p.m. New York City time on the date when due, in immediately available funds in U.S. Dollars.

        1.6     [RESERVED]

        1.7     [RESERVED]

        1.8     Payments Generally. Borrower shall make each payment to be made by it under this Agreement or under any other Loan Document (whether of principal, interest or fees, or otherwise) before 2:00 p.m. New York City time on the date when due, in immediately available funds in U.S. Dollars, without setoff, deduction or counterclaim.

        1.9     Lender Expenses and Fees.

        1.9.1. Lender Expenses. Borrower agrees to pay Lender all Lender Expenses. All Lender Expenses shall be payable by Borrower to Lender upon demand by Lender; provided that all Lender Expenses incurred by Lender prior to the Closing Date shall be payable by Borrower to Lender in full on the Closing Date; provided, further that, Lender hereby acknowledges that prior to the Closing Date Borrower paid to Lender an engagement fee in the amount set forth in Annex B (the "**Engagement Fee**"), and the full amount of such Engagement Fee (to the extent not used for Lender Expenses prior to the Closing Date) shall be applied by Lender to pay the Lender Expenses payable by Borrower to Lender on the Closing Date under this Section 1.9, and Borrower shall be obligated to pay any portion of the Lender Expenses not covered by application of the Engagement Fee.

        1.9.2. Loan Origination Fee. Borrower agrees to pay to Lender, on the Closing Date, the Loan Origination Fee.

        1.9.3. Collateral Administration Fee. If Lender liquidates the Borrower Collateral following an Event of Default, Borrower shall pay to Lender a Collateral administration fee in the amount set forth in Annex B (the "**Collateral Administration Fee**").

        1.9.4. Computation of Lender Expenses; Fees Fully Earned. Each determination by Lender of Lender Expenses under the Loan Documents shall be conclusive and binding for all purposes, absent manifest error. Unless otherwise expressly provided in the Loan Documents, Borrower shall not be entitled to any credit, rebate, or repayment of any fees earned or expenses incurred by Lender under the Loan Documents notwithstanding any termination of any of the Loan Documents or the suspension or termination of Lender's obligation to make the Loan hereunder.

        1.9.5. Commitment Fee.     Borrower agrees to pay to Lender a commitment fee which shall accrue at the Commitment Fee Rate on the daily undrawn portion of the Commitment during the period from and including the Closing Date to but excluding the date on which the Commitment terminates. Accrued commitment fees shall be payable in arrears on the first day of each calendar month and on the date on which the Commitment terminates, commencing on the first such date to occur after the date hereof.

ANNEX D

CONDITIONS PRECEDENT FOR LOAN

(i) Delivery of all items on the checklist following this page, and (ii) satisfaction of all other conditions indicated by such checklist, in each case (in respect of clauses (i) and (ii) above), to the satisfaction of Lender.

| Agreement / Other deliverable | Signatories |
|---|---|
| 1. Loan and Security Agreement | Lender, Borrower |
| (a) Annex A – Definitions | N/A |
| (b) Annex B - Loan Details | N/A |
| (c) Annex C - Loan Mechanics | N/A |
| (d) Annex D - Conditions Precedent | N/A |
| (e) Schedule A - Artwork Collateral | N/A |
| (f) Schedule 4.3.1 - Financing Statements | N/A |
| (g) Schedule 4.6 – Litigation | N/A |
| (h) Schedule 4.11.1 - Borrower info | N/A |
| (i) Exhibit A - Form of Promissory Note | N/A |
| (j) Exhibit B - Form of Borrowing Base Certificate Notice | N/A |
| (k) Exhibit C – Form of Draw Request | N/A |
| 2. Individual Guarantee | Individual Guarantor |
| 3. Promissory Note | Borrower |
| 4. Corporate Guaranty | Corporate Guarantor |
| 5. Subordination Agreement | Borrower, Lender, Individual Guarantor, Corporate Guarantor |
| 6. Financing Statements | N/A |
| 7. Artwork Collateral Due Diligence – Annex I | N/A |
| 8. Financial Condition Due Diligence – Annex II | N/A |
| 9. Payment of all Lender expenses | N/A |
| 10. Legal Opinions | |
| 11. Resolutions | |
| (a) Borrower | Borrower |
| 12. Payoff Letter re: Existing Corporate Guarantor Credit Agreement | Lender/Corporate Guarantor/Individual Guarantor |
| 13. Direction Letter re: Initial Draw under LSA | Borrower/Lender/Corporate Guarantor/Individual Guarantor |

