UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                              :
                                         Docket #1:20-cv-04669-
 ATHENA ART FINANCE CORP.,          : GBD-VF

                    Plaintiff,      :

   - against -                      :

 THAT CERTAIN ARTWORK BY JEAN-MICHEL : New York, New York
 BASQUIAT ENTITLED HUMIDITY, 1982,    August 4, 2022
 IN REM,                            :

                    Defendant.      :

                                      <u>TELEPHONE CONFERENCE</u>
------------------------------------ :

                    PROCEEDINGS BEFORE
             THE HONORABLE VALERIE FIGUEREDO,
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:            GOODWIN PROCTER, LLP
                          BY:  CHRISTINE VANESSA SAMA, ESQ.
                               JAMES D. GATTA, ESQ.
                          620 Eighth Avenue
                          New York, New York 10018-1405

                          GOODWIN PROCTER LLP
                          BY:  JONATHAN A. SHAPIRO, ESQ.
                          Three Embarcadero Center, Suite 2800
                          San Francisco, California 94111


Transcription Service:  Carole Ludwig, *Transcription Services*
                          155 East Fourth Street #3C
                          New York, New York 10009
                          Phone:  (212) 420-0771
                          Email:  <u>Transcription420@aol.com</u>

Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service

APPEARANCES - CONTINUED:

For Plaintiff-Intervenor     GROSSMAN LLP
Satfinance Investment:       BY:  WEBSTER DEAN MCBRIDE, ESQ.
                                  JUDD B. GROSSMAN, ESQ.
                             745 Fifth Avenue, 5th Floor
                             New York, New York 10151

For Defendant Counter-       CLARICK GUERON REISBAUM LLP
claimant Delahunty:          BY:  GREGORY A. CLARICK, ESQ.
                                  ASHLEY ROZE CLAIRE HALL, ESQ.
                             220 Fifth Avenue
                             New York, New York 10001

<u>**INDEX**</u>

<u>**E X A M I N A T I O N S**</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | Re-<br><u>Direct</u> | Re-<br><u>Cross</u> |
|---|---|---|---|---|
| None | | | | |

<u>**E X H I B I T S**</u>

| Exhibit<br><u>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | Voir<br><u>Dire</u> |
|---|---|---|---|---|
| None | | | | |

THE CLERK:  This is the matter of Athena Art Finance Corp. v. that Certain Artwork By Jean-Michel Basquiat Entitled Humidity, 1982, In Rem; docket number 20-cv-4669, the Honorable Valerie Figueredo, presiding.

Counsel, please note your appearance for the record, starting with plaintiff's counsel.

MS. CHRISTINE V. SAMA:  Good morning, your Honor; Christine Sama from Goodwin Procter for Athena Art Finance Corporation.  With me are Jon Shapiro and Jim Gatta from Goodwin Procter, as well.

HONORABLE VALERIE FIGUEREDO (THE COURT):  Good morning.

MS. SAMA:  Good morning.

MR. WEBSTER D. MCBRIDE:  And good morning, your Honor.  This is Webster McBride from Grossman LLP for intervenor plaintiff, Satfinance.  And Judd Grossman is on the line, as well.

MR. GREGORY A. CLARICK:  Good morning, your Honor.  This is Gregory Clarick from Clarick Gueron Reisbaum with my colleague, Ashley Hall, on behalf of Delahunty Limited.

THE COURT:  Good morning, everyone.  This is Judge Figueredo.  The conference was scheduled to address the issues raised in the June 23rd and then follow-up

letters on June 28th and, I guess June -- both follow-up
letters are from June 28th.  So I guess, just to get the
discussion started, I know at our previous conference we
had had the issue come up as to whether Athena had, I
don't want to say preserved, but raised the deficiencies
in either Satfinance or Delahunty's productions prior to
2022, so prior to this spring, May or June.  And I think
at the time -- and feel free to correct me if I'm wrong -
- Athena counsel had represented that they had raised
these objections in the summer of 2021 and that they
would provide some indication or letter or something to
that effect indicating that they had previously raised
these objections.  So in the June 23rd letter I know
there was an Exhibit A attached, which is a letter from
June 30th of 2021, where Athena points to the -- indicate
that this was where they had previously raised these
objections to the production.

         I guess the first problem with the letter is it
does seem to only be addressed to issues in Satfinance's
production and not Delahunty.  And then the other problem
with the letter, but again tell me if I'm missing
something, is that there was a subsequent follow up
response and objection served by Satfinance on August
30th.  So I would have thought that for Athena to argue

1

2  that they had adequately raised these objections before,

3  that they would have had to have come back after that

4  August 30, 2021, responses and objections from

5  Satfinance.  And I don't think you've submitted anything

6  that indicates that after that point you then came back

7  with a response to the objections.  Am I missing

8  something?

9          MS. SAMA:  Your Honor, this is Christine Sama.

10 You're not.  The letter is addressed to Satfinance.  You

11 may have seen with respect to the June 20th letter as

12 well, they've sort of been taking the lead for both of

13 the parties at issue here.  And sort of consistent with

14 that protocol, the deficiency letter was addressed to

15 them, as well.

16         But with respect to the August 30th responses

17 and objections, you're correct; those response are in

18 response to a different set of discovery requests.  You

19 know, as was outlined in our letters, there was a long

20 period where there wasn't a lot of advancement on either

21 side, on either of these issues.  And so I sort of, you

22 know, respectfully disagree that we were expected to have

23 to have to re-raise the same issues and say that they

24 were still a concern to us again, having already done so.

25         THE COURT:  So am I -- so the August 30th dealt

with an entirely different set of requests, is that what

you're saying?

        MS. SAMA:  That's correct, your Honor.

        THE COURT:  Does either Mr. McBride or

Mr. Grossman want to respond?

        MR. MCBRIDE:  Yes, your Honor.  This is Webster

McBride from Grossman LLP for Satfinance.  And we agree

entirely with what you've said.  These objections were

from June 2021, and they have been let to lie ever since

then.  We produced a second production with additional

objections in August 2021.  These objections were not re-

raised in any subsequent correspondence with us.  They

were not referenced in Athena's status update to the

Court on February 22, 2022 -- that's docket number 101.

Athena deposed Satfinance's representatives under no

objections, no reservations of rights -- this was in

April and May of 2022.  And these objections were not

even referenced in a post-deposition letter that Athena

sent us in May 2024 -- May 24, 2022, referencing other

documents that they were seeking.  So these objections

have been let to lie for over a year now.  Athena did not

move to compel.  They did not even raise these objections

with the Court, bring them to the Court's attention until

fact discovery had closed.

THE COURT: When did fact discovery close?

MR. MCBRIDE: June 10th.

MS. SAMA: Your Honor, if I may? I just -- I'm a little surprised because this is the same chronology that we've been talking about; you know, the same lethargy between the parties that we've been talking about. There was no Rule of Civil Procedure that we're aware of that required us to raise the deficiencies again; yet, there are all these fundamental gaps in the productions of the other parties that are core to the issues in the case. They've alleged that they were in a partnership with Mr. Philbrick, who was the borrower from our client, who is now in prison. And they refused to produce communications with him about the core issues in this case. And that's something that needs to be fixed. We've fixed the deficiencies that they raised only recently, and they haven't fixed theirs.

THE COURT: I mean, I get your point that there's technically not a Rule of Civil Procedure, but there is something to be said about the fact that if you don't follow up on your objections, the other parties can presumably -- if after a year you don't raise the issue again, that they might think that maybe you've let them go or they're settled, particularly where you did go and

take depositions and continue on and never -- didn't come

back and say hey, these deficiencies are still

outstanding.  It seems -- like, I guess I understand

there was a change of counsel and maybe that's why the

objections are now being raised.

I'd like to -- Ms. Sama mentioned that the

August 30th, 2021, responses were not really -- from

Satfinance -- were to a different set of discovery

requests or responses, but I don't think I have the -- or

at least I don't have it in front of me, the August 2021

responses and objections.  Is it the case that they

really are not directly related to the June 28th --

sorry, the June 30, 2021, objections raised by Athena?

MR. MCBRIDE:  This is Webster --

THE COURT:  I guess I'm addressing this to

Mr. McBride or Mr. Grossman.

MR. MCBRIDE:  Yes.  This is Webster McBride for

Satfinance.  And, yes, so Athena served two sets of

discovery requests on us, and the objections to our

objections referred to our objections to their first

discovery requests.  August was in response to a second

set of discovery requests from Athena.

If I may, though, one -- you mentioned that the

change in counsel may have had something -- provided some

explanation for these objections being resuscitated.  We

wanted to alert the Court that something we learned just

yesterday at a deposition is that Athena's present

counsel, Goodwin, has in fact been involved in this

action since -- well, prior to their formal substitution

as counsel of record in June 2022, including advising

their clients to communicate directly with our client,

who is obviously represented by counsel, and with those

communications including potential witness tampering, all

of which is troubling on, you know, any number of levels.

And we can get into that as the Court would like.

          THE COURT:  Ms. Sama, did you want to respond?

          MS. SAMA:  If I may, my colleague, Mr. Shapiro,

is here.  He was most directly involved in that

deposition, if I could let him address that?

          THE COURT:  Sure.

          MR. JONATHAN SHAPIRO:  So good morning, Judge.

This is Jonathan Shapiro.  I guess on the responsible

partner for Yieldstreet, we've been representing Yield

Street -- and Athena's a division of that -- for, I don't

know, going back a couple of years.  But we were not

counsel in this particular case.  I think that's a flat

mischaracterization of the deposition yesterday.

          With respect to the deposition yesterday -- and

1

2   I realize that courts stick to the agenda that's stated

3   as opposed to coming attractions -- but there were a lot

4   of issues about yesterday's deposition.  We're working on

5   a motion based on that deposition.  It was a deposition

6   of the founder of Yieldstreet.  It was a deposition that

7   was required to be in person, even though we wanted it by

8   Zoom.  And it was a deposition in which the founder of

9   Yieldstreet was examined on precisely two documents, both

10  of which were explicitly on their face settlement

11  communications, neither of which had been produced

12  previously and only one of which Mr. Weiss, who's the

13  founder of Yieldstreet who was called to testify in

14  person, had ever seen or like was a party to.  So we have

15  very substantial issues about that deposition.

16          But to respond precisely and close this out,

17  unless your Honor wants to hear more, number one, there

18  was zero witness tampering.  That's just a flat-out, you

19  know, false statement.  Number two, me personally and

20  this law firm was not advising anybody with respect to

21  witness tampering or non-witness tampering with respect

22  to the like 2021 settlement communications that were the

23  subject of yesterday's deposition.  We'll have a motion

24  on that.  We wouldn't expect your Honor to want to hear

25  anything about it until those papers are filed and can be

considered sort of in the usual course under the rules.

Thank you, Judge.

THE COURT:  Okay.  Thank you.

MR. MCBRIDE:  If I may, your Honor?

THE COURT:  Yes, go ahead.

MR. MCBRIDE:  This is William Blumenschein for Satfinance.  We didn't say that they were formal counsel in this case, but we did say that they counseled their client to communicate with our client about this case. Specifically, we have communications that Mr. Weiss is on, including a text message of his one week prior to our client's deposition in this case, in which Mr. Weiss threatens to expose our client as, quote, "criminally fraudulent," end quote, at that deposition unless our client comes to the settlement negotiating table.  So we have serious concerns about coercion and witness tampering.

However, not only did Mr. Weiss fail to produce that text message, which was clearly responsive to the subpoena we served on him, but when at deposition we sought to probe those communications, counsel asserted privilege over all such communications, including those intended to be and ultimately in fact relayed to our client.  And Mr. Weiss stated repeatedly that everything

he said in his communications was, quote, "at the

direction of counsel," end quote.  So we also have ethics

considerations about counsel directing a client to

communicate directly with a party that counsel knows to

be represented and, it bears repeating, where the content

of those communications may amount to witness tampering

and where the witness testified that.  And we've just

received the transcript now, but the witness testified

that, quote, "Any intent that I had to convey to Mr.

Pesko" -- that's our client -- "about anything that had

to do with this topic was under the advice of counsel."

          So, you know, we were hopeful, and we came

before you six weeks ago, that Athena's having engaged

new counsel could get things back on the track with

discovery.  But, unfortunately, we find ourselves, you

know, potentially in a worse place than we were back

then.  And yesterday's deposition and, you know, conduct

at that deposition only exacerbated those concerns.

          I'd also like to highlight, just going back to

your marching orders from our last conference, Athena,

with new counsel, has simply and bafflingly ignored your

directive to have their in-house counsel provide an

account of how they failed over two years of litigation

to provide a single internal communication among other

glaring production deficiencies.  And Athena's production

since that conference only puts in stark relief the scale

of those deficiencies, as Athena's produced 50,000, five-

zero-thousand pages in the last six weeks, after

producing a total of 3,500 pages over the two years

prior.  Athena has very competent, very experienced in-

house counsel, and this discrepancy is not an oversight.

Something was done wrong, and we and the Court are

entitled to an explanation, as we're concerned about

possible spoliation issues, both with regard to Athena's

prior production and with regard to Mr. Weiss, who either

deleted this text message or failed to search for it --

we don't know.  But we remain concerned that we are -- we

still may not have all that we're entitled to.

THE COURT:  Okay.  Ms. Sama, were you able to

speak to your client to get an understanding as to what

happened in terms of the document collection and

production?

MR. SHAPIRO:  So, Judge, it's Jonathan Shapiro.

I had those direct conversations.  Without waiving

anything, I can represent the following facts to the

Court.  Number one, at the commencement of the

proceeding, indeed, before the commencement of the

proceeding that's before the Court, because it was

removed from state court and there was an ancillary

bridge proceeding, documents were preserved. So I don't

know where the charge of spoliation comes from. I think

it's unsubstantiated. It's certainly inconsistent with

my understanding. So point number one, like nothing went

missing. All right? Point number two is that documents

were produced by predecessor counsel, and documents were

withheld in that production. The documents that were

withheld had been preserved, and they were withheld on

the basis of objections that were provided to that

existed in draft form were approved by the client without

waiving any privileges. The result was those were never

served by predecessor counsel, and they are now

predecessor counsel. And I just need to leave it at that

because of, obviously, the sensitivity of that particular

issue.

    So, number one, everything was preserved.

Number two, everything was appropriately withheld

pursuant to objections. The problem was that the

objections were not served. That is a big problem,

right? That's why we're involved in the case now, and

that's why we've since fixed that problem. I appreciate

counsel's recognition that we produced, you know, just

under 50 pages -- under 50,000 documents to address that.

Opposing litigants have already been enormous

beneficiaries of that because of predecessor counsel's

foot fault in not serving objections as was required.

Nothing was withheld on the basis of, you know, scope,

dupli -- you know, unduly burdensome.  There's none of

that here.  That's why they have the 50,000 pages.  So

net-net everything was done appropriately other than

counsel didn't serve objections, and Athena has already

seriously paid the price for that.  And in the course of

the last, what, five, six weeks, we've (indiscernible),

we've produced the documents, a ton of documents.

There's certainly no prejudice to any other litigant

here.  If anything, there's, you know, there's been

prejudice to Athena because its counsel didn't serve the

objections, and we're just stuck with that.

          Right now we want to move on and we want to

litigate the case on the merits.  There's a number of

open items.  They all were preserved at the same time in

the same kind of lethargic way.  I can't speak to why it

was, but there was a total lack of energy on both sides

here.  I can't change that, but those issues were raised.

They were raised clearly, and here we have a circumstance

where the very basis for the challenge to this artwork by

Satfinance, the party to whom the letter was addressed,

is in agreement between Satfinance, its principal, a

gentleman by the name of Mr. Pesko, Sasha Pesko, and a

guy who is in jail named Inigo Philbrick, who is like an

international fraudster and has since been sentenced for

that.

The very basis for their claim to this painting

is as relationship between the incarcerated Mr. Philbrick

and the opposing litigant, Mr. Pesko, and Satfinance; and

we don't have full discovery of communications involving

that relationship.  They were requested; they were

complained about in the letter.  Everybody here moved

slowly at the same glacial pace -- I can't fix that.  We

own the mistake that was made.  The lawyers for Athena

did not serve objections.  We have fixed that problem,

but there is nothing that's been missing.  And just

simply because it was said, and I just have to say it,

there was no witness tampering.  There was no

nonproduction of a text message thread that Mr. Weiss,

the founder of Yieldstreet, wasn't on.  We can deal with

those issues -- apparently now there are ethical issues -

- we can deal with all of those in the usual course if

they get raised by motion.

But in terms of the issues that are before the

Court, which are the ones in the June 23rd letter, we

fixed and cleaned up our house.  Nothing went missing, no

one acted inappropriately, there's been no prejudice to

the other side.  It's a question of remedy, and we are --

we think we're entitled, Judge, to, you know, to a

production of communications, for example, between and

among the incarcerated borrower, Inigo Philbrick, and

Satfinance, Sasha Pesko, on the other side, because

that's the very basis for their claim to own a piece of

this art, some secret deal they had.

          Thank you.

          MR. MCBRIDE:  Your Honor, if I may?

          THE COURT:  Sure.  Go ahead.

          MR. MCBRIDE:  This is Webster McBride for

Satfinance.  With respect -- what Mr. Shapiro just told

you about their objections is simply false.  Athena did

eventually, over a year past its deadline to do so, serve

some objections.  There is nothing -- there is nothing in

those objections that allows Athena to withhold any, let

alone every, internal communication.  Athena produced

zero internal communications.  There is no objection in

their objections served a year-plus after their deadline

to do so that allows them to withhold internal

communications.  There's also nothing that allows them to

withhold various communications with Mr. Philbrick, the

1

2  individual Mr. Shapiro was just referencing, which they

3  failed to produce for reasons beyond us.  And, yeah, and

4  those objections are facially absurd.  For example, those

5  objections, which were served a year-plus after the

6  deadline, so we didn't have the opportunity to push back

7  on them, set a start date for production of three days

8  prior to the transaction that is at the core of this

9  case, which is laughable on its face.  But, of course, we

10 had no opportunity to meet and confer about that and to

11 reject that unilaterally-established start date for

12 producing documents.

13        So those objections are full of problems.  They

14 certainly do not provide an explanation for Athena's

15 various production deficiencies, which is why we have

16 been asking ever since Athena's predecessor counsel left

17 the case, meaning we couldn't have addressed this with

18 them any longer, which is why we have been asking for an

19 affidavit from Athena's in-house counsel who was there

20 and running the show at the time, explaining how this was

21 possible that instead of us receiving 53,000 documents

22 over the first two years of the case, we only received

23 3,000 documents.

24        THE COURT:  Okay, let me just take a step back.

25 Mr. Shapiro, you have indicated that because the

objections had been drafted but not served by predecessor

counsel, that you subsequently produced documents, and

nothing was withheld on the basis of scope or duplicity,

those types of objections.  Mr. McBride, I believe,

indicated that you haven't produced emails or

communications with Philbrick?

MR. SHAPIRO:  So the first question is correct;

we have not withheld anything on the basis -- on any

basis other than attorney-client and work-product

privilege.

THE COURT:  Okay.

MR. SHAPIRO:  Including scope or whatever.  I

mean, I can't -- because we didn't go through the

exercise, Judge, of the 50,000 pages -- it would have

been a lot less than that.  So we are not resting on

objections that were untimely.  We blew that, and we own

that.  Okay?

THE COURT:  Okay.  So you don't --

MR. SHAPIRO:  Point number --

THE COURT:  So -- I'm sorry, I don't want to --

I didn't mean to --

MR. SHAPIRO:  Oh, no, no, I --

THE COURT:  -- interrupt; I just --

MR. SHAPIRO:  -- answer your question.

1

2          THE COURT:  You've only withheld based on a

3    privilege objection?

4          MR. SHAPIRO:  Correct.

5          THE COURT:  Okay.  And --

6          MR. MCBRIDE:  And, your Honor --

7          THE COURT:  Sorry, is this Mr. McBride?

8          MR. MCBRIDE:  Yes.  Webster McBride for

9    Satfinance.  Just for your clarification, he's referring

10   to currently.  But that does not explain why all these

11   documents were withheld for the first two years of this

12   case, which is what we want an explanation for.  The fact

13   that they as of now have produced 50,000 additional

14   documents is not relevant to the question of what

15   happened in the initial document retention, collection,

16   review, production that allowed them to --

17         THE COURT:  Could I --

18         MR. MCBRIDE:  Yes.

19         THE COURT:  Sorry.  I understood him to say that

20   predecessor counsel and the company, Athena, had

21   preserved the documents, as they were required to do, was

22   contemplating objections that were drafted but counsel

23   dropped the ball and never served them.  And so that

24   would explain why so much time went by that they didn't

25   produce the documents.  Now that they've realized that

the objections would be untimely, they've since produced

everything except for privilege documents.  And they're

representing that the company appropriately had a

document-retention policy in place.

MR. MCBRIDE:  But, again, your Honor -- this is

Webster McBride for Satfinance -- the objections that

they belatedly served would not have provided any basis

for them to withhold every single internal communication.

So those objections are an insufficient explanation for

what happened during the first two years of the case.

THE COURT:  Oh, I see.  So you're saying that

initially -- I'm sorry if I'm a little slow on picking up

on this -- but they withheld all internal communications,

even ones not involving counsel for potentially

privileged.  And you're saying I guess your understanding

of it is whatever objections they belatedly served would

not have been a proper basis to withhold all those

documents?

MR. MCBRIDE:  That's absolutely correct.  And

the reason we moved for the discovery conference

initially was to get to the bottom of how it could be

that a sophisticated entity such as Athena with an in-

house department with sophisticated, experienced in-house

counsel could have allowed the case to progress for two

years up to the eve of our 30(b)(6) deposition of

Athena's representative without having produced a single

internal communication and without having at that point

served any objection or even composed an objection that

would provide any basis for withholding those documents.

THE COURT:  Okay.  But they've since -- am I

wrong that they've since produced all of those internal

communications?

MR. MCBRIDE:  They have represented that they

have, yes.

THE COURT:  Okay.  And then --

MR. MCBRIDE:  And I will do it again, your

Honor, yes.

THE COURT:  Okay.  And so you have all the

documents.  So now the only issue is like why it

happened.  But you have them now?

MR. MCBRIDE:  So Webster McBride for Satfinance.

We have all of the internal communication -- they have

represented -- in their last cover letter they

represented that they had completed production of all

internal communications.  It is not clear to us whether

they have completed production of all external

communications, as well.  And as far as we can tell, they

have not produced any documents from June through

December of 2016, which our document requests called for.

THE COURT: Okay, and just one second before we move onto that question. You said you had deposed their 30(b)(6) witness, but you did so without having had any of the communications?

MR. MCBRIDE: We did not. We had to adjourn that deposition because of these production deficiencies.

THE COURT: Okay. So you have yet to take that 30(b)(6) witness deposition?

MR. MCBRIDE: Correct. And we are -- what we are looking for is, A, an explanation of what happened during the first few years of this case so that we can then consider the appropriate remedy. And we are then looking for production of all responsive documents to our document requests to be complete, at which point we are eager to move forward with the 30(b)(6) deposition, among others.

THE COURT: Okay. So, Mr. Shapiro, what about the external communications? Can you represent that those have all been produced?

MR. SHAPIRO: Absolutely, Judge. And, in fact, there's some -- I'm a little bit confused about this question about the start date, but we produced and we sent a letter to opposing counsel, I think on June 10,

2022, in which we didn't just tell them what the start

date was, which was a start date of January 1, 2017, but

we listed all the custodians we were searching, all of

the search terms, and there were like dozens of them.

          Listen, we approached this, Judge, knowing that

there was this problem.  Like, if anything, we

overcorrected here, from our perspective.  And I'm not

looking for credit for that; I just think at some point

we just need to move on.  Okay?  The objections that were

served or not served, like that's history; we're not

relying on them.  They've gotten the benefit of not

having to litigate over objection; that's fine.  We just

want to move on with this case at some point.  And if we

have to deal with incriminations about misbehavior and so

forth, I guess we'll do that in the usual way.  But we

just want basic discovery that was sort of served and

preserved at the same time, right, of the problem here,

you know, that we've been called --

          THE COURT:  What about the -- what about the

June through December 2016 communications that he

mentioned not having anything from that period?

          MR. SHAPIRO:  So I believe there was production

of documents within that date range previously.  However,

we specifically sent a letter to opposing counsel on

June 10, 2022, in which we like identified -- there's

three columns -- I'm looking right at it -- date range of

documents we'd be producing.  January 1, 2017, through

October 11, 2019.  We list five custodians.  We list

search terms, including external email addresses.  We

didn't draw any distinction between internal or external

whatsoever, right.  We sent this to opposing counsel on

June 10, 2022, so they saw what we were doing to fix the

problem.  And this is the first I think I'm hearing about

some sort of date issue.  But we've been transparent like

in this process that the 50,000-odd additional pages were

from January 1, 2017.

          MR. MCBRIDE:  If I may, your Honor?

          THE COURT:  Sure.  Go ahead.

          MR. MCBRIDE:  Webster McBride for Satfinance.

Mr. Shapiro is correct; they sent the letter on June 10th

providing a start date of January 1st.  On June 13th I

wrote them saying, among other things, quote, "Your

proposed date range begins January 1, 2017, but it should

begin no later than June 6, 2016, this being, one, the

date on which Kenny Shachter introduced Inigo to Andre

Denasay by email; and, two, approximately one month prior

to Athena's first loan to Inigo in July 2016.  And that

was giving them the benefit of six days -- the first six

days of June, which would be responsive to our requests,

but which we, you know, agreed to waive.  But this was

brought to Mr. Shapiro and his colleague's attention

three days after he sent the letter he's referring to.

MR. SHAPIRO:  And, so, Judge, I'm looking at

Ms. Sama here across the table.  We think there was

further email on this, so I honestly don't know where we

ended up on like the second two quarters of 2016.  I

didn't even know there was an open issue with this.  But

certainly as to external communications, we didn't like

filter those out.  We did the same thing for external,

internal, Philbrick, this painting, Satfinance, Sasha,

Sasha within Pesko, Pesko within -- I mean, we've been

very transparent in how we thought about the process.

And it's resulted in an extraordinarily substantial

production for a case that's actually not all that large.

MR. MCBRIDE:  Your Honor, Webster McBride for

Satfinance.  We appreciate Mr. Shapiro's representation

that it does apply to external -- that their completed

production applies to external communications, as well.

We just raise that because their final cover letter had

specifically referenced internal communications only.

With regard to the last six months of 2016,

however, this is a key period because this is, as my

email that I just read from indicates, this is the time

when they made their first loan to Mr. Philbrick, the

fraudster, and so this is the time when they would have

done, presumably, due diligence on, or at least their

initial due diligence, on Mr. Philbrick, the individual

and his companies.  So it's important for us to have

discovery of that time period.  We requested it in our

objections and requests -- I mean, excuse me -- in our

document requests.  They failed to timely object.  They

objected 14 months later, only.  And so they should have

to produce for that entire time period.

THE COURT:  Okay.  So I guess I'd like to find a

way to make everyone as happy as possible under the

circumstances.  And I guess this question would go to

either Mr. McBride or Mr. Grossman, but Mr. Shapiro had

previously indicated that Satfinance had withheld

communications between -- or the payments received from

Philbrick, Philbrick entities, and then communications

regarding Athena or Mr. Philbrick; is that the case, or

am I getting the category wrong?

MR. MCBRIDE:  We objected -- we limited these

categories of document requests to documents concerning

the painting at issue in this action.

THE COURT:  So you did produce communications

involving Mr. Philbrick that concern the painting?

MR. MCBRIDE: Yes. For example, we produced 400

pages' worth of text messages between Mr. Pesko and

Mr. Philbrick. And, you know, I don't have the number,

but countless emails, as well.

THE COURT: And I guess --

MR. MCBRIDE: And -- and -- I mean, and, your

Honor, just as an indication of incoming -- Goodwin came

into this case. They were looking for a way to make this

a two-way street rather than a one-way street. They dug

up these prior objections raised a year earlier by

predecessor counsel, and they just parroted those

objections. The fourth objection concerning documents

concerning payments, if you look at the original

objection, it's a null set. I don't want to get too far

into the weeds here, but, you know, they ask -- they

suggest that maybe we're not producing documents

concerning a loan against the painting when we agreed to

produce all documents concerning payments concerning the

painting, which would include documents concerning the

loan against the painting. So there's no "there" there

as far as payments go. And that's the case with --

THE COURT: So the --

MR. MCBRIDE: -- many of these other categories

that they judge dredged up from objections that had been

raised a year before, many of which had already been

sorted out.

THE COURT: Well, so the -- the issue with the

payments received from Philbrick, which I think

Mr. Shapiro had indicated earlier was something they were

seeking, you're indicating that you've already turned

over all of those documents that relate to that category?

MR. MCBRIDE: Concerning the painting, correct,

absolutely. And we -- we did, we never objected; we

always produced timely.

THE COURT: Okay, so Mr. Shapiro, can we assume

that that settles that issue with regard to those

objections?

MR. SHAPIRO: If I may? You settle the issues;

I don't. From our perspective, no. And here's why,

Judge. This limited-to-the-painting piece is a bit of an

issue, and here's why. Number one, this painting had

nothing to do with Athena, for example, until April 7,

2017, which is why we started the production, you know,

January 1. The relationship with Philbrick is a

borrower. So he's a borrower, and he secures these art

loans. He ran a gallery or something, and he secures

these loans with like many paintings. The painting that

2  Satfinance and Delahunty claims to own had nothing -- you

3  know, didn't get on stage until April 7, 2017.

4           The reason we asked for the discovery of the

5  relationship between and among Pesko -- Mr. Pesko --

6  pardon me -- Satfinance and Inigo Philbrick broadly is

7  because they had a partnership agreement.  They call it

8  the Spirit of Partnership.  This was like some sort of

9  secret partnership among these two guys in Europe to own

10 a painting that they never secured in any public way.  It

11 was kind of like we privately own this painting.  The

12 painting, according to their document, was purchased from

13 a green grocer somewhere in rural Pennsylvania.  And one

14 of these gentlemen is now in prison.

15          So the reason we asked for communications

16 between and among Pesko and Inigo Philbrick is because

17 that relationship is relevant beyond this one painting.

18 We understand that they had been sort of doing stuff with

19 other paintings going back any number of years.  So

20 that's why limiting it to this painting, you know, may

21 be, as counsel has represented, a null set or maybe a

22 sheet of paper or two.  But we think that we would be

23 fairly under the rules entitled to reasonable discovery

24 of the business relationship between two people who

25 somehow privately claim to own a painting that was in

2  Athena's safe in New Jersey or hanging on a gallery wall

3  and the subject of UCC liens.  So that's why narrowing it

4  to the painting, if the Court were to narrow it to the

5  painting, maybe we're done with that item.  But we just

6  think that that is a very narrow reading of the scope in

7  dispute, Judge.

8            MR. MCBRIDE:  And, your Honor, if I may?

9            THE COURT:  Sure, sure.

10            MR. MCBRIDE:  Webster McBride for Satfinance.  I

11  didn't hear anything in Mr. Shapiro's discussion there,

12  respectfully, that would be any basis for extending

13  relevance outside of documents concerning the painting.

14  We agree with what he said.  This case involves a

15  business relationship between Mr. Pesko and Mr. Philbrick

16  with regard to this particular painting.  And we have,

17  from the outset, agreed to produce and we have produced,

18  everything concerning that painting.  And I didn't hear

19  anything explaining why further discovery is necessary in

20  this regard.

21            THE COURT:  The relationship between Mr. Pesko

22  and Philbrick dates back how long?

23            MR. MCBRIDE:  I don't --

24            THE COURT:  The business relationship?

25            MR. MCBRIDE:  -- I don't -- Webster McBride for

Satfinance -- I don't recall off the top of my head. I

can try to get that information for you, Judge, but I

don't have it at my fingertips.

THE COURT: Okay, no, that's okay. I'm just

trying to get a sense of exactly the scope of the

request, how broad it would be if we're talking about all

communications between Mr. Pesko and Philbrick.

MR. MCBRIDE: Yes, and I think the concern would

be less -- you know, the start date for production would

not change, so how far back the relationship goes

wouldn't impact that.

THE COURT: I see. But I guess -- in a sense I

was trying to figure out how unduly burdensome this type

of request could be. Like, were they exchanging many

communications? Were they in constant -- like, were they

constantly communicating? Is this just like -- were

there just -- were there a bunch of transactions that

they entered into with a bunch of different paintings?

MR. MCBRIDE: I don't have hard data at my

fingertips. There were transactions involving other

paintings. You know, I think that really it's just a

matter of fairness to our client, who went through the

production process years ago and now, through no fault of

his own, only through the fault of Athena, is -- Athena

is asking to have discovery of his documents reopened.

We'd have to go re -- re-review, assess all of this. You

know, I don't have -- I don't have hard numbers in terms

of the scope or the burden, but it would be significant

and at a time when from our client's perspective this

should have been long done.

THE COURT:  There's no mention --

MR. JUDD GROSSMAN:  Your Honor, this is Judd

Grossman for -- just to add to Mr. McBride, it would be

extremely burdensome.  They had a business relationship

which involved a number of different artworks totally

unrelated to the case.  Over that period of time they

communicated about those paintings, about other unrelated

transactions, as well as personal communications.  So not

only is it irrelevant, not only was it not called for

initially; it would be incredibly burdensome even if this

were day one.

THE COURT:   Okay.  Mr. McBride, you have

previously indicated that there were objections you have

served, that there were documents you wanted that Athena

had not produced.  And other than the internal

communications and external communications, is there any

other category that we're talking about?

MR. MCBRIDE:  Based on Mr. Shapiro's

2  representations on this call, I believe the -- what

3  remains outstanding is June through December of 2016 --

4  that would be internal and external.  But, otherwise,

5  based on Mr. Shapiro's representations, I understand

6  Athena to have completed production of both internal and

7  external communications and other documents otherwise.

8            THE COURT:  And, Mr. Shapiro, is there -- can

9  you just explain why you're looking for all payments from

10 Philbrick related to -- and maybe this -- maybe you

11 already did, but if you just want to explain it again --

12 for all acquisitions, all investments, partnerships,

13 coownership, everything besides just this particular

14 painting?

15           MR. SHAPIRO:  Absolutely, Judge.  The first

16 point is that the very request from, you know, opposing

17 litigants and counsel for documents going back to 2016 is

18 based on the notion that relationships between the

19 parties are relevant even if not tethered to the

20 painting.  And that's because Athena did not take

21 security in this painting until, you know, April 7, 2017.

22 So there ought to be some symmetry there.

23           Moving beyond that, this is super strange,

24 Judge.  Athena is a lender.  It gets reps from a borrower

25 that it owns the painting.  Athena physically has this

painting; it has it today in like some secret safe.  I

already just said the state -- right?  It has UCC liens

that are record notice that it is like the priority

lienholder and has security, both physical custody and

UCC lien custody -- if that's a term, right.  Then, out

of the blue, these other claimants, Satfinance,

Mr. Pesko, claims that he has some sort of secret

partnership.  They have a document.  They call it the,

quote, "Spirit of Partnership," close quote, in which

there's this undisclosed ownership, the secret ownership

in a Basquiat.  It's a little -- it's kind of unusual,

Judge.  It's a really strange relationship.  There's no

UCC filings.  They own a painting, but no one has the

painting.  I mean, we would suggest that we are

appropriately entitled to discovery about how these two

gentlemen in Europe sort of are doing business in 12 $20

million paintings that no one knows they own.  So that

was why we asked for discovery that was broader than this

particular painting.

Apparently, because it was just stated on the

record, they've done this before.  So we'd like discovery

of that.  No one has ever suggested that even frequent,

you know, texting or emails between two gentlemen, it's

not like -- it doesn't make this the Microsoft case.

It's not like warehouses or the electronic equivalent of

same.  So that's why we asked for it and that's why we

think it's discoverable.

          But the idea --

          THE COURT:  But is there any --

          MR. SHAPIRO:  I beg your pardon.

          THE COURT:  -- is there any indication to think

that there -- you keep mentioning the fact that they've

done this before with other paintings.  Is there any

indication to think that the transactions with the other

paintings similarly have this like -- I'm going to call

it fraud aspect, but maybe that's not the right word --

but just like something not above board?

          MR. SHAPIRO:  So, your Honor, the answer --

that's why we asked for the discovery and we have a basis

to ask for it -- I'm not going to suggest that there's

other sort of kind of quiet private dealings in artwork

that are hidden from lenders.  It may very well be -- and

I think it's a reasonable question to ask.  And bearing

in mind, Judge, they popped out of the box and are

asserting a claim in a federal court to an ownership

interest under circumstances in which one of them is a

fraud -- I'll say that.  He's been adjudicated as such.

I'm not labeling other people anything.  We get to try

the case after we do the discovery.  But it is very

unusual for people to have private sort of like contracts

and, quote, "Spirit of Partnership," close quote,

documents about really expensive art that is not in their

possession.  So we thought it was a reasonable discovery

request.  I can't prejudge what that discovery would

reveal if it were to be provided.

MR. MCBRIDE:  If I may -- if I may, Judge?

THE COURT:  Go ahead, Mr. McBride.

MR. MCBRIDE:  Webster McBride for Satfinance.

It is not at all unusual, particularly in the art world,

to have private agreements concerning multimillion-dollar

artwork.  And what distinguishes Athena's position from

ours here is that there is absolutely no -- you

mentioned, you know, fraud is not the right word -- it's

not the right word.  Nobody is alleging, there's

absolutely no shred of basis for any allegation that

anything that Satfinance did was fraudulent or in any way

wrongful.  Nothing about Satfinance's transaction

involving this painting violated anybody else's rights in

the painting.

In contrast, Athena's transaction with this

painting was in violation of Satfinance's rights and in

violation of Delahunty's rights and perhaps others we

don't even know.  But that is why it is -- that is why

Athena's due diligence as to Inigo Philbrick is very

relevant, and that is why there is no basis for any need

to be probing other transactions between Philbrick and

Inigo *[sic]*.

THE COURT:  Okay.  So on this issue I tend to

agree with Mr. McBride that I just haven't heard anything

from Mr. Shapiro that would indicate that the entire

scope of this business relationship between Pesko and

Philbrick would be relevant to the dispute involving this

one painting.

On the topic of the communications regarding

Athena and/or Philbrick, is this something that

Satfinance has already produced everything, or were some

of these communications withheld?

MR. MCBRIDE:  So -- Webster McBride for

Satfinance -- again, we produced everything involving the

painting.

THE COURT:  Oh, so this is the same issue where

you've limited it in scope to the painting?

MR. MCBRIDE:  That's right.  But, you know, as

another example of how these objections are just outdated

and not really relevant, the request for documents

involving Athena is essentially mooted by the cutoff for

2  production that both Satfinance and Athena agreed to.

3  Satfinance had never heard of Athena before

4  Mr. Philbrick's fraud came to light.  So, again, there's

5  no "there" there.

6           But, in any event, we from the outset agreed to

7  and did produce all documents concerning the painting,

8  including communications with Athena -- there are none --

9  and communications with Philbrick.

10          THE COURT:  Would there have been communications

11 with -- by Philbrick about Athena that did not concern

12 the painting?

13          MR. MCBRIDE:  Not with our client.  No, we --

14 no, we did not withhold anything concerning the painting,

15 other than on privilege grounds, whether it was from

16 Mr. Philbrick or otherwise.

17          THE COURT:  And you've turned over

18 communications with the insurers regarding the painting?

19          MR. MCBRIDE:  Another, as is provided or in the

20 agreement between Philbrick and Pesko or Satfinance,

21 Philbrick was to be responsible for insurance.  And so,

22 again, our client had no communication with insurers,

23 because that was Philbrick's responsibility.  We did

24 produce, as we said we would, documents sufficient to

25 show insurance coverage.  We produced a certificate of

insurance that we received from Philbrick.  But we had no

communications with insurers, because that was

Philbrick's responsibility.

THE COURT:  Okay.  And the undertaking posted in

the UK proceeding related to the painting, you produced

those?

MR. MCBRIDE:  There we're not entirely clear

what is being referred to.  We withheld documents on the

basis of privilege.  This is a litigation that Satfinance

was a party to.  Athena was also a party to that

litigation, so public documents related to that

litigation are within Athena's control.  That litigation

also postdated the relevant period on which the parties

have agreed to produce discovery, so, you know, yet

another null set, as far as we can tell.

THE COURT:  Okay.  So, Mr. Shapiro, other than

the communications between Pesko and Philbrick that

relate to just the overall business relationship, as

opposed to the painting, is there any other category here

that you want to raise that you think Satfinance has not

produced documents for?

MR. SHAPIRO:  Well, we -- listen, Ms. Sama and

I, we identified in the letter, you know, the Category of

A.  You certainly heard us on the relationship, and the

Court has ruled.  So sort of moving on, but, you know,

you asked about the communications with the insurers, the

UK proceedings.  If your Honor is limiting the discovery

to the painting, then it may actually all be covered.

THE COURT:  Well, I'm just looking at your

letter dated June 10, 2022, page three, where you say you

appeared -- there appeared to be additional deficiencies.

And you have several bullet points.  I was just going off

of those bullet points, which is why I asked about

communications with insurers regarding the painting,

because that's specifically what your bullet point said.

And it sounds like Mr. McBride says there's nothing there

because they didn't have communications, and they

produced what they might have had.  And then with the

undertaking, he gave his rationale there, too.  And so

I'm wondering if there's anything left from those bullet

points that are worth discussing now.

MR. SHAPIRO:  Sure.  So, for example, and, you

know, one of them was communications with members of the

press or media.  That might be nothing.  I mean, I don't

know, because they're just sort of questions without

answers.  If there's any like power of attorney or

advisory agreements, I mean, these are two gentlemen who

operated in the context of a partnership.  So typically

you'd see stuff like that.  Not to be colloquial, but

like, you know, a power of attorney or signature

authority on accounts, advisory agreements.  If they have

nothing in response to these, we're perfectly fine with

that because that would all be indicia of a legitimate

relationship.  So the absence of it, including the

absence of insurance on a -- whatever -- $20 million

painting, we're fine with that.  I just want to make sure

that we understand whether any --

        THE COURT:  I don't think he said the absence of

insurance.

        MR. SHAPIRO:  -- thing was --

        THE COURT:  I think he just said they didn't --

they weren't the ones who secured it; so that's why the

wouldn't have the communications.

        MR. SHAPIRO:  Then that's fine.  That's fine.

I'm happy with null sets; I just want to understand

whether things are being withheld or whether they don't

exist.

        THE COURT:  Okay.  So we covered the categories

of the communications with Philbrick and Athena and the

payments received for Philbrick, Philbrick entities in

relation to the investment, financing, coownership,

acquisitions and sales of artwork, those categories.

1
2  We're limiting it to just the painting, which

3  Mr. McBride, I think previously had indicated have

4  already been produced?

5          MR. MCBRIDE:  That's it, your Honor.

6          THE COURT:  Okay.  So, then that's -- I think

7  we're -- so communications with members of the press or

8  media, this would all be limited to the painting again.

9  And has that been produced?  Or nothing exists?

10         MR. MCBRIDE:  There again, Satfinance was

11 essentially a silent partner here.  I don't think there's

12 any reason he would have -- would have to be going to the

13 press about this painting.  I think it would only be

14 counterproductive.  I don't think I can make a

15 representation right now definitively, but I would be

16 surprised if anything existed.  And, again, we don't

17 think there's any basis for us to have to do that search

18 now.

19         THE COURT:  And the powers of attorney documents

20 or (indiscernible) agreements, that --

21         MR. MCBRIDE:  Yes, yes.  Yes, Webster McBride

22 for Satfinance.  That came out in deposition testimony a

23 grand total of one of those agreements exists.  It

24 predated the relevant period on which we agreed to

25 produce.  Nevertheless, we have agreed to produce it and

have now produced it.

THE COURT:  Okay.  So I guess the only open issue would be those communications with members of the press or media?

MR. MCBRIDE:  I believe that's right.

THE COURT:  And, Mr. Shapiro, why is it that you need the communications with the members of the press or the media about the painting?

MR. SHAPIRO:  Well, certainly, your Honor, what a claimant to own a piece of art says externally about their ownership of the art would be probative of the ownership of the art.  And that's very consistent with the other categories that we've listed that you've already covered, like the insurance.  They claim to own this painting, Judge.  And, like, what they're saying and doing with it, including not having it, not insuring it, not filing UCC liens, is all from our perspective for trial indicia of them not really owning it.  So that's why we asked for communications with the press and the media. I can't imagine it's too burdensome.  If they ask their client and the answer is like, "Oh, I've never communicated with the media about this or any of this," then it's over.  I just don't know the answer to the question.  We're just asking it for the discovery.

MR. MCBRIDE: And, your Honor, this is Webster McBride for Satfinance. Again, I can't imagine there's any there; but if this will resolve things, we're happy to confirm.

THE COURT: Okay. So this is what I'll say: Given the late stage at this point, I'm not going to have Satfinance conduct another search; but if you just want to confirm with your client, it seems like -- what you indicated was that this was a private agreement; he wouldn't -- I'm sorry, not "he" -- Satfinance wouldn't have communicated to the media about it. If this is just a question you could raise with them and see -- but I'm not going to say that you have to now conduct another document search and search for these communications. Does that make sense to everyone?

MR. MCBRIDE: Webster McBride for Satfinance. That sounds fine. We're happy to do that.

MR. SHAPIRO: Understand the ruling here, Judge. Thank you.

THE COURT: And then, Mr. McBride, I just want to make sure your objections have been covered. Was there any other category that you have issues with from Athena's production that you'd like to raise?

MR. MCBRIDE: So at this point I think the only

2   document concern we have is that second half of 2016.

3   However, I do just want to remind the Court that we

4   believe that the Court and we are entitled to an

5   affidavit or an affirmation, in fact, from Rebecca Fine,

6   Athena's in-house counsel at all relevant times,

7   providing an account for what went wrong in the early

8   stages of this litigation so that we can be satisfied

9   that there are no spoliation concerns that we need to be

10  looking into and so that we can come to a conclusion as

11  to what sort of remedy, if any, we should seek.

12          And we would also like an instruction to

13  Mr. Weiss to comply with the subpoena to produce

14  documents served on him several months ago where again he

15  either has deleted text messages or failed to search for

16  them.  We don't know which, but we have a copy of a text

17  message that was plainly responsive to a subpoena.  He

18  failed to produce it.  He claimed there were no

19  responsive documents.  So I want an explanation for that,

20  too, so that we can be satisfied that we are in fact

21  receiving all that we're entitled to.

22          THE COURT:  So can I just clarify?  Have you

23  got -- you have a representation from counsel that they

24  instituted appropriate document preservation protocols

25  and preserved documents.  Why does that not settle it?

1

2          MR. MCBRIDE:  Largely because --

3          THE COURT:  It sounds like (indiscernible) just,

4  you know, dropped the ball.

5          MR. MCBRIDE:  Well, it's hard to -- it's not --

6  it's hard to believe that it was a dropping of the ball

7  that meant that zero internal communications were

8  produced over the course of two years when, even

9  accepting at face value that they had drafted some

10  objections that they sat on for a year despite our filing

11  letters to the docket saying hey, Athena hasn't objected

12  -- what -- Athena hasn't objected.  None of those

13  objections said we decline to produce any internal

14  communications.  You know, there's no basis, even

15  purportedly stated.  It's hard to take at face value that

16  this was just the ball was dropped.  And we'd like to

17  know dropped by whom.  Dropped by in-house counsel,

18  dropped by predecessor counsel.  You know, it seems like

19  egregious --

20          THE COURT:  Can I ask you --

21          MR. MCBRIDE:   -- excuse me?  Sorry?

22          THE COURT:  I don't mean to cut you off.  It's

23  just hard to do with these phone conferences.  But just a

24  related question.  The email communications that were not

25  produced until recently, were those things that you would

1

2  have -- that's not the right way to phrase it -- but are

3  there certain communications that you would have wanted

4  to ask witnesses about that you didn't get an

5  opportunity?

6          MR. MCBRIDE:  Absolutely.  Again, we had -- we

7  want to ask Athena's 30(b)(6) deponent about discussions

8  between and among Athena employees, officers, about the

9  due diligence they performed on Inigo Philbrick and this

10 painting.  For example, again, we had not a single email

11 between or among Athena employees.  And absolutely we

12 would want to ask, you know, copious questions on those

13 documents at depositions.

14         MR. GROSSMAN:  Your Honor, this is Judd

15 Grossman.  Just to add to Mr. McBride, we did depose

16 Athena's former CEO without the benefit of any of these

17 documents.  So not only going forward, but looking back,

18 we were greatly prejudiced by the absence of those

19 documents at that critical deposition.

20         THE COURT:  So I guess this is what I'll say on

21 the issue.  Like, I understand you want an explanation.

22 To me the more relevant issue would be to confirm that

23 they've preserved everything, turned everything over, and

24 then to the extent necessary, you know, I'd be willing to

25 say you'd have an opportunity to reopen the 30(b)(6) and

the witnesses for whose internal communications you

didn't have at the time of those depositions. But I'm

just not sure it really would be a useful exercise of our

time to try to get any further explanation than the one

we've heard here from counsel.

MR. MCBRIDE: Your Honor, Webster McBride for

Satfinance. I suppose that sounds okay. We'd

respectfully request that that representation come in an

affidavit from Ms. Fine, who was actually present at the

time, not from incoming counsel who's been formally

involved in this case only for the last two months.

THE COURT: Okay. I mean, I certainly think

that's fair. Could in-house counsel represent that

they've -- and just detail the procedures they took to

preserve the documents?

MR. SHAPIRO: So, listen, your Honor, the short

answer is sure. But the long answer is, like, this is a

company that relied on a lawyer that is now gone. This

was not an insignificant thing for all involved. We had

to fix the problem. There's no -- there's no basis

whatsoever on the planet to suggest things weren't

preserved. We just produced 50,000 pages in a small

case. And there's no gaps. There's no -- I mean, all

the things you would look at where both as the producing

1

2 party and the receiving party you would look to see if

3 there was like some indicia of like a problem. There's

4 none of that. The whole matter's been the subject of a

5 criminal investigation with the United States Attorney's

6 Office that resulted in Mr. Philbrick like being

7 convicted by plea in which Athena, you know, it was

8 involving Athena alone. Nothing has gone missing. I'm

9 happy to ask Ms. Fine. It feels kind of abusive.

10      MR. MCBRIDE: And if I may, your Honor? You

11 know, hearing everything Mr. Shapiro is saying, A, it

12 seems like okay, please have Ms. Fine state that in an

13 affidavit. What's the burden there if everything he says

14 is the case? And, B, I think that our reading of the

15 situation is, you know, further colored again by what

16 happened yesterday where Mr. Weiss -- we don't know what

17 happened to this text message, but it was clearly

18 responsive. Our subpoena sought a very specific category

19 of documents from a very specific time frame. He said he

20 had nothing. We know he had something. We don't know if

21 he destroyed it. We don't know if he just failed to

22 search for it. We don't know. But once again, even with

23 new counsel, we're having the same issue. So we just

24 would have liked to have some definitive representation.

25      MR. SHAPIRO: If I may, Judge? The text message

2   that counsel keeps referring to was not to Mr. Weiss or

3   from Mr. Weiss.  If there needs to be a motion practice

4   on that, we would just ask that we have an opportunity to

5   brief it up and do it in some sort of normal way as

6   opposed to on-the-fly incriminations because it's not

7   substantiated; it's not what's before the Court; and it's

8   serious.

9          MR. MCBRIDE:  Agreed that it's not before the

10  Court.  But the text message was from Mr. Weiss.

11         THE COURT:  Well, since --

12         MR. SHAPIRO:  Exhibit 2 to -- oh, pardon me,

13  Judge.

14         THE COURT:  No, no, go ahead.

15         MR. SHAPIRO:  I was just going to say

16  Exhibit 2 -- I didn't mean to cut you off, your Honor --

17  Exhibit 2 to the deposition yesterday was an email

18  between an outside director for Yieldstreet within the

19  control group, okay, and Mr. Pesko.  It was not Mr.

20  Weiss's text message.

21         MR. MCBRIDE:  In which he copied and pasted a

22  text message from Mr. Weiss.

23         MR. SHAPIRO:  And the antecedent of "he" is

24  someone other than Mr. Weiss.

25         THE COURT:  Okay.  So the -- I think on the

issue of in-house counsel, I'm not -- I don't think that

this has to be overly burdensome.  It would just be a

representation in an affidavit that they had instituted

document preservation protocols and specifically, you

know, what those protocols were.  I don't think that

would be overly burdensome at this point given that it

was a significant period of time that elapsed before

Athena did produce any internal or external

communications.

On the issue of the Weiss text message, if the

parties want to raise that separately, you know, you can

come back before me.  But I thought I saw at some point

there being a request for all text message and WhatsApp,

and I think Athena saying that they were missing that.

WhatsApp messages, text messages.  Am I wrong?

MR. MCBRIDE:  This is Webster McBride for

Satfinance.  Athena did raise that.  Athena has produced

zero text messages, zero WhatsApps.  Satfinance has

produced 400 pages of text messages and a few WhatsApp

chains.

THE COURT:  Has --

MR. MCBRIDE:  And if you look -- sorry?

THE COURT:  No, I just want to confirm, has

Satfinance produced all the text messages and WhatsApp

that were requested and are in your possession?  Are

there things you're withholding?

MR. MCBRIDE:  No, no, nothing's being withheld,

no.

THE COURT:  Okay.  And then Athena -- so has

Athena collected these text messages, WhatsApps?  Do they

exist?

MR. SHAPIRO:  So I'm aware of a couple that will

be on our privilege log.  As a general matter, just by

being familiar with the client and this particular file,

I mean, Athena's like a bank.  I mean, it issue -- you

know, it's part of a business that issues securities.

It's not -- like these relationships are documented in a

way that's fairly formal.  So, I mean, it's secured

lending.  So I mean, like the files and the

communications with the borrower and things, they're not

-- it's like -- it's a little more old school.

THE COURT:  So are you basically saying you

searched for text messages and WhatsApps and whatever and

that type of communication, and there was nothing?

MR. SHAPIRO:  I'll check, but I will tell you

that, A, I know we have a couple, because I'm in the

process of reviewing, you know, the privilege log.  And I

know there's a couple on there is all I'm saying.  And we

can go back and look at anything, Judge.  Our point is we're not withholding any --

THE COURT:  But the -- I understand if you're withholding them on privilege.  I guess I just would like Athena to confirm --

MR. SHAPIRO:  Sure.

THE COURT:  -- that they searched for WhatsApp, text messages, whatever other type of app communication that was requested and that you can represent that the only thing you're withholding was on privilege grounds.

MR. SHAPIRO:  And I will do precisely that.

MR. MCBRIDE:  Your Honor?

THE COURT:  Yes.

MR. MCBRIDE:  If I may, this is Webster McBride for Satfinance.  With regard to the Fine affidavit, one other thing that we would respectfully request is that Ms. Fine represent that the responses and objections served 14 months late were in fact prepared in March of 2021.

MR. SHAPIRO:  Your Honor, on that --

THE COURT:  Well, how would she know that?  I mean, how could she represent that if it was prepared by outside counsel?

MR. MCBRIDE:  She's been very involved in this

litigation from the beginning.  You know, she was present
at various depositions.  Our understanding is that she
has been very active.  And, you know, if she can't
represent that, she could represent that she has no
knowledge.  But we would think that she could.

THE COURT:  But I'm just -- I'm wondering,
they're not relying on the objections.  They've given you
everything.  And potentially you can come back to me, as
I indicated earlier, and you could tell me, well, these
are the email communications we would have questioned the
30(b)(6) witness on.  And as I've indicated, I'd be
willing to let you reopen that deposition or a similar
deposition.  So what do you get from a representation
that says that outside counsel drafted this in March of
2021?

MR. MCBRIDE:  Yes, and that is fair.  I think
that our concern here is really just that, you know, it
seems like something went wrong, and late-arriving
objections and responses just adds to our questions of
what's going on here.  So -- but it's a fair point that I
don't think it would give us anything more substantively.

THE COURT:  Okay.  I think as long as she just
explains the document-retention policy that was
instituted, when it was instituted and that they didn't

just -- you know, they did what they were supposed to do

in the regular course.  Given that you've basically, I

think, effectively -- I mean, I understand this is a

delay and there was a waste of time, but I'm trying to

make you as whole as possible, given the issues.  And

they've turned over the documents.  So I'm not inclined

to have her make an additional representation on what

opposing counsel did in March of 2021.

MR. MCBRIDE:  Okay.  Understood, your Honor.

THE COURT:  Is there --

MR. SHAPIRO:  Your Honor, just one more small

point?  Because -- only because your Honor noted it twice

about reopening the 30(b)(6) deposition to cure

prejudice.  They never took that deposition.  Right?  I

mean, we're waiting to schedule it.

THE COURT:  Well, I think it might have been --

I'm sorry if I labeled it a 30(b)(6) witness.  I thought

Mr. McBride indicated that he took the deposition of a

CEO where there were --

MR. SHAPIRO:  That's an additional gentleman.

And that one's already --

MR. MCBRIDE:  A former CEO, correct.

THE COURT:  Former CEO, right, where there now

seems to be a substantial number of email communications

```
 1
 2   that they would have questioned him about?
 3          MR. SHAPIRO:  I don't know.  The deposition's
 4   still open.  I mean, like -- I mean, if they want more
 5   time, he's a nonparty now; he's our former CEO.  Like,
 6   the notion this would ever wind up in front of your
 7   Honor, frankly.  Like, we heard you.  I just want it to
 8   be clear that it wasn't the 30(b)(6) because that one had
 9   not in fact commenced.
10          THE COURT:  Okay.  Well, so there's no other
11   issues, then, you know, thank you for your time.  And you
12   can always write us another letter if there's something
13   else that comes up.
14          MR. MCBRIDE:  Thank you, your Honor.
15          THE COURT:  Thank you.
16          (Whereupon, the matter is adjourned.)
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E

     I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Athena Art Finance Corp. v. that Certain Artwork By Jean-Michel Basquiat Entitled Humidity, 1982, In Rem, Docket #20-cv-04669-GBD-VF, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____*Carole Ludwig*_____

                Carole Ludwig

Date:    August 12, 2022