# Exhibit A

Page 1

1
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------------------X
4    ATHENA ART FINANCE CORP.,
5                         Plaintiff,
                                     Case No.
6         -against-                 20-cv-4669 (GBD)
7    that CERTAIN ARTWORK BY JEAN-MICHEL BASQUIAT
     ENTITLED HUMIDITY, 1982, In Rem,
8
                         Defendants.
9
     SATFINANCE INVESTMENT LIMITED and DELAHUNTY
10   LIMITED d/b/a DELAHUNTY FINE ART,
11                        Interested Parties.
     ------------------------------------------X
12   SATFINANCE INVESTMENT LIMITED,
13                    Intervenor-Plaintiff,
             -against-
14   ATHENA ART FINANCE CORP. and that CERTAIN
     ARTWORK BY JEAN-MICHEL BASQUIAT ENTITLED
15   HUMIDITY, 1982, In Rem,
16                    Intervenor-Defendants.
     ------------------------------------------X
17                        April 4, 2023
                          9:22 a.m.
18

       ***CONFIDENTIAL - UNDER PROTECTIVE ORDER***
19
20          VIDEOTAPED DEPOSITION of MICHAEL
21   PLUMMER, taken pursuant to Notice, held at the
22   offices of Goodwin Procter, LLP, 620 8th
23   Avenue, New York, New York, before Fran Insley,
24   a Notary Public of the States of New York and
25   New Jersey.

Page 2

```
1
2  A P P E A R A N C E S :
3      GOODWIN PROCTER, LLP
4          Attorneys for Plaintiff
5          620 Eighth Avenue
6          New York, New York  10018
7      BY:   JONATHAN SHAPIRO, ESQ.
8          CHRISTINE SAMA, ESQ.
9          OWEN MARKS, ESQ.
10         jshapiro@goodwinlaw.com
11
12     GROSSMAN LLP
13         Attorneys for Interested Party
14         Satfinance Investment Limited
15         745 Fifth Avenue, 5th floor
16         New York, New York  10151
17     BY:   JUDD B. GROSSMAN, ESQ.
18         jgrossman@grossmanllp.com
19         -and-
20         WEBSTER McBRIDE, ESQ.
21         wmcbride@grossmanllp.com
22
23
24
25
```

Page 4

```
1
2  -------------- I N D E X -----------------
3  WITNESS          EXAMINATION BY      PAGE
4  MICHAEL PLUMMER   MR. SHAPIRO        8
5               MS. HALL      405
6
7  -------------E X H I B I T S----------------
8  PLUMMER      DESCRIPTION          PAGE
9  Exhibit 1  Loan and Security agreement   68
10 Exhibit 2  Purchase agreement       72
11 Exhibit 3  Expert report          106
12 Exhibit 4  Interview in Artnet      146
13 Exhibit 5  Partnership agreement      284
14 Exhibit 6  Overton report          346
15 Exhibit 7  Affidavit          387
16 Exhibit 8  Security agreement with      403
17     attachments
18 Exhibit 9  Invoice          408
19 Exhibit 10 Rebuttal report          411
20
21         (EXHIBITS PRODUCED.)
22
23
24
25
```

Page 3

```
1
2  A P P E A R A N C E S :  (Continued)
3      CLARICK GUERON REISBAUM, LLP
4          Attorneys for Interested Party
5          Delahunty Limited d/b/a Delahunty
6          Fine Art
7          220 Fifth Avenue, 14th floor
8          New York, New York 10001
9          (212) 633-4310
10     BY:  ASHLEY HALL, ESQ.
11         ahall@cgr-law.com
12
13 ALSO PRESENT:
14     ANDREA ORTEGA, Videographer
15     REBECCA FINE, ESQ.
16         xxxx
17
18
19
20
21
22
23
24
25
```

Page 5

```
1
2         S T I P U L A T I O N S
3      IT IS HEREBY STIPULATED AND AGREED by
4  and between the attorneys for the respective
5  parties herein, that filing, sealing and
6  certification, and the same are, hereby waived.
7
8      IT IS FURTHER STIPULATED AND AGREED
9  that all objections except as to the form of
10 the question, shall be reserved to the time of
11 the trial.
12
13     IT IS FURTHER STIPULATED AND AGREED
14 that the within deposition may be signed and
15 sworn to by an officer authorized to administer
16 an oath, with the same force and effect as if
17 signed and sworn to before the Court.
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 14

Plummer - Confidential

1
2    Q.   Whereas secured lending could be
3  asset-backed lending that is secured by
4  multiple assets?
5    A.   By multiple assets or an entire
6  business.
7    Q.   Fair enough.  That would be a
8  blanket lien, correct?
9    A.   Correct, correct.
10    Q.   Other than that, do you draw any
11  distinction in your mind between asset-backed
12  lending and secured lending?
13    A.   I don't.
14    Q.   If I were to ask the question, do
15  you draw any distinctions between assets plural
16  backed lending and secured lending your answer
17  is the same; it's the same in your mind?
18    A.   Correct.
19    Q.   What is alternative lending?
20    A.   I'm not sure what you mean.
21    Q.   Are you familiar with the term
22  alternative lending classes?
23    A.   I am not sure I am in the context
24  you are using it.
25    Q.   Sitting here today, you're not

Page 15

Plummer - Confidential

1
2  claiming to be any expert in alternative asset
3  class lending?
4    A.   No.  I am an expert in alternative
5  investments in art.
6    Q.   Okay.  Well, what is an alternative
7  investment in art?
8    A.   It's when art is used as an
9  investment as an alternative -- it's used --
10  it' called alternative investing and art is an
11  investment that is nonstandard as an investment
12  category.
13    Q.   Are you referring to an investment
14  in debt or an investment in equity?
15    A.   I'm referring to an investment in
16  debt, but -- in equity, but I'm sure that you
17  could refer to debt as well.
18    Q.   I just need to understand what you
19  mean by your use of the term alternative
20  lending in art, that's all.  So one more time.
21  What is alternative lending in art?
22        MR. MC BRIDE:  Objection.  You can
23     answer.
24    A.   I think it's -- I believe it's the
25  same way it is used in investing that art is a

Page 16

Plummer - Confidential

1
2  nonstandard form of lending or investing as
3  then it's considered historically a standard
4  form which would be in real estate or something
5  like that.
6    Q.   So in your mind real estate is a
7  standard form of investing?
8    A.   Correct.
9    Q.   That includes a publicly traded
10  REIT, sir?
11    A.   Yes.
12    Q.   Would it also include a second home?
13    A.   I don't know.
14    Q.   Would it include an investment in
15  real estate that is not publicly traded?
16    A.   I don't know.
17    Q.   Is investing in a private placement
18  of securities a standard investing in your mind
19  or nonstandard?
20    A.   I don't know.  This is not my area
21  of specialty.
22    Q.   Fair enough.  Do you consider
23  yourself an expert in asset-backed lending?
24    A.   I consider myself an expert in art
25  asset-backed lending.

Page 17

Plummer - Confidential

1
2    Q.   So you're not holding yourself out
3  as an expert in any kind of asset-backed
4  lending, other than asset-backed lending that
5  is backed by art?
6    A.   Correct.
7    Q.   Do you consider yourself an expert
8  in secured lending?
9    A.   In a general sense, no.  When it
10  pertains to art, yes.
11    Q.   Why do you consider yourself --
12  withdrawn.
13        Why do you consider yourself to be
14  an expert in asset-backed lending with the
15  narrow focus of art?
16    A.   Because that's been my professional
17  focus off and on for the last 40 years almost.
18  I started doing that -- working in that
19  category at Sotheby's in the treasury
20  department in 1980.
21    Q.   Back in 1980, you were
22  professionally employed in the field of
23  asset-backed lending with assets backed only by
24  art?
25    A.   That was one part of my job in the

Plummer - Confidential

1 Christie's for an asset-backed lending
2 business?
3
4    A.   2007.
5    Q.   And that's the year in your mind, as
6 near as you can figure, that you would feel
7 comfortable saying you were an expert in
8 asset-backed lending?
9    A.   I don't know if I would pick out a
10 particular years when I became an expert.  I
11 think I just have developed the cumulative
12 experience over the years and that position,
13 the first position and other experiences
14 working with dealers in different categories
15 and roles that I, at least by now, am an
16 expert.
17    Q.   So did there -- how about this?
18 What is the earliest date that sitting here
19 today you are comfortable saying you considered
20 yourself an expert in asset-backed lending?
21       MR. MC BRIDE:  Objection.
22    A.   I can't answer that question.  I
23 don't know.
24    Q.   Sometime between 2007 and today?
25    A.   Yes.

Plummer - Confidential

1
2    Q.   Have you ever taken a course in
3 secured lending?
4    A.   In college at Wharton.  It was
5 included in part of the course.
6    Q.   So you took a course that included
7 many things, one of which was secured lending?
8    A.   Yes.
9    Q.   What do you remember from that
10 course?
11       MR. MC BRIDE:  Objection.
12    A.   It was so long ago, I don't
13 remember.
14    Q.   Have you ever taken another course
15 in secured lending?
16    A.   No.
17    Q.   Have you ever taken a course in
18 credit risk?
19    A.   I don't remember.
20    Q.   Have you ever taken a course in
21 underwriting?
22    A.   Not specifically.
23    Q.   You know what I mean by
24 underwriting?
25    A.   Yes.

Plummer - Confidential

1
2    Q.   How about generally have you ever
3 taken a course in underwriting?
4    A.   I don't remember.
5    Q.   Are there accredited colleges and
6 universities that offer classes in secured
7 lending?
8    A.   I'm sure there are.
9    Q.   Can you name one?
10    A.   No.
11    Q.   Are there accredited colleges and
12 universities that offer classes in credit risk
13 assessment and management?
14    A.   I'm sure there are.
15    Q.   Can you name any?
16    A.   No.
17    Q.   Same question, sir, are there
18 accredited colleges and universities that offer
19 classes in underwriting?
20       MR. MC BRIDE:  Objection.  Go ahead.
21    A.   I'm sure there are.
22    Q.   Can you name any?
23    A.   No.
24    Q.   Mr. Plummer, do you hold any
25 professional licenses?

Plummer - Confidential

1
2    A.   I hold actually a real estate
3 license.
4    Q.   Is that to buy and sell real estate
5 in the State of New York?
6    A.   Yes.
7    Q.   Do you hold any professional
8 licenses other than your real estate license?
9    A.   No.
10    Q.   When did you obtain your real estate
11 license?
12    A.   In 1988 when I was working for the
13 real estate company for Sotheby's.
14    Q.   And that real estate company at
15 Sotheby's had nothing to do with asset-backed
16 lending, true?
17    A.   Correct.
18    Q.   Have you held your real estate
19 license continuously since that time?
20    A.   Actually no, I have not.  I let it
21 lapse for a while and then reinstated it.
22    Q.   Why did you reinstate it?
23    A.   Because we had a client who -- with
24 art, an art collection who also had a real
25 estate, a piece of real estate to sell.

Page 30

Plummer - Confidential

```
 1              Plummer - Confidential
 2     Q.   Full service firm, sir?
 3     A.   In that context.
 4     Q.   Do you hold any professional
 5  licenses or credentials that have anything to
 6  do with asset-backed lending?
 7     A.   No.
 8     Q.   Do you have any professional
 9  licenses or credentials that are in any form or
10  fashion relevant to underwriting or to credit
11  risk?
12     A.   No.
13     Q.   Do you hold any professional
14  licenses or credentials that are relevant to
15  the offering of a debt securities?
16     A.   No.
17     Q.   Have you ever held a lender's
18  license?
19     A.   No.
20     Q.   Have you ever held a broker's
21  license other than with respect to real estate?
22     A.   No.
23     Q.   Have you ever held a license to sell
24  debt collateral backed securities?
25     A.   I have not.
```

Page 31

Plummer - Confidential

```
 1              Plummer - Confidential
 2     Q.   Are you a CPA?
 3     A.   I am not.
 4     Q.   Are you a CFA?
 5     A.   I am not.
 6     Q.   Are you aware that CPAs and CFAs
 7  have professional training in the area broadly
 8  of collateral backed securities?
 9     A.   Yes, I do.  That was part of my
10  Wharton education.  A lot of my classmates went
11  on to get CFAs and CPAs.  I did not.
12     Q.   You did not.  Have you ever worked
13  as an underwriter?
14     A.   I was in -- head of the underwriting
15  at Christie's.  That was my responsibility to
16  oversee that area.  So I did not do
17  specifically the underwriting myself, but that
18  was my job description.
19     Q.   So, you, because you were the CFO of
20  the organization, you had lots of different
21  disciplines underneath you?
22     A.   Several, yeah.
23     Q.   But you've never worked as an
24  underwriter yourself?
25     A.   Well, actually I would say in the --
```

Page 32

Plummer - Confidential

```
 1              Plummer - Confidential
 2  that was -- that was sort of part of the job
 3  when I was in the treasury department at
 4  Sotheby's was underwriting, was reviewing the
 5  credit risk involved with dealers to extend to
 6  them trade terms, credit trade terms.  So that
 7  was a form of underwriting, yeah.
 8     Q.   This was a job that ended in 1984,
 9  sir?
10     A.   Yes.
11     Q.   Did you actually sign as an
12  underwriter off on the extension of credit to
13  anyone at Sotheby's in the '80s?
14     A.   Yes, that was part of the job.
15     Q.   What was the limit of your
16  underwriting authority?
17     A.   Oh, I couldn't remember.  It was a
18  hundred thousand, a couple hundred thousand.
19     Q.   Did you need to get --
20     A.   But that was in 1984 and today's
21  dollars that would be probably be close to a
22  million or so.
23     Q.   Have you ever been a lead
24  underwriter anywhere?
25     A.   No.
```

Page 33

Plummer - Confidential

```
 1              Plummer - Confidential
 2     Q.   What is the usual career progression
 3  for an underwriter of asset-backed loans?
 4     A.   I don't know.  I might -- my
 5  experience is in the art world.  So I can't
 6  speak to general asset-backed lending.  I can
 7  only speak to and only consider myself an
 8  expert on art asset-backed loans.
 9     Q.   Do you think you're qualified to be
10  an underwriter for anything other than an
11  asset-backed loan?
12     A.   Other than an asset-backed loan?
13     Q.   Pardon me.  Do you think you're
14  qualified to serve as an underwriter for any
15  asset-backed loan, other than one backed by
16  art?
17     A.   I have no interest in that area.  So
18  I wouldn't even look for a position or job
19  doing that.  So I have never thought whether
20  I'm qualified or not.
21     Q.   You're not claiming to be an expert?
22     A.   I'm not claiming to be an expert.  I
23  think that the art world is too unique and
24  specific and idiosyncratic.  That's the only
25  one I'm interested in.
```

9 (Pages 30 - 33)

Plummer - Confidential

1
2    Q.   Well, is there anything unique and
3  idiosyncratic about the perfection of a
4  security interest in art as opposed to the
5  perfection of a security interest in any other
6  chattel?
7    A.   I think it's -- yeah.  I think the
8  art world because of its opaque nature and its
9  longstanding traditions of doing business and
10  how difficult it is to get information and how
11  it operates, I think it is different.
12    Q.   Do you remember my question, sir?  I
13  can ask it again.  It's my job.
14    A.   Please do.
15    Q.   When it comes to the perfection of a
16  security interest under the UCC as you
17  previously testified, is it any different for a
18  security interest in art than it is in a
19  security interest in any other chattel?
20    A.   I don't know because I'm not an
21  expert on other chattels.
22    Q.   So sitting here today, you don't
23  know if the rules of the road as it were for
24  the perfection of a security interest in art
25  are in any fashion different than they are for

Plummer - Confidential

1
2  the perfection of a security interest in
3  another chattel?
4    A.   No.
5    Q.   Have you ever worked as a risk
6  officer?
7    A.   No.
8    Q.   Do you consider yourself qualified
9  to be a risk officer?
10    A.   In art, yes.
11    Q.   How about a credit risk officer?
12    A.   In art, yes.
13    Q.   Are there regulators' requirements
14  to be a credit risk officer?
15    A.   In the art world I'm not aware of
16  them.
17    Q.   Have you ever served on a credit
18  committee?
19    A.   Yes.
20    Q.   When?
21    A.   2007, 2008 at Christie's.
22    Q.   Other than 2007 and 2008 at
23  Christie's, have you ever served on a credit
24  committee?
25    A.   Not that I can recall.

Plummer - Confidential

1
2    Q.   Have you ever served on a risk
3  committee?
4    A.   Not that I can recall.
5    Q.   Have you ever worked for a
6  registrant?
7    A.   No.
8    Q.   Have you ever worked for a federal
9  or state chartered financial institution?
10    A.   Nope.
11    Q.   Are there federal regulations and
12  guidelines that are applicable to asset-backed
13  lending in the United States?
14    A.   For outside of the art world, I'm
15  not familiar with them.
16    Q.   Sir, are you aware of any exception
17  to financial regulation in America for art?
18    A.   No.
19    Q.   Are you -- withdrawn.
20        Can you identify the government
21  agencies that are involved in the regulation of
22  asset-backed and other lending in America?
23    A.   No.
24        MR. MC BRIDE:  Objection.
25    Q.   No idea?

Plummer - Confidential

1
2    A.   It's not an area that I focused on.
3    Q.   How about the treasury department?
4        MR. MC BRIDE:  Objection.
5    A.   Again, not an area I focus on.
6    Q.   How about the OCC?
7    A.   I'm aware of them.  And I have seen
8  some of their writings and seen some mention of
9  it in the accounts report, but I think some of
10  them are contrary to how the art market
11  operates and I think that some of them are
12  not -- some of their guidelines are not
13  relevant.
14    Q.   So, in your view, the regulation and
15  guidance from the federal OCC doesn't apply to
16  the art world?
17        MR. MC BRIDE:  Objection.
18    A.   I didn't say the regulations.  I
19  said the guidance.  There is specific guidance
20  that I don't think is relevant.
21    Q.   Do art lenders ever need licenses
22  from regulators?
23    A.   I'm not certain about that.
24    Q.   Well, sir, if you're an expert in
25  asset-backed lending collateralized by art, how

10 (Pages 34 - 37)

Plummer - Confidential

1 is it that you don't know if there is any
2 licensure requirements to engage in that
3 practice?
4    MR. MC BRIDE:  Objection.
5    A.  I haven't focused on that.
6    Q.  How about the FDIC?  Does the FDIC
7 have any regulations or guidance that are
8 applicable to asset-backed lending?
9    A.  I don't know.
10    Q.  How about the Federal Reserve?
11    MR. MC BRIDE:  Objection.
12    A.  I don't know.
13    Q.  Have you ever had a client in
14 California?
15    A.  Yes.
16    Q.  Need a license to be a dealer in art
17 in California?  I'm asking you.
18    A.  I wasn't acting as a dealer in
19 California.
20    Q.  Were you -- in what capacity were
21 you acting on behalf of a client in California?
22    A.  I was brokering a loan for them.
23    Q.  As a loan broker in California, is
24 it subject to any licensure requirement?

Plummer - Confidential

1    A.  Maybe in California, but in New York
2 I wasn't aware that I had to be licensed.
3    Q.  So in your view, as long as you are
4 sitting in New York, you can broker a loan for
5 a Californian?
6    MR. MC BRIDE:  Objection.
7    A.  It was a while ago.  I don't
8 remember the specifics.
9    Q.  Are you licensed to be a lender in
10 California?
11    A.  No, I am not and I wasn't acting as
12 a lender.
13    Q.  Do you know what it even means to be
14 acting as a lender in California?
15    MR. MC BRIDE:  Objection.
16    A.  I don't know how you mean that
17 question.
18    Q.  In your mind, is brokering a loan in
19 California not acting as a lender in
20 California?
21    A.  I was consulting with a client as a
22 go between between a lender who did have the
23 proper licenses to lend in California and they
24 provided the lending.  I know that the lending

Plummer - Confidential

1 laws in California are different and I know
2 that it is much more regulated here in New
3 York, but this was twelve years ago and I don't
4 remember many specifics about the case.
5    Q.  So you just referred to working with
6 I suppose a counterparty who had a license in
7 California?
8    A.  Yes.
9    Q.  Is it your testimony as an expert --
10 withdrawn.
11    Is it your testimony as a claimed
12 expert in asset-backed lending in art that to
13 engage in asset-backed lending collateralized
14 by art you need a license in California?
15    MR. MC BRIDE:  Objection.
16    A.  I don't remember the specifics.  I
17 know that we had to have various provisions to
18 make sure that we were fitting within the
19 regulations of California law with regard to
20 lending.
21    Q.  Who is the antecedent of we?
22    A.  What do you mean?
23    Q.  You just testified that we had to
24 make sure we were complying with the law in

Plummer - Confidential

1 California or something to that effect?
2    A.  My company, Artvest Partners.
3    Q.  Were you personally responsible for
4 ensuring compliance with the lending laws of
5 California?
6    MR. MC BRIDE:  Objection.
7    A.  With the party that we were working
8 with who was extending the credit together we
9 were.
10    Q.  Name of that party?
11    MR. MC BRIDE:  Objection.
12    A.  Do I have to --
13    MR. SHAPIRO:  The witness testified
14    that they had a license.  I would like to
15    know who they are and why he thinks --
16    A.  I didn't testify that they had a
17 license.  I testified that they went -- they
18 went through various measures to make sure that
19 they were compliant with the law.  I don't
20 remember whether they have a license or not.
21    Q.  Do you even know if you need a
22 license to make an asset-backed loan secured by
23 art in California?
24    A.  Yes, I do because we looked at that

Page 58

Plummer - Confidential

1 that's where you first learned about it,
2 correct?
3    A.    Correct.
4    Q.    And then you told me that you were
5 the CFO of a lending business, correct?
6    A.    Correct.
7    Q.    Have the standards for stress
8 testing changed over the course of what was by
9 my math 30 odd years?
10    A.    Yeah, they have.
11    Q.    In what way have they changed?
12    A.    I think since the debt crisis they
13 have become more sophisticated and more robust.
14    Q.    What debt crisis?
15    A.    The 2007/2008 crisis.
16    Q.    In what fashion have they become
17 more sophisticated and robust in your
18 expertise?
19    A.    I think that there is an awareness
20 of the fragility of liquidity in the art world
21 that it has caused the auction houses and
22 others to be aware that periods of time can
23 elapse that things can be very difficult to
24 sell.  So I think that there is an eye towards

Page 59

Plummer - Confidential

1 the mix of property and the fragility of the
2 valuations and I think they are reviewed more
3 frequently with that in mind.
4    Q.    Let's talk about default rates.  Are
5 you familiar with the default rate?
6    A.    Yeah.
7    Q.    True or false, appropriate credit
8 underwriting is designed to manage default
9 rates within an acceptable risk envelope?
10    A.    Yes.
11    Q.    The basic, right?
12    A.    Well, yes.  However, I would say
13 auction houses are different from some place
14 like Athena because an auction house actually
15 makes more money off of a loan when they have a
16 default than when they don't.  So the issue of
17 default is in a different category than it is
18 in a place liked Athena.
19    Q.    Okay, fair enough.  That is a sharp
20 contrast between say the business of Christie's
21 where you were the CFO for that business unit--
22    A.    Right.
23    Q.    You have to let me finish.  And
24 Athena?

Page 60

Plummer - Confidential

1    MR. MC BRIDE:  Objection.
2    A.    Sorry, ask the question again.
3    Q.    Sure.  So we have two things going
4 on, one I'm going to speak faster and faster if
5 you keep interrupting me because I'm trying to
6 get it out and we will have a terrible record.
7    You have to let me finish and I'll
8 do my best to not interrupt you and we will all
9 get along, okay?
10    A.    Hmm-hmm.
11    Q.    If I heard your answer correctly,
12 the business that you were responsible for as
13 CFO at Christie's was different than Athena
14 because at Christie's the risk management took
15 into account that Christie's makes more money
16 in the event of a default?
17    MR. MC BRIDE:  Objection.
18    A.    I would say that the level of risk
19 for Christie's and Sotheby's is different than
20 Athena and so, therefore, stress testing had --
21 was of a different urgency or priority.
22    Q.    It's fundamentally different; fair
23 enough?
24    A.    Yes.

Page 61

Plummer - Confidential

1    Q.    What are the risk mitigants that are
2 taken into account in underwriting an
3 asset-backed loan?
4    A.    An art asset-backed loan?
5    Q.    Fair enough.  Let me try it again.
6 What are the risk mitigants that are
7 appropriately taken into account when
8 underwriting an asset-backed loan with art as
9 the collateral?
10    A.    Well, I think the mitigants are the
11 salability of the art and how fast it can be
12 sold.  I think one of the problems is that art
13 is not an income producing asset and one of the
14 issues that I took with the Katz rebuttal is
15 that he said that the OCC recommendation was
16 that or theory was that all asset-backed loans
17 which he applied to loan are given on the
18 premise that the underlying asset is going to
19 be sold and a lot of people who -- businesses
20 who lend against art assets are not intending
21 for that art asset to be sold because it can
22 take a lot of time for the art to be sold and
23 in that period of time the art is not earning
24 money, but actually costing money because of

Plummer - Confidential

1 insurance and because it is making no income.
2
3    Q.    So going back to my question, sir,
4 what are the other risk mitigants that are
5 properly considered when underwriting an
6 asset-backed loan securitized by art?
7    A.    Having a guarantor who is on the
8 hook to pay the interest and pay for the loan.
9    Q.    Okay.  Next?
10    A.    I don't have another that quickly
11 comes to mind.  I can think about it, but I
12 can't think of one.
13    Q.    Sir, you're claiming to be an expert
14 in asset-backed lending recognizing the narrow
15 category secured by art, right?
16    A.    Yes.
17    Q.    Other than the art and the personal
18 guarantee, what are the other risk mitigants
19 that an underwriter takes into account?
20    A.    Those are the two primary ones.
21    Q.    You can't -- sitting here today, you
22 can't think of another one?
23    A.    Not at the moment.
24    Q.    Okay, moving on.  How significant
25 are interest rates to underwriting asset-backed

Plummer - Confidential

1
2 lending secured by art?
3    A.    Can you clarify that question?
4    Q.    Sure.  In underwriting a loan that
5 is secured by art, how significant are interest
6 rates?
7        MR. MC BRIDE:  Objection.
8    A.    They are quite significant
9 because -- and a determinant factor in many
10 ways because the -- and I talk about this in my
11 expert witness report and they affect
12 businesses like Athena because the source of
13 capital -- let me put it a different way.
14        Up until the recent levels of
15 inflation and interest rate hikes by the fed,
16 private collectors were able to get loans from
17 their banks for their art collections in the
18 3 percent range.
19        When businesses like Athena, who are
20 not banks, and also auction houses like
21 Sotheby's and Christie's have to charge
22 interest rates in the 9, 10 percent or higher
23 rate and those are high levels of interest to
24 serve on -- to service on an annual basis, so
25 you have to take into account when looking to

Plummer - Confidential

1
2 underwrite the loan that the person who is
3 borrowing the money can service that debt for
4 the period of time because that's a substantial
5 amount of money, so it's an important question
6 to take into account when you are underwriting
7 a loan.
8    Q.    Prevailing interest rates as they
9 impact the borrower?
10    A.    Yes.
11    Q.    Fair to say that a lender has the
12 right, within certain statutory limitations, to
13 set interest rates, right?
14    A.    Yes.
15    Q.    How does the ability to set the
16 interest due and owing in a debt instrument
17 bear on the underwriting of the instrument?
18    A.    Well, you tend to increase the
19 interest rate based on the risk assessment of
20 the loan in the underwriting process.  So the
21 riskier the loan, the higher the interest rate.
22    Q.    And that is a 100 percent
23 appropriate way to manage portfolio risk, yes,
24 sir?
25    A.    Correct.

Plummer - Confidential

1
2    Q.    We call that risk adjusted pricing?
3    A.    Yes.
4    Q.    You're familiar with risk adjusted
5 pricing?
6    A.    Hmm-hmm.
7    Q.    How do you go about risk adjusted
8 pricing as an underwriter for an asset-backed
9 loan secured by art?
10    A.    Well, you start with the cost of the
11 capital, your source of capital and then you
12 make adjustments to the source of your pricing
13 above and beyond the margin you charge based
14 on, as I said, the risk of the loan that you
15 are giving.
16    Q.    Are you aware that Athena did
17 precisely that?
18    A.    Yes, I saw their credit memos and
19 their discussion on this.
20    Q.    In that regard you have no quarrel
21 whatsoever?
22        MR. MC BRIDE:  Objection.
23    A.    No, not with risk adjusted pricing,
24 no.
25    Q.    So that piece of the underwriting

17 (Pages 62 - 65)

Plummer - Confidential

1  you're fine with?
2
3      A.  Yeah.
4      Q.  You have no quarrel about -- with
5  how Athena goes about reviewing on a periodic
6  basis the risk exposure from its current
7  portfolio?
8      A.  To the extent I know and have seen,
9  no, but it's not something I have evaluated.
10         MR. MC BRIDE:  We are at the one
11  hour mark.  Is this good for a break?
12      Q.  Do you need a break?
13      A.  It would be nice to take one soon.
14      Q.  Sure.  Well, none of this is civil
15  rights violation, so absolutely.  Why don't we
16  do that.
17         MR. MC BRIDE:  Sounds good.
18         THE VIDEOGRAPHER:  We are going off
19  the record.  The time is 10:26.
20         (Brief recess taken.)
21         THE VIDEOGRAPHER:  We are going on
22  the record.  The time is 10:45 a.m.
23  BY MR. SHAPIRO:
24      Q.  Mr. Plummer, this morning you
25  testified at some point that in the process of

Plummer - Confidential

1  perfecting security interests for asset-backed
2  lending that lenders rely among other things on
3  lawyers, yes?
4
5      A.  Yes.
6      Q.  That's a fully appropriate thing to
7  do in your mind?
8      A.  Yes.
9      Q.  In fact, it's necessary, yes?
10      A.  Yes.
11      Q.  Are you familiar with Steve Brody?
12      A.  Very much.
13      Q.  Who is Steve Brody?
14      A.  He is a lawyer I have used who is --
15  his first form of expertise is in real estate
16  law, but he has also done work in the art world
17  and he has done work for me.
18      Q.  Good.  You're aware, right, that you
19  know he was involved among other lawyers in
20  advising Athena with respect to the Philbrick
21  and the Boxwood loans?
22      A.  I'm not sure I was.  I know he did
23  work for Athena, but I'm not sure that I knew
24  he was involved in Philbrick and Boxwood.
25      Q.  You didn't see that in the paperwork

Plummer - Confidential

1  you reviewed in preparation for today?
2
3      A.  I saw, you know, what -- now that
4  you mention it, I did see his name on I think
5  the credit memo or something.
6      Q.  As being the domestic US lawyer?
7      A.  Yeah, yeah.  I do remember that now.
8      Q.  And regardless, it sounds like we
9  are in an all heated agreement that Mr. Brody
10  is excellent at what he does?
11      A.  Yes, he is.
12      Q.  So I handed you what has been marked
13  as Plummer Exhibit 1.
14         (Whereupon document was marked
15         Exhibit 1 for identification as of this
16         date.)
17      Q.  Do you recognize this as a loan and
18  security agreement made March 31, 2017 by and
19  among Athena Art Finance Corp. and 18 Boxwood
20  Green?
21      A.  Yes.
22         MR. MC BRIDE:  Take a minute to
23  familiarize yourself with the document.
24  You don't have to read all of it, but be
25  familiar with it.

Plummer - Confidential

1      A.  (Witness reading document).
2
3      Q.  After you have reviewed it, just
4  tell me whether Plummer Exhibit 1 is the loan
5  and security agreement that you reviewed in
6  connection with forming your opinions in this
7  matter?
8      A.  Yes.
9      Q.  Sitting here today, sir, is there
10  anything whatsoever improper about the loan and
11  security agreement that has been marked as
12  Plummer Exhibit 1?
13         MR. MC BRIDE:  Objection.  Go ahead.
14      A.  No.
15      Q.  In fact, when you reviewed it, you
16  concluded that it was a fully appropriate loan
17  and security agreement for an asset-backed loan
18  secured in this instance by art collateral?
19         MR. MC BRIDE:  Objection.
20      A.  I don't think I made any mention,
21  I -- yes and I don't think I made any mention
22  of it.
23      Q.  Fair enough.  Believe it or not, I
24  was trying to actually not put words in your
25  mouth.  You haven't raised any criticism

1            Plummer - Confidential
2  whatsoever about the loan and security
3  agreement that has been marked as Exhibit 1?
4      A.   No.
5      Q.   In fact, it indicates in the recital
6  that the borrower has requested lender to make
7  available revolving US dollar loan facility?
8      A.   Yeah.
9      Q.   Then there is the loan and the terms
10 of the payment, correct?
11     A.   Yeah.
12     Q.   Loan commitment, right?
13     A.   Yes.
14     Q.   Maybe just turn to the next page.
15 Do you see that it requires a qualified art
16 appraisal as you would expect for every
17 workmanlike loan and security agreement; yes,
18 sir?
19     A.   Yes.
20         MR. MC BRIDE:  Objection.
21     Q.   Then there is the creation of the
22 security interest that is Section 3 at the
23 bottom of page 2, Plummer Exhibit 1?
24     A.   Yes.
25     Q.   And the creation of the security

1            Plummer - Confidential
2  interest in collateral provisions are necessary
3  to secure an interest for purposes of the UCC,
4  right?
5      A.   Correct.
6      Q.   Look at 3.3, there is a continuing
7  security interest, correct?
8      A.   Correct.
9      Q.   I don't know, flipping forward page
10 4, Section 4, there is a series of
11 representations and warranties, correct?
12     A.   Yes, correct.
13     Q.   Can we agree that the
14 representations and warranties that the
15 borrower made to Athena were extensive?
16     A.   Yes.
17     Q.   Can you think of a single rep or
18 warranty that should have been in this loan and
19 security agreement but wasn't?
20         MR. MC BRIDE:  Objection.
21     A.   No.
22     Q.   Turning to 4.3, there is description
23 terms about borrower collateral, correct?
24     A.   Yes.
25     Q.   Turning to the next page, page 6,

1            Plummer - Confidential
2  Section 5.4, "Obligations to Maintain
3  Collateral Insurance," correct?
4      A.   Correct.
5      Q.   We can agree that is an important
6  term that redounded to the benefit of lender
7  Athena Art?
8          MR. MC BRIDE:  Objection.
9      A.   Yes.
10     Q.   Of course.
11     A.   Yes.
12     Q.   And just flipping through this
13 document, is there anything whatsoever in your
14 expert opinion that should have been in the
15 loan and security agreement executed by Athena
16 and the borrower Plummer Exhibit 1 that isn't
17 in here?
18         MR. MC BRIDE:  Objection.
19     A.   No.
20     Q.   We are done with that one.
21 Mr. Plummer, I just handed you what the court
22 reporter has marked as Plummer Exhibit number
23 2.
24         (Whereupon document was marked
25         Exhibit 2 for identification as of this

1            Plummer - Confidential
2      date.)
3      Q.   After you have taken a look at it,
4  can you state for the record in your words what
5  is Plummer Exhibit 2?
6      A.   (Witness reviewing document).
7  Plummer Exhibit 2 is the purchase agreement
8  from Phillips to Inigo Philbrick for the
9  Basquiat for purchase price of $12,500,000 plus
10 applicable sales text.
11     Q.   What is the date of the private sale
12 buyer agreement?
13     A.   July 27, 2016.
14     Q.   You're familiar with Plummer
15 Exhibit 2, sir?
16     A.   Yes.
17     Q.   You reviewed that to form your
18 opinions, correct?
19     A.   Yes.
20     Q.   Similar questions to the one we just
21 went through with Mr. Brody's security
22 agreement.
23         Directing your attention to Plummer
24 Exhibit 2, is there anything in this private
25 sale buyer agreement that shouldn't be in here?

19 (Pages 70 - 73)

Plummer - Confidential

1
2    A.    That should not be in here?
3    Q.    Should not be in here.
4    A.    Not that I believe.
5    Q.    Okay, reverse question.  Is there
6  anything missing from Plummer Exhibit 2, the
7  private sale buyer agreement in your mind?
8         MR. MC BRIDE:  Objection.
9    A.    Well, it's not unusual that
10  Philbrick would be buying this under his name
11  for somebody else, but I don't want to say that
12  it would normally or always be -- such a thing
13  would always be here.
14    Q.    Sir, all right, that's fair.  You're
15  entitled to your answer.  I was asking a much
16  more basic question.
17         When it comes to private sale buyer
18  agreements --
19    A.    Is this standard?
20    Q.    Yes?
21    A.    In every respect, correct?
22    Q.    In every respect, correct?
23    A.    Yes, correct.
24    Q.    And even today, years later, there
25  is no question in your mind that Plummer

Plummer - Confidential

1
2  Exhibit number 2 is authentic?
3    A.    Correct, and I have taken no issue
4  with this.
5    Q.    Fair enough.  You have no issue
6  whatsoever with the appropriateness and the
7  workmanlike nature of Plummer Exhibit 2?
8    A.    Correct.
9    Q.    And Plummer Exhibit 2 identifies the
10  buyer as Inigo Philbrick, right?
11    A.    Yes.
12    Q.    And it states the purchase price is
13  12.5 million, correct?
14    A.    Correct.
15    Q.    And it states that the obligation
16  for Mr. Philbrick to get the painting is that
17  he has to give 12.5 million in good and in
18  cleared funds by a certain date, right?
19    A.    Correct.
20    Q.    As you know, he fully complied with
21  that obligation?
22         MR. MC BRIDE:  Objection.
23    A.    Yes.
24    Q.    And then there is a provision about
25  ownership, correct, sir?

Plummer - Confidential

1
2    A.    Yes.
3    Q.    And is the provision about ownership
4  a standard provision in such private sale buyer
5  agreements in the art world?
6    A.    Yes.
7    Q.    And it says that ownership and the
8  property shall pass to you, correct?
9    A.    Yes.
10    Q.    And you is defined above as the
11  buyer, Inigo Philbrick, correct?
12    A.    Correct.
13    Q.    Upon receipt by Phillips of the full
14  purchase, right?
15    A.    Correct.
16    Q.    Sitting here today that happened
17  also, right?
18         MR. MC BRIDE:  Objection.
19    A.    In -- at the moment of this
20  transfer, yes, but there are mitigating
21  factors.
22    Q.    Things happened later, yes, sir?  Is
23  that your point?
24    A.    In the context of the payments that
25  he made to Phillips to satisfy this agreement,

Plummer - Confidential

1
2  the ownership was clouded by the contribution
3  of his using Satfinance's funds.
4    Q.    None it of that is in this document,
5  correct, sir?
6    A.    But this document does not reflect
7  that.
8    Q.    The document says he has to give
9  good and cleared funds, yes, sir?
10    A.    Correct.
11    Q.    Now we are working backwards, but
12  that is okay.  Your understanding of the facts
13  are, in fact, that Phillips received good and
14  cleared funds, correct?
15    A.    Correct.
16    Q.    From someone who in this contract is
17  identified as the buyer, right?
18    A.    Correct.
19    Q.    And there is no doubt in your mind
20  that thereafter Phillips discharged its
21  obligation to pass ownership of the property to
22  the buyer upon receipt of the good and clear
23  funds?
24         MR. MC BRIDE:  Objection.
25    A.    Correct.

1          Plummer - Confidential
2          MR. MC BRIDE:  Objection.
3      A.   Sorry?
4      Q.   Sir, I'm not sure you have your
5  facts straight.  Was Boxwood paid with the
6  proceeds from Athena?
7          MR. MC BRIDE:  Objection.
8      A.   Yes, and those proceeds were passed
9  on to IPL.
10     Q.   Okay, perfect.  How is that not a
11 payment?
12         MR. MC BRIDE:  Objection.
13     A.   Boxwood did not pay IPL in total for
14 the artwork that it was using as collateral.
15     Q.   Sir, isn't that like every loan?
16         MR. MC BRIDE:  Objection.
17     A.   Not when the proceeds are going to a
18 different party than the borrower who is
19 receiving the loan.
20     Q.   Sir, okay, true or false, Boxwood
21 received the loan proceeds from Athena?
22     A.   Right.
23     Q.   True, yes, sir?
24     A.   Yes.
25     Q.   Boxwood held title to the collateral

1          Plummer - Confidential
2  that was backing the loan, correct?
3          MR. MC BRIDE:  Objection.
4      A.   I don't know that I would agree with
5  that based on the other facts surrounding this
6  case.
7      Q.   That came up later, but in terms of
8  all the documents that you've seen at the time
9  of underwriting, that's what it said, right?
10     A.   Right.
11     Q.   So, Boxwood received the proceeds
12 from the loan which is money from Athena; yes,
13 sir?
14     A.   Right.
15     Q.   And Boxwood was at least record
16 holder of the painting, right?
17     A.   Right.
18     Q.   True, right?
19     A.   Yes.
20     Q.   How is that an underwriting failure?
21     A.   Well, the incremental amount that
22 IPL received from adding the Basquiat to the
23 collateral pool I think was in the range of
24 $3,000,000.  That was then forwarded on to IPL
25 to pay down the balance, not just for the

1          Plummer - Confidential
2  Basquiat, but for the other works of art.  But
3  that amount of money did not cover all of the
4  art that had been transferred to Boxwood.  So
5  the remainder of it had to be a loan and it was
6  a loan that I have not seen documentation of.
7      Q.   Sir, you can pay for things with
8  loans, right?
9      A.   Yes.
10     Q.   And we could at least agree that the
11 Basquiat by every evaluation was way more than
12 the amount that Athena was at risk, correct?
13         MR. MC BRIDE:  Objection.
14     A.   Yes.
15     Q.   And you're also familiar with
16 intercompany loans, correct?
17     A.   Yes.
18     Q.   Do you have any more clarifying you
19 would like to do on why this was an
20 underwriting issue in your mind?
21         MR. MC BRIDE:  Objection.
22     A.   Because I didn't see any
23 documentation or it wasn't discussed that this
24 would be an intercompany loan.  It wasn't that
25 any -- anything that I saw that it was

1          Plummer - Confidential
2  contemplated that this was how the transaction
3  would ultimately be handled.
4      Q.   Is it your testimony that there
5  wasn't like a very deliberate choice to
6  structure this loan through a SPV?
7          MR. MC BRIDE:  Objection.
8      A.   Is it my -- am I arguing what?
9      Q.   Sir, when you testified that you
10 weren't aware that there was any discussion of
11 this item, I think is what you just said,
12 right?
13         MR. MC BRIDE:  Objection.
14     A.   Nothing that I saw documented.
15     Q.   You didn't see this in the credit
16 committee memo, sir?
17     A.   No, I don't recall seeing it in the
18 credit memo.
19     Q.   That is where one would look, right?
20     A.   Yes.
21     Q.   Is there any document in your mind
22 that on any value to loan ratio that Athena was
23 very well secured with this loan?
24         MR. MC BRIDE:  Objection.
25     A.   I wasn't arguing whether or not

Plummer - Confidential

1          Plummer - Confidential
2 Athena was well secured.  I was arguing about
3 the transaction and the nature of the
4 transaction and even the motivation for the
5 transaction with Boxwood.
6      Q.   So the transaction -- so now we are
7 talking about financial due diligence, right?
8          MR. MC BRIDE:  Objection.
9      A.   We are talking about legal due
10 diligence, not just financial due diligence.
11     Q.   So you're not a lawyer, right?  You
12 don't want me asking legal questions, do you?
13     A.   No.
14     Q.   You are not offering any legal due
15 diligence opinions, right?
16     A.   No, we're not.
17     Q.   Did you review the Subordination
18 Agreement?
19     A.   No.
20     Q.   Have you ever heard of a
21 Subordination Agreement?
22     A.   Yes.
23     Q.   So to be clear, have you read an
24 agreement of subordination and assignment as
25 amended and restated between Boxwood Green

1          Plummer - Confidential
2 Limited, Inigo Philbrick, Inigo Philbrick
3 Limited and Athena Art Finance?
4      A.   I don't believe I've seen that
5 document.
6      Q.   What is a Subordination Agreement
7 and Assignment?
8      A.   Subordination Agreement is when I
9 believe you pledge someone else rights you have
10 and subordinate your rights to theirs.
11     Q.   It's your testimony that whatever
12 that you think was paid for or not paid for
13 between Boxwood on the one hand and IPL on the
14 other, resulted in poor financial due diligence
15 of that particular loan extension?
16         MR. MC BRIDE:  Objection.
17     A.   I would say that it raised questions
18 in my mind as to open issues, both the nature
19 of it and the reasons it was happening in the
20 first place.
21     Q.   So before we move on from this,
22 because I think we are basically done with it,
23 you do know there were reasons why this
24 transaction was structured with Boxwood as an
25 SPV, correct?

1          Plummer - Confidential
2          MR. MC BRIDE:  Objection.
3      A.   I do know there were reasons and I
4 am suspicious of some of them.
5      Q.   Well, use of an SPV, sir, is very
6 common in --
7      A.   I understand that.
8      Q.   You've got to let me finish my
9 question.  Use of a SPV is very common when it
10 comes to asset-backed lending, right?
11     A.   Yes.
12     Q.   It is highly protective of the
13 lender, yes, sir?
14     A.   Yes.
15     Q.   Because it isolates the debt and the
16 assets in ways that protect the lender from
17 other creditors and crazy people out there,
18 right?
19     A.   Yes, but those same reasons that
20 protect it from creditors can also be a means
21 for transferring assets the creditors have
22 legal rights to.
23     Q.   Fine, sir, and that's precisely why
24 SPVs are structured for asset-backed lending.
25 It's actually a risk mitigant; isn't it?

1          Plummer - Confidential
2          MR. MC BRIDE:  Objection.
3      A.   I understand that.
4      Q.   That's why Athena wanted it done
5 this way, correct?
6          MR. MC BRIDE:  Objection.
7      A.   Yes and I question its motivations
8 for doing that.
9      Q.   You're questioning Athena's
10 motivations?
11     A.   Yes.
12     Q.   Is part of your expert opinion about
13 what is in people's heads, sir?
14         MR. MC BRIDE:  Objection.
15     A.   I think -- no.
16     Q.   Go ahead.
17     A.   But my -- the way in which the due
18 diligence was handled and the conditions of
19 Philbrick's business at this time made me, and
20 this is totally my opinion, feel that the
21 reasons for using the SPV structure were to
22 protect it from the very things that were
23 happening that caused this problem in the first
24 place.
25     Q.   And that's a feeling?

27 (Pages 102 - 105)

Plummer - Confidential

1
2    A.   It's an informed feeling.
3    Q.   We are going to go through your
4 report and we are going to look at some facts.
5 Okay, sir?
6    A.   Okay.
7    Q.   Mr. Plummer, do you recognize what
8 has been marked as Plummer Exhibit 3?
9        (Whereupon document was marked
10    Exhibit 3 for identification as of this
11    date.)
12    A.   Yes.
13    Q.   As your expert witness report, yes,
14 sir?
15    A.   Give me a second.
16        (Witness reviewing document).  Yes.
17    Q.   Did you prepare this report?
18    A.   Yes, I did.
19    Q.   And you read it again before you
20 came here, right?
21    A.   I did, yes.
22    Q.   You approved it before it went in?
23    A.   Yes.
24    Q.   Is everything in this expert report
25 in your mind, Plummer Exhibit 3, completely

Plummer - Confidential

1
2 honest?
3    A.   It's completely honest from the
4 information I had.
5    Q.   Well, earlier you testified you
6 weren't suffering for any lack of information,
7 right?
8        MR. MC BRIDE:  Objection.
9    A.   From what I know.  One doesn't know
10 what one doesn't know.
11    Q.   Well, sir, you weren't missing any
12 information that changes your conviction and
13 your opinions set forth in here; do you?
14        MR. MC BRIDE:  Objection.
15    A.   Not that I'm aware of.
16    Q.   As far as you are concerned, there
17 is a factual basis for 100 percent of your
18 opinions?
19        MR. MC BRIDE:  Objection.
20    A.   Except a few instances where I say
21 I'm giving my opinion, yeah.
22    Q.   Well, sir, the entire thing is your
23 opinion, sir, that's why you are being paid to
24 be in the room, right?
25    A.   Right.

Plummer - Confidential

1
2    Q.   Are there any opinions in here for
3 which you don't feel you have an adequate
4 factual basis?
5    A.   Not that I can think of.
6    Q.   I mean you know this is a federal
7 court proceeding, right?
8        MR. MC BRIDE:  Objection.
9    A.   Yes.
10    Q.   This needs to be more than just
11 thoughts, right, sir?
12    A.   Of course.
13    Q.   You prepared Plummer Exhibit 3, your
14 expert report, for this case, correct?
15    A.   Correct.
16    Q.   It's bespoke?
17    A.   Yes, there are some general
18 descriptions of the industry that I have used
19 in previous reports.
20    Q.   Did you start with another report
21 when you wrote this one?
22    A.   Did I start with it?
23    Q.   Yes.
24        MR. MC BRIDE:  Objection.
25    A.   I used some general information from

Plummer - Confidential

1
2 the other report.
3    Q.   I'm sorry, I'm not being specific
4 enough.  Did you open up a clean Word document
5 and start typing?
6    A.   No, I edited from an older report.
7    Q.   You started with an older report and
8 then kind of like modified it?
9        MR. MC BRIDE:  Objection.
10    A.   I started with some general issues
11 of the -- on the art market.
12    Q.   Sir, how is an expert report from
13 another matter the place to start for an expert
14 report in this matter?
15        MR. MC BRIDE:  Objection.
16    A.   General issues about the art market
17 are general issues about the art market.
18    Q.   Fair enough.  So some part of this
19 report is generic?
20        MR. MC BRIDE:  Objection.
21    A.   I wouldn't say generic.  It's a
22 description of what makes the art market
23 different.
24    Q.   It's about the art market
25 generically and it could apply to any number of

1        Plummer - Confidential
2  cases, correct?
3        MR. MC BRIDE:  Objection.
4     A.   Correct.
5     Q.   That makes it generic to the art
6  market, yes, sir?
7        MR. MC BRIDE:  Objection.
8     A.   My knowledge of the art market, yes.
9     Q.   Which report did you start with?
10        MR. MC BRIDE:  Objection.
11     A.   Can I answer?
12     Q.   You must.
13        MR. MC BRIDE:  I'm going to object
14     on the basis that draft reports are
15     protected.
16        MR. SHAPIRO:  The witness just
17     testified that he prepared a report in
18     this case starting with another report.
19     The report he started with as the template
20     for this one is a fair question.
21        MR. MC BRIDE:  I think that's -- you
22     can answer that.  For questions down this
23     road, I'm going to object to draft
24     reports.
25        MR. SHAPIRO:  Take them one at a

1        Plummer - Confidential
2  time.
3        MR. MC BRIDE:  I'll take them one at
4     a time.
5        MR. SHAPIRO:  Fair enough.
6     A.   The Overton report.
7     Q.   The Overton report?
8     A.   Yes.
9     Q.   Why did you start with the Overton
10  report?
11     A.   Because it had aspects, descriptions
12  of particularly the credit industry that I
13  thought were highly relevant to this report.
14     Q.   The Overton report, all right.  Page
15  3, Scope of the Opinion and Disclosures.  Do
16  you see that?
17     A.   Hmm-hmm.
18     Q.   Then there is item number 2 and
19  there are three items, A, B and C, right?
20     A.   Right.
21     Q.   "Counsel has asked me to form an
22  opinion with respect to the following;" is that
23  true what you write here?
24     A.   Yeah.
25     Q.   Who determined what would be the

1        Plummer - Confidential
2  opinions you would be offering?
3        MR. MC BRIDE:  Objection and I am
4     going to instruct you only and to the
5     extent you can do so without disclosing
6     the substance of discussions between you
7     and counsel.
8     A.   I don't know that I can.
9     Q.   Who is the counsel you refer to in
10  paragraph two?
11     A.   Grossman.
12     Q.   Like Mr. Grossman or someone who
13  works with Mr. Grossman?
14     A.   Both.
15     Q.   And they asked you to form an
16  opinion on what you have as A, B and C; yes,
17  sir?
18     A.   Yes.
19     Q.   Did they ask you on the phone?
20     A.   Yes.
21     Q.   Did they ask you anything other than
22  A, B and C?
23        MR. MC BRIDE:  Objection.  I would
24     instruct you not to answer that.
25     Q.   Has anyone asked you to form an

1        Plummer - Confidential
2  opinion in this case that you refused to?
3     A.   Not that I'm aware of.
4     Q.   So when you were commissioned to do
5  this report, you knew you were doing it on
6  behalf of SIL, right?
7     A.   Yes.
8     Q.   What is SIL?
9        MR. MC BRIDE:  Objection.
10     A.   Satfinance is a company owned by
11  Sasha Pesko.
12     Q.   Who is that?
13     A.   A collector/investor based in
14  London.
15     Q.   Have you ever met him?
16     A.   No.
17     Q.   Ever spoken to him?
18     A.   Yes.
19     Q.   Have you ever done due diligence on
20  him?
21        MR. MC BRIDE:  Objection.
22     A.   A limited amount.
23     Q.   Where is he living?
24        MR. MC BRIDE:  Objection.
25     A.   Now he is living in London.

Plummer - Confidential

1
2   A.   Yes.
3   Q.   And then the rate that SIL and
4 Mr. Pesko are compensating you is listed in
5 paragraph six, correct?
6   A.   Yes.
7   Q.   Turn the page.  Here it says -- it
8 lists some qualifications in kind of a
9 narrative form, right?
10   A.   Hmm-hmm.
11   Q.   Yes, sir?
12   A.   Yes.
13   Q.   And then on page 5, it says the CV
14 is Exhibit C.  Do you see that?
15   A.   Yes.
16   Q.   Why don't we just go there, I think
17 it will be easier, to Exhibit C and tell me
18 when you are there.
19   A.   Okay, I'm there.
20   Q.   Starting at the bottom, Wharton.
21 That's when you got the BS graduating in 1980,
22 sir?
23   A.   Yes.
24   Q.   You graduated in three years?
25   A.   I was a transfer student.

Plummer - Confidential

1
2   Q.   Okay.  Right on.  Then we have a
3 category -- I'm working up from the bottom of
4 the page -- called "Other" and there are two
5 bullets, correct, sir?
6   A.   Yes.
7   Q.   One is called -- for something
8 called the Luxury Marketing Council and then
9 there is something called the American Friends
10 of the London Academy?
11   A.   Yes.
12   Q.   Without in any way trivializing the
13 importance of that involvement, do either of
14 those two bullets have anything to do with
15 asset-backed lending?
16   A.   No.
17   Q.   Moving on up, Sotheby's Treasury
18 Department.  This is where you worked in the
19 credit department for 4 years, 40 years ago,
20 correct?
21   A.   Correct.
22   Q.   First job out of college?
23   A.   Correct.
24   Q.   How many asset-backed loans did you
25 underwrite at the Sotheby's Treasury Department

Plummer - Confidential

1
2 from 1980 to 1984?
3   A.   Well, since that was not yet a real
4 industry to speak of, I only did one and it was
5 one of the first and it was a very sizable one
6 for the time.  I think it was in the
7 $10,000,000 range if I remember correctly.
8   Q.   Were you the lead underwriter on
9 that?
10   A.   No, I was not the lead underwriter.
11   Q.   You were a young guy at the time,
12 right, that was your first job?
13   A.   Yes.
14   Q.   That was an asset-backed loan?
15   A.   Yes.
16   Q.   Was it the subject of a security
17 agreement?
18   A.   Yes.
19   Q.   What was your role on that loan?
20   A.   Managing it from a day-to-day basis
21 after the underwriting process, making the
22 interest calculations, checking on the
23 collateral, releasing collateral, getting new
24 collateral.
25   Q.   Sure.  So you were effectively

Plummer - Confidential

1
2 performing an important loan servicing
3 monitoring function on that loan?
4   A.   Correct.
5   Q.   And the loan servicing and
6 monitoring starts after the loan is issued,
7 right?
8   A.   Correct.
9   Q.   Can we agree, sir, that that is
10 different than doing, you know, credit,
11 underwriting risk assessment and so forth?
12   A.   Yes, correct.
13   Q.   Have I fairly covered the
14 asset-backed lending experience with that one
15 loan?
16   A.   I will add however that in addition
17 to that loan, I was on a day-to-day basis
18 approving and reviewing dealers, businesses for
19 trade credit which was a version of
20 asset-backed or of lending.
21   Q.   Dealer trade credit is essentially
22 like warehouse facilities or something, right?
23   A.   Warehouse facilities?
24   Q.   You're not familiar with that term?
25   A.   I'm not sure how you mean it in this

Plummer - Confidential

1
2 context.
3    Q.   That is very different than the
4 Athena loan, correct?
5         MR. MC BRIDE:  Objection.
6    A.   Yes, that is different than the
7 Athena loan, but it was analyzing dealers for
8 credit capabilities and limits on their credit
9 with Sotheby's, which was a big risk for
10 Sotheby's because it was releasing the property
11 to the client.
12   Q.   I understand.  It's an auction
13 house; yes, sir?
14   A.   Yes, sir.
15   Q.   It's a totally different business
16 than what Athena is in?
17        MR. MC BRIDE:  Objection.
18   A.   It's not totally different, but it's
19 different.
20   Q.   Where did Sotheby's make its money
21 in 1984?
22        MR. MC BRIDE:  Objection.
23   A.   Well, it made its money off of that
24 loan that I was telling you about and it makes
25 its money off the dealers.  They were an

Plummer - Confidential

1
2 important part of the business.  That credit
3 was critical to the success of Sotheby's
4 auctions.
5    Q.   Because you need to accommodate
6 those customers, so you can make money on the
7 auctions, right?
8    A.   Correct.
9    Q.   It's keeping your customers happy,
10 right?
11   A.   Without taking too much credit risk.
12   Q.   It's like the popcorn at the car
13 wash, right, the car wash is making money at
14 the car wash and without taking too much risk
15 they are giving, I don't know, popcorn?
16        MR. MC BRIDE:  Objection.
17   Q.   Right?
18   A.   Hardly a relevant comparison because
19 the dealers were at least 50 percent or
20 60 percent of the business.  Back in 1980, '84,
21 collectors -- Sotheby was not yet dealing
22 directly with private collectors.  They were
23 dealing primarily with dealers.  They were more
24 like a wholesale auction house, so it was a
25 completely different industry than it is today.

Plummer - Confidential

1
2    Q.   Fair enough.  Not to offend you with
3 popcorn.  It's an ancillary business to the
4 auction business, yes, sir?
5    A.   No, I'm saying that dealer purchases
6 were bigger than the private purchases, so this
7 is the biggest part of the business.
8    Q.   And $10,000,000 was a big deal to
9 Sotheby's?
10   A.   Well, for this very first private
11 loan, but we are talking dealers that were
12 doing -- giving trade credit in the millions of
13 dollars for other sectors for other businesses.
14   Q.   I understand, but that is trade
15 credit that is different, yes, sir?
16   A.   Yes, it is different.
17   Q.   I understand that that is something
18 that Sotheby does for those who use and direct
19 others to use the valuable auction services.
20 Got that.
21        I'm talking about the asset-backed
22 loan and that was the one you identified before
23 where you had key responsibility as you
24 described it for the servicing and monitoring
25 and so forth, right?

Plummer - Confidential

1
2    A.   Right.
3    Q.   And that included things like
4 running interest calculations after the loan
5 was done, right?
6    A.   Correct.
7    Q.   Any other loans like that
8 $10,000,000 loan during your four years?
9    A.   No.
10   Q.   How many asset-backed loans did you
11 underwrite as the business manager for the
12 Asian Art Division at Sotheby's from 1984 to
13 '87?
14   A.   None.
15   Q.   Zero.  Next line up.  Is it correct
16 that you then spent the next four years at
17 Sotheby's International Realty?
18   A.   Correct.
19   Q.   That's a real estate business,
20 right?
21   A.   Correct.
22   Q.   No asset-backed loans there, right?
23   A.   No.
24   Q.   Not even art world?
25   A.   No.

32 (Pages 122 - 125)

1       Plummer - Confidential
2       Q.   Keep moving up.  Then you were in a
3   marketing role and a communications role for
4   Sotheby's Marketing, correct?
5       A.   Correct.
6       Q.   That's very external facing as you
7   would say?
8       A.   Correct.
9       Q.   That's not credit underwriting,
10  right?
11      A.   Correct.
12      Q.   No loans there, right?
13      A.   Correct.
14      Q.   Moving up, then you became head of
15  the marketing division for the Americas and
16  Asia from 1993 to '96, right?
17      A.   Correct.
18      Q.   That was in the same reporting
19  organization as your prior job in marketing; it
20  was just a more senior role?
21      A.   Correct.
22      Q.   You were promoted, correct?
23      A.   Yes.
24      Q.   No loans between '93 and '96, right?
25      A.   No.

1       Plummer - Confidential
2       Q.   Then you left Sotheby's and you
3   joined something called Accoustiguide, correct?
4       A.   Yes.
5       Q.   And now Accoustiguide had nothing to
6   do with lending either; did it?
7       A.   No.
8       Q.   Accoustiguide makes headsets, right,
9   sir?
10      A.   No, they do audio tours for museums.
11      Q.   Fair enough.  They do audio tours
12  for museums that you listen to on the headset;
13  it is the self-guided audio tours?
14      A.   Correct, but it's the content that
15  they provide.
16      Q.   Fair enough.  You're right.  It's
17  valuable content.  In my mind it's the headset
18  that you put on your head?
19      A.   But its intellectual content that
20  they are providing.
21      Q.   Very intellectual, but it has
22  nothing to do with loans?
23      A.   Correct.
24      Q.   All right.  Moving up.  The Carbone
25  Smolan Agency, this is where you worked from

1       Plummer - Confidential
2   '97 to 2000, correct?
3       A.   Correct.
4       Q.   Can we agree, sir, that had nothing
5   to do with loans?
6       A.   Correct.
7       Q.   That was a brand, a branding ad
8   agency type business?
9       A.   Correct, correct.
10      Q.   So then from 2000 to 2003, you went
11  to the ArtBase, Inc., correct?
12      A.   Correct.
13      Q.   No loans there, right, sir?
14      A.   Correct.
15      Q.   ArtBase was a software company,
16  correct?
17      A.   Correct.
18      Q.   So then we get to 2003 to 2006 and
19  that's when you were the COO of Fernwood Art
20  Investments, correct?
21      A.   Correct.
22      Q.   That was the first time you had a
23  C-Suite position, correct?
24          MR. MC BRIDE:  Objection.
25      A.   Well, unless you count ArtBase.

1       Plummer - Confidential
2       Q.   That was the first time you had a
3   C-Suite position that had anything whatsoever
4   to do with art or lending, right?
5          MR. MC BRIDE:  Objection.
6       A.   Yes.  It was art lending, yeah.
7       Q.   Was it art lending?
8       A.   Art investment mostly.
9       Q.   So no loans at Fernwood, right?
10      A.   No loans at Fernwood, correct.
11      Q.   In fact, Fernwood turned out to be a
12  colossal disaster; yes, sir?
13          MR. MC BRIDE:  Objection.
14      A.   It did end up being a disappointment
15  because the founder of it had perpetrated a
16  fraud.
17      Q.   It was a Ponzi of some sorts, right?
18      A.   No, it wasn't a Ponzi.  It was --
19      Q.   It was just stolen money?
20          MR. MC BRIDE:  Objection.
21      A.   Yes.
22      Q.   You were the chief operating officer
23  reporting to the CEO, correct?
24      A.   Correct.
25      Q.   This was the first time you had any

33 (Pages 126 - 129)

Plummer - Confidential

1
2 significant responsibility for any part of art
3 world involving financial services, right?
4       MR. MC BRIDE:  Objection.
5    A.   It was the first time I had a
6 C-Suite title for such, yeah.
7    Q.   Well, sir, you hadn't had anything
8 to do with financial services, all right, debt
9 or equity at this point in nearly ten years,
10 right, since you left Sotheby's Treasury
11 Department, right?
12   A.   Correct.
13   Q.   And that turned out to be a flat out
14 fraud, right?
15   A.   Not from me, but by the founder,
16 yes.
17   Q.   I understand.  You have been very
18 clear it wasn't your fault.  It was just a
19 colossal failure, right?
20       MR. MC BRIDE:  Objection.
21   A.   Well, it was a disappointment and a
22 failure in the sense that he was found out to
23 be doing fraudulent activity.  On the other
24 hand, it was doing -- we had done some primary
25 work and I had brought on board some of the

Plummer - Confidential

1
2 leading dealers in the country because what we
3 were doing was so pioneering and because it was
4 so well thought of in terms of what we were
5 accomplishing in terms of the research and the
6 analysis of the art market and the work
7 underlying work that it came to the attention
8 of the chairman of Christie's that they hired
9 me at Christie's as the CFO.
10   Q.   Let's talk about how proud you are
11 about Fernwood Art Investments.  It never
12 extended a single asset-backed loan to anyone,
13 did it?
14   A.   No, I never said it did.
15   Q.   Nothing to do with lending, right?
16   A.   Right.
17   Q.   So no part of your expertise that
18 you claim in lending has anything to do with
19 Fernwood Art, which never did a loan?
20       MR. MC BRIDE:  Objection.
21   A.   Right.
22   Q.   Then it turned out to be a total
23 fraud because the gentleman that you reported
24 to stole everyone's money, right?
25       MR. MC BRIDE:  Objection.

Plummer - Confidential

1
2    A.   Stole some money.
3    Q.   How many millions did he steal,
4 Mr. Plummer?
5    A.   Two million.
6    Q.   That's a lot of money, right?
7    A.   Yeah.
8    Q.   What you just described sounded like
9 a sales job to me.
10       MR. MC BRIDE:  Is there a question?
11   A.   What was a sales job?
12   Q.   What you just described about
13 Fernwood Art Investment about getting everybody
14 all excited sounds like a sales job to me.
15       MR. MC BRIDE:  No question.  No
16 question was asked.
17   Q.   Was it a sales job?
18   A.   No.
19   Q.   Was it an underwriting job?
20   A.   No.
21   Q.   Was it a risk management job?
22   A.   No, but it was an analysis of art as
23 an asset job analyzing the markets, analyzing
24 the viability of art as an asset and doing some
25 very fundamental work on art market trends and

Plummer - Confidential

1
2 pricing behavior.
3    Q.   Fine.  So that's like an art market
4 business development analysis job?
5    A.   No, no.  It's an analysis of art as
6 an asset and how it performs as an asset and
7 what kinds of returns it has.  So it was
8 financial analysis of the art market and very
9 indepth.
10   Q.   Did it have data?
11       (Crosstalk)
12   A.   Yes, A lot of data.
13   Q.   Pricing sensitivities?
14   A.   Yes.
15   Q.   How did you calculate pricing
16 sensitivities?
17   A.   We had a team that ran the analysis
18 for us at the time.  That's 20 years ago, so I
19 can't remember all the specifics.
20   Q.   Did you do regression analysis?
21   A.   Yes.
22   Q.   How did you go about doing a
23 regression analysis?
24   A.   I had someone working for me who did
25 that, did the analysis.

34 (Pages 130 - 133)

Plummer - Confidential

2    MR. MC BRIDE:  Objection.
3    A.   I would say such a position is not
4  of interest to me.
5    Q.   Okay, fair enough.  I'm not trying
6  to put too fine a point on it because I am not
7  qualified to be a CFO either, but --
8    A.   And I do understand the distinction.
9    Q.   Fair enough.  Like, you know, you're
10  not qualified to have anything to do with like
11  financial and accounting controls for example?
12    MR. MC BRIDE:  Objection.
13    A.   No, that's not true.
14    Q.   Sir, you're not an accountant,
15  right?
16    A.   I had a very rigorous accounting
17  background training at Wharton and I know quite
18  a lot about it.
19    Q.   Sir, there is a difference between
20  being an undergraduate in Wharton 40 years ago,
21  around the time Donald Trump was an
22  undergraduate at Wharton 40 years ago, and
23  being a CFO of financial services.
24    A.   I'm objecting to your asserting that
25  I have no qualifications on the matter.

Plummer - Confidential

2    Q.   Sir, do you have any reason to
3  believe anyone would hire you as a CFO?
4    A.   I would never apply for a role as a
5  for CFO.
6    Q.   Okay, fair enough, self select out.
7  You were the COO of Christie's Financial
8  Services, right?
9    A.   Correct.
10    Q.   What did the COO of Christie's
11  Financial Services do when it comes to loan
12  underwriting?
13    A.   I was responsible for managing an
14  individual, as well as myself, for creating a
15  global structure for underwriting loans for
16  Christie's to offer as well as working with
17  financial partners like US Trust and which
18  became Bank of America later and Barclays to
19  help them create underwriting processes for
20  loans that they would do in partnership or for
21  clients they would refer to -- Christie's would
22  refer to them.
23    Q.   How many asset-backed loans did you
24  sign off on as an underwriter while the COO of
25  Christie's financial services?

Plummer - Confidential

2    A.   Three rather significant ones.
3    Q.   Three loans?
4    A.   Yep.
5    Q.   Did you do the full underwriting on
6  those loans?
7    A.   No, I had one person working with
8  me, helping with -- the assisting with the
9  underwriting, doing the day-to-day details.
10    Q.   Like the underwriter, right?
11    A.   Yes.
12    Q.   What was her or his qualification?
13    A.   She had qualifications in
14  underwriting from a major bank as I recall.
15    Q.   Qualifications that you, sir, do not
16  have?
17    A.   I did not have those qualifications
18  working for a bank, no.
19    Q.   And so far we have been through the
20  whole list.  You only had worked on one as
21  society based loan in your life and that was
22  back in the early '80s when you were
23  responsible for servicing a loan underwritten
24  by another, true?
25    A.   Probably, yeah.

Plummer - Confidential

2    Q.   I mean it's fair, sir, successful
3  people can supervise others like that had
4  different skill sets and experience, of course,
5  right?
6    A.   Right.
7    Q.   I mean Jamie Dimon is a very
8  successful banker, correct?
9    A.   Correct.
10    Q.   Without knowing anything about his
11  background, it's either investment banking or
12  some other aspect of financial services, but
13  probably not both, right?
14    MR. MC BRIDE:  Objection.
15    A.   Yes.
16    Q.   He has a number of expert credit
17  underwriters reporting up to him probably
18  indirectly, right?
19    A.   Yes.
20    Q.   What is the name of the person who
21  reported to you at Christie's?
22    A.   Her name was -- do I have to answer
23  that?
24    Q.   Yes.
25    MR. MC BRIDE:  Yes.

36 (Pages 138 - 141)

Page 142

Plummer - Confidential

1
2     A.   Lisa Redpath.
3     Q.   How do you spell Lisa's last name?
4     A.   R-E-D-P-A-T-H.
5     Q.   And Lisa Redpath had meaningful
6  credentials and experience as a credit
7  underwriter from a big bank, correct?
8     A.   I believe it was a big bank, yeah.
9     Q.   Was she from art world?
10    A.   No, she was not from the art world,
11  so I provided the art world insight.
12    Q.   The fact of the matter is it takes a
13  village to run a good business?
14    A.   Absolutely.
15    Q.   You came with experience in
16  different aspects of the art world and the
17  passion for it, right, sir?
18    A.   Yes.
19    Q.   And she was a credit underwriter,
20  right?
21    A.   Correct.
22    Q.   So you said there were three loans
23  that were ultimately underwritten under your
24  supervision at Christie's Financial Services?
25    A.   Hmm-hmm, yes.

Page 143

Plummer - Confidential

1
2     Q.   I'm sorry, you have to answer
3  audibly.
4     A.   I understand.
5     Q.   Mr. Plummer, why did you leave
6  Christie's in 2009?
7     A.   Because of the financial crisis they
8  shut down the financial wing.
9     Q.   Christie's like made a business
10  decision to just shut the whole thing down,
11  right?
12    A.   Yes, because they were having --
13  going through a very bad time after the crisis.
14  They came off of the art market crash in 2008
15  when in a real liquidity crunch so they had to
16  pair themselves back to their core business.
17    Q.   So Fernwood Art Investments was the
18  first time you had a senior role in any art
19  business that also was financial services and
20  it failed, yes, sir?
21    A.   Correct.
22    Q.   The next stop was Christie's
23  Financial Services, which was the first time
24  you had a senior role in any business that was
25  art related that extended loans and it failed,

Page 144

Plummer - Confidential

1
2  right?
3     A.   Correct.  No, wait.  Repeat the
4  question.
5     Q.   Well, Christie's shut it down,
6  right?
7     A.   Yes.  It didn't fail.
8     Q.   It didn't fail.  Christie's just
9  decided that like an economic headwinds were
10  shutting it down, right?
11    A.   They had capital constraints, very
12  serious capital constraints.
13    Q.   So they shut down the business?
14    A.   So they had to pull back on many of
15  their new initiatives.
16    Q.   They bulled back on the things they
17  considered dispensable, vulnerable or weak,
18  right?
19         MR. MC BRIDE:  Objection.
20    A.   They cut back on things that they
21  couldn't afford to do.
22    Q.   So for whatever reason, sir, okay,
23  your role as an executive at Christie's
24  financial services came to a close when the
25  owner named Christie's shut it down?

Page 145

Plummer - Confidential

1
2     A.   Yes.
3     Q.   Why couldn't Christie's raise money
4  for its lending business if it was successful?
5     A.   I don't know that I can reveal that.
6  That's confidential information.
7     Q.   It didn't happen, right?
8     A.   It didn't happen and there were good
9  reasons for it, but I'm not sure that I can
10  reveal what they are.
11    Q.   That's fine, okay.  It just shut it
12  down.  It didn't sell the business, did it?
13    A.   No.
14    Q.   It didn't refinance the business?
15    A.   No.
16    Q.   It just shut it down and everyone
17  went home?
18         MR. MC BRIDE:  Objection.
19    Q.   Right?
20    A.   It was more complicated than that.
21    Q.   It always is, sir, but the business
22  ceased to exist.  It wasn't sold and it wasn't
23  refinanced; all that is true?
24         MR. MC BRIDE:  Asked and answered.
25    Q.   Yes?

37 (Pages 142 - 145)

Plummer - Confidential

1  In fact, it was in the --
3     Q.  Are you taking credit for like the
4  exposure of Fernwood Art Investments as a
5  fraud?
6        MR. MC BRIDE:  Objection.
7     A.  Yes, I am.
8     Q.  You were the COO of Fernwood Art
9  Investors, correct?
10    A.  Right.
11    Q.  Earlier you testified you were the
12 CFO, right?
13    A.  I meant COO.
14    Q.  Here in the article it says you are
15 the CEO, right?
16    A.  That is typical Brook.  I never was
17 the CEO.
18    Q.  Okay, but regardless, you are quite
19 proud of the role you had in exposing the fraud
20 at the company for which you were the chief
21 operating officer?
22       MR. MC BRIDE:  Objection.
23    A.  I would say it was a tragedy for
24 many people, some of whom lost money that they
25 shouldn't have lost, who couldn't afford to

Plummer - Confidential

1
2  lose it.  So it was a tragedy on many levels.
3     Q.  On many levels?  On every level?
4     A.  Okay, on every level.
5     Q.  It was a fraud, sir, and you were
6  the chief operating officer?
7        MR. MC BRIDE:  No question.
8     Q.  Yes?
9     A.  Yes.
10    Q.  That is not a good thing, is it sir?
11       MR. MC BRIDE:  Objection.
12    A.  No.
13    Q.  Let's move on.
14    A.  Can I respond to that?
15    Q.  Your attorney can ask you some
16 questions at the end in which he can raise
17 anything that matters:
18       No part of your fraud at Fernwood
19 Art Investments had anything to do with an
20 asset-backed loan; did it?
21       MR. MC BRIDE:  Objection.
22    A.  You just said my fraud.
23    Q.  Pardon me.  No part of the fraud at
24 the company for which you served as the chief
25 operating officer had anything to do with

Plummer - Confidential

1
2  asset-backed lending, correct?
3     A.  It had to do with asset-backed
4  lending in terms of identifying the stability
5  of art as an asset and their attributes and
6  their liquidity which has an indirect
7  relationship to art as an asset-backed source
8  for lending.
9     Q.  Sir, Fernwood Art Investments never
10 extended a single asset-backed loan, true?
11    A.  No.
12    Q.  In fact, Fernwood Art Investments
13 never did anything in terms of equity
14 investment either, true?
15    A.  It depends on how you define that,
16 but I would say no.
17    Q.  True, yes?
18    A.  True.
19    Q.  Right.  I understood he raised money
20 from other people and stole it, right, that
21 ended up being kind of what was happening?
22    A.  It -- not the company, the founder,
23 Bruce Taub.
24    Q.  And he raised it for Fernwood Art,
25 right?

Plummer - Confidential

1
2     A.  Yes.
3     Q.  And you were the COO of that,
4  correct?
5        MR. MC BRIDE:  Objection.
6     A.  I was the COO and in the process of
7  having information withheld from me that I
8  ultimately demanded Bruce Taub siphoned the
9  remainder of the funds out of the company and
10 split.
11    Q.  And you started demanding
12 information and getting information after it
13 was too late, right?
14    A.  No, there was still money in the
15 accounts.
16    Q.  Well, it was too late for the
17 roughly 3 million dollars that he had already
18 stolen was spent, right?
19       MR. MC BRIDE:  Objection.
20    A.  No, there was still money there that
21 would have covered the investors, but he
22 withdrew that in the process of my trying to
23 get the information from him.
24    Q.  That's stealing, right, sir?
25    A.  Yeah, and I'm not saying it wasn't.

39 (Pages 150 - 153)

1          Plummer - Confidential
2      Q.   Is there any more you want to tell
3  me about Fernwood Art Investments which you
4  think qualifies you as an expert in
5  asset-backed lending?
6          MR. MC BRIDE:  Objection.
7      A.   I would say understanding art is an
8  asset.  It's important to understand the
9  asset-backed lending.
10      Q.   Great, let's keep moving.
11  Co-director of Spring Masters.  As the
12  co-director of Spring Masters, did you
13  underwrite any asset-backed loans?
14      A.   No.
15      Q.   That is an art fair, right?
16      A.   Yes, but during that period we did
17  art asset-backed loans at Artvest Partners.
18      Q.   We are not there yet, sir.  I'm just
19  working through your resume.  I'm going through
20  every single bullet, okay?
21      A.   Hmm-hmm.
22      Q.   Spring Masters is an art fair,
23  right?
24      A.   Was, yes.
25      Q.   Was, okay.  Likewise in the bullet

1          Plummer - Confidential
2  above that it says "Co-director and Co-owner of
3  TEFAF?"
4      A.   Hmm-hmm.
5      Q.   And that's TEFAF, T-E-F-A-F.  TEFAF,
6  those are art fairs also, right?
7      A.   Hmm-hmm.
8      Q.   Yes, sir?  You have to answer
9  audibly.
10      A.   Yes.
11      Q.   Art fairs are trade shows; yes, sir?
12      A.   Yes.
13      Q.   In the sense that people within an
14  industry come together at the trade show and
15  there's people who do exhibitions and
16  networking and there are booths, right?
17      A.   Yes, and it's the principal form of
18  selling for dealers where they do the majority
19  of their business for the year.
20      Q.   And running an art fair is like
21  running a trade show; you have to deal with
22  large numbers of people coming together who
23  have a shared interest in a particular industry
24  or profession?
25          MR. MC BRIDE:  Objection.

1          Plummer - Confidential
2      A.   Yes.
3      Q.   So that includes things like renting
4  space, right?
5      A.   Correct.
6      Q.   Doing ticket sales, right?
7      A.   Yeah.
8      Q.   VIP packages, right?
9      A.   Yes.
10      Q.   Endless cocktail parties, right?
11      A.   Yes, it involves a whole bunch of
12  other things.
13      Q.   I have seen the pictures.  There is
14  a lot of cocktail parties; yes, sir?
15      A.   There are some, but you know, it
16  also involves getting to know the dealers well,
17  getting to know the cash flows of their
18  businesses, getting to know what they are
19  selling and whatnot, getting to know the
20  industry and how it's doing in any specific
21  moment in time and understanding the underlying
22  businesses that are functioning in the art
23  business.
24      Q.   Sir, does that happen at every trade
25  show for every profession?

1          Plummer - Confidential
2          MR. MC BRIDE:  Objection.
3      A.   I don't know.
4      Q.   So when the ophthalmologists all get
5  together and compare how they are examining
6  people's eyes in the new laser technologies, at
7  the booths, at the cocktail parties, it's
8  critical networking, but it's fundamentally the
9  same as an art fair or any trade show, right?
10          MR. MC BRIDE:  Objection.
11      A.   No, no.  For instance, at the art
12  fair you would learn that the post war area is
13  doing well, but the old master sector is not.
14  That the old master sector is having cash flow
15  problems and the post war sector is having
16  trouble finding inventory.  So you have your
17  finger on the pulse of the industry and what is
18  happening and how businesses are dealing.
19      Q.   Fair enough, sir.  So let's take
20  another example.
21          A trade show of fast food companies,
22  right, at the trade show of the fast food
23  companies do the different industry titans at
24  the fast food chains have a pulse on their
25  industry?

1       Plummer - Confidential
2       MR. MC BRIDE:  Objection.
3       A.  I don't know.  I don't know that
4  category.
5       Q.  Fair enough.  Just as the masters
6  may be up and the impressionists may be down,
7  this could be a year for chicken as opposed to
8  burgers, right, sir?
9       MR. MC BRIDE:  Objection.
10      A.  I don't know.
11      Q.  It's an industry trade show, right,
12  sir?
13      MR. MC BRIDE:  Objection.
14      A.  It's more than that.
15      Q.  In fact, the dealers they rent
16  booths from the trade show, right?
17      A.  Yes.
18      Q.  Booths, right?  Do you have their
19  bank statements when you rent booths for them?
20      A.  No, but we do have a sense of their
21  liquidity by the speed with which they are able
22  to pay for those booths and their discussions
23  for looking for terms and whatnot because they
24  can't afford to do it because their businesses
25  aren't doing well.

1       Plummer - Confidential
2       Q.  Sir, are you suggesting that renting
3  a booth at a trade show is anything like credit
4  underwriting?
5       MR. MC BRIDE:  Objection.
6       A.  I'm not making a direct comparison,
7  but I'm saying that credit underwriting
8  involves analysis of the conditions, market
9  conditions and having a sense of market
10  conditions from being at an art fair, running
11  an art fair and having close relationships with
12  the dealers is very important market
13  intelligence.  So market intelligence is
14  essential to good credit underwriting.
15      Q.  Right.  It's talking to everybody in
16  the biz, right, sir?
17      MR. MC BRIDE:  Objection.
18      A.  It's gathering market intelligence
19  which is consistent with what I have to say,
20  not your characterization or it.
21      Q.  Well, fair enough.  And your role in
22  running a trade show is to figure out how many
23  booths are going to be -- who is going to get
24  what booths, how much you are going to charge
25  for it and chase the people who don't pay on

1       Plummer - Confidential
2  time for the booths, all right?
3       MR. MC BRIDE:  Objection.
4       A.  No, it's more than that.  It's
5  actually working with some of these people who
6  are thought leaders in each of their categories
7  in coming up with ways to reach new audiences,
8  reach new clients, get the right environment
9  where they are selling more, selling what they
10  need to sell.  It's actually engaging with them
11  at a very high level about their businesses and
12  how they operate.
13      Q.  You think that qualifies you to be
14  an expert in asset-backed lending?
15      MR. MC BRIDE:  Objection.
16      A.  I think it gives me market
17  intelligence on what attributes need to be
18  found out and observed in asset-backed lending.
19      Q.  Has anyone ever shared with you
20  proprietary credit underwriting guidelines in
21  your role as the manager of a trade show?
22      A.  You mean has someone like Athena, a
23  lender, shared their proprietary guidelines or
24  has the dealer shared their bank statements
25  with me?

1       Plummer - Confidential
2       Q.  Well, I'm not asking about a dealer
3  bank statements because you're not an expert in
4  dealer bank statements in this case.  You're an
5  expert in asset-backed lending securitized in
6  art, right?
7       MR. MC BRIDE:  Objection.
8       A.  Yes.
9       Q.  Has an asset-backed lender shared
10  with you their underwriting guidelines in
11  connection with your role running the trade
12  show?
13      A.  In connection with, no.
14      Q.  Of course not.  Now earlier you
15  testified that part of having your pulse on the
16  industry is seeing how quickly or not quickly
17  dealers pay for the space they rent or the
18  booths they rent at the trade show, right?
19      A.  Hmm-hmm.
20      Q.  You have to answer audibly, sir.
21      A.  Yes.
22      Q.  Is it the case, sir, that the speed
23  with which someone pays says something about
24  their liquidity?
25      A.  Yes.

Plummer - Confidential

1 it's more than that.  It's 90 minutes a course,
2 so it was five courses, so whatever that
3 amounts to.
4     Q.  Do you get some credential that
5 allows you to be a credit underwriter from
6 Christie's Education?
7     A.  No.
8     Q.  Can anyone sign up for these
9 classes?
10         MR. MC BRIDE:  Objection.
11     A.  Yes.
12     Q.  Right, like you don't need like a
13 qualifying undergraduate or professional
14 degree?
15     A.  You know, I don't know what
16 Christie's qualifications are.  I know they
17 made it a core element of one of their core
18 courses and I'm not sure if that larger course
19 is accredited or not.
20     Q.  Do you have course materials that
21 you use for Christie's Education on
22 asset-backed lending?
23     A.  I do.
24     Q.  What are the materials about

Page 170
1          Plummer - Confidential
2 it's more than that.  It's 90 minutes a course,
3 so it was five courses, so whatever that
4 amounts to.
5    Q.  Do you get some credential that
6 allows you to be a credit underwriter from
7 Christie's Education?
8    A.  No.
9    Q.  Can anyone sign up for these
10 classes?
11       MR. MC BRIDE:  Objection.
12    A.  Yes.
13    Q.  Right, like you don't need like a
14 qualifying undergraduate or professional
15 degree?
16    A.  You know, I don't know what
17 Christie's qualifications are.  I know they
18 made it a core element of one of their core
19 courses and I'm not sure if that larger course
20 is accredited or not.
21    Q.  Do you have course materials that
22 you use for Christie's Education on
23 asset-backed lending?
24    A.  I do.
25    Q.  What are the materials about

1          Plummer - Confidential
2 asset-backed lending that you use?
3    A.  They talk about the riskiness of the
4 different art sectors, the liquidity of the
5 different art sectors, the risks in certain
6 works of art, the risks in valuations of works
7 of art.
8       Like, for example, how contemporary
9 is the riskiest in terms of value and old
10 masters and impressionists and modern are less
11 risky in terms of value, various aspects of
12 art, risks to art as an asset, authentication.
13    Q.  I'm talking about credit, sir.  Do
14 you teach credit boxes at Christie's Education?
15    A.  Credit boxes?
16    Q.  Yes.
17    A.  I'm not sure I understand that
18 question.
19    Q.  You're not familiar with that term,
20 credit box?
21    A.  No.
22    Q.  Why don't we take a lunch break?
23    A.  Okay.
24       THE VIDEOGRAPHER:  We are going off
25 the record.  The time is 1:00 p.m.

1          Plummer - Confidential
2       (Lunch recess taken.)
3       AFTERNOON SESSION
4       THE VIDEOGRAPHER:  We are going on
5 the record.  The time is 1:44 p.m.
6 BY MR. SHAPIRO:
7    Q.  Mr. Plummer, returning to Plummer
8 Exhibit 4 which is your expert report --
9       MR. MC BRIDE:  Exhibit 3.
10    Q.  Pardon me.  Mr. Plummer, returning
11 to Plummer Exhibit 3, which is your expert
12 report, would you please now turn to Exhibit D
13 which is "Testimony, Publications and
14 Presentations?"
15    A.  Okay.
16    Q.  Tell me when you are there.
17    A.  I'm here.
18    Q.  Why did you not list the Overton
19 report under Testimony, Publications and
20 Presentations?
21    A.  Because it was done in 2016 and I
22 was advised by the attorneys involved in the
23 case that it had not been filed.  The case had
24 been settled privately and that's why.
25    Q.  Well, sir, you disclosed an expert

1          Plummer - Confidential
2 witness report from a case in 2014, right?
3    A.  Yeah, because it was a prestigious
4 prominent case and I think it spoke to my bona
5 fides in general as an expert witness because
6 it was such a prominent case for the Deloitte
7 bankruptcy trial.
8    Q.  Is it fair to say, sir, that Exhibit
9 D, Testimony, Publications and Presentations,
10 are really testimony, publications and
11 presentations that you, Michael Plummer, think
12 are prestigious?
13       MR. MC BRIDE:  Objection.
14    A.  No, no.  I thought the other one was
15 confidential.
16    Q.  According to whom?
17    A.  I asked the attorney if it had been
18 filed and if it was a matter of public record
19 and he said no.
20    Q.  He said the Overton report is not a
21 matter of public record?
22    A.  Yes.
23    Q.  What is the name of that lawyer?
24    A.  I -- should I share that name?
25    Q.  If you know it.

Plummer - Confidential

1    Plummer - Confidential
2    A.   I can't remember his last name.
3    Q.   So, sir, it's your testimony today
4 that you left out the 2016 Overton expert
5 report from this Federal Court expert report,
6 Plummer Exhibit 3, because a gentleman, the
7 name of which you do not know, told you?
8    A.   He, because he told me that it had
9 not been filed publicly.
10    Q.   And you don't know what his name is?
11    A.   I would have to go back and find it
12 for you.
13    Q.   When did you ask him?
14    A.   A couple of months ago.
15    Q.   And you don't remember his name?
16    A.   Not off the top of my head.
17    Q.   Sir, do you consider yourself
18 obligated to give like truthful and complete
19 lists of testimony, publications and
20 presentations --
21        MR. MC BRIDE:  Objection.
22    Q.   -- on Plummer number 3?
23        MR. MC BRIDE:  Objection.
24    A.   Do I not feel obligated?
25    Q.   Do you consider yourself to be

Plummer - Confidential

1    Plummer - Confidential
2 obligated to be truthful and honest and
3 complete?
4    A.   Of course I do.
5    Q.   But you weren't?
6    A.   I was to the extent of what I
7 thought I was told was true.
8    Q.   By a gentleman whose name you don't
9 even know?
10    A.   I have to find the name of the
11 attorney who I spoke to.
12    Q.   Is there any reason you couldn't
13 have dropped a footnote and said I did
14 something else, but it's top secret, so at
15 least people would know you were hiding things?
16        MR. MC BRIDE:  Objection.
17    A.   I didn't think to do that.
18    Q.   Did you disclose to Mr. Grossman or
19 his firm that you had withheld that
20 information?
21        MR. MC BRIDE:  Objection.  I
22 instruct you not to respond to that.
23    Q.   You're going to follow your
24 counsel's instruction?
25    A.   Yes.

Plummer - Confidential

1    Plummer - Confidential
2    Q.   I'm going to build a record, sir.
3 Number one, did you understand the question I
4 just asked you?
5    A.   The last question you asked me?
6    Q.   Yes, sir.  I need to build a record
7 here, so stick with me, sir.
8        Number one, did you understand the
9 last question I asked you?
10        MR. MC BRIDE:  Which question is
11 that?
12    Q.   Let me try it again.  I'm going to
13 ask you a question and then afterwards my first
14 question will be do you understand what I just
15 asked you.  So that's going to be a yes or a
16 no.  Okay?
17    A.   Okay.
18    Q.   Did you disclose to Judd Grossman or
19 a member of his team at the law firm that you
20 had omitted the Overton report from Exhibit D
21 to your expert report, Plummer Exhibit 3?
22        MR. MC BRIDE:  I instruct you not to
23 answer that question.
24    Q.   Do you understand that question?
25        MR. MC BRIDE:  You can answer,

Plummer - Confidential

1    Plummer - Confidential
2 whether you understand the question.
3    A.   I understand the question.
4    Q.   Number two, without telling me the
5 answer, do you know the answer to that
6 question?
7    A.   Yes.
8    Q.   Number three, what is the answer to
9 that question?
10        MR. MC BRIDE:  Don't answer that
11 question.
12    A.   I take advice from my attorney.
13    Q.   So you're not going to answer that
14 question?
15    A.   Correct.
16    Q.   But we can agree, sir, that you gave
17 an expert report in 2016 in the Overton matter
18 which was your starting point for your expert
19 report in this case, yes, sir?
20        MR. MC BRIDE:  Objection.
21    A.   Yes.
22    Q.   And you did not disclose that in
23 your expert report in this matter, right?
24    A.   Correct.
25    Q.   And that's based on a phone

1          Plummer - Confidential
2 conversation you had with a gentleman, the last
3 name of which you do not know?
4     A.   I know.  I know.  I'm trying to
5 remember what it is and if you give me time, I
6 probably will remember it.
7     Q.   And that gentleman told you it's
8 because the Overton report is private and has
9 never been public?
10         MR. MC BRIDE:  Asked and answered.
11    A.   Yes.
12    Q.   Do you even know if that is true?
13    A.   I went on the attorney's say so.
14    Q.   Is he your attorney?
15    A.   No, he was the attorney in the case.
16    Q.   Were you deposed in that case?
17    A.   No, it didn't reach the level of
18 deposition.
19    Q.   That does happen.  You also referred
20 to that expert report in this deposition,
21 right?
22    A.   Sorry?
23    Q.   You referred to the Overton report
24 in this deposition, right?
25    A.   In the context of earlier -- your

1          Plummer - Confidential
2 questioning earlier, yes.
3     Q.   So confidentiality didn't stop you
4 then, did it?
5     A.   That wasn't a confidential question
6 about whether or not I worked on the -- taken
7 the Overton thing as a starting point.
8     Q.   So the fact of the Overton report
9 was not confidential because you shared it
10 before the lunch break, right?
11         MR. MC BRIDE:  We can represent that
12    the Overton report had come out in a
13    report in this case.
14    Q.   You said there was an Overton report
15 in 2016; that was your testimony, sir, right?
16    A.   Yes.
17    Q.   Is there any reason you couldn't
18 have said the fact of the Overton report in
19 your report in this matter?
20         MR. MC BRIDE:  Asked and answered.
21    A.   (No response.)
22    Q.   Do you see the inconsistency there
23 at all, sir?
24         MR. MC BRIDE:  Objection.
25    A.   Not really.

1          Plummer - Confidential
2     Q.   Sir, did you think we weren't going
3 to locate the Overton report?
4         MR. MC BRIDE:  Objection.
5     A.   I didn't know.  I wasn't trying to
6 keep it a secret.  I just wasn't certain on the
7 propriety of discussing it.
8     Q.   Sitting here today, do you know if
9 we reviewed the Overton report?
10    A.   It's clear from the Katz rebuttal
11 that it was reviewed.
12    Q.   Were you surprised?
13    A.   Not necessarily.
14    Q.   When you saw the Katz rebuttal, were
15 you glad you didn't disclose it?
16         MR. MC BRIDE:  Objection.
17    A.   No.
18    Q.   Is there anything else that you
19 haven't disclosed in this report, sir?
20         MR. MC BRIDE:  Objection.
21    A.   No.
22    Q.   Now is the time, Mr. Plummer, is
23 there anything else in Exhibit 3, your expert
24 report, that you didn't disclose and you want
25 to get out on the table right now?

1          Plummer - Confidential
2     A.   No.
3     Q.   Okay.  Because so the questions are
4 only going to get harder, okay, sir?
5         MR. MC BRIDE:  Objection.
6     Q.   Let's go to page 6.  Paragraph 23.
7     A.   Okay.
8     Q.   Paragraph 23.  In paragraph 23 do
9 you give kind of an overview of what the
10 purpose of this section of your report is?
11         MR. MC BRIDE:  Objection.  The
12    report speaks for itself.
13    Q.   I'm asking him, sir.
14    A.   Yeah.
15    Q.   So Section 3 of your report is
16 providing context, correct?
17    A.   Correct.
18    Q.   Do you offer any opinion in
19 paragraph 23 about Athena?
20    A.   No.
21    Q.   It's background, right?
22    A.   Right.
23    Q.   In fact, is paragraph 23 taken from
24 your Overton report?
25    A.   I don't believe so.  It might have a

46 (Pages 178 - 181)

Plummer - Confidential

1
2     A.   No, we used that rule of thumb at
3   Sotheby's.  We used that rule of thumb at
4   Christie's.  I have no reason -- there is no
5   reason out there to doubt it.
6     Q.   Sir, you provide no support for it,
7   sir.  And don't tell me about what happened in
8   1980 and '84 at your first job because you have
9   no basis to say that the world hasn't changed
10  in 40 years.
11    A.   It certainly was true of Christie's
12  in 2007, 2008.
13    Q.   Okay, so how many years ago is that,
14  sir?
15    A.   Well, I actually had discussions
16  with Athena about referring them loans and this
17  is what was told to me about Athena.
18    Q.   Sir, you had a discussion with
19  Athena before your engagement in this matter?
20    A.   Yes.  No, hang on.  I had
21  discussions with them about possibly doing
22  loans with them that we did not do and this is
23  information that was quoted to me by Athena.
24    Q.   Is it your testimony under oath that
25  Athena says it uses fair market valuation?

Plummer - Confidential

1
2     A.   Are you talking about fair market
3   value versus what they call market cash value?
4   Are you talking about the difference between
5   those two terminologies?
6     Q.   I'm talking about the basis for your
7   opinion in paragraph 28.
8          MR. MC BRIDE:  There is no question.
9     Q.   Sir, one more time, okay.
10         What is the entirety of your basis
11  for your statement in paragraph 28 that the
12  most common rule of thumb in underwriting in
13  asset-backed loans secured by art is fair
14  market valuation and then you take 50 percent
15  of that to get to LTV?
16         MR. MC BRIDE:  Objection.  Asked and
17    answered.
18    A.   Yes, I think I have answered that
19  question.
20    Q.   Have you done your very best to
21  answer that question, sir?
22    A.   Yes.
23    Q.   You can't name the name of a single
24  soul who has told you that, can you?
25         MR. MC BRIDE:  Objection.

Plummer - Confidential

1
2     A.   I told you I had a conversation with
3   Athena on this when they were starting out with
4   Andrea as to what their terms were.
5     Q.   So Andrea and Athena is the source
6   of paragraph 28?
7          MR. MC BRIDE:  Objection.
8     A.   He is one of multiple sources.
9     Q.   Name a source other than the party
10  that is on the other --
11    A.   Is it Christie's?
12    Q.   Name a source of someone other than
13  Athena who is on the other side of this case
14  for which you support paragraph 28?
15         MR. MC BRIDE:  Objection.
16    A.   I'm not sure.  On the other side of
17  the case, are you saying someone who is
18  involved in this specific case?
19    Q.   Sir, you just testified that the
20  source of your information in paragraph 28 is
21  the former CEO of Athena?
22    A.   No, I testified -- you asked me
23  where I got my multiple sources from and I said
24  a source was Andrea because you implied that my
25  source information was too old and I am telling

Plummer - Confidential

1
2   you that it was as recent as having a
3   conversation with Andrea that I had it
4   confirmed.
5     Q.   So let me be very clear, sir.  I'm
6   not implying anything.  I am asking you if you
7   have a basis to say anything in paragraph 28
8   because so far all you've said is once upon a
9   time you had a conversation with the guy who
10  worked at J.P. Morgan and that the former CEO
11  of Athena confirmed this fact at no point in
12  history?
13         MR. MC BRIDE:  Objection.
14    Mischaracterizes testimony.  Asked and
15    answered and you're badgering the witness.
16    Answer.  There is a question outstanding.
17    Q.   I'm asking you, do you have anything
18  more for it or are you done?
19    A.   I have done loans.
20    Q.   You have not done loans.  What loans
21  have you done?  You did three loans at the
22  failed Christie's business 15 years ago, right?
23         MR. MC BRIDE:  Objection.  Badgering
24    the witness.
25    Q.   What loan have you underwritten

Plummer - Confidential

1
2 since then?
3     A.   I underwrote loans at Artvest.
4     Q.   You were an underwriter at Artvest?
5     A.   No, I didn't underwrite.  I
6 consulted on loans.
7     Q.   You represented a borrower who was
8 looking for some money, sir, right?
9     A.   Yes.
10     Q.   That's not underwriting, is it, sir?
11     A.   No, I misspoke.  I did not mean to
12 suggest I underwrote a loan, but I dealt with a
13 lender.  I was a go-between and their terms
14 were exactly this.
15     Q.   Sir, sir, what lender discloses
16 their credit guidelines?
17     A.   I just told you.  I answered your
18 question.  I told you what it was and now
19 you're saying no one would do that, would tell
20 me that.
21     Q.   Sir, you're not an underwriter; you
22 haven't underwritten a loan?
23     A.   I didn't say I was.  I misspoke and
24 said I was.  I didn't mean to use the word
25 underwriter.

Plummer - Confidential

1
2     Q.   What you said is that you have had
3 clients from time to time who needed loans, so
4 you helped them find bankers, right?
5     A.   Correct.
6     Q.   Is that why you think you're an
7 expert in asset-backed lending?
8         MR. MC BRIDE:  Objection.
9     A.   My experience goes far beyond that.
10 It's my experience in understanding art as an
11 asset.  It's my experience in understanding
12 dealer businesses and creditworthiness.  So it
13 is my general experience in the industry
14 overall and leads me to be asked to be an
15 expert witness on this subject.
16     Q.   Okay, sir.  I don't know why you
17 were asked to be an expert witness, right,
18 because I don't get into other people's heads,
19 but other than what you have testified to
20 today, have you underwritten any particular
21 asset-backed loan that you think informs your
22 judgment as to whether the underwriters at
23 Athena did a good job?
24     A.   I would say the work we did at
25 Christie's.

Plummer - Confidential

1
2     Q.   Right.  Those were the three loans,
3 right, 15 years ago?
4     A.   They were in -- they were -- one was
5 a $60,000,000 loan and one was a hundred
6 million dollar loan, so I do think that the
7 impact of that on the balance sheet of
8 Christie's made this a very meaningful
9 transaction that needed to be done correctly.
10     Q.   Fair enough, sir.  So you are saying
11 you're an expert because you did three loans
12 supervising a credit underwriter 15 years ago
13 makes you an expert today in asset-backed
14 loans?
15         MR. MC BRIDE:  Objection.
16     A.   No, I'm saying much more than that.
17 I'm saying much more experience than that
18 contributes me to being --
19     Q.   Right.  It's just not credit
20 experience, correct?
21     A.   It's credit experience plus other
22 experience.
23     Q.   I got it.  You're in the art world.
24 I get that.  Ms. Sachs, do you know how many
25 loans she has underwritten?

Plummer - Confidential

1
2     A.   I don't, but I was impressed with
3 her CV, which is why I was surprised by some of
4 the actions and decisions she made on the
5 thing.
6     Q.   Sir, she has underwritten billions
7 of dollars of loans, sir?
8     A.   I understand that.
9     Q.   You know something about Cynthia
10 Sachs; she is rarely wrong, okay?
11         MR. MC BRIDE:  There is no question.
12     Q.   Do you know how many loans Athena
13 has underwritten?
14     A.   I don't know exactly.
15     Q.   Do you know generally?
16     A.   Maybe, I know --
17         MR. MC BRIDE:  If you don't know.
18     A.   I don't know for sure.  I heard
19 numbers.
20     Q.   Is that not relevant?
21         MR. MC BRIDE:  Objection.
22     A.   I'm not sure that it is.
23     Q.   Sir, are you offering an opinion
24 that Athena Art doesn't do a very good job
25 underwriting art loans?

53 (Pages 206 - 209)

Plummer - Confidential

1
2      A.   This would be someone like and now
3  we have talked about J.P. Morgan, but we
4  haven't talked about Chase.  This would be
5  someone like Chase and also First Republic Bank
6  who have over the years serviced the midlevel
7  dealer community and they have used the income
8  stream of the business rather than the art
9  assets or general wealth portfolio to provide
10  loans to the business and under that there is a
11  general lien against the business and a lien
12  against their art portfolio.
13         And, for example, First Republic got
14  into a great deal of difficulty with the Larry
15  Salander scandal which I talk about later on in
16  the document because they had a lien against
17  the entire business and that's when there were
18  different consignors and different owners and
19  it became very confusing.  For them to
20  liquidate the business out of bankruptcy took
21  them, I think, something like two or three
22  years.
23      Q.   Because there the secured collateral
24  was not in a separate SPV, correct?
25         MR. MC BRIDE:  Objection.

Plummer - Confidential

1
2      A.   An SPV couldn't possibly have been
3  done in a business like that.
4      Q.   I'm not sure what your basis for
5  that is, but the fact of the matter is that you
6  avoid that parade of horribles by ring fencing
7  your debtor and your collateral in a SPV, true?
8      A.   No, it's generally considered too
9  complicated and difficult for inventory when
10  you are moving in and out of the premises and
11  selling it all the time and turning it over.
12  That's part of the complexity of doing
13  exclusive live asset-backed loans for dealers.
14      Q.   Yes, that's why you need someone
15  like Cynthia Sachs to understand how to
16  underwrite them, right?
17         MR. MC BRIDE:  Objection.
18      A.   No, I don't agree with that.
19      Q.   You talk about a blanket lien.  Have
20  you ever put a blanket lien on anyone?
21      A.   I have not.
22      Q.   Has anyone ever put a lien on you?
23      A.   No.
24      Q.   Never?
25      A.   Once.

Plummer - Confidential

1
2      Q.   Only once?
3      A.   That I'm aware of.
4      Q.   The IRS?
5      A.   Yes.
6      Q.   That's the current lien, right?
7      A.   Right.
8      Q.   And that current lien has been
9  outstanding since 2019?
10      A.   Yep.
11      Q.   And that was after your work with
12  the art fairs ended in litigation, right?
13      A.   Correct.
14      Q.   There are other liens as well in the
15  past, right?
16      A.   I don't know what they are or I
17  don't remember what they are.
18         MR. MC BRIDE:  Objection.
19      Q.   Sir, have you, as a lender, placed
20  more liens on other people than other people
21  have placed liens on you?
22         MR. MC BRIDE:  Objection.
23      A.   I don't know that I have placed
24  liens on anyone.
25      Q.   You just know that at least

Plummer - Confidential

1
2  governments have placed liens on you?
3      A.   I know of that particular loan which
4  was because of an exceptional circumstance.
5      Q.   First Republic you just testified
6  about; is that bank still around?
7      A.   I know it had a great deal of
8  difficulty recently.
9      Q.   Yeah, like two weeks ago.  Moving
10  forward, auction house term loans, that is not
11  Athena, right?
12      A.   No.
13      Q.   Auction house consignment advances,
14  that is not Athena, right?
15      A.   No, but it's an important source of
16  liquidity of dealers, a very highly important
17  source of liquidity for dealers.
18      Q.   But there is nothing in paragraph
19  30D which says Cynthia Sachs and her expert
20  team did a good job or a bad job, right?
21      A.   No, this section wasn't discussing
22  that.
23      Q.   In fact, it was lifted from the 2016
24  Overton report?
25         MR. MC BRIDE:  Objection.

1        Plummer - Confidential
2  financial services at lunch a couple of weeks
3  ago, that the cost of and him you can ask about
4  this, the higher the cost of the interest on
5  the loan, the more of a burden it is on a
6  dealer business and the higher the risk the
7  business fails.
8        Q.   Okay, sir.  So in your mind, if
9  Athena had assessed lower interest, reduced
10 pricing on Philbrick would that have reduced
11 the risk of the Philbrick loan?
12       A.   I'm not saying that they should
13 charge less.  They have to charge what they
14 have to charge to make it worthwhile what they
15 are doing.  I'm only arguing the point that
16 charging a risk adjusted loan covers for the
17 risk and makes it less -- not covers for the
18 risk it compensates for the risk, but
19 it doesn't make the loan less risky.
20       Q.   Did you ever discuss this risk
21 adjusted pricing with Amy who actually had the
22 credit background at Christie's?
23       A.   Amy?  No.
24       Q.   Five minutes, please.
25            THE VIDEOGRAPHER:  We are going off

1        Plummer - Confidential
2  the record.  The time is 2:58 p.m.
3       (Brief recess taken.)
4            THE VIDEOGRAPHER:  We are going on
5  the record.  The time is 3:21 p.m.
6  BY MR. SHAPIRO:
7       Q.   If you would turn, Mr. Plummer, to
8  paragraph 41 of your expert report, Plummer
9  Exhibit 3?
10      A.   Yep.
11      Q.   Would you read the second sentence
12 of paragraph 41 into the record and you can
13 stop at the colon?
14      A.   The second sentence?
15      Q.   The second sentence of paragraph 41.
16      A.   "But there are several that are
17 essential for an asset-backed loan, and cannot
18 be overlooked, avoided or waived away."
19      Q.   And the "several" refers to several
20 due diligence items?
21      A.   Yes.
22      Q.   Okay, sir.  Tell me every fact you
23 have for the proposition that in the world of
24 asset-backed lending that there are several due
25 diligence items that are essential and can

1        Plummer - Confidential
2  never be overlooked, avoided or waived away?
3       A.   Definitive proof of artwork
4  ownership.
5       Q.   No, I'm not asking what they are.
6  I'm asking what your source for that fact is.
7  We are going to go through each three.  Where
8  does the fact come from?
9       A.   The fact comes from my experience
10 and exposure to all the asset-backed lenders
11 out there and work I have done with them and my
12 time at Christie's.
13      Q.   So your time at Christie's with the
14 three loans, right?
15      A.   Yes.
16      Q.   And your experience as an art
17 advisor who helps borrowers find people to lend
18 them money?
19      A.   Yes, and my experience at Sotheby's
20 even if it was 40 years ago.
21      Q.   And that was one loan, sir?
22      A.   Yes, but also in dealing with credit
23 issues, but yes.
24      Q.   But this is talking about
25 asset-backed loans, right?

1        Plummer - Confidential
2       A.   Yes.
3       Q.   And there was only one of them in
4  1982 down in Sotheby's, right?
5       A.   And then again consulting with
6  clients to help them get the loans.
7       Q.   In which case you're not an
8  underwriter; you're just simply trying to --
9       A.   I'm not an underwriter.
10      Q.   Pardon me.  You're just simply
11 trying to find a bank or financial institution
12 that will extend them credit?
13      A.   And getting the information that the
14 bank needed.
15      Q.   Right, which is like a shopping list
16 of things to get, right, typically?
17      A.   That's not how I would characterize
18 it.
19      Q.   It's a list of items to get, right?
20      A.   Correct.
21      Q.   Do you have any other sources for
22 the statement that the four enumerated items in
23 paragraph 41 are due diligence items that can
24 never be overlooked, avoided or waived?
25      A.   Sorry, what was the question again?

Plummer - Confidential

1
2    Q.   Paragraph 43, back to Exhibit 3.
3  Sir, did you take a deep dive into three of the
4  Inigo Philbrick credit memos?
5    A.   Yes.
6    Q.   Is that true?
7    A.   I believe so.
8    Q.   Well, it's your report, sir.  Is it
9  true?
10    A.   Yes.
11    Q.   Okay.  Turn to the back of your
12  report, Exhibit D -- pardon me, Exhibit B where
13  you list the documents relied upon.
14    A.   Right.
15    Q.   Do you see that?
16    A.   Yep.
17    Q.   As I review this, I see only two
18  credit memos and that's the fifth and the sixth
19  bullet.  The first being a March 30, 2017
20  credit memo and then the second being an
21  April 6, 2017 credit memo?
22    A.   And my fault I neglected to mention
23  the very first one which was from in July of
24  2016.
25    Q.   Okay.  So that was just --

Plummer - Confidential

1
2    A.   An error.
3    Q.   Okay, just an error.  How many
4  credit memos did Athena prepare with regard to
5  the borrowing relationship with Inigo Philbrick
6  inclusive of IPL, inclusive of Boxwood?
7       MR. MC BRIDE:  Objection.
8    A.   I had access to those three.  I did
9  not have access to all the others, any others.
10    Q.   Are you aware that there were any
11  others?
12    A.   I was aware that there were others.
13    Q.   Because the later credit memos refer
14  to the work that was conducted in connection
15  with the earlier underwriting, correct?
16       MR. MC BRIDE:  Objection.
17    A.   Say that again.
18    Q.   Because the later credit memos that
19  you reviewed refer to the work that was done in
20  the earlier credit memos?
21    A.   Correct.
22    Q.   Is it fair to say that it's an
23  obligation of any responsible asset-backed
24  lender doing underwriting of an additional loan
25  or a change to a loan to an existing borrower

Plummer - Confidential

1
2  to take into full account of everything that
3  had been done to date, correct?
4    A.   Correct.
5    Q.   That is why underwriters consider it
6  to be significant to review the performance of
7  a borrower under earlier arrangements before
8  making new ones?
9    A.   Correct.
10    Q.   That's exactly what happened here,
11  correct?
12    A.   Correct.
13    Q.   Sir, how are you comfortable passing
14  on the appropriateness of Ms. Sachs and her
15  teams underwriting of later loans without
16  reviewing the whole credit file?
17    A.   I was focused on the existing, the
18  transaction, the Boxwood transaction.
19    Q.   But so the Boxwood transaction
20  wasn't done in isolation?
21       MR. MC BRIDE:  No question.
22    Q.   Was it?
23    A.   I don't -- probably no.
24    Q.   No, the Boxwood transaction came
25  after a series of underwritten credit

Plummer - Confidential

1
2  agreements, correct?
3    A.   Yes, another one if I remember
4  correctly was a guarantee in addition to the
5  Phillips guarantee, and there is another one
6  which I can't remember exactly the details of.
7  So I think we are talking two other credit
8  memos.
9    Q.   Sir, were there six in total?
10    A.   There might have been.
11    Q.   You don't know, do you, sir?
12    A.   No, I don't know.
13    Q.   Because you didn't review the whole
14  credit file, did you?
15    A.   No, I did not.
16    Q.   You didn't ask to review the whole
17  credit file?
18    A.   No, I did not.
19    Q.   And one of your criticisms of
20  Ms. Sachs' expertise is that she didn't do
21  enough financial due diligence on Inigo
22  Philbrick, the human, and IPL, the business, as
23  guarantors, correct?
24    A.   Correct.
25    Q.   And you have no idea of what due

Plummer - Confidential

1 
2 diligence was done, financial due diligence was
3 done on either that human being or that entity
4 in the earlier credit memos that you didn't
5 review?
6         MR. MC BRIDE:  Objection.
7     A.   I do not know what was done in those
8 credit memos.  I base my decision on what was
9 done on the largest loan and the biggest, the
10 most important credit that Athena was extending
11 to them.
12    Q.   It is the case, sir, that any
13 responsible credit underwriter of an
14 asset-backed loan or frankly any commercial
15 loan has to take into account the diligence
16 that was done before and the borrower's conduct
17 with the lender?
18    A.   I know that in the context of the
19 borrower's conduct with the lender that Inigo
20 was being difficult in supplying information to
21 Athena and that Cynthia, Ms. Sachs, was having
22 difficulty in getting information out of Inigo
23 and the fact that he actually walked away from
24 the first loan at the demand for what was
25 really reasonable information.  He came back,

Plummer - Confidential

1 
2 but he walked away, as Cynthia referred to,
3 peacocked on the loan.
4     Q.   Ms. Sachs also testified, if you
5 want to see the basis for underwriting, you
6 have to look at the credit file, right?
7     A.   Yes.
8     Q.   You didn't look at the credit file,
9 so you don't know how she actually underwrote
10 the loans ultimately before extending the
11 valuable credit of the Athena Art Corporation?
12        MR. MC BRIDE:  Objection.
13    A.   No, she said look at the credit
14 memos where the credit memos have the
15 information.  I looked at three of the credit
16 memos.
17    Q.   You don't know what is in the other
18 three?
19    A.   For the earlier smaller deals, two
20 of the earlier smaller deals, I do not know.
21    Q.   Sir, you didn't even know there were
22 six of them until I just told you; did you?
23    A.   I thought there were five.
24    Q.   So your counsel showed you a
25 transcript of an argument that I made to a

Plummer - Confidential

1 
2 federal judge on a collateral discovery issue
3 and you considered that in forming your
4 opinion, correct?
5     A.   Yes.
6     Q.   But you didn't consider the full
7 credit file and an expert report about the
8 underwriting, the credit underwriting of an
9 asset-backed loan?
10        MR. MC BRIDE:  Objection.
11    A.   I thought I had the information that
12 I needed for the analysis.
13    Q.   Sitting here today, do you think it
14 would have been a good idea to review the whole
15 credit file of this borrower and related
16 entities before opining about whether it was
17 appropriately underwritten?
18        MR. MC BRIDE:  Objection.
19    A.   I am not sure that it would have
20 changed the issues that I raised.
21    Q.   You don't know because you didn't
22 even look?
23        MR. MC BRIDE:  No question.
24    Q.   Correct?
25        MR. MC BRIDE:  Objection.

Plummer - Confidential

1 
2     A.   I -- I -- I have nothing to say.
3     Q.   There is no explanation for that, is
4 there, sir?
5         MR. MC BRIDE:  Objection.
6     A.   There is.  I thought I had the
7 information I needed to do this analysis.
8     Q.   Right.  You thought three out of
9 five was enough and you didn't even know there
10 were six, correct?
11        MR. MC BRIDE:  Objection.  Asked and
12    answered.  Badgering the witness.  Let's
13    move on.
14    Q.   Is that fair?
15    A.   No.
16    Q.   It's not fair?  What part of that is
17 wrong?
18        MR. MC BRIDE:  Objection.
19    A.   I said I thought I had the
20 information I needed to make the decisions I
21 made.
22    Q.   That information just didn't happen
23 to include the full credit file you were
24 opining on?
25        MR. MC BRIDE:  Objection.  Asked and

1           Plummer - Confidential
2 experience, sir.
3           MR. MC BRIDE:  No question.  There
4 is no question.
5      Q.   Were you aware of that?
6      A.   I thought it was probably in that
7 range.
8      Q.   And in your mind that was not
9 significantly valuable to inform the art issues
10 that came up in underwriting?
11           MR. MC BRIDE:  Objection.
12      A.   I think, as you indicated before,
13 that extending credit in underwriting art loans
14 is a very complicated and underwriting in
15 general is a very complicated thing.  And I
16 don't think ten years of experience is
17 significant in that context.
18      Q.   Sir, you keep repeating about your
19 wonderful credit experience 40 years ago as a
20 28 year old with non ABL loans.  Why is that
21 valuable then?
22           MR. MC BRIDE:  Objection.
23      A.   I am not going to respond to you
24 sitting there diminishing my experience in the
25 industry that crosses a whole bunch of aspects

1           Plummer - Confidential
2 that relate to this that don't just have to do
3 with underwriting experience.
4           There is also experience of the
5 industry that is highly relevant to this that
6 would have helped uncover a lot of these
7 issues.
8      Q.   What about Giovanna Quattrone?
9      A.   I don't know her.
10      Q.   So you don't know the relevant
11 experience and credentials and energy she
12 brings to the underwriting process?
13      A.   No, I did not see her name in any of
14 the materials I reviewed.
15      Q.   How about Nigel Glenday,
16 G-L-E-N-D-A-Y?
17      A.   No.
18      Q.   No idea what he does?
19      A.   No.
20      Q.   Have you ever heard of the company
21 Masterworks?
22      A.   Yes.
23      Q.   He's the CFO of Masterworks, sir?
24           MR. MC BRIDE:  Presently.
25      A.   Presently?

1           Plummer - Confidential
2      Q.   Yes, and before that he was at
3 Athena and you have no idea what his acumen,
4 experience and contributions were?
5      A.   Was he part of the credit memo
6 process at this time?
7      Q.   I don't get to answer the questions,
8 sir, but I have to have a basis for them, so
9 yes.
10           How about George Wilkinson?
11           MR. MC BRIDE:  What is the question?
12      Q.   Do you know what George Wilkinson's
13 contributions were?
14      A.   Was he the CFO?
15      Q.   If you know.
16      A.   I do know that he played a role in
17 this.
18      Q.   I'm asking, sir, because you drew a
19 conclusion that Athena lacked expertise?
20      A.   Specifically in the art world.
21      Q.   Correct, and I'm asking you about
22 all these other people who had expertise to see
23 if you knew anything about them.
24           MR. MC BRIDE:  No question.
25      Q.   Can you identify an asset based

1           Plummer - Confidential
2 lender that extended credit on the basis of
3 securitized art that has a larger team than
4 Athena's?
5           MR. MC BRIDE:  Objection.  A larger
6      team?
7           MR. SHAPIRO:  A larger team.
8      A.   No, but I was addressing the fact
9 that the largest part of the Athena team was
10 from the Fintech sector outside of the art
11 market and I thought that there was an
12 imbalance there that in terms of decision
13 making power and authority that may have led to
14 this, this problem that we are talking about
15 here.
16      Q.   Can you name me any successful
17 financial lending institution in any asset
18 class where the senior most people have to sign
19 off on credit, art credit people?
20           MR. MC BRIDE:  Objection.
21      A.   Sotheby's and Christie's.
22      Q.   And you consider them to be
23 sophisticated financial institutions?
24      A.   I think Sotheby's is the most
25 sophisticated and successful in asset-backed

```
 1         Plummer - Confidential
 2 lending of any organization in the world.
 3     Q.   Does Sotheby's have better
 4 underwriting results than Athena?
 5     A.   Their underwriting results aren't
 6 public, so I couldn't tell you.
 7     Q.   So you have no basis for that at
 8 all?
 9     A.   I know by the size of their
10 portfolio and their success in the business
11 that they're sufficiently happy with it, that
12 it works for them.
13     Q.   Do you know what margins Sotheby's
14 gets on its portfolio as compared to Athena?
15     A.   I generally understand it to be
16 similar because I believe their cost of capital
17 is similar and what they charge is similar.
18     Q.   That is sort of an assumption; isn't
19 it?
20     A.   It's an informed assumption based on
21 different pieces, sources of information, but
22 it could be wrong, but --
23     Q.   When is the last time you saw a
24 portfolio snapshot of the existing book of
25 business at Sotheby's?
```

```
 1         Plummer - Confidential
 2     A.   Since it has not been public for
 3 several years, I have no insight into their
 4 portfolio now except that I know from having
 5 lunch with the head of it a couple of weeks ago
 6 that they are pretty happy with the -- with it
 7 and they had a big burst of activity recently
 8 and I believe they are close to a billion
 9 dollars in asset, in portfolio.
10     Q.   Is one of your opinions in this case
11 that Athena would have closed the Boxwood loan
12 no matter what?
13     A.   I believe I said something to that
14 effect.
15     Q.   Yes.  In fact, that's sort of your
16 conclusion; isn't it, sir?
17         MR. MC BRIDE:  Objection.
18     Q.   You give an opinion that Mr. Danese
19 and Ms. Sachs were under extraordinary
20 pressure?
21     A.   Yes.
22     Q.   Do you have any facts for that?
23     A.   Various data points from observing
24 them from outside, from the industry from
25 observing them from outside and knowing
```

```
 1         Plummer - Confidential
 2 something about the size of this market.
 3         The size of the asset-backed market
 4 is much smaller than people think.  They were
 5 under pressure to grow the business and they
 6 had a very expensive burn rate, very expensive
 7 setup with all the staff that they had and
 8 that's my conclusion based on my outside
 9 analysis.
10     Q.   Okay, so why don't you turn to page
11 39.  And you'll see at the bottom of 39 of your
12 report, Exhibit G, you refer to the intense
13 pressure that Danese, Sachs and others in
14 Athena's senior team were under?
15     A.   Yes, I see G.
16     Q.   Do you consider yourself an expert
17 in the psychological state of Andrea Danese?
18     A.   No, but I do consider my expert --
19 myself an expert in having a startup and small
20 entrepreneurial business in the art world and
21 having outside investors and knowing what it's
22 like to -- what the results they expect.
23         I also generally know what The
24 Carlyle Group is looking for in terms of their
25 investments and so it makes sense to me that
```

```
 1         Plummer - Confidential
 2 they would be at this point in time looking to
 3 expand the portfolio.
 4     Q.   Sir, do you know that's true or you
 5 are just saying that it would make sense that
 6 it's true?
 7     A.   I think it's likely to be true.
 8     Q.   Okay.  Sir, are you offering an
 9 expert opinion that Andrea Danese, Cynthia
10 Sachs and others in Athena's senior team
11 compromised their underwriting judgment because
12 of some sort of pressure they were feeling?
13         MR. MC BRIDE:  Objection.
14     A.   To be candid, I thought it was the
15 only reason I could figure out that made sense
16 for the decisions they made at the time in
17 their underwriting process.
18     Q.   Sir, do you know how many loans
19 Athena has passed on?
20     A.   I know, yes, I can easily guess
21 based on the people that came to us at Artvest
22 after we set up, put out our shingle.  There
23 are so many frauds out there and fake loans
24 coming to the surface that that is not a
25 measure of anything.
```

Plummer - Confidential

1
2      We would get calls on a daily basis
3  with all sorts of things.  So I don't consider
4  turning down loans to be a sign of much.
5      Q.   You think it's irrelevant?
6           MR. MC BRIDE:  Objection.
7      A.   Kind of.
8      Q.   Okay, sir.  By the way, sir, when
9  you are giving all your experience in startups
10 in the art finance world, you haven't been
11 associated with a successful one, have you?
12          MR. MC BRIDE:  Objection.
13     A.   Why do you say that?
14     Q.   Well, there was one which ended up
15 in fraud lawsuits?
16     A.   Yeah.
17     Q.   And never did a loan and never did a
18 deal.  Then there was one that did three loans
19 that you say were so fabulous, but that was
20 shut down because the person who owned it
21 didn't think it made sense.
22          MR. MC BRIDE:  I'm not sure what the
23     question is.
24     A.   No, no.
25          MR. MC BRIDE:  There is no question.

Plummer - Confidential

1
2  There is no question and you're harassing
3  the witness.
4      A.   I think I want to take a break.
5      Q.   What basis do you think you have the
6  expertise?
7      A.   I want to take a break.
8           THE VIDEOGRAPHER:  We are going off
9  the record.  The time is 5:03.
10          (Brief recess taken.)
11          THE VIDEOGRAPHER:  We are going on
12     the record.  The time is 5:17.
13 BY MR. SHAPIRO:
14     Q.   Mr. Plummer, before the break I had
15 a terrible omission.  Do you know who Rebecca
16 Fine is?
17     A.   Yes.
18     Q.   Do you consider Rebecca Fine to be
19 someone who is in the art world?
20     A.   Yes, but focused in the legal part
21 of the art world.
22     Q.   Do you think Rebecca Fine
23 contributed in a meaningful and significant way
24 to the underwriting of the partial loan that
25 you focused on?

Plummer - Confidential

1
2      A.   Yes, and I have heard good things
3  about Rebecca in the industry.
4      Q.   Do you consider Sotheby's to be some
5  sort of blue-chip when it comes to asset-backed
6  lending?
7      A.   They make mistakes like everybody
8  else does.
9      Q.   Do you know Sotheby's hired one of
10 Rebecca Fine's former deputies to be its vice
11 president of risk?
12     A.   That's great.
13     Q.   Have you ever sought a job from
14 Athena, sir?
15     A.   No.
16     Q.   You never asked Steve Brody to reach
17 out to Athena on your behalf for a job?
18     A.   No.
19     Q.   Okay.
20     A.   Oh, he had a contact with a certain
21 organization, a bank that I asked him about,
22 but I never asked him for a job at Athena, to
23 get me a job at Athena, ever.
24     Q.   In fact, sir, you know that Athena
25 would never hire you, sir?

Plummer - Confidential

1
2           MR. MC BRIDE:  Objection.
3      A.   I don't want to work for Athena.
4      Q.   Do you remember the last time you
5  spoke to Mr. Danese?
6      A.   He was a sponsor of the TEFAF Fair.
7      Q.   Do you remember right around the
8  time that the Board of Directors of TEFAF
9  parting ways with you and your partner that you
10 had a meeting at Athena with Mr. Danese?
11     A.   Yes.
12     Q.   Do you remember it was a heated
13 meeting?
14     A.   I do.
15     Q.   Mr. Danese threw you out of the
16 office, didn't he, sir?
17     A.   We were trying to talk to him about
18 his expectations as a sponsor relative to what
19 he was paying and he got angry and asked us to
20 leave.
21     Q.   Well, sir, that's a quite sanitized
22 version of it; isn't it, sir?
23          MR. MC BRIDE:  Objection.
24     A.   That's what I remember.
25     Q.   Do you remember Mr. Danese saying in

Plummer - Confidential

1
2  some form of words that he considered you and
3  Artvest to be fundamentally incompetent and
4  rude and that he was sick of the manner in
5  which you were speaking to him and other
6  members of the team and he asked you to
7  immediately leave the building?
8          MR. MC BRIDE:  Objection.
9      A.  I don't remember him saying that.
10     Q.  You don't remember being thrown out
11 of the office?
12     A.  I remember asking him -- him asking
13 us to leave and I don't remember any cause for
14 him saying that other than our trying to
15 discuss the terms of his sponsorship and what
16 he was getting for it.
17     Q.  Is there any reason why you have now
18 written two reports purporting to be an
19 objective expert on Athena's underwriting
20 practices with captions that say United States
21 Federal Court on it and nowhere mentioned that
22 you and your partner had a substantial business
23 relationship with Athena that Athena didn't
24 renew and it ended up with Athena literally
25 throwing you out of its office?

1           Plummer - Confidential
2          MR. MC BRIDE:  Objection.
3      A.  We had a disagreement over the terms
4  of the sponsorship and I immediately turned it
5  over to another member of TEFAF.  Remember this
6  is a joint venture.  It wasn't something we ran
7  on our own.  We had partners in this and then
8  our partners continued to interface and work
9  with Andrea to give him what he needed.
10     Q.  Sir, is there any reason why you
11 didn't mention the fact that your personal
12 relationship with Athena and Andrea Danese was
13 simply so broken that you were thrown out of
14 his office?
15         MR. MC BRIDE:  Objection.
16     Q.  Is there any reason you didn't
17 mention that in your report?
18         MR. MC BRIDE:  Objection.
19     A.  I didn't think it was relevant
20 because I interpreted it differently than you
21 do.
22     Q.  Sir, Mr. Danese said essentially get
23 out of here.  I never want to see you again and
24 I think you're incompetent and you don't think
25 that creates an issue of potential bias in this

1           Plummer - Confidential
2  matter?
3          MR. MC BRIDE:  Objection.
4      Q.  You don't think that creates a
5  potential bias in this matter?
6          MR. MC BRIDE:  Objection.
7      A.  I disagree with what was said that
8  you're saying what was said in our discussion.
9      Q.  Sir, my question is, you don't think
10 it was necessary to disclose the fact that you
11 filed an expert report with a Federal Court
12 criticizing an organization that paid yours
13 hundreds of thousands of dollars and the
14 relationship went so south that you were not
15 even welcome on the premises?
16         MR. MC BRIDE:  Objection.  Asked and
17     answered.  No legal expertise.
18     Q.  You didn't mention that in this
19 report, sir?
20         MR. MC BRIDE:  Speaks for itself.
21     A.  I already addressed the issue.
22     Q.  Did it occur to you that you might
23 want to mention that in a report?
24         MR. MC BRIDE:  Asked and answered.
25     Let's move on.

1           Plummer - Confidential
2          MR. SHAPIRO:  Pardon me.  Don't
3     interrupt my question.
4      Q.  Did it even occur to you that you
5  may want to see something in a Federal Court
6  expert report --
7          MR. MC BRIDE:  Objection.
8      Q.  -- that you had a financially
9  significant relationship with Athena and that
10 it ended in a way that resulted in you being
11 kicked to the curb?
12         MR. MC BRIDE:  Objection.  Asked and
13     answered.
14     A.  I disagree with your
15 characterization of it.
16     Q.  Fair enough, sir.  It was a big
17 dispute and you didn't mention it in your
18 report.  Why didn't you mention it in your
19 report?
20         MR. MC BRIDE:  Objection.  Asked and
21     answered.
22         I also take this opportunity to
23     direct the witness not to disclose any
24     substantive discussion with counsel with
25     regard to any question about why you did

Page 342

1         Plummer - Confidential
2    or did not include anything in your
3    report.
4    Q.   It didn't occur to you, sir, to
5 disclose that in your report?
6         MR. MC BRIDE:  Objection.  Asked and
7    answered.
8    A.   I have said what I have to say on
9 the matter.
10   Q.   You have nothing more to say on that
11 matter; do you, sir?
12        MR. MC BRIDE:  Objection.
13   A.   I have nothing more to say.
14   Q.   Do you remember at the beginning of
15 the deposition I asked if you thought there was
16 any reason why anyone could question your
17 objectivity or independence?  Do you remember
18 that question?
19   A.   Yes.
20        MR. MC BRIDE:  Objection.
21   Q.   And you said no, right?
22   A.   Correct.
23   Q.   And you remember that right before a
24 break I asked is there anything else you want
25 to get out on the table and you said no, right?

Page 343

1         Plummer - Confidential
2    A.   Correct.
3    Q.   Sir, you filed an expert report
4 being critical of Mr. Danese, suggesting that
5 he was not competent, taking a position adverse
6 to Athena without mentioning that Athena had
7 paid you and your partner literally hundreds of
8 thousands of dollars.
9    A.   Well, that's incorrect.
10        MR. MC BRIDE:  No question.  No
11   question.
12   Q.   Sir, we have the invoices.
13        MR. MC BRIDE:  No question has been
14   asked.
15   Q.   And we have all the e-mail.
16        MR. MC BRIDE:  No question has been
17   asked.
18   Q.   Did that occur to you?
19        MR. MC BRIDE:  Did what occur to
20   him?
21   Q.   That we have the invoices and the
22 e-mail.
23   A.   Invoices to whom?
24        MR. MC BRIDE:  Objection.  You're
25   badgering the witness.

Page 344

1         Plummer - Confidential
2    A.   TEFAF?
3    Q.   Artvest.
4    A.   Artvest was never paid any money.
5    Q.   It was paid by TEFAF, wasn't it,
6 sir?
7    A.   What?
8    Q.   Artvest was paid by TEFAF?
9    A.   Okay.
10   Q.   And Athena paid TEFAF and after the
11 relationship with Athena broke down, it was
12 right around the time that TEFAF also showed
13 you the door and the next thing that happened
14 was that there was an IRS lien against you,
15 sir; that's the chronology, right?
16        MR. MC BRIDE:  Wonderful sleuthing.
17   There is no question to you.  Nothing to
18   say.
19   A.   I couldn't --
20        MR. MC BRIDE:  There is no question.
21   Q.   Are those the facts?
22        MR. MC BRIDE:  Objection.
23   A.   No.
24   Q.   Those facts are all wrong?
25        MR. MC BRIDE:  Objection.

Page 345

1         Plummer - Confidential
2    A.   They are not.  I have nothing -- I
3 disagree on such a profound level as to what
4 you are trying to imply and what you are saying
5 outright.  That it's just wrong.
6    Q.   Sir, I'm not implying anything.  I'm
7 going to ask one more time.  Do you have any
8 possible explanation for failing to disclose in
9 your Federal Court expert report that you and
10 your organization had a very large financial
11 relationship with Athena, that that
12 relationship ended and it ended with you being
13 asked to leave the building?
14        MR. MC BRIDE:  Objection.  Asked and
15   answered.  No legal expertise.  Don't
16   answer the question.
17   Q.   If you have no further explanation,
18 we can move on.
19        MR. MC BRIDE:  No question.
20   A.   Nothing more to say.
21   Q.   Nothing more to say on that topic?
22   A.   No.
23   Q.   Did you think this wouldn't come up
24 at your deposition?
25        MR. MC BRIDE:  Objection.

87 (Pages 342 - 345)

1          Plummer - Confidential
2     Q.  I'm just asking, did you think this
3  topic wouldn't come up?
4          MR. MC BRIDE:  You're badgering the
5     witness.  Let's move on.
6     A.  I have nothing more to say.
7     Q.  Directing your attention to what is
8  now Plummer Exhibit 6.  This is the Stephanie
9  Overton expert report that you also didn't
10  disclose.  Do you recognize it?
11         (Whereupon document was marked
12     Exhibit 6 for identification as of this
13     date.)
14         MR. MC BRIDE:  Objection.
15     A.  Yes, I recognize it.
16     Q.  You knew I'd be asking about this
17  one; yes, sir?
18         MR. MC BRIDE:  Objection.
19     A.  Yes.
20     Q.  You're prepared to answer questions
21  about this one?
22     A.  Yes.
23     Q.  Good.  Because you knew we found it
24  when you read Mr. Katz's rebuttal?
25         MR. MC BRIDE:  Objection.

1          Plummer - Confidential
2     Q.  Correct?
3     A.  I saw it, yes.
4     Q.  Because you thought it was
5  confidential, but we found it, right, sir?
6          MR. MC BRIDE:  Objection.  Asked and
7     answered.
8     A.  I was told it was confidential.
9     Q.  Well, that wasn't true either now.
10  Page 14, sir.  In page 14 of the undisclosed
11  Overton report, do you see a section that
12  refers to the due diligence that was performed
13  by Rose, AFP, Cerulean and Knickerbocker?
14         MR. MC BRIDE:  Which page?
15         MR. SHAPIRO:  Fourteen.
16     A.  So which number did you say?
17     Q.  Page 14, paragraph 47.
18     A.  Yep.
19     Q.  Do you see that?
20     A.  Yep.
21     Q.  That's where you provide some
22  opinions, including that Rose, AFP and Cerulean
23  performed all reasonable due diligence under
24  those circumstances, correct?
25     A.  Correct.

1          Plummer - Confidential
2     Q.  Paragraph 50, were you of the
3  opinion that it was appropriate for AFP and
4  Knickerbocker to rely on representations and
5  warranties provided in that case by Sammons?
6     A.  I was.
7     Q.  Yes, sir?
8     A.  I was.
9     Q.  And they conducted UCC lien
10  searches, correct?
11     A.  Correct.
12     Q.  Were those reasonable due diligence
13  steps?
14     A.  They were.
15     Q.  Did Athena take those very
16  reasonable due diligence steps in this matter?
17         MR. MC BRIDE:  Objection.
18     A.  They did.
19     Q.  Okay, good.  Move down to paragraph
20  52.  And also 53.  And paragraphs 52 and 53, I
21  guess I should pick one of them.  Fifty-two,
22  was part of your conclusion in the Overton
23  matter that Rose, AFP, Cerulean and
24  Knickerbocker, collectively, undertook all
25  reasonable due diligence based on your

1          Plummer - Confidential
2  conclusion that Mr. Rose personally examined
3  each of the pieces?
4          MR. MC BRIDE:  Objection.
5     A.  I'm sorry, ask the question again.
6     Q.  Sure.  In paragraph 52, is one of
7  the reasonable due diligence steps that forms
8  the basis for you opinion in Overton that the
9  pieces were personally examined in person?
10     A.  Yep.
11     Q.  And that they're the -- I'll call
12  him the bad actor, Mr. Sammons, had control of
13  each work prior to its delivery to the
14  applicable art defendant, right?
15     A.  Correct.
16     Q.  Can we agree in this matter that
17  Athena personally examined each of the pieces?
18     A.  Yes.
19     Q.  Can we agree, sir, in this matter
20  that Inigo Philbrick had control of each work
21  prior to its delivery to Athena?
22     A.  Yes, but I would like to add that
23  after the Sammons event a number of us in the
24  art world, including myself, began to
25  reconsider the significance or the risks to

1          Plummer - Confidential
2  someone having possession of the art.  This
3  caused a rethink in the industry.
4      Q.   So paragraph 52, it's still a
5  reasonable diligence step, you're just saying
6  it's not as much of a plus fact for the reasons
7  you said before, right?
8      A.   Correct.
9      Q.   It's still something one should take
10  into account?
11     A.   Yes, correct.
12     Q.   You're just saying how in the
13  holistic world of credit underwriting people
14  weigh that particular plus factor does change
15  from time to time?
16     A.   Correct.
17     Q.   So then why don't you turn the page
18  again, paragraph 55.  In paragraph 55 was one
19  of the reasonable due diligence steps that you
20  found to be important that was undertaken by
21  what you called in the Overton matter, the
22  applicable art defendants was the fact that in
23  this case AFP had done a search for the
24  relevant work on the art loss register?
25         MR. MC BRIDE:  Objection.

1          Plummer - Confidential
2      A.   Right.
3      Q.   And, in fact, Athena did a search on
4  the art loss register, correct?
5      A.   Right.
6         MR. MC BRIDE:  Objection.  AFP did a
7  search on one piece.
8      Q.   Absolutely and you considered that
9  one search on that one piece was a reasonable
10  due diligence step in the Federal Court report
11  that you filed in Overton, yes?
12     A.   Exactly, but as I point out in this
13  the kind of fraud that Sammons perpetrated and
14  others perpetrated after this would not be
15  evident on our loss register.
16     Q.   Fair enough.  Let's take two points
17  your counsel pointed out, that in Overton, AFP
18  did a search other than just one work, right?
19     A.   Right.
20     Q.   Athena does a search on every work,
21  correct?
22     A.   Right.
23     Q.   So in that respect, Athena went well
24  beyond what was a reasonable due diligence in
25  your expert opinion for AFP in Overton,

1          Plummer - Confidential
2  correct?
3         MR. MC BRIDE:  Objection.
4      Q.   Correct?
5      A.   That you're saying that Athena went
6  above and beyond what AFP did in its due
7  diligence?
8      Q.   Sure, because your counselor just
9  pointed out AFP checked one work and Athena
10  checks every work?
11     A.   In terms of checking with the art
12  loss registry, yes.
13     Q.   Fair enough.  Then the second point
14  you made is the last sentence in paragraph 55
15  which is that checking the art loss register
16  wouldn't have mattered either way because
17  checking the art loss register would not have
18  revealed the fraud, correct?
19         MR. MC BRIDE:  Objection.
20     A.   I'm sorry, what number are you?
21     Q.   I'm at the last sentence of
22  paragraph 55.
23     A.   Correct.  Yes.
24     Q.   So your point was it was a
25  reasonable due diligence step to check the art

1          Plummer - Confidential
2  loss register, true?  Correct?
3      A.   Right, but that it would not have
4  shown up the fraud that was at issue here.
5      Q.   Which is exactly what happened in
6  Athena, correct?
7      A.   Which is what is consistent with
8  everything I have been saying all along.
9      Q.   Which is that it's a reasonable due
10  diligence step to check it, but if someone else
11  with an interest chooses not to report it to
12  the art register, it wouldn't be on the
13  register?
14     A.   Correct.
15         MR. MC BRIDE:  Objection.
16     A.   Which is why I state from the start
17  that AFP is an imperfect resource.
18     Q.   Well, you don't state that in
19  Overton, sir?
20     A.   I did do state it in today's --
21         MR. MC BRIDE:  Objection.
22     A.   In the report for --
23     Q.   Right, right.  So when your clients
24  did it in Overton, it was a reasonable due
25  diligence step; that's what you say in

Plummer - Confidential

1 paragraph 55, correct?
2          MR. MC BRIDE:  Objection.
3      A.   Well, I also point out the problem
4 that it wouldn't show up.
5      Q.   But you don't say it was an
6 unreasonable due diligence step; do you?
7          MR. MC BRIDE:  Objection.
8      A.   No, but I point out why it might not
9 show up.
10      Q.   You point out why it might not show
11 up, but when Athena did it, you said that it
12 was -- it's basically worthless, right?
13      A.   I didn't say it's worthless.  I said
14 that it's of dubious value.
15      Q.   You didn't say it was basically
16 worthless?
17      A.   I said a lot of our professionals, I
18 got very specific -- I said a lot of our
19 professionals find it of questionable value
20 because it does not show these kinds of frauds
21 that have become more prevalent over the last
22 couple of years and I pointed to the individual
23 frauds that have become more prevalent
24 including this one.

**Page 354**

1          Plummer - Confidential
2 paragraph 55, correct?
3          MR. MC BRIDE:  Objection.
4      A.   Well, I also point out the problem
5 that it wouldn't show up.
6      Q.   But you don't say it was an
7 unreasonable due diligence step; do you?
8          MR. MC BRIDE:  Objection.
9      A.   No, but I point out why it might not
10 show up.
11      Q.   You point out why it might not show
12 up, but when Athena did it, you said that it
13 was -- it's basically worthless, right?
14      A.   I didn't say it's worthless.  I said
15 that it's of dubious value.
16      Q.   You didn't say it was basically
17 worthless?
18      A.   I said a lot of our professionals, I
19 got very specific -- I said a lot of our
20 professionals find it of questionable value
21 because it does not show these kinds of frauds
22 that have become more prevalent over the last
23 couple of years and I pointed to the individual
24 frauds that have become more prevalent
25 including this one.

**Page 355**

1          Plummer - Confidential
2      Q.   Sir, was it a reasonable due
3 diligence step for AFP to do a search on the
4 art loss register for at least one of the
5 works?
6          MR. MC BRIDE:  Objection.
7      A.   Was it?
8      Q.   A reasonable due diligence step?
9      A.   For Athena?
10      Q.   For AFP to do it?
11      A.   Yes.  I'm not disputing it was a
12 reasonable one, but I'm pointing out the
13 problems with it.
14      Q.   It's a reasonable imperfect due
15 diligence step, right?
16      A.   Yes.
17      Q.   And when Athena did it, it was also
18 a reasonable but imperfect step, true?
19      A.   Yes.
20      Q.   There is no difference.  It's the
21 same reasonable --
22      A.   I don't think I made a different
23 point in Athena.
24      Q.   Okay.  Fair enough.  So then in
25 paragraph 56 you say that it doesn't matter

**Page 356**

1          Plummer - Confidential
2 that "AFP did not receive purchase invoices
3 from Sammons demonstrating his ownership of
4 some work," correct?
5      A.   Yes.
6      Q.   And the fact that AFP did not
7 receive purchase invoices from Sammons
8 demonstrating his ownership of some of the work
9 for purposes of Overton in your mind was fully
10 consistent with due diligence, correct?
11          MR. MC BRIDE:  Objection.
12      A.   Yes.
13      Q.   But that's not the case with Athena,
14 is it, sir?
15      A.   I think in the contents of the
16 events of this and the subsequent frauds and
17 the size of the transaction, I have
18 reconsidered my position on this.
19      Q.   So paragraph 56 in your Federal
20 Court opinion in Overton you now say is wrong?
21          MR. MC BRIDE:  Objection.
22 Mischaracterizes testimony.
23      A.   I now say in the context of time and
24 events in the art world, I would rethink how I
25 would phrase this.

**Page 357**

1          Plummer - Confidential
2      Q.   Sir, you signed this opinion like
3 basically within twelve months of the
4 underwriting decision that was made by Athena
5 that you are now criticizing, correct?
6          MR. MC BRIDE:  Objection.
7      A.   Yes, but it was seven years ago from
8 today.
9      Q.   Sir, but you've been criticizing
10 Athena's decision from 2017, correct?
11      A.   Okay.
12      Q.   So, Athena did more by way of
13 purchase invoices than AFP, true?
14      A.   Yes, they had purchase invoices, but
15 they didn't have proof of payment of those
16 purchase invoices.
17      Q.   This says nothing about proof of
18 payment.  I'm talking about the purchase
19 invoices in the first instance, right?
20      A.   But the criticism that I leveled
21 against them was the lack of proof of payment.
22      Q.   Did they have proof of payment in
23 Overton?
24      A.   I don't remember if I discussed that
25 in here.

Plummer - Confidential

1
2   Q.   You didn't raise it at all.  You
3   didn't even get there, sir.  It was irrelevant.
4        MR. MC BRIDE:  There is no question.
5   There is no question.
6   Q.   Paragraph 56, stick with me, second
7   sentence.  Do you see where it says "That is
8   not uncommon?"
9   A.   Yep.
10   Q.   Could you read the next two
11   sentences into the record?
12   A.   "Sometimes there is no
13   documentation --"
14   Q.   No start with the prior sentence,
15   the one beginning with "That is not uncommon?"
16   A.   "That is not uncommon in the art
17   world and would not have been a cause for
18   distress.  Sometimes there is no
19   documentation -- the art world is still a
20   marketplace where deals can be done on a
21   handshake.  In addition --"
22   Q.   Okay.  Is that true still, that
23   statement?
24   A.   Yes.
25   Q.   Read the last sentence of paragraph

Plummer - Confidential

1
2   56 and tell me if that is still your sincere
3   opinion about the art world beginning with "In
4   addition?"
5   A.   "In addition, if a reputable dealer
6   is willing to represent and warrant that they
7   have clear title to the work, the absence of a
8   purchase invoice is not cause for suspicion."
9   Q.   That was your opinion in a Federal
10   Court case roughly a year before Athena
11   accepted the representations and warranties
12   from Philbrick, correct?
13   A.   Correct.
14   Q.   Keep going.  Look at paragraph 60.
15   Go to paragraph 60.  In 60 you said that the
16   lack of proof of insurance on behalf of your
17   art defending clients was not concerning from a
18   diligent standpoint, correct?
19   A.   Correct.
20   Q.   Athena always had proof of
21   insurance, correct?
22   A.   Yes.
23   Q.   Could we agree that proof of
24   insurance is at least something of an added
25   plus factor in diligence?

Plummer - Confidential

1
2   A.   I am not sure it's an important one.
3   I don't change my opinion on that.
4   Q.   Okay.  Fine.  Insurance is
5   irrelevant in your mind?
6        MR. MC BRIDE:  Objection.
7   A.   I didn't say it's irrelevant.  I
8   think it's a given.
9   Q.   So in paragraph 57, okay, in your
10   Overton expert report supporting your
11   conclusion that the due diligence that was
12   performed was reasonable, you said it was
13   reasonable for, who you describe as the art
14   defendants, to have accepted a bill of sale for
15   artwork that had been e-mailed to them by
16   Mr. Sammons, correct?
17   A.   Right.  You're talking 57?
18   Q.   Paragraph 57, correct.  And you said
19   because Mr. Sammons' fraudulent activities had
20   not come to light, there would be no reason for
21   anyone to suspect that he would have been
22   resorting, and I'm paraphrasing a bit,
23   resorting to quote, "the creation of falsified
24   documents," correct?
25   A.   Correct.

Plummer - Confidential

1
2   Q.   Was there any document why that
3   conclusion is any different for Athena?
4   A.   Yes.
5   Q.   And that's because of Inigo
6   Philbrick's age?
7        MR. MC BRIDE:  Objection.
8   A.   No, it is because Timothy Sammons
9   had been active in the art world for 30 to 35
10   years and that might be a function of age, but
11   he had worked at Sotheby's in New York and had
12   a senior level there.
13        He had worked at Sotheby's London
14   and had a very senior position there.  He had
15   gone off on his own after about 15 years at
16   Sotheby's.  So he was well known, well regarded
17   and he had done many transactions and a lot of
18   business with all the auction houses.  So his
19   history was far more robust and excessive than
20   was Inigo's at only --
21   Q.   He was in his 50s or 60s?
22   A.   He was in his 50s.
23   Q.   So doesn't that just disprove the
24   notion that younger people are, when it comes
25   to credit underwriting, more likely to be a

1          Plummer - Confidential
2  credit problem?
3          MR. MC BRIDE:  Objection.
4      A.    I think there -- there is a greater
5  chance of them being a higher risk.
6      Q.    Well, but if the risk is that of
7  fraud, this guy Sammons was a colossal fraud
8  and he is roughly your and my age, right?
9      A.    Right.
10     Q.    So today, as an expert, do you think
11 there is any correlation of a fraud risk
12 between someone who is younger and very
13 successful and someone who is older and very
14 successful?
15     A.    I think that this came as a surprise
16 to the art world and it made a lot of people
17 rethink the risk of fraud out there and I think
18 I refer in some version to that in my expert
19 opinion that the relevance of this fraud has
20 become a concern to those of us in the art
21 world that we all need to do more due diligence
22 and think differently about approaching these
23 issues.
24     Q.    Is it reasonable, as a matter of
25 asset-backed credit underwriting, to apply

1          Plummer - Confidential
2  different underwriting standards to borrowers
3  of different ages?
4      A.    No, and I'm not suggesting that.
5      Q.    In fact, sir, that may very well be
6  offensive, correct?
7      A.    It may even be illegal.
8          MR. MC BRIDE:  Objection.
9      Q.    It may even be illegal, right?
10     A.    Yes.
11     Q.    Did Athena call the seller of the
12 artwork?
13     A.    Did Athena call the seller of the
14 Basquiat?
15     Q.    Of course.
16     A.    I don't believe so.
17     Q.    Athena called Phillips?
18     A.    Oh, you're talking about the
19 Basquiat.  I thought we were back at the --
20 never mind.
21     Q.    We will start again.  In this case,
22 sir, there was no question that Athena had a
23 bill of sale from Phillips?
24     A.    Right.
25     Q.    Which no dispute is authentic and

1          Plummer - Confidential
2  actually picked up the phone and called
3  Phillips, true?
4      A.    Yes.
5      Q.    I understand that in your mind Ms.
6  Sachs should have asked additional questions,
7  but she did pick up the phone and call the
8  seller, Phillips, correct?
9      A.    Yes.
10     Q.    In Overton you concluded that the
11 art defendants exercised reasonable due
12 diligence and they didn't even try to call the
13 seller; did they?
14     A.    No, they did not try to call the
15 seller.
16     Q.    In fact, you said it might have
17 almost been improper or unseemingly to call the
18 seller, correct?
19         MR. MC BRIDE:  Objection.
20     A.    Well, that was -- if I remember
21 correctly, that was a different situation.  I
22 mean calling an auction house is not violating
23 or puncturing the dealer confidentiality
24 because the auction house is there.  They are
25 known and you're getting a general opinion,

1          Plummer - Confidential
2  without actually speaking specifically to the
3  client who owns it, whereas in the case, I
4  think you are referring to here, if I remember
5  correctly, we are talking about talking to an
6  individual and that would be a violation of
7  confidentiality.
8      Q.    But the bottom line, sir, and I'm
9  referring specifically, you know, to like
10 picking up the phone and calling, right, Athena
11 did have like the bill of sale or the purchase
12 contract and did call the seller Phillips,
13 right?
14     A.    Right.
15     Q.    The art defendants that you
16 concluded exercised reasonable due diligence
17 didn't even try to do that, correct?
18         MR. MC BRIDE:  Objection.
19     A.    No, for the reasons I stated.
20     Q.    Sir, putting aside their subjective
21 motivation, okay, they didn't do it and yes,
22 they still conducted reasonable diligence in
23 your expert opinion?
24         MR. MC BRIDE:  Objection.
25     A.    It was also a loan that was a

1      Plummer - Confidential
2 unredacted bank statements?
3           MR. MC BRIDE:  Objection.
4      A.   No, to go back to a couple of months
5 of statements around the time that that was
6 bought.
7      Q.   One more time say that.
8           MR. MC BRIDE:  Can we have it read
9 back?
10      Q.   I actually would appreciate you said
11 it again because it's not actually what you
12 meant to say.
13           Fine.  Your answer is, sir, no, you
14 only need to go back a couple of months of
15 statements around the time it was bought?
16      A.   Yes.
17      Q.   Under your new underwriting standard
18 for ABL loans, you are supposed to look 90 days
19 before and after the acquisition of the
20 painting that is pledged as collateral?
21           MR. MC BRIDE:  Objection.
22      A.   I wouldn't necessarily say it was 90
23 days, but the period in which it could be
24 proved that there was not money coming in from
25 an agent or a buyer that he was acting as agent

1      Plummer - Confidential
2 for.
3      Q.   But why would that necessarily show
4 anything in a world where a dealer is
5 constantly adding and removing collateral?
6 There are constant ins and outs; aren't there?
7           MR. MC BRIDE:  Objection.
8      A.   There are, but usually there is
9 evidence of who the money is coming from and
10 what it is for, the wire transfers.
11      Q.   Do your bank statements always say
12 that?
13      A.   Most of the bank statements I have
14 seen in the art world have identifying issues
15 like Basquiat and all of that.
16      Q.   Is that even legal in Europe, sir,
17 to ask for that?
18      A.   I don't know the laws in Europe.
19 I'm talking about here in the United States.
20      Q.   That's not where Philbrick was; was
21 it?
22      A.   No, his bank account was in U.S.
23 dollars.  Was it at Santander?  I don't know.
24 I didn't hear that come up as an issue.
25      Q.   Paragraph 69.  In paragraph 69 you

1      Plummer - Confidential
2 support your conclusion that the art defendants
3 performed all reasonable due diligence under
4 the circumstances because, again paragraph 69,
5 Sammons signed standard representations and
6 warranties which you describe over the next
7 half dozen lines, correct?
8      A.   Hmm-hmm.
9      Q.   Yes, sir?
10      A.   Yes, yes.
11      Q.   It's the case, sir, that the Steve
12 Brody prepared reps and warranties in the loan
13 and security agreement were far more extensive
14 than the ones that were set forth in paragraph
15 69, correct?
16           MR. MC BRIDE:  Objection.
17      A.   I don't disagree with that.
18      Q.   So the reasonable reliance on
19 representations and warranties, which you told
20 the Federal Court was appropriate due diligence
21 in Overton, certainly was the case for Athena
22 which had way more and way better reps and
23 warranties?
24      A.   I didn't dispute having reps and
25 warranties.  I said that Athena had an over

1      Plummer - Confidential
2 reliance on reps and warranties that did not
3 work for them in this instance.
4      Q.   Well, sir, it didn't work in the
5 instance of Sammons because he lied also,
6 right?
7      A.   Yes.
8      Q.   They are in exactly the same
9 position, but Athena got a lot more reps and
10 warranties, correct?
11      A.   Correct.
12      Q.   It's also the case that Athena had
13 repeated standalone assurances, all those
14 e-mails in the criminal complaint from
15 Philbrick as to his ownership free and clear of
16 the painting, true?
17      A.   Yes.
18      Q.   In fact, the United States Attorney
19 for the Southern District of New York based a
20 criminal prosecution against Philbrick not just
21 on the reps and warranties in the Steve Brody
22 approved loan and security agreement, but the
23 constant e-mail that Philbrick was saying
24 repeating them, correct?
25           MR. MC BRIDE:  Objection.  No legal

Plummer - Confidential

1
2  expertise.
3      Q.  Yes, sir?
4      A.  I don't feel I have the authority to
5  speak on that.
6      Q.  Sir, it's a document you said you
7  relied on in your report.  You've seen the
8  criminal complaint, right?
9      A.  Yes.
10     Q.  And the US Attorney in the criminal
11 complaint not only refers to Athena's reliance
12 on the frankly redundant Steve Brody's reps and
13 warranties in the loan and security agreement,
14 but separately, that repeatedly -- Inigo
15 Philbrick repeated them?
16     A.  I have never taken an issue with the
17 reps and warranties in the Athena documents.
18     Q.  And Athena was entitled to rely on
19 them as reasonable due diligence just like your
20 clients in Overton were entitled to rely on the
21 reps and warranties, true?
22     A.  Yes, they were.
23     Q.  Paragraph -- in fact, earlier you
24 identified Sotheby's as being in your mind
25 something of a blue-chip asset-backed lender,

Plummer - Confidential

1
2  correct?
3      A.  I don't think I ever used that
4  phrase.
5          MR. MC BRIDE:  Objection.
6      Q.  I might have used it and you might
7  have agreed.  Rather than put words in your
8  mouth, do you consider Sotheby's to be a high
9  quality, careful asset-backed lender?
10     A.  I think it depends on who is running
11 it at the time and some times are better than
12 others, but I do think they have been the most
13 successful.
14     Q.  And certainly you believe that
15 Knickerbocker exercised at least reasonable due
16 diligence in its financial affairs because you
17 told the Federal Court that, correct?
18     A.  Yes.
19         MR. MC BRIDE:  Objection.
20     A.  I wouldn't make a comparison between
21 Knickerbocker and Sotheby's.
22     Q.  Correct.  Fair enough.
23 Knickerbocker discharged its industry duty and
24 Sotheby's might be well better than that; fair
25 enough?

Plummer - Confidential

1
2      A.  That's a reasonable statement.
3      Q.  Fair enough.  Page 20 of 27.  It's
4  the end of paragraph 70.
5      A.  Yep.
6      Q.  Where you tell the Federal Court in
7  your Overton report that asset-backed lenders
8  such as Sotheby's and Knickerbocker are
9  tremendously reliant on such representations
10 and warranties, correct?
11     A.  Yes.
12     Q.  That was true when you signed your
13 Federal Court report in Overton, right?
14     A.  Right.
15     Q.  And that's still true today?
16     A.  As I said a few minutes ago, I have
17 not taken an issue with the reps and
18 warranties.  I just said there are other things
19 I needed to rely upon where these weren't
20 sufficient.
21     Q.  Is there anything that any of the
22 art defendants, if you will, and in the Overton
23 case, did by way of diligence that Athena did
24 not do?
25     A.  No.

Plummer - Confidential

1
2          MR. MC BRIDE:  Objection.
3      Q.  Paragraph 76.  In paragraph 76 do
4  you conclude that, "The conditions of the
5  Asset-backed Loans issued by Knickerbocker were
6  consistent with the practices of others in the
7  sector of the art lending industry," correct?
8      A.  At that point in time.
9      Q.  How were the conditions of the
10 Athena asset-backed loans any different than
11 those of Knickerbocker?
12     A.  It was a different moment in time
13 and I think that Athena held out a type of due
14 diligence that was in excess of this and I
15 don't think they exercised even the due
16 diligence that they said they did.
17     Q.  Okay, sir.  I guess the question is
18 whether the practice of others in the sector of
19 the art lending industry and remember earlier I
20 asked you if you could identify whether the
21 underwriting practices of Athena -- withdrawn.
22         Remember the question that I asked,
23 if you could identify anybody who had stronger
24 or more robust asset-backed underwriting
25 lending authority than Athena and you couldn't

97 (Pages 382 - 385)

1            Plummer - Confidential
2 identify anyone, correct?
3     A.   Correct.
4     Q.   Focus now on just the conditions of
5 the asset-backed loans which is the subject of
6 paragraph 76.
7          Is there anything missing by way of
8 the terms and conditions of the Athena
9 asset-backed loans that makes them fall short
10 of what you consider to be quote, "the
11 practices of others in this sector of the art
12 lending industry?"
13        MR. MC BRIDE:  Objection.
14     A.   Proof of payment.
15     Q.   And that's because you don't
16 consider -- you don't consider the documents
17 that Athena received to be proof of payment
18 which included number one, a contract, number
19 two, a seller saying they received payment,
20 number three, a buyer saying they made payment,
21 right, and number four, possession and number
22 five, a borrower albeit fraudulently supplying
23 documentation which on its face really did show
24 the payments if believed?
25        MR. MC BRIDE:  Objection.

1            Plummer - Confidential
2     A.   I'm sorry, what is the question at
3 the heart of that?
4     Q.   That's the proof of payment that
5 Athena received, correct; all of that?
6        MR. MC BRIDE:  Objection.
7     A.   They did not receive proof of
8 payment either for the document that was part
9 of the guarantee at Phillips nor did they
10 receive payment -- proof of payment for the
11 Basquiat and I would like to take a bathroom
12 break.  I will be fast.
13     Q.   That's fine.  Take a break.  You
14 don't have to be fast.
15        THE VIDEOGRAPHER:  We are going off
16 the record.  The time is 6:07.
17        (Brief recess taken.)
18        THE VIDEOGRAPHER:  We are going on
19 the record.  The time is 6:28.
20        (Whereupon document was marked
21        Exhibit 7 for identification as of this
22        date.)
23 BY MR. SHAPIRO:
24     Q.   Mr. Plummer, the court reporter has
25 just handed you Exhibit 7.

1            Plummer - Confidential
2     A.   Right.
3     Q.   Is Plummer Exhibit 7 an affidavit
4 that you swore out in the Supreme Court of the
5 State of New York?
6        MR. MC BRIDE:  Read the whole thing,
7 a couple of the pages, not word for word,
8 but look at each page.
9     A.   (Witness reviewing document).
10    Q.   Are you familiar with that, sir?
11    A.   I'm familiar with it.  I'm just
12 making sure what is in it.  I haven't seen it
13 for quite a few years.
14    Q.   Pardon me, can we go off the record?
15        THE VIDEOGRAPHER:  We are going off
16 the record.  The time is 6:30 p.m.
17        (Brief recess taken.)
18        THE VIDEOGRAPHER:  We are going on
19 the record.  The time is 6:33.
20 BY MR. SHAPIRO:
21    Q.   I just need to apologize to
22 Mr. Plummer and counsel for having just jumped
23 out of here.  We are back on the record.
24        Directing your attention to Plummer
25 Exhibit 7.  This is the affidavit, Mr. Plummer,

1            Plummer - Confidential
2 that you signed and swore on April 24, 2018?
3     A.   Yep.
4     Q.   And this is in connection with the
5 dispute between your business Artvest Partners
6 and TEFAF?
7     A.   Right.
8     Q.   TEFAF I'm shorthanding the name of
9 the opposing litigant I think in a way that
10 doesn't offend any of the parts.
11        All right, sir, is it fair to say
12 that there came a time where the predominant --
13 pardon me, directing your attention to
14 paragraph 24, that you and Mr. Rabin were
15 spending almost all of your time managing the
16 two annual art fairs on behalf of TEFAF?
17    A.   Correct.
18    Q.   And it says so in paragraph 24?
19    A.   Correct.
20    Q.   That includes the very short art
21 fair activities that were the subject of
22 Athena's sponsorship?
23    A.   Right.
24    Q.   And you were not the only, but for
25 some extended period of time, the most senior

Plummer - Confidential

1

2 direct contact between Artvest and TEFAF on the
3 one hand and Athena on the other?
4     A.   Correct, with -- I was with a number
5 of the sponsors.
6     Q.   Fair enough, but you were the senior
7 guy?
8     A.   Yeah.
9     Q.   Okay.  And that's the relationship
10 that wasn't renewed and resulted in the
11 acrimony that was the subject of the earlier
12 testimony, correct?
13        MR. MC BRIDE:  Objection.
14     A.   Which was the relationship that
15 wasn't renewed?
16     Q.   The relationship that wasn't renewed
17 between TEFAF and in the first instance,
18 Athena, correct?
19     A.   Oh, no, that was not the source of
20 the dispute between -- Athena was not the
21 source of the dispute between TEFAF.
22     Q.   There were two disputes, right?  One
23 was the dispute between Athena Art Finance,
24 which was dissatisfied with its relationship
25 with TEFAF, correct?

Plummer - Confidential

1

2     A.   TEFAF general.
3     Q.   Correct, but the TEFAF relationship
4 was managed by you and Artvest?
5     A.   Not initially.  Actually I was
6 brought in to help because it had taken a dark
7 turn with Patrick van Maris and he was unhappy.
8 So I was brought in to fix a problem that had
9 already existed.
10     Q.   You were unable to fix that problem?
11     A.   I was unable to fix that problem to
12 Danese's satisfaction.
13     Q.   You remember long meetings that
14 discussed things like the color of coffee cups,
15 correct?
16     A.   Vaguely.  I won't remember all the
17 details.
18     Q.   The fact that Athena ordered 50 VIP
19 passes, only got 30, and you could only find
20 another 10 and things like that?
21     A.   There were other people involved who
22 dealt with some of that detail, not me.
23     Q.   You dealt with finding new space at
24 the Empire Room, correct?  You don't remember
25 that issue?

Plummer - Confidential

1

2     A.   No.
3     Q.   About like constant relocations of
4 Athena's space at the fair?
5     A.   I don't remember that.
6     Q.   You don't remember a discussion
7 about the floral arrangements?
8     A.   No, I don't remember that either.
9        MR. MC BRIDE:  Objection.
10     Q.   Regardless, okay, you have already
11 testified about the fact that the relationship
12 between Athena and TEFAF, right, of which I
13 mean your name is on the slide decks and you
14 were involved, that broke down, right?
15        MR. MC BRIDE:  Objection.
16     A.   It had broken down before I was
17 involved.
18     Q.   Correct, but the breakdown I'm
19 referring to was that dispute which you -- I
20 have already asked you about in which voices
21 were raised and Mr. Danese asked you to leave
22 the Athena offices?
23     A.   That's not the entire picture.  What
24 happened was we came to an agreement, I and
25 Naomi Bigell came to an agreement.  They were

Plummer - Confidential

1

2 going to pay less money, but we were going to
3 give them more for paying less money and she
4 and I came to an agreement sometime in August
5 and we had agreed we would -- because it was
6 the end of summer, come to -- we would
7 memorialize the agreement by September when
8 business picked up again.
9     Q.   And you missed the deadline for
10 that?
11     A.   No, I didn't miss the deadline for
12 that.
13     Q.   You don't think there is e-mail
14 after e-mail of you missing that deadline?
15     A.   I know they maintained I missed that
16 deadline, but I did not miss that deadline.
17 They use that as an excuse to trump other
18 things.
19        The real reason of what was going on
20 is that we had a relationship with Bank of
21 America and Bank of America was paying multiple
22 times what Athena was paying and they were
23 asking for less.  And then Athena started
24 asking for things that trampled on what we
25 could give Bank of America and that's when the

Page 394

1        Plummer - Confidential
2   issue became problematic and we went over to
3   Andrea's office to discuss it and that's when
4   he had rationally -- and that's when he had an
5   emotional reaction.
6       Q.   You hate Andrea; don't you?
7            MR. MC BRIDE:  Objection.
8       A.   No.
9       Q.   Do you know how he feels about you?
10           MR. MC BRIDE:  Objection.
11      A.   I don't care because I don't
12  interact with him.
13      Q.   Well, sir, he told you what he
14  thought of you.
15      A.   You know, but I don't remember what
16  he said.
17      Q.   Sir, is it your testimony under oath
18  that you don't remember raised voices in the
19  Athena office in which you accused Naomi of
20  something, you deeply upset that woman?
21      A.   No, I don't remember that.
22      Q.   You don't remember any of this?
23           MR. MC BRIDE:  Objection.
24      A.   I remember raised voices with
25  Andrea, but I don't remember any raised voices

Page 395

1        Plummer - Confidential
2   with Naomi nor do I remember accusing her of
3   anything.
4       Q.   You never accused her of being rude
5   to you at a time when you were sick?
6       A.   I mean that's something -- that
7   might have happened in some daily course of
8   action, but I don't remember it being something
9   outside the norm of daily business.
10      Q.   Is it not outside the norm of daily
11  business, as you put it, to be literally asked
12  to leave a financial services company office
13  for misbehavior?
14           MR. MC BRIDE:  Objection.
15      A.   We didn't misbehave.
16      Q.   So that was Mr. Danese acting
17  inappropriately; is that your testimony?
18           MR. MC BRIDE:  Objection.
19      A.   I would argue that he had an extreme
20  reaction emotionally when we were trying to
21  have a very logical discussion with him about
22  what was possible and what wasn't.
23      Q.   And you tried to placate him by
24  sending him apology notes; didn't you?
25           MR. MC BRIDE:  Objection.

Page 396

1        Plummer - Confidential
2       A.   I honestly don't remember.
3       Q.   Going back to your affidavit, sir,
4   this affidavit, Exhibit 7, is about your
5   Artvest dispute with Pay Back, correct?
6       A.   Correct.
7       Q.   When you were meeting with the
8   Athena, you never once disclosed to Athena that
9   TEFAF was already seeking to essentially remove
10  you and Artvest?
11      A.   What is the timing of this?
12      Q.   I don't know.  I can only go with
13  what you told the court, but if you look to
14  paragraph 34, it started in September of 2017.
15      A.   The dates --
16      Q.   And then if you look at paragraph
17  35, by December you were being disinvited to
18  meetings.
19           MR. MC BRIDE:  Wait for a question.
20      Q.   Right?
21      A.   By what date did you say?
22      Q.   By early, mid December, you were
23  actually disinvited?
24      A.   Of what year?
25      Q.   2017.

Page 397

1        Plummer - Confidential
2       A.   I believe the dispute that you are
3   referring to and characterizing with Andrea
4   happened in August, September of 2017.
5       Q.   Correct and then by December of
6   2017, you were actually being, you know, either
7   removed or disinvited from meetings by TEFAF?
8            MR. MC BRIDE:  Objection.
9            Mischaracterizes paragraph 35.
10      A.   I'm not sure how this is relevant to
11  the Athena discussions because these internal
12  matters wouldn't have been something that would
13  have been any Andrea's business to know about.
14      Q.   So you don't think that someone was
15  soliciting a literally $400,000 payment from
16  Athena based on your involvement about TEFAF,
17  that you didn't need to disclose the fact that
18  you were being disinvited to board meetings by
19  TEFAF?
20           MR. MC BRIDE:  Objection.
21      A.   There are a number of things wrong
22  with that question.  The first is the $400,000
23  Athena never paid, was never planning to pay,
24  was never billed for, was never in the realm of
25  $400,000 in their sponsorship role.

100 (Pages 394 - 397)

Plummer - Confidential

1
2    Q.   Under oath, sir, are you saying you
3    didn't ask Athena for $400,000 for a two year
4    contract?
5    A.   That may have been discussed at some
6    early stage, but by the time of 2017, we were
7    talking something in the range of $60,000.
8    Q.   Well, we will see what the documents
9    say because it was 400?
10       MR. MC BRIDE:  No question.
11   Q.   And then after your relationship
12   with Athena broke down to the point that you
13   were asked to leave the Athena building, your
14   relationship with TEFAF devolved such that your
15   partner at Artvest, Mr. Rabin, was physically
16   restrained by TEFAF, right?  Paragraph 38.
17   A.   Yes, that was at a -- we went to the
18   exhibitor meeting, which we normally went to,
19   and Nanne Dekking, the chairman, asked us to
20   leave and we had consulted with counsel whether
21   or not we had right to be there and did, yes.
22   Q.   And it became physical?
23   A.   No, Jeff wasn't physical.  TEFAF was
24   physical.
25   Q.   I understand you told the court and

Plummer - Confidential

1
2    asked the court to enjoin certain conduct on
3    the basis of a sworn declaration that you were
4    disinvited from meetings, that you were asked
5    to leave the room and at one point the
6    relationship that you had with TEFAF got so bad
7    that there was something of a physical incident
8    which, according to your sworn testimony, was
9    witnessed by dozens of exhibitors and clients?
10   A.   Yeah, and we can go back to those
11   exhibitors and tell you what really happened.
12   Q.   Fair enough.  So the point being,
13   taking you at your word as I do, the
14   relationship with Athena over the TEFAF art
15   fair degenerated to the point where you were
16   asked to leave the Athena office.
17       Then within a couple of months,
18   according to your own declaration, your
19   relationship with TEFAF disintegrated to the
20   point where you were disinvited from meetings,
21   excluded from conversations and then eventually
22   there was an effort by TEFAF to physically
23   remove you from an event, correct?
24       MR. MC BRIDE:  Objection.
25   A.   I don't see the relevance of the

Plummer - Confidential

1
2    two.
3    Q.   Sir, you have filed an expert report
4    in which you spend a lot of time talking about
5    all this TEFAF, right?
6    A.   I don't understand the relevance
7    between our relationship with TEFAF and my
8    relationship with Andrea.  They have nothing do
9    with each other.
10   Q.   Well, sir, respectfully, you don't
11   decide that and I don't decide that.  That's
12   why we have judges and juries, sir, but you
13   have an expert report which relies heavily on
14   your experience running the art fair trade show
15   that is TEFAF and you don't disclose that that
16   ended so badly there was a lawsuit and a
17   physical altercation and you file an expert
18   report criticizing Athena without disclosing
19   what was for Athena a significant economic
20   relationship that ended in beyond a business
21   disagreement that led you to be expelled from
22   Athena.  That's the point, sir, and none of
23   that is disclosed in your report, right?
24       MR. MC BRIDE:  Objection.
25   A.   Because I do not interpret the

Plummer - Confidential

1
2    situation the way you do nor do I have the
3    facts that you are purporting because they are
4    not true.  I did not think it made sense to put
5    such a thing in my expert witness report.
6    Q.   Sir, isn't it the case that when you
7    don't disclose information in an expert report,
8    you deprive the reader of the expert report of
9    the ability to make that judgment for
10   themselves?
11       MR. MC BRIDE:  Objection.  No legal
12   expertise.
13   A.   I don't have the legal background to
14   answer that.
15   Q.   Sir, just like you didn't disclose
16   the 2016 expert report that actually was the
17   basis for the one that you prepared here, that
18   was your starting point, you didn't disclose
19   that either; did you, sir?
20       MR. MC BRIDE:  Objection.
21   A.   I gave my -- I explained my reasons
22   for that already.
23   Q.   Right.  It was based on a
24   conversation with a gentleman, the name of whom
25   you didn't know, who told you a demonstrably

101 (Pages 398 - 401)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

ATHENA ART FINANCE CORP.,

                         Plaintiff,                 No. 20-cv-04669 (GBD) (VF)

      -against-

that

CERTAIN ARTWORK BY JEAN-MICHEL BASQUIAT
ENTITLED HUMIDITY, 1982, *In Rem*,

                         Defendant,

SATFINANCE INVESTMENT LIMITED and
DELAHUNTY LIMITED d/b/a DELAHUNTY FINE ART,

                         Interested Parties.

---------------------------------------------------------------------X

## <u>ERRATA SHEET FOR APRIL 4, 2023, DEPOSITION OF MICHAEL PLUMMER</u>

      I, MICHAEL PLUMMER, wish to make the following changes, for the following reasons:

| PAGE | LINE | | |
|------|------|------|------|
| 25 | 11 | CHANGE: | "CFO" to "COO" |
| | | REASON: | Misspoke, corrected later in Deposition |
| 40 | 3 | CHANGE: | Insert "than' between "regulated" and "here" |
| | | REASON: | Transcription error |
| 46 | 6 | CHANGE: | "evaluation" to "valuation" |
| | | REASON: | Transcription error |
| 48 | 24 | CHANGE: | Insert "and conduct" between "analyze" and "their" |
| | | REASON: | Transcription error or misspoke |
| 52 | 18 | CHANGE: | Insert "values" between "changing" and "and" |
| | | REASON: | Transcription error |
| 56 | 19 | CHANGE: | "full" to "Old" |
| | | REASON: | Transcription error |
| 61 | 17 | CHANGE: | "of" to "their" |
| | | REASON: | Transcription error |

| 61 | 18 | CHANGE: | Insert "this" between "to" and "loan" |
| | | REASON: | Transcription error |

| 65 | 12 | CHANGE: | Replace "source" with "cost" |
| | | REASON: | Transcription error |

| 74 | 13 | CHANGE: | Insert "not" between "would" and "always" |
| | | REASON: | Transcription error |

| 81 | 7 | CHANGE: | Delete "the" between "in" and "accessing" |
| | | REASON: | Transcription error |

| 114 | 11 | CHANGE: | Replace "force" with "source" |
| | | REASON: | Transcription error |

| 131 | 6 | CHANGE: | Delete "work" |
| | | REASON: | Transcription error |

| 131 | 8 | CHANGE: | "Chairman" to "CEO" |
| | | REASON: | Transcription error or misspoke |

| 131 | 9 | CHANGE: | "CFO" to "COO of Christie's Financial Services" |
| | | REASON: | Misspoke |

| 139 | 21 | CHANGE: | Replace "- -" with "us and" |
| | | REASON: | Transcription error |

| 143 | 15 | CHANGE: | Delete "when" |
| | | REASON: | Transcription error |

| 143 | 16 | CHANGE: | Replace "pair" with "pare" |
| | | REASON: | Transcription error |

| 154 | 7 | CHANGE: | Replace "is" with "as" |
| | | REASON: | Transcription error |

| 154 | 8 | CHANGE: | Insert "asset in" after "the" |
| | | REASON: | Transcription error |

| 159 | 19 | CHANGE: | Replace "to say" with "been saying" |
| | | REASON: | Transcription error |

| 159 | 20 | CHANGE: | Replace "or" with "of" |
| | | REASON: | Transcription error |

| 173 | 6 | CHANGE: | Replace "Deloitle" with "Detroit" |
| | | REASON: | Transcription error |

| 217 | 4 | CHANGE: | Delete "high" |
| | | REASON: | Transcription error |

| 219 | 15 | CHANGE: | Replace "would long to" with "prefer not to" |
| | | REASON: | Transcription error |

| 230 | 5 | CHANGE: | Replace "import and" with "important" |
| | | REASON: | Transcription error |

| 246 | 16 | CHANGE: | Insert "rate" between "loan" and "covers" |
| | | REASON: | Transcription error |

| 246 | 17 | CHANGE: | Delete after the word "risk" |
| | | REASON: | Transcription error or misspoke |

| 246 | 18 | CHANGE: | Delete the first "risk" |
| | | REASON: | Transcription error or misspoke |

| 253 | 3 | CHANGE: | Delete "of a" |
| | | REASON: | Transcription error |

| 254 | 9 | CHANGE: | "they" to "there" |
| | | REASON: | Transcription error |

| 266 | 5 | CHANGE: | "a million .2" to "1.2 million" |
| | | REASON: | Clarity |

| 273 | 20 | CHANGE: | Insert "not" before "a private backer" |
| | | REASON: | Transcription error |

| 275 | 15 | CHANGE: | "the" to "their" |
| | | REASON: | Transcription error |

| 275 | 16 | CHANGE: | Delete "Christie's" before "Ed Dolman" & add "when at Christie's" after "Ed Dolman" |
| | | REASON: | Transcription error or misspoke |

| 275 | 24 | CHANGE: | Insert "someone else as" between "of" and "an" |
| | | REASON: | Transcription error or misspoke |

| 285 | 12 | CHANGE: | Replace "seller" with "SIL" |
| | | REASON: | Transcription error |

| 288 | 9      | CHANGE:  | "Inigo" to "Aleksander"                       |
|-----|--------|----------|-----------------------------------------------|
|     |        | REASON:  | Transcription error or misspoke               |
| 288 | 22     | CHANGE:  | "Under" to "Until"                            |
|     |        | REASON:  | Transcription error                           |
| 354 | 18, 19 | CHANGE:  | Replace "our" with "art"                      |
|     |        | REASON:  | Transcription error                           |
| 356 | 15     | CHANGE:  | Replace "contents" with "context"             |
|     |        | REASON:  | Transcription error                           |
| 373 | 6      | CHANGE:  | Delete "in 2007"                              |
|     |        | REASON:  | Transcription error or misspoke               |
| 373 | 19     | CHANGE:  | "negatively" to "negative"                    |
|     |        | REASON:  | Transcription error                           |
| 376 | 14     | CHANGE:  | Delete "fund"                                 |
|     |        | REASON:  | Transcription error                           |
| 394 | 4      | CHANGE:  | Replace "rationally" with "behaved irrationally" |
|     |        | REASON:  | Transcription error                           |
| 396 | 5      | CHANGE:  | Replace "Pay Back" with "TEFAF"               |
|     |        | REASON:  | Transcription error                           |

May 11, 2023

_____                              _____

WITNESS SIGNATURE                                            DATE

4