iv

## ANNEX D
## ANNEX I - ARTWORK COLLATERAL DILIGENCE

| | |
|---|---|
| 1. | Professional high-resolution photograph of each proposed piece of Artwork Collateral Piece |
| 2. | All information available to Borrower or of which Borrower is aware concerning the title, attribution, authenticity, description, exhibition history and provenance of each Artwork Collateral Piece |
| 3. | Evidence satisfactory to Lender that that each Artwork Collateral Piece is owned, legally and beneficially, 100% by Borrower, including without limitation bills of sale, invoices, evidence of payment, certificates of ownership and similar documents |
| 4. | Evidence satisfactory to Lender that that each Artwork Collateral Piece is free of any existing claim, mortgage, deed of trust, hypothecation, assignment (as security), deposit arrangement, lien (statutory or other), levy, charge, pledge, security interest or other encumbrance of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease), in each case whether voluntarily incurred or arising by operation of law or otherwise |
| 5. | Art Loss Register (or its equivalent) with respect to each Artwork Collateral Piece, with results satisfactory to Lender |
| 6. | Copies of any export licenses relating to each Artwork Collateral Piece |
| 7. | Two (2) independent initial written appraisals (and valuations) of each Artwork Collateral Piece, each performed by fine art appraisers of national or international standing, approved by Lender in its sole and absolute discretion, and each following physical inspection of such Artwork Collateral Piece by such appraiser, in form and substance satisfactory to Lender in its sole discretion |
| 8. | A conservation report for each Artwork Collateral Piece from a fine art conservator approved by Lender in its sole discretion |
| 9. | Confirmation of authenticity and attribution, satisfactory to Lender in its sole discretion, including by means of a scholar's or other authenticator's written opinion, Catalogue Raisonne, exhibition history, provenance, certificate of authenticity and/or similar means with respect to each Artwork Collateral Piece |
| 10. | Copies of all artwork insurance policies with respect to each Artwork Collateral Piece. Each policy shall satisfy the criteria set forth on Schedule I attached hereto. |
| 11. | Endorsements in favor of Lender to each artwork insurance policy, as set forth on Schedule I attached hereto, including lender's loss payee and additional insure and requirement of notice to Lender of material alternations, cancellations and non-renewals of policy |
| 12. | Results of UCC, tax and judgment lien searches, bankruptcy and pending lawsuit searches or equivalent reports or searches |

HF 10678817v.5 #17926/0012

ANNEX D
ANNEX I; SCHEDULE I
ARTWORK INSURANCE REQUIREMENTS

All risk, worldwide fine art insurance with a worldwide geographic territory covering each Artwork Collateral Piece, including coverage against fire, damage, theft and such other risks and extended coverages (including windstorm coverage and hurricane coverage) and containing no exclusions for mysterious disappearance, terrorism, flood or earthquake coverage; (i) issued by financially sound and reputable insurance companies acceptable to Lender and having a Best's Financial Strength Rating of "A" or higher and a Financial Size Category rating of "VII" or higher, as determined or otherwise as rated by A.M. Best Company, Inc. (and any successor thereto) (the **"Collateral Insurer"**); (ii) in form, amounts, coverages and basis satisfactory to Lender; provided, however, that, with respect to each Artwork Collateral Piece, the aggregate insurance coverage, net of any deductible amount, shall equal at all times at least 100% of the Fair Market Value, as defined by USPAP, of such Artwork Collateral Piece; (iii) require losses to be paid on an agreed value basis; (iv) name Lender as an additional insured and loss payee thereunder, via an endorsement to such insurance policy in form acceptable to Lender, with Lender's rights not to be affected by any act or neglect of Borrower; (v) provide that Lender be copied on all correspondence with the Collateral Insurer and insurance brokers, and cause the Collateral Insurer and insurance broker, to be so notified; and (vi) provide that at least thirty (30) days' prior written notice of cancellation, expiration, nonrenewal or substantial modification, and the opportunity to cure any failure by Borrower to pay premiums for such Collateral Insurance Policy, as defined below, shall be given to Lender.

HF 10678817v.5 #17926/0012

## ANNEX D
## ANNEX II - FINANCIAL CONDITION DILIGENCE (BORROWER)

1. Certified balance sheets, statements of income and statements of cash flows as of and for the end of the most current quarter and fiscal year, setting forth in each case in comparative form figures from the previous fiscal year and quarter end, prepared by a certified public accountant, acceptable to the Lender in its sole discretion, and in accordance with consistently applied generally accepted accounting principles in the United States of America as in effect from time to time ("GAAP")

2. Applicable Organizational Documents.

3. Authorizing Resolutions.

4. All documentation and other information with required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including Title III of Publ. 107-56 (signed into law October 26, 2001))

5. Such other documents and other items as Lender may request, in form and substance satisfactory to Lender

## ANNEX D
## ANNEX II - FINANCIAL CONDITION DILIGENCE (INDIVIDUAL GUARANTOR)

1. Bank and investment account statements for the two most recent calendar month ends

2. True and accurate copies of driver's license, passport, and any alternate identification issued by the state of the U.S., or other jurisdiction in which principal residence is located

3. The front two (2) summary pages of federal tax returns for the two most recent calendar years

4. Statement of annual income for the most recently completed calendar year, on Lender's form

5. Statement of total assets, total liabilities, liquid net worth, and total net worth as of the most recent month's end prior to the Closing Date, on Lender's form

6. Paystubs for the two most recent calendar months

7. All documentation and other information with required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including Title III of Publ. 107-56 (signed into law October 26, 2001))

8. All documentation and other information with respect to Individual Guarantor required for a FICO credit score report

9. Such other documents and other items as Lender may request, in form and substance satisfactory to Lender

HF 10678817v.5 #17926/0012

## SCHEDULE A

### ARTWORK COLLATERAL PIECES

| ARTIST, TITLE OF WORK, AND DESCRIPTION | LOCATION | ARTWORK COLLATERAL PIECE VALUE (AS OF CLOSING DATE) |
|---|---|---|
| Donald Judd, *Untitled (1967)*, 5" x 69" x 8" | Approved Storage Facility | ███████ |
| Rudolf Stingel, *Untitled (1994)*, 68" x 52.75" | Approved Storage Facility | ███████ |
| Mark Bradford, *Rat Catcher of Hamelin II, (2011)*, 120" x 126" | Approved Storage Facility | ███████ |
| Rudolf Stingel, *Untitled (2015)*, 83" x 67" (each, 3 parts) | Approved Storage Facility | ███████ |
| Mark Bradford, *Untitled (2015)*, 132" x 120" | Approved Storage Facility | ███████ |

HF 10678817v.5 #17926/0012

SCHEDULE 4.3.1

FINANCING STATEMENTS

None

i

SCHEDULE 4.6

LITIGATION

None

SCHEDULE 4.11.1

CERTAIN INFORMATION WITH RESPECT TO BORROWER

| Legal Name: | 18 Boxwood Green Limited |
|---|---|
| Jurisdiction of Organization: | Jersey |
| Type of Entity: | Limited Liability Company |
| Registered organization (yes/no): | Yes |
| Organizational Identification Number, if any: | 119821 |
| Registered Office: | First Floor, 7 Esplanade, St Helier, Jersey JE2 3QA |
| Other Places of Business: | None |
| Mailing Address: | First Floor, 7 Esplanade, St Helier, Jersey JE2 3QA |
| Location Where Books and Records Relating to Borrower Collateral are Located: | First Floor, 7 Esplanade, St Helier, Jersey JE2 3QA |
| All of the foregoing information for the past 5 years: | Past address re Borrower Collateral records:<br><br>• 22 Davies Street, London W1K 3DE<br><br>• 5 Grosvenor Street, Mayfair, London, W1K 3HY |

SCHEDULE 4.11.2

ORGANIZATIONAL CHART

See attached

i

# INIGO PHILBRICK LTD/ATHENA ART FINANCE
## PRO FORMA CORPORATE STRUCTURE
### March 31, 2017



1. Existing $5.0mm January 2017 loan to be fully refinanced and Existing Collateral (including new Bradford) to be transferred to 18 Boxwood Green Ltd. ("BGL")
2. Existing $4.0mm March 2017 loan secured by Stingel/Phillips Guarantee to remain in Inigo Philbrick Ltd. ("IPL") until fully repaid
3. Existing $5.0mm IPL Loan to be refinanced via drawing under BGL's new $10.0mm Revolving Credit Facility
4. Ark Wright Holdings Ltd. (new SPV) formed in Jersey to become the borrowing vehicle for all new auction guarantee bridge loan financings
5. No cross-collateralization/cross-default between BGL and IPL/New SPV.  Cross-collateralization/cross-default between IPL and New SPV
6. Minimum net worth covenants of £5.0mm at IPL and $25.0mm at Inigo Philbrick

EXHIBIT A

FORM OF PROMISSORY NOTE

$10,000 000                                          New York, New York
                                                     Dated: March 31, 2017

FOR VALUE RECEIVED, the undersigned, 18 BOXWOOD GREEN LIMITED, a private limited liability company incorporated under the laws of Jersey having a registered office at First Floor, 7 Esplanade, St Helier, Jersey JE2 3QA ("**Borrower**"), hereby promises to pay to the order of Athena Art Finance Corp., a Delaware corporation, with offices located at 400 Park Avenue, 12th Floor, New York, New York 10022 ("**Lender**"), the principal amount of the lesser of (a) TEN MILLION and 00/100 ($10,000,000.00) and (b) the aggregate unpaid principal amount of the Loans (as defined in the Loan and Security Agreement referred to below) outstanding under the Loan and Security Agreement referred to below, which principal amount shall be due and payable in such amounts and on such dates as are set forth in the Loan and Security Agreement referred to below.

Borrower further promises to pay interest on the unpaid principal amount hereof, from the date hereof until paid in full, at the interest rate(s), and on the dates, specified in the Loan and Security Agreement.

This Promissory Note (as amended, restated, supplemented or otherwise modified from time to time, this "**Note**") is the Note referred to in the Loan and Security Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "**Loan and Security Agreement**"), by and between Borrower and Lender, and is subject to the provisions thereof and is subject to optional and mandatory prepayment in whole or in part as provided therein. Capitalized terms used in this Note which are defined in the Loan and Security Agreement shall have such defined meanings unless otherwise defined in this Note or unless the context otherwise requires.

All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in immediately available funds, in accordance with the Loan and Security Agreement.

This Note is secured as provided in the Loan and Security Agreement. Reference is hereby made to the Loan and Security Agreement for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security, the terms and conditions upon which the security interest was granted and the rights of the holder of this Note in respect thereof.

Upon the occurrence of any one or more of the Events of Default specified in the Loan and Security Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided in the Loan and Security Agreement.

All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand, protest and all other notices of any kind.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

BORROWER, AND LENDER BY ITS ACCEPTANCE OF THIS NOTE, HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY DISPUTE ARISING UNDER OR IN ANY WAY RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

IN WITNESS WHEREOF, Borrower has duly executed and delivered this Note on the date first written above.

BORROWER:

**18 BOXWOOD GREEN LIMITED**

By:_____
Name:
Title:

[Signature Page to Promissory Note]

iii

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF _____  )

        On the __ day of _____ in the year ____, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/they executed the same in his/their capacity(ies), and that by his/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

                                        _____
                                        Notary Public

**EXHIBIT B**

**FORM OF**
**BORROWING BASE NOTIFICATION**

Athena Art Finance Corp.
400 Park Avenue, 12th Floor,
New York, New York 10022

Dated _____

18 BOXWOOD GREEN LIMITED
First Floor, 7 Esplanade
St Helier, Jersey JE2 3QA
Attention: _____

Ladies and Gentlemen:

Reference is hereby made to that certain Loan and Security Agreement, dated as of March 31, 2017 (the "**Loan and Security Agreement**"), by and between Athena Art Finance Corp., a Delaware corporation ("**Lender**") and 18 BOXWOOD GREEN LIMITED, a limited liability company incorporated under the laws of Jersey (company number 119821) (the "**Borrower**"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Loan and Security Agreement.

This Borrowing Base Notice is being delivered pursuant to Section 2.3.1 of the Loan and Security Agreement, in connection with the Qualified Art Appraisal(s) dated [_____] (the "**Reporting Date**").

[List the current Artwork Collateral Piece Value of each Artwork Collateral Piece (x) as of the Closing Date and (y) as of the Reporting Date, and with respect to each Artwork Collateral Piece the difference (expressed as a percentage) between the Artwork Collateral Piece Value thereof as of the Closing Date and as of the Reporting Date]

| | |
|---|---|
| Artwork Collateral Piece Value as of the Closing Date: | $_____ |
| Artwork Collateral Piece Value as of the Reporting Date: | $_____ |
| Difference between Artwork Collateral Piece Value as of Closing Date and Reporting Date: | $_____ |
| Percentage Difference between Artwork Collateral Piece Value as of Closing Date and Reporting Date: | ____% |

The Artwork Collateral Value has decreased by more than [ten percent (10%)] since the Closing Date: [YES] [NO]

[Pursuant to Section 1.4.2(b) of Annex C of the Loan and Security Agreement, Borrower is required, within thirty (30) days of Borrower's receipt of this Borrowing Base Notice, to either (A) provide additional unencumbered collateral, satisfactory to Lender in its sole discretion, with sufficient value (as determined by Lender in its sole discretion) to increase the Artwork Collateral Piece Value such that Borrowing Base is equal to or greater than the Outstanding Amount, or (B) repay the principal amount of the Loan such that the Outstanding Amount shall not exceed the Borrowing Base, or (C) any combination of the foregoing that will result in the Borrowing Base being equal to or greater than the Outstanding Amount.]

Attached hereto is supporting information with respect to the calculations set forth above.

i

Very truly yours,

ATHENA ART FINANCE CORP.

By: _____
Name:
Title:

Acknowledged and agreed:

The undersigned hereby certifies, represents and warrants that (i) the information set forth in this Borrowing Base Certificate (including the supporting information attached hereto) is true, correct and complete in all material respects and (ii) such Borrowing Base Certificate sets forth a true, correct and complete list of all Artwork Collateral Pieces.

18 BOXWOOD GREEN LIMITED

By: _____
Name:
Title:

EXHIBIT C

FORM OF DRAW REQUEST

Date: [            ]

To:    Athena Art Finance Corp.
       400 Park Ave.
       New York, NY 10022

From:  18 BOXWOOD GREEN LIMITED

       Re: Loan and Security Agreement, dated as of March 31, 2017 (the "**Loan Agreement**"), by and among
ATHENA ART FINANCE CORP. ("**Lender**") and 18 BOXWOOD GREEN LIMITED ("**Borrower**").

1. Reference is made to the Loan Agreement.  Capitalized terms used in this Draw Request shall have the
   meaning ascribed thereto in the Loan Agreement.

2. This is a Draw Request pursuant to the Loan Agreement and Borrower hereby requests a Loan as follows:

   a. Proposed draw amount: [            ] (NOTE: this must be at least $1,000,000 or the Available
      Loan Amount as of the date hereof if the Available Loan Amount is less than $1,000,000)

   b. Maturity Date: [            ] (NOTE: this must be a Business Day on or after the One-Year
      Anniversary Date of such Loan (or the Final Maturity Date if the Final Maturity Date is before
      such One-Year Anniversary Date).

   c. Proposed funding date: [            ] (NOTE: this must be a Business Day on or after the date
      that is 10 Business Days from the date of this Draw Request.)

3. Borrower hereby confirms that each condition set forth in Section 2.1.2 of the Loan Agreement is satisfied
   on the date hereof.

4. This Draw Request is irrevocable.

18 BOXWOOD GREEN LIMITED

By:     _____
Name:
Title:

iii