UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATHENA ART FINANCE CORP., <br><br> *Plaintiff,* <br><br> -against- <br><br> that <br><br> CERTAIN ARTWORK BY JEAN-MICHEL BASQUIAT ENTITLED HUMIDITY, 1982, *in Rem*, <br><br><br> *Defendants.* <br><br> SATFINANCE INVESTMENT LIMITED and DELAHUNTY LIMITED d/b/a DELAHUNTY FINE ART, <br><br> *Interested Parties.* | 20-CV-04669 (GBD) (VF) <br><br> **REPORT AND** <br> **RECOMMENDATION** |
| SATFINANCE INVESTMENT LIMITED <br><br> *Intervenor-Plaintiff,* <br><br> -against- <br><br> ATHENA ART FINANCE CORP. and that CERTAIN ARTWORK BY JEAN-MICHEL BASQUIAT ENTITLED HUMIDITY, 1982, *in Rem*, <br><br> *Intervenor-Defendants.* | |

**VALERIE FIGUEREDO, United States Magistrate Judge**

**TO: THE HONORABLE GEORGE B. DANIELS, United States District Judge.**

This is an *in rem* action arising out of a title dispute involving a painting by world-renowned artist Jean-Michel Basquiat. Plaintiff and Intervenor-Defendant Athena Art Finance Corporation ("Athena") made a loan that was secured by Basquiat's painting, entitled Humidity, 1982 (the "Painting"), and Athena now seeks an order permitting it to foreclose upon and sell the

1

Painting. See ECF No. 8-1 at Compl. ¶ 19. Intervenor Plaintiff and Interested Party Satfinance

Investment Limited ("Satfinance") claims it acquired full title to the Painting and never sold or

transferred any part of its ownership interest. Interested Party and Counterclaim Plaintiff

Delahunty Limited ("Delahunty") also claims an ownership interest in the Painting. Before this

Court are motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure filed by Athena, Satfinance, and Delahunty. See ECF Nos. 170, 173, 175. For the

reasons set forth below, Delahunty's motion is **GRANTED** in part and **DENIED** in part,

Athena's motion is **DENIED**, and Satfinance's motion is **GRANTED**.

## BACKGROUND[1]

I.   Factual Background[2]

A.   Inigo Philbrick, through his company, acquires the Painting

Inigo Philbrick was an art dealer in the United Kingdom who did business through his

wholly owned and operated entity, Inigo Philbrick Limited ("IPL"). ECF No. 172 ("Delahunty

---

[1] The page numbers referenced herein for citations to the electronic docket ("ECF") are to the original pagination in those documents, except for citations to exhibits submitted by the parties in support of their respective summary judgment motions. For those exhibits, page numbers referenced herein are to the ECF-generated page numbers.

[2] Unless otherwise noted, the facts recounted herein reflect the undisputed, material facts contained in the parties' Local Civil Rule 56.1 Statements of Facts. See ECF No. 172 ("Delahunty R. 56.1"); ECF No. 176 ("Athena R. 56.1"); ECF No. 178 ("Satfinance R. 56.1"). Any facts contested or challenged by pointing to admissible evidence in the record are considered to be disputed and are not included in the facts recounted herein. However, where a party provides only a conclusory denial and/or fails to include any record citations to certain facts, those facts are deemed admitted. See Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); see also N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 648 (2d Cir. 2005) (finding it within the district court's discretion to deem the moving party's statement of material facts admitted where the opposing party "offered mostly conclusory denials" and "failed to include any record citations").

R. 56.1") ¶ 1; ECF No. 176 ("Athena R. 56.1") ¶ 1. Through his company, Philbrick purchased

and resold valuable artwork. ECF No. 178 ("Satfinance R. 56.1") ¶ 4. On July 27, 2016, IPL

purchased the Painting from Phillips Auctioneers LLC ("Phillips"), through a written agreement

whereby IPL agreed to pay $12.5 million for the Painting (the "Phillips Agreement").[3]

Delahunty R. 56.1 ¶ 2; Athena R. 56.1 ¶ 2. The Phillips Agreement states that "[o]wnership of

the [Painting] shall pass to [IPL] upon receipt by Phillips of the full Purchase Price in good

funds." Delahunty R. 56.1 ¶ 3.

Between August 12, 2016, and September 16, 2016, IPL paid Phillips $12.5 million for

the Painting, in the form of wire transfers and account offsets. Id. ¶ 19. Specifically, IPL wired

$2,000,000 to Phillips on August 12, 2016; IPL wired $1,999,975 to Phillips on August 29,

2016; IPL wired $1,885,820 to Phillips on September 1, 2016; and IPL wired $1,000,000 to

Phillips on September 13, 2016. Id. With respect to the account offsets, on August 22, 2016,

$2,614,180 of the sales proceeds from a painting IPL consigned to Phillips was credited towards

the purchase price of the Painting, and on September 16, 2016, IPL sold two paintings to Phillips

for $3,000,000, which was also credited towards the purchase price of the Painting. Id. On

October 6, 2016, Phillips authorized release of the Painting to IPL, following full payment for

the Painting, and on or around October 11, 2016, the Painting was released to IPL. See

Delahunty R. 56.1 ¶¶ 20-21; Satfinance R. 56.1 ¶ 30; see also ECF Nos. 179-17 at 2; 184-13 at

6-7.

---

[3] Delahunty's Rule 56.1 Statement states that the Phillips Agreement was entered into on
July 29, 2016. Delahunty R. 56.1 ¶ 2. However, both Athena and Satfinance point out that the
Phillips Agreement was actually entered into on July 27, 2016. See ECF No. 198 ¶ 2; ECF No.
211 ¶ 2. The document that supports this fact in Delahunty's Rule 56.1 Statement confirms that
the Phillips Agreement was entered into on July 27, 2016. See ECF No. 179-5.

B.  Satfinance's interest in the Painting

Aleksandar Pesko ("Pesko"), an advisor to Satfinance,[4] and Philbrick were introduced in 2013 through a mutual art-world acquaintance. Satfinance R. 56.1 ¶¶ 1-2; Delahunty R. 56.1 ¶ 4. After Pesko and Philbrick met, their respective companies—Satfinance and IPL—began co-investing in art. Satfinance R. 56.1 ¶ 5. In July 2016, Philbrick approached Pesko about the possibility of investing in the Painting. Delahunty R. 56.1 ¶ 4; Satfinance R. 56.1 ¶ 8.

On August 10, 2016, Philbrick sent Pesko a signed bill of sale showing that IPL and Satfinance were purchasing the Painting from "SKH Management Corp." (not Phillips) for $18.4 million. Delahunty R. 56.1 ¶¶ 6-7; Satfinance R. 56.1 ¶ 10; ECF No. 180-1 at 2-4. On September 14, 2016, Philbrick sent Pesko an email attaching a second bill of sale and an agreement of sale. Satfinance R. 56.1 ¶ 12; ECF No. 180-2 at 10. The agreement of sale stated that Philbrick's company, IPL, as the buyer, was "the agent for an undisclosed purchaser" and that IPL had authority to buy the Painting on behalf of the undisclosed purchaser. ECF No. 180-2 at 3. It was later revealed that this agreement of sale and accompanying bill of sale were a fake. Satfinance R. 56.1 ¶ 25; Delahunty R. 56.1 ¶ 12.

On August 11, 2016, Satfinance and Philbrick entered into an agreement, which stated that Pesko and Philbrick "intend to jointly purchase" the Painting. Delahunty R. 56.1 ¶¶ 6-7; see also ECF No. 180-3. The agreement provided for Satfinance to "contribute 50% of the purchase price or $9,200,000" and Philbrick to "contribute $6,200,000."[5] ECF No. 180-3. The agreement

---

[4] Satfinance was Pesko's family investment vehicle run by Pesko's father, Boris Pesko. Satfinance R. 56.1 ¶ 2.

[5] No party in its Rule 56.1 statement included details about the substance of the agreement between Satfinance and Philbrick, beyond that fact that the agreement stated that Pesko and Philbrick "intended to jointly purchase" the Painting. While the Court is "not required to consider what the parties fail to point out" on a motion for summary judgment, it "has discretion to conduct an assiduous review of the record" and rely on facts contained therein.

further stated that Satfinance would provide Philbrick "a loan of $3,000,000," and that this loan would be "secured against the [Painting] and will be senior to [Philbrick's] $6,200,000 equity contribution." Id. Under the terms of the agreement, Pesko and Philbrick were to "jointly own the work," with Philbrick "retain[ing] possession of the [P]ainting, and cover[ing] all associated costs of insurance, storage, shipping and marketing etc.," but with Satfinance holding "full title to the [Painting]." Id. The agreement stated that "[a]ll profits above the purchase price of $18,400,000 will be shared equally between" Satfinance and Philbrick, and "any loss from the purchase price" would also be shared equally. Id. Finally, the agreement indicated that, "for the avoidance of doubt," Satfinance "shall hold full title to the [Painting]." Id.

On August 11, 2016, IPL issued an invoice to Satfinance reflecting Satfinance's $12.2 million contribution for a "66% share in" the Painting. Satfinance R. 56.1 ¶ 20. The invoice stated that "[f]ull title [is] to be transferred from [IPL] to Satfinance upon receipt of above balance." Satfinance R. 56.1 ¶ 22. On August 12, 2016, Satfinance paid $10.5 million, and on September 6, 2016, Satfinance paid an additional $1.7 million. Id. ¶ 24. Satfinance never had physical possession of the Painting. Athena R. 56.1 ¶ 27. It was later revealed that Philbrick lied to Pesko about the identity of the seller of the Painting, as well as the true purchase price of the Painting, which had been acquired by Philbrick from Phillips for $12.5 million. Satfinance R. 56.1 ¶¶ 25-26, 28.

C.  Delahunty's interest in the Painting

At around the same time that Philbrick was in discussions with Pesko and Satfinance, Philbrick began discussing a joint purchase of the Painting with Damian Delahunty, Managing

---

Orbetta v. Dairyland USA Corp., No. 20 Civ. 9000 (JPC), 2023 WL 6386921, at *7 (S.D.N.Y. Sept. 30, 2023) (internal quotation marks and citations omitted).

Director of Delahunty. Delahunty R. 56.1 ¶ 13. Philbrick first met Damian while operating art galleries in London, and they later regularly jointly purchased and resold artwork. Delahunty R. 56.1 ¶¶ 14-15. Damian earned a profit on each of these joint deals, and as a result, Philbrick became a trusted business partner. Id.

On August 18, 2016, Philbrick sent Damian a "fake" bill of sale for the Painting identifying "SKH Management Corp." as the seller (not Phillips), IPL as the buyer, and $22 million as the purchase price (not $12.5 million). Delahunty R. 56.1 ¶ 18; ECF No. 179-12. The fake bill of sale also indicated that IPL would retain title, stating: "[t]he Closing Date is the date the Buyer pays the Purchase Price to the Seller and Seller conveys title to the [Painting] to Buyer in accordance with this Agreement." Delahunty R. 56.1 ¶ 18.

On November 1, 2016, IPL issued an invoice to Delahunty for $2.75 million, indicating that Delahunty would receive 12.5% of the Painting. Id. ¶ 22. On November 1, 2016, Delahunty wired $2.53 million to IPL for the Painting. Id. ¶ 24. Delahunty paid the remaining $220,000 from "funds on account" that Delahunty had with IPL. Id. ¶ 25.

Delahunty never had physical possession of the Painting. Athena R. 56.1 ¶ 32.

D.  Athena's interest in the Painting

Athena is a specialty lender that provides loans secured by high value art. Delahunty R. 56.1 ¶ 31. 18 Boxwood Green Limited ("Boxwood"), a limited liability company incorporated under the laws of Jersey, United Kingdom, is a special-purpose vehicle wholly owned by Philbrick. Athena R. 56.1 ¶ 3; Satfinance R. 56.1 ¶ 32; Delahunty R. 56.1 ¶ 30. Philbrick was an individual guarantor on Boxwood's borrowings, and IPL was a corporate guarantor. Satfinance R. 56.1 ¶ 37. Philbrick was the "sole beneficial shareholder" of Boxwood. Delahunty R. 56.1 ¶ 43.

On March 31, 2017, Athena entered into a Loan Security Agreement (the "LSA") with Boxwood, under which Boxwood pledged various artworks to Athena as collateral for a revolving loan facility (the "Loan"). Athena R. 56.1 ¶ 4; Satfinance R. 56.1 ¶ 34; Delahunty R. 56.1 ¶ 31. Joseph Betts, one of the independent directors of Boxwood, signed the LSA. Athena R. 56.1 ¶ 5. Philbrick personally guaranteed the debt under the LSA, and IPL provided a corporate guaranty of the debt. Id. ¶¶ 6-7; Satfinance R. 56.1 ¶ 37.

Under the LSA, Boxwood represented and warranted that it was "the sole and absolute lawful and beneficial owner" of the collateral, and that it had "the authority to sell and/or transfer good and marketable title to" the collateral. Satfinance R. 56.1 ¶ 38; Athena R. 56.1 ¶ 11. The initial loan under the LSA was secured by a collateral pool of five pieces of art, none of which was the Painting. Delahunty R. 56.1 ¶ 33.

On March 31, 2017, Boxwood drew down on $6.75 million of the $10 million credit line with Athena, $5 million of which it used to pay off a previous loan from Athena to IPL. Delahunty R. 56.1 ¶ 35. That same day, Athena filed an "all-assets" U.C.C.-1 statement in the District of Columbia against non-U.S. borrower, Boxwood. Athena R. 56.1 ¶ 9.

On April 7, 2017, in connection with adding the Painting to the collateral pool underlying the Loan from Athena to Boxwood, Philbrick signed a "Transfer of Title" on behalf of IPL, which stated:

> For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and is set forth on the invoice attached hereto, on 7-April-2017, INIGO PHILBRIK LTD . . . transferred to 18 BOXWOOD GREEN LIMITED . . . all right title and interest to the [Painting].

Delahunty R. 56.1 ¶¶ 37-41; Athena R. 56.1 ¶ 10. The Transfer of Title was accompanied by an invoice from IPL to Boxwood for $12.5 million for the Painting. Delahunty R. 56.1 ¶ 42. Pursuant to the LSA, Boxwood agreed to "pledge[], assign[], and grant[] to [Athena], a security

interest in all of its right, title and interest in" the Painting. Satfinance R. 56.1 ¶ 39; Athena R. 56.1 ¶ 8.

On April 7, 2017, IPL transferred the Painting to Athena's storage facility in Long Island City, New York. Delahunty R. 56.1 ¶ 49; Athena R. 56.1 ¶ 16. On May 25, 2018, Athena and Boxwood amended the LSA for the fourth time, reflecting, among other changes, an increase in the loan facility to $13.5 million. Delahunty R. 56.1 ¶ 50. The Painting remained part of the collateral pool. Id.

Delahunty first learned of Athena and its security interest in the Painting in August 2019. Delahunty R. 56.1 ¶¶ 52-53. On October 14, 2019, Athena sent Boxwood, Philbrick, and IPL a default notice advising of a default on the loan facility. Satfinance R. 56.1 ¶ 42; Athena R. 56.1 ¶ 20. On October 18, 2019, Satfinance, through counsel, sent Athena an email stating that Satfinance owned the Painting and demanding that Athena "not take any steps to purport to sell, transfer, pledge, mortgage, dissipate or in any way deal with the [Painting] without giving [Satfinance] fourteen days' notice in writing." Satfinance R. 56.1 ¶ 43. Before October 2019, neither Delahunty nor Satfinance informed Athena that either had a claim to, or interest in, the Painting. Athena R. 56.1 ¶¶ 29, 34.

On March 2, 2020, the Supreme Court, New York County entered a judgment for Athena and against Boxwood, IPL, and Philbrick in the amount of $14,306,800.47 ($13,500,000 of outstanding loan principal and the then-outstanding and accrued interest as of the date of the order). Athena R. 56.1 ¶ 21.

E.  Philbrick is convicted in this Court of a scheme to defraud

On June 12, 2020, a criminal complaint filed in this Court was unsealed, charging Philbrick with wire fraud and aggravated identity theft in connection with numerous transactions

involving valuable works of art, including his dealings described herein related to the Painting. Satfinance R. 56.1 ¶ 46; see also Delahunty R. 56.1 ¶ 55; ECF No. 179-31. The criminal complaint alleged that as part of a "fraudulent scheme," Philbrick "made material misrepresentations to various investors and to [Athena] regarding certain artworks that became part of the Collateral Pool, including . . . [the Painting]." Delahunty R. 56.1 ¶ 55; see also ECF No. 179-31 ¶ 6.[6] The complaint also states that Philbrick "never disclosed" to Athena, during discussions about the Painting, the interests of Satfinance or Delahunty in the Painting. Delahunty R. 56.1 ¶ 55. The complaint further alleges that in or about October 2019, after Philbrick asked Athena "what would happen if he defaulted on his loan," he "admitted" to Athena that he was "not the sole owner of the [Painting]." Id. On April 30, 2020, Philbrick was indicted in this District and charged with one count of wire fraud in violation of 18 U.S.C. § 1343. Id. ¶ 55.

On November 18, 2021, Philbrick pled guilty to one count of wire fraud. Id. ¶ 56. During his plea colloquy, Philbrick admitted, among other things, that from 2016 through November 2019, he "knowingly engaged in a scheme for obtaining money and property by false pretenses, representations and promises." Id. Specifically, Philbrick admitted that he "made material misrepresentations and omissions to art collectors, investors and lenders to access art and obtain sale proceeds, fundings and loans." Id. Philbrick also admitted that he "knowingly misrepresented the ownership of certain artworks; for example, by selling artworks and/or using artworks as collateral on loans without the knowledge of co-owners and without disclosing the

---

[6] The complaint does not identify Athena by name, referring to it as an "Art Finance Company" based in Manhattan. See ECF No. 179-31 ¶ 5(a). Although not identified by name, it is clear from the facts alleged in the complaint, which entirely mirror the facts alleged here, that Athena and the Art Finance Company are one and the same. In its briefing, Athena does not claim otherwise.

ownership interest of third parties to buyers and lenders." Id. Philbrick was sentenced to seven

years in prison and was ordered to pay $86,672,290 in damages. Id. ¶ 58; Satfinance R. 56.1

¶ 47.

II.  Procedural History

Athena commenced this in-rem action in Supreme Court, New York County on June 2,

2020, seeking to foreclose on its lien and obtain the court's permission to immediately sell the

Painting, claiming that: (1) IPL alone had title to the Painting; (2) IPL transferred title to

Boxwood; and (3) Athena, as a secured lender, had "the absolute right, unilaterally, to sell the

[Painting]" and to apply the sale proceeds to the entire amount of Boxwood's and Philbrick's

indebtedness under the Loan. See ECF 8-1. On June 18, 2020, Satfinance, as an "interested party

and real party in interest," removed the case to this Court. See ECF No. 8. Delahunty filed a

notice of appearance and joined the proceedings on June 23, 2020. See ECF No. 10.

On July 30, 2020, Delahunty filed its answer to the complaint along with a counterclaim

seeking a declaration that it has a 12.5% ownership interest in the Painting. See ECF No. 26

¶¶ 40-48. On July 31, 2020, Satfinance filed an intervenor complaint to assert its claim that it had

full title to the Painting. See ECF No. 30 ¶¶ 71-117. On March 17, 2021, the parties agreed that

Athena—who has possession of the Painting (see ECF No. 20-2 ¶ 2)—would not sell, transfer, or

dispose of the Painting pending the outcome of this case. See ECF No. 75.

Fact discovery closed on January 12, 2023, and expert discovery closed on May 4, 2023.

See ECF Nos. 148, 164. On July 20, 2023, Delahunty, Athena, and Satfinance filed motions for

summary judgment seeking declarations with respect to their interests in the Painting. See ECF

Nos. 170, 173, 175. The Court held oral argument on the instant motions for summary judgment

on June 25, 2024. See ECF No. 257 ("Tr.").

**DISCUSSION**

I.    Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage . . . is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of demonstrating an entitlement to judgment as a matter of law and identifying the matter or matters that "it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323; Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008).

A fact is material when it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (quoting Anderson, 477 U.S. at 248) (internal quotation marks omitted). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (quoting Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted); Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008) (noting that the Court must view all facts "in the light most favorable" to the non-moving party). However, a court is not required to draw any inference that is "blatantly contradicted by the record, so that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Jaramillo, 536 F.3d at 145. "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). For a genuine dispute regarding a material fact to warrant a jury trial, there must be sufficient evidence supporting the claimed factual dispute "to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson, 477 U.S. at 249 (internal quotation marks and citation omitted). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo, 22 F.3d at 1224.

## II.    Analysis

Athena argues that it has a perfected security interest in the Painting pursuant to Article 9 of the Uniform Commercial Code (the "U.C.C."), with priority over any interest belonging to Satfinance or Delahunty. See ECF No. 174 at 11-15. Athena further contends that Satfinance and Delahunty are estopped from disputing its perfected security interest in the Painting. Id. at 15-18.

Delahunty and Satfinance counter that Athena has no enforceable security interest in the Painting because the debtor that pledged the Painting to Athena—Boxwood—had no rights in the Painting and thus could not convey a security interest to Athena. See ECF No. 171 at 11-19; ECF No. 177 at 10-15. Satfinance focuses on it having title to the Painting and argues that IPL

did not transfer title to the Painting to Boxwood, and Delahunty contends that any transfer of rights between IPL and Boxwood was a fraudulent conveyance. See ECF No. 171 at 12-16; ECF No. 177 at 8-15. Delahunty further argues that it has a 12.5% ownership interest in the Painting, ECF 171 at 20-24, while Satfinance asserts that it is the Painting's sole title holder, ECF 177 at 8-10. At oral argument, Delahunty and Satfinance acknowledged that the Court need not resolve each entity's ownership interest in the Painting and need only resolve (1) whether Athena has a security interest, and (2) whether Satfinance has full title in the Painting. See Tr. at 81-82, 84, 108-10; see also ECF No. 227 at 6.

For the reasons explained below, Athena does not have a security interest in the Painting because Boxwood did not have any rights in the Painting to which a security interest could attach. Satfinance has full title to the Painting, and although both Satfinance and Delahunty have an ownership interest in the Painting, an issue of fact exists as to the exact percentage of that ownership interest.

A.  Athena does not have a security interest in the Painting.

Security interests are creatures of statute, and U.C.C. § 9-203(b) "outlines the criteria for when a security interest is enforceable." Bank of N.Y. Mellon Trust Co., N.A. as Tr. for Mortg. Assets Mgmt. Series I Trust v. Hendrickson, 79 Misc. 3d 540, 544 (Sup. Ct., Rockland Cnty. 2023). A security interest is enforceable when "(1) value has been given," "(2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party," and "(3) the debtor has authenticated a security agreement." N.Y. U.C.C. §§ 9-203(a), (b); see also United States v. Mann, -- F. Supp. 3d -- , 2024 WL 1486632, at *7 (N.D.N.Y. Apr. 5, 2024) (discussing U.C.C. § 9-203(b)).

A security interest cannot attach to property if the "debtor"—the person or the entity purporting to own the property and using it as collateral—does not have either "rights in the collateral or the power to transfer rights in the collateral to a secured party," the creditor. See N.Y. U.C.C. § 9-203(b)(2); see also Creation of Security Interests, 4D N.Y. Prac., Com. Litig. in New York State Courts § 101:16 (4th ed.) (Under U.C.C. Section 9-203(b)(2), it is "only at the point that the debtor has obtained an ownership interest in the collateral that the security interest will attach."); Bank of N.Y. v. Silverberg, 86 A.D.3d 274, 282 (2d Dep't 2011) (explaining that, for transfers or assignment, the conveying party can transfer only those rights that it actually has). It is well-settled that, "[n]otwithstanding any agreement between the debtor and the creditor, if the debtor has no rights in the collateral, no security interest in that collateral comes into existence." In re Emergency Beacon Corp., 665 F.2d 36, 40 (2d Cir. 1981); see also Logan & Kanawha Coal Co., Inc. v. Banque Francaise Du Com. Exterieur, 868 F. Supp. 63, 66 (S.D.N.Y. 1994) (explaining that where a debtor has no rights in the collateral, then a lender's security interest cannot attach); Gasser Chair Co. v. Infanti Chair Mfg. Corp., No. 03-CV-6413 (ILG), 2006 WL 297451, at *3 (E.D.N.Y. Feb. 8, 2006) (finding that security interest in patent was not perfected because none of the debtors "had any interest in the Patent to convey").

Under the U.C.C., "[a] debtor's limited rights in collateral, short of full ownership, are sufficient for a security interest to attach." N.Y. U.C.C. § 9-203 cmt. 6. Athena does not dispute that a security interest attaches only to whatever rights the debtor—in this case, Boxwood—may have had in the Painting. See ECF No. 174 at 11; Tr. at 73 ("Athena has a secured interest in the painting that is coextensive with what Boxwood had."); see also Tr. at 3, 29, 66-67, 81, 85, 113. Accordingly, to the extent Athena, a creditor, has a security interest in the Painting, the "security

interest would necessarily be limited to the scope of [Boxwood's] own rights" in the Painting. Mann, 2024 WL 1486632, at *8; see also N.Y. U.C.C. § 9-203 cmt. 6.

The parties agree that IPL obtained title and ownership of the Painting when it purchased the Painting from Phillips for $12.5 million in 2016. Delahunty R. 56.1 ¶¶ 19-21; Satfinance R. 56.1 ¶¶ 28-30; Athena R. 56.1 ¶ 2; see also ECF No. 182-20 (private sale agreement between IPL and Phillips); Tr. at 4, 30. What happened next is at the heart of the parties' dispute.

Satfinance and Delahunty argue that Boxwood, the debtor that pledged the Painting to Athena pursuant to the terms of the LSA, had no rights in the Painting to convey to Athena. See ECF No. 171 at 11-19; ECF No. 177 at 10-15. Athena concedes that for a security interest to attach, Boxwood must have had rights in the Painting or the power to transfer rights in the Painting.[7] See Tr. at 73. As explained below, Boxwood did not have title to the Painting. And to the extent IPL had ownership rights that it could have transferred to Boxwood, the sale between IPL and Boxwood was a fraudulent conveyance, such that IPL did not transfer any rights in the Painting to Boxwood. Because Boxwood did not have any rights in the Painting, Athena could not obtain a security interest in the Painting.

---

[7] In its brief, Athena attempts to treat Philbrick, IPL, and Boxwood as a single entity, referring to the three collectively as the "obligors" who pledged the Painting to Athena. See, e.g., ECF No. 174 at 1, 6; ECF No. 206, at 10-11. This ignores the plain terms of the LSA, which was executed between Boxwood and Athena and states that "Athena" was the "Lender" and Boxwood was the "Borrower." ECF No. 182-1 at 2; see also Delahunty R. 56.1 ¶ 31; Athena R. 56.1 ¶ 4. Under the LSA, it was Boxwood that purportedly pledged the Painting to Athena as collateral. See ECF No. 184-16 at 5; Satfinance R. 56.1 ¶ 38; Athena R. 56.1 ¶ 4. Although Philbrick personally guaranteed the debt under the LSA and IPL provided a corporate guaranty of the debt under the LSA, Athena R. 56.1 ¶¶ 6-7, both occurred through separate agreements distinct from the LSA. See ECF Nos. 182-4, 182-5.

1.  *Satfinance has title to the Painting.*

Athena relies on the April 7, 2017 Transfer of Title document signed by Philbrick, on behalf of IPL, to show that Boxwood had rights in the Painting and the power to convey a security interest in the Painting to Athena. See ECF No. 174 at 12 (citing ECF No. 182-10 at 2). The Transfer of Title states that title to the Painting is transferred from IPL to Boxwood "[f]or good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and is set forth on the invoice attached hereto." ECF No. 182-10 at 2. The attached invoice, issued by IPL to Boxwood, indicates that the Painting was sold to Boxwood for $12.5 million. ECF No. 182-10 at 5. Athena points to an e-mail chain from April 2017 that confirms a payment of $3.25 million from Boxwood to IPL. See ECF No. 174 at 12 (citing ECF No. 182-12).

However, on August 11, 2016, nearly eight months prior to the Transfer of Title from IPL to Boxwood, Satfinance and Philbrick entered into an agreement that gave Satfinance "full title" to the Painting. Delahunty R. 56.1 ¶¶ 6-7; see also ECF Nos. 180-3, 180-4. In an agreement dated August 11, 2016, Aleksander Pesko, on behalf of Satfinance, agreed to "jointly purchase" the Painting with Philbrick, for a purchase price of $18.4 million. See ECF No. 180-3. Under the terms of the agreement, Satfinance would contribute 50% of the purchase price or $9.2 million and Philbrick would contribute $6.2 million; both would "jointly own the work." Id. Satfinance would also loan Philbrick $3 million towards the purchase of the Painting, and that loan would be "secured against the artwork" and "senior" to Philbrick's $6.2 million equity contribution. Id. Under the agreement, "[a]ll profits above the purchase price" of $18.4 million would "be shared equally between" Satfinance and IPL, but "[f]or the avoidance of doubt Satfinance shall hold full title to the artwork." Id. Accompanying the written agreement was an invoice from IPL to Satfinance, which expressly incorporated the terms of the "side letter" agreement dated August

16

11, 2016. See Satfinance R. 56.1 ¶¶ 20-21; ECF No. 180-4. Consistent with the side letter agreement, the invoice stated: "Full title to be transferred from [IPL] to Satfinance upon receipt of above balance." ECF No. 180-4 at 3. The invoice indicated a balance to be paid by Satfinance of $12.2 million of the purchase price for the Painting. Id.

Accompanying the invoice was an email from Philbrick to Pesko which stated that the $12.2 million represented a "66% share" in the Painting. Id. at 2. On August 12, 2016, Satfinance paid $10.5 million, and on September 6, 2016, Satfinance paid an additional $1.7 million, for a total payment from Satfinance to IPL of $12.2 million. Satfinance R. 56.1 ¶ 24. The undisputed evidence thus shows that Satfinance obtained full title to the Painting in 2016, before the LSA between Athena and Boxwood. Athena points to nothing in the record showing a transfer of title from Satfinance to any other entity, including Boxwood, Philbrick, or IPL.

Athena argues that the agreement between IPL and Satfinance is too contradictory to be enforceable because despite it stating that Satfinance retained full title to the Painting, it also indicated that Satfinance and IPL jointly purchased the Painting and shared ownership of the Painting. See ECF No. 229 at 2-4. Satfinance's acquisition of full title in the Painting is not negated by the fact that the agreement provided Satfinance and IPL with joint ownership of the work, or that it permitted the two entities to share "equally" in all profits and losses. ECF No. 180-3 at 2. Having "beneficial ownership" of property, which is the "enjoyment of the title owner's interests in the profits, benefits or contractual advantages of ownership," is distinct from "having legal title to the property." De Suze v. Linden Plaza Pres., 988 N.Y.S.2d 522, 2014 WL 886880, at *1 n.1 (Sup. Ct., Kings Cnty. 2014), modified on other grounds, 24 N.Y.S.3d 370, 135 A.D.3d 936 (2d Dep't 2016); see also In re PCH Assocs., 949 F.2d 585, 603 (2d Cir. 1991) (noting the difference between beneficial ownership and "mere legal title"); United States v.

Chowaiki, 369 F. Supp. 3d 565, 570, 573-74 (S.D.N.Y. 2019) (distinguishing between a party's "entitlement to money" from artwork and that party's "ownership or other interest"); ACF Indus., Inc. v. Bd. of Assessors of City of Buffalo, 13 A.D.2d 154, 157 (4th Dep't 1961) (stating that there can be a difference between someone that has beneficial ownership and someone who has legal title), aff'd, 197 N.E.2d 784 (N.Y. 1964); Whitman Realty Group v. Galano, 41 A.D.3d 590, 592 (2d Dep't 2007) (drawing distinction between "contractual right to payment" and "legal ownership" to disputed monies, for purposes of conversion claim). IPL and Satfinance were free to structure their joint purchase of the Painting so as to separate legal title in the Painting from beneficial ownership in the work. See N.Y. U.C.C. § 2-401(1) ("[T]itle to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties."). And as it pertains to legal title, there is no contradiction in the side letter agreement or invoice: both unambiguously indicate that Satfinance held full title to the Painting. See ECF Nos. 180-3, 180-4, at 3; see also ECF No. 180-4, at 2 (e-mail from Philbrick to Pesko indicating that "full title" would be transferred to Satfinance). Athena points to nothing in the record that raises an issue of fact as to whether Satfinance obtained full title to the Painting from IPL when it paid IPL $12.2 million.

### 2. IPL did not transfer any rights in the Painting to Boxwood.

Under the August 11, 2016 agreement between IPL and Satfinance, IPL and Satfinance would "jointly own the work" with profits from the sale of the Painting to be "shared equally." See ECF No. 180-3. Satfinance provided $9.2 million towards the purchase price of the Painting and also loaned IPL $3 million towards IPL's share of the purchase price of the Painting. Id. Because of this loan, an email between IPL and Pesko that attached the invoice, states that Satfinance's "[$]12.2m represents a 66% share in the work." See ECF No. 180-4, at 2. Given

this, there is a dispute of fact as to whether Satfinance owned a 50% share in the Painting or a 66% share in the Painting. Nevertheless, the evidence establishes that IPL retained some ownership interest in the Painting after the transaction with Satfinance. If Satfinance had a 50% ownership interest, then IPL necessarily retained the other 50%. Alternatively, if Satfinance had a 66% ownership interest, then IPL necessarily retained the other 34% share.

On November 1, 2016, IPL and Delahunty reached an agreement whereby Delahunty purchased a 12.5% interest in the Painting for $2.75 million. See Delahunty R. 56.1 ¶ 22. Delahunty paid $2.53 million to IPL for the Painting and the remaining $220,000 was paid from "funds on account" that Delahunty had with IPL. Id. ¶¶ 24-25. IPL could (and did) transfer an ownership interest to Delahunty after the transaction with Satfinance. As such, following the transaction between IPL and Delahunty, three entities had an ownership interest in the Painting: Satfinance, Delahunty, and IPL.

Even without title to the Painting, Athena could have obtained a security interest in whatever rights Boxwood had in the Painting. See Inland Bank & Trust v. ARG Int'l AG, No. 16 Civ. 9964 (LAK) (SN), 2018 WL 3543905, at *3 (S.D.N.Y. May 3, 2018) (explaining that although a debtor must have "substantial rights" in the collateral for a security interest to attach, the debtor need not "possess title to the collateral" because even "limited rights in the collateral, short of full ownership" suffice for a security interest). Because IPL retained an ownership interest in the Painting after the transactions with Satfinance and Delahunty, it is necessary to determine whether IPL transferred any ownership rights in the Painting to Boxwood, such that Athena's security interest could attach to those rights. See In re Emergency Beacon Corp., 665 F.2d at 40 ("Notwithstanding any agreement between the debtor and the creditor, if the debtor has no rights in the collateral, no security interest in that collateral comes into existence.").

i.  IPL's sale of the Painting to Boxwood was a fraudulent conveyance.

Under New York law, "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay or defraud any [present or future] creditor of the debtor." N.Y. Debt. & Cred. Law § 273(a)(1).[8] Additionally, for purposes of the Debtor & Creditor Law, the definition of a "creditor" is broad and includes "a person that has a claim." See id. § 270(3)(d). A "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." Id. § 270(3)(c). Under New York law, a "creditor" includes "one who has a right to maintain a tort action but has not recovered judgment at the time of the transfer." Drenis v. Haligiannis, 452 F. Supp. 2d 418, 428 (S.D.N.Y. 2006). Delahunty and Satfinance became a "creditor" of IPL when IPL fraudulently conveyed the Painting to Boxwood, despite Delahunty's and Satfinance's respective ownership interest in the Painting. See Drenis, 452 F. Supp. 2d at 428 (concluding that plaintiffs were tort creditors by virtue of their claims in instant action and thus had standing to sue as creditors under the New York Debtor & Creditor Law); see also Perrone v. Amato, No. 9 Civ. 0316 (TCP) (AKT), 2010 WL 11629624, at *11 (E.D.N.Y. Aug. 30, 2010) (holding that fraudulent conveyance claim survived dismissal because plaintiff obtained "creditor" status "[w]hen [p]laintiff signed the contract with [defendant]" and "received

---

[8] On April 4, 2020, the New York Uniform Voidable Transactions Act was enacted and replaced Article 10, Sections 270 through 281 of the Debtor & Creditor Law. Van De Walle v. Van De Walle, 68 Misc. 3d 1224(A), 2020 WL 5638636, at *7 (Sup. Ct. Nassau Cnty. Sept. 11, 2020). The new statute, however, does not apply to transfers that occurred prior to its enactment, as is the case with the transfer at issue here. Id.; see also In re 45 John Lofts, LLC, 650 B.R. 602, 612 n.11 (Bankr. S.D.N.Y. 2023) (applying prior version of the Debtor & Creditor Law to 2014 transaction because "the Uniform Voidable Transactions Act only applies to transactions which occurred on or after April 4, 2020").

rights in [the property] and the proceeds therefrom" that were "diminished as a result of [defendant's] transfers").

Under Section 276 of the Debtor & Creditor Law, "[w]here actual intent to defraud is proven, the conveyance will be set aside regardless of the adequacy of the consideration given." In re Sharp Int'l Corp., 403 F.3d 43, 56 (2d Cir. 2005) (quoting United States v. McCombs, 30 F.3d 310, 328 (2d Cir. 1994)). Evidence of an intent to defraud must be clear and convincing. Kim v. Yoo, 311 F. Supp. 3d 598, 610 (S.D.N.Y. 2018). Actual intent to defraud is typically "difficult to establish through direct evidence" and thus courts examine indirect evidence of fraudulent intent, such as the "facts and circumstances surrounding the transfer." Kim, 311 F. Supp. 3d at 612 (internal quotation marks and citations omitted). The so-called "badges of fraud" include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

Id. (quoting Ford Motor Credit Co. LLC v. Orton-Bruce, No. 14 Civ. 5382 (KMK), 2017 WL 1093906, at *9 (S.D.N.Y. Mar. 22, 2017)).

Because there exists direct evidence of Philbrick's intent to defraud Athena, Satfinance, and Delahunty, an analysis of the badges of fraud is not necessary. Philbrick pled guilty to wire fraud, admitting that he knowingly participated in a scheme to defraud. Delahunty R. 56.1. ¶¶ 55-57; Satfinance R. 56.1 ¶ 47; see also ECF No. 179-32. During his plea, Philbrick admitted that he "knowingly misrepresented the ownership of certain artworks," including the Painting, by for example, "selling artworks and/or using artworks as collateral on loans without knowledge of

co-owners and without disclosing the ownership interest of third parties to buyers and lenders."
Delahunty R. 56.1 ¶ 56. Philbrick admitted, under penalty of perjury, that he knowingly engaged
in a scheme, making "material misrepresentations and omissions to art collectors, investors and
lenders to access art and obtain sales proceeds, funding and loans." Id.; see also ECF No. 179-32
at 20-21.[9]

Philbrick was charged with having misrepresented to Athena the ownership interests of
Delahunty and Satfinance in the Painting and, by pleading guilty, Philbrick admitted that he had
made material misrepresentations about the ownership of the Painting in order to use the Painting
as collateral for a loan. Delahunty R. 56.1 ¶¶ 55-56. Given Philbrick's plea to a crime that
includes an intent to defraud as a specific element, his guilty plea establishes his actual intent to
defraud by clear and convincing evidence.[10] See United States v. Rosen, 409 F.3d 535, 549 (2d
Cir. 2005) (noting that guilty plea is "an admission of all the elements of a formal criminal
charge") (quotation marks and citations omitted); Masoud v. Holder, 487 F. App'x 633, 635 (2d
Cir. 2012) (explaining that "specific intent to defraud" is an element of the crime of wire fraud).
Moreover, because IPL was wholly owned by Philbrick (see Athena R. 56.1 ¶1; Delahunty R.
56.1 ¶ 1), Philbrick's knowledge of the fraud and his intent to defraud can be imputed to IPL.[11]

---

[9] Citations to the transcript of Philbrick's guilty plea are to the original pagination in that
document.

[10] Athena argues that Delahunty has not submitted undisputed evidence of IPL's intent to
create an insolvency. See ECF No. 206 at 16-17. But the transfer between IPL and Boxwood was
an actual fraudulent conveyance—not a constructive fraudulent conveyance—and consequently
Delahunty does not have to show that IPL acted with an intent to create an insolvency. See In re
Sharp Int'l Corp., 403 F.3d 43, 53, 56 (2d Cir. 2005) (discussing the transferor's belief that "it
will incur debt beyond its ability to pay" in the context of a constructive fraudulent conveyance
and laying out legal standard for actual fraudulent conveyance).

[11] Athena's argument that Philbrick's guilty plea did not address IPL and Boxwood (see
ECF No. 206, at 17-18) ignores that IPL and Boxwood were wholly owned by Philbrick, such
that Philbrick's intent to defraud could be imputed to both entities. Moreover, Athena's reliance

See Battino v. Cornelia Fifth Ave., LLC, 861 F. Supp. 2d 392, 405 (S.D.N.Y. 2012) ("The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation."); see also Moss v. Garcia-Chamorro, 110 A.D.3d 475, 476 (1st Dep't 2013) (affirming grant of summary judgment in favor of plaintiff on theories of piercing the corporate veil and fraudulent conveyance where defendant "was the sole owner and officer of all three corporations [and] that he transferred assets between the corporations for no value"). Accordingly, the transaction between IPL and Boxwood must be set aside because there is clear and convincing evidence that the conveyance was made with IPL's fraudulent intent.

All of Athena's arguments to the contrary are unavailing. First, Athena argues that a determination as to whether the sale from IPL to Boxwood was a fraudulent conveyance requires that IPL and Boxwood be parties to this action. See ECF No. 206 at 3-4, 13. A party is necessary under Federal Rule of Civil Procedure 19(a)(1) only if without that party the Court cannot grant complete relief to the present parties. See MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc., 471 F.3d 377, 385 (2d Cir. 2006). In the context of a fraudulent conveyance claim, "an earlier transferee who has parted with all interest in the transferred property is not necessary in a suit against a subsequent transferee." In re M. Fabrikant & Sons, Inc., 394 B.R. 721, 744 (Bankr. S.D.N.Y. 2008); see also Commissions Import Export S.A. v. Republic of Congo, No. 19 Misc. 195 (KPF), 2023 WL 3601035, at *7 n. 4 (S.D.N.Y. May 23, 2023) (rejecting argument in fraudulent conveyance case that "other alleged transferor and transferee entities" were necessary parties). "The only necessary parties to a fraudulent conveyance action are the transferee and any

---

on the allegations in the complaint ignores that Philbrick admitted to engaging in the scheme to defraud as a part of his guilty plea to a crime that required Philbrick to admit to an intent to defraud. See In re Bayou Group, LLC, 439 B.R. 284, 306 (S.D.N.Y. 2010) (examining guilty plea and allegations in Government's Information to conclude that intent to defraud was established).

other party who may claim an interest in the property conveyed." <u>Lyman Commerce Solutions, Inc. v. Lung</u>, No. 12 Civ. 4398 (TPG), 2013 WL 4734898, at *8 (S.D.N.Y. Aug. 30, 2013).

Neither IPL nor Boxwood is a necessary party. IPL is an earlier transferee that parted with any interest it had in the Painting when it sold it to Boxwood for purposes of pledging the Painting as collateral to Athena. Similarly, Boxwood is also an earlier transferee that parted with any interest in the Painting when it provided Athena with possession of the Painting, defaulted on the Loan, and allowed Athena to obtain a judgment against it and IPL. <u>See</u> Athena R. 56.1 ¶¶ 14-16, 20, 21. Additionally, Boxwood was served with notice of this action and declined to join. <u>See</u> ECF No. 8-1 (notice of removal showing service on IPL and Boxwood).

Second, Athena argues that New York law, and thus the Debtor & Creditor Law, does not apply to invalidate a transaction between IPL and Boxwood, two overseas entities. <u>See</u> ECF No. 206 at 14-15. Athena appears to suggest that English law applies. Under Debtor & Creditor Law § 279, a claim for relief "is governed by the local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred." N.Y. Debt. & Cred. Law § 279. That provision, however, did not take effect until April 4, 2020, and it does not apply to a transfer that predated its enactment, like the transfer between IPL and Boxwood which occurred in April 2017. <u>See</u> <u>Van De Walle</u>, 2020 WL 5638636, at *7 (explaining that the Uniform Voidable Transactions Act, which enacted § 279, "does not apply to transfers . . . which occurred prior to its enactment" in April 2020).[12]

---

[12] Athena cites <u>Frontier Airlines, Inc. v. AMCK Aviation Holdings Ireland Ltd.</u>, 676 F. Supp. 3d 233 (S.D.N.Y. 2023), <u>see</u> ECF No. 206 at 14, which applied the new Section 279. That case, however, concerned a fraudulent transfer claim based on a transaction that occurred after the enactment of the new Section 279. <u>See</u> <u>Frontier Airlines</u>, 676 F. Supp. 3d at 255 (discussing fraudulent transfer claim involving a transfer from December 2021).

New York's choice-of-law rules apply to the fraudulent conveyance claim here because in determining which jurisdiction's substantive laws apply, "a federal court sitting in diversity must apply the conflict of laws rules of the state in which the federal court sits." Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC, 842 F. Supp. 2d 661, 664-65 (S.D.N.Y. 2012) (quoting GFL Advantage Fund, Ltd. v. Colkitt, No. 03 Civ. 1256 (JSM), 2003 WL 21459716, at *2 (S.D.N.Y. June 24, 2003)). "The first step of New York's choice-of-law rules is to determine whether there is an actual conflict between the laws of the jurisdictions involved." Id. at 665. Athena makes no argument that a conflict exists between New York law and English law. See ECF No. 206 at 14-15. "If the party advocating a choice of law analysis fails to demonstrate an actual conflict between New York and another state's laws, no choice law analysis need be undertaken." Park Place Entm't Corp. v. Transcontinental Ins. Co., 225 F. Supp. 2d 406, 408 (S.D.N.Y. 2002).

Regardless, a choice-of-law analysis demonstrates that New York law would apply as New York has the greatest interest in applying its law to the instant dispute. To resolve a conflict of laws in a tort case, "New York applies an interest analysis to identify the jurisdiction that has the greatest interest in the litigation based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that relate to the purpose of the particular law in conflict." Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006) (internal quotation marks and citations omitted). "A tort occurs in 'the place where the injury was inflicted,' which is generally where the plaintiffs are located." Id. (quoting Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001)).

Athena's principal place of business is New York. See ECF No. 30 ¶ 16; ECF No. 31 ¶ 18. The Transfer of Title document which memorialized the transfer of the Painting from IPL

to Boxwood was drafted by Athena. See Delahunty R. 56.1 ¶ 38; ECF No. 179-24 at 2; ECF No. 179-27 ¶ 12(b).[13] IPL transferred the Painting from its storage facility in New York to Athena's storage facility, which was at the same address in New York.[14] See ECF No. 179-28 at 5 (Straight Bill of Lading for Basquiat Humidity, showing address in Long Island City, New York for both storage facilities); see also Athena R. 56.1 ¶ 16. Athena, with its principal place of business in New York, released funds ($3,245,000) to Boxwood, which Boxwood used to make partial payment to IPL for the Painting. See ECF No. 179-27 ¶ 12(e)-(f). After Boxwood's default, Athena obtained a judgment against it in New York. See ECF No. 8 at Compl. ¶ 4; see also Athena R. 56.1 ¶ 21. Finally, the LSA between Athena and Boxwood, for which the Painting was collateral, required application of New York law. See ECF No. 179-1 ¶¶ 12.3.1, 12.3.2. In short, even if a choice-of-law analysis were necessary, that analysis points to the application of New York law, because New York has the greatest interest in policing secured transactions that occur in New York. See Bakalar v. Vavra, 619 F.3d 136, 144-45 (2d Cir. 2010) (holding that New York law applied to dispute over ownership "of a stolen piece of artwork [that] was delivered in New York to a New York gallery").

---

[13] Athena contends that the document cited by Delahunty to support its assertion that Athena drafted the Transfer of Title document is inadmissible hearsay. See ECF No. 211, Response No. 38. The document that Delahunty relies on is an e-mail, sent by a Managing Director at Athena to Philbrick. That e-mail attached the Transfer of Title document that was executed in connection with the Loan to Boxwood. See ECF No. 179-24. Contrary to Athena's argument, the document is not hearsay because it is not being offered for its truth. "[I]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." See United States v. Dupree, 706 F.3 131, 136 (2d Cir. 2013) (quoting Fed. R. Evid. 801(c) advisory committee's note). Delahunty's reliance on the document is not for the truth of any statement made therein but, rather, for the fact that the Transfer of Title was a document that Athena prepared and sent to Philbrick.

[14] Although the Painting was in London from September 22, 2017, until November 1, 2017, it returned to Athena's custody and was shipped to New York on November 8, 2017. See ECF No. 179-27 ¶¶ 14-16.

In sum, the transaction between IPL and Boxwood was a fraudulent conveyance, which must be set aside. Boxwood therefore did not obtain any rights in the Painting through the Transfer of Title in April 2017. See Cantor v. Anderson, 639 F. Supp. 364, 368 (S.D.N.Y. 1986) (stating that where evidence showed art dealer entrusted with painting did not have "rights in the collateral," art dealer could not pledge the painting to a third party), aff'd, 833 F.2d 1002 (2d Cir. 1986); Gasser v. Infanti Int'l., Inc., 353 F. Supp. 2d 342, 356 (E.D.N.Y. 2005) (explaining that a debtor who "never owned" a patent "could not transfer any interest in the [p]atent" pursuant to a security agreement).

          ii.      Neither Boxwood nor Athena obtained title to the Painting as buyers in the ordinary course.

"Sales of artwork are governed by [New York's version of] the Uniform Commercial Code [('UCC')], which provides that a purchaser generally acquires only the title which a seller had." Overton v. Art Fin. Partners LLC, 166 F. Supp. 3d 388, 399 (S.D.N.Y. 2016) (alterations in original) (quoting Dorothy G. Bender Found., Inc. v. Carroll, 40 Misc. 3d 1231(A), 40 Misc. 3d 1231(A), 2013 WL 4487458, at *6 (N.Y. Cnty. 2013)). Section 2-403(1) of the U.C.C. makes clear that a purchaser can acquire only the title which is held by the seller and that the seller is able to transfer. Overton, 166 F. Supp. at 399-400. As discussed, after October 2016, Satfinance had full title to the Painting and was the only entity that could transfer title in the Painting. See supra Section II.A.1.

There are two narrow exceptions that allow someone other than the title holder to transfer title—the U.C.C.'s "entrustment doctrine" and the concept of "voidable title." See Overton, 166 F. Supp. at 400 (discussing the entrustment doctrine); Zaretsky v. William Goldberg Diamond Corp., 820 F.3d 513, 524-25 (2d Cir. 2016) (discussing the concept of voidable title). Neither exception applies here to have permitted IPL to transfer title to the Painting to Boxwood.

The merchant entrustment rule states that "[a]ny entrusting of . . . goods to a merchant who deals in goods of that kind gives [the merchant] power to transfer all rights of the entruster to a buyer in the ordinary course of business." N.Y. U.C.C. § 2-403(2); see also Overton, 166 F. Supp. 3d at 400 ("[A]n entrustee—i.e., someone to whom property has been entrusted by its owner—has voidable, as opposed to void, title, and therefore can pass good title to a third party.") (internal quotation marks and citations omitted). A buyer in the ordinary course of business is "a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind." Overton, 166 F. Supp. 3d at 401 (quoting N.Y. U.C.C. § 2-104(9)). "A good faith purchaser or bona fide purchaser for value means a purchaser for fair consideration without knowledge of any fraud or other facts that would indicate that there is a cloud on the title to the merchandise that he or she purchased." Matter of a Special Proceeding Application of TD Bank, NA v. One 2016 Cadillac Escalade, 79 Misc.3d 1201(A), 2022 WL 20014781, at *5 n.7 (Albany Cnty. 2022). Here, it is undisputed that Delahunty and Satfinance entrusted an art merchant, IPL, with the Painting. See Satfinance R. 56.1 ¶¶ 3,17; Athena R. 56.1 ¶ 32. Boxwood, however, was not a buyer in the ordinary course of business, such that the merchant entrustment doctrine would not permit IPL to have transferred good title to Boxwood.

Philbrick was on both sides of the purported transfer of title between IPL and Boxwood in April 2017. Philbrick owned IPL. Athena R. 56.1 ¶ 1. Philbrick also wholly owned Boxwood, a limited liability company. Athena R. 56.1 ¶ 3. Philbrick's knowledge could therefore be imputed to IPL and Boxwood. See Battino, 861 F. Supp. 2d at 405 ("The knowledge of a

director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation.") (quoting Baker v. Latham Sparrowbush Assoc., 72 F.3d 246, 255 (2d Cir. 1995)).

Philbrick was undoubtedly aware in April 2017, when IPL purported to transfer title to Boxwood, that he had months earlier entered into an agreement with Satfinance transferring full title to Satfinance. Indeed, it was Philbrick who entered into the agreement with Satfinance on behalf of IPL. See ECF No. 180-3. And Philbrick admitted, in connection with his guilty plea to wire fraud, that he knowingly misrepresented the ownership of certain artworks. Delahunty R. 56.1 ¶ 56. As the architect of the fraud on Satfinance, Delahunty, and Athena, Philbrick's knowledge could be imputed to Boxwood and thus Boxwood, as the purported purchaser of the Painting in April 2017, was aware that IPL did not have title to the Painting and that Satfinance and Delahunty had ownership interests in the Painting. Boxwood therefore could not be a buyer in the ordinary course under the U.C.C., because Boxwood lacked a good faith belief that IPL was not violating the rights of Satfinance and Delahunty when it purported to transfer the Painting to Boxwood.[15] See Davis v. Carroll, 937 F. Supp. 2d 390, 422-23 (S.D.N.Y. 2013) ("As a general matter, New York law provides that 'buyer in ordinary course' means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods . . . .") (quoting N.Y. U.C.C. § 1-201(9)).

Nor could IPL have transferred title to the Painting under the "voidable title" doctrine. Section 2-403(1)(d) of the U.C.C. provides that:

---

[15] Further, as a lender, Athena could not qualify as a buyer in the ordinary course, because the U.C.C. explicitly excludes lenders from being "buyers in the ordinary course." See N.Y. U.C.C. § 9-203, cmt. 6 ("In some cases, a debtor may have power to transfer another person's rights only to a class of transferees that excludes secured parties."); N.Y. U.C.C. § 1-201 ("buyer in the ordinary course of business" does not include person who acquires goods "as security for or in total or partial satisfaction of a money debt"); Overton, 166 F. Supp. 3d at 400 ("Excluded from th[e] definition [of 'buyer in the ordinary course of business'] are persons who acquire goods 'as security for . . . a money debt.'") (quoting N.Y. U.C.C. § 1-201).

> A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though . . . the delivery was procured through fraud punishable as larcenous under the criminal law.

N.Y. U.C.C. § 2-403(1)(d). Under the voidable title doctrine, the party with "voidable title" has the power to transfer "good title" to a good faith purchaser for value. Sheridan Suzuki, Inc. v. Caruso Auto Sales, Inc., 110 Misc. 2d 823, 825 (Erie Cnty. 1981) ("A 'bona fide purchaser for value' can receive good title from a person with 'voidable' title"). As already discussed, Boxwood is not a good faith purchaser for value, because Philbrick's knowledge of his fraud is imputed to Boxwood, such that Boxwood could not have acted in good faith.

Even if Boxwood could qualify as a good faith purchaser for value, IPL did not have voidable title at the time IPL purported to transfer title to Boxwood. Section 2-403 of the U.C.C. requires that a party obtain voidable title through a "transaction of purchase." Alexander v. Spanierman Gallery, LLC, 64 A.D.3d 487, 487 (1st Dep't 2009) (holding that seller who "possessed [sculpture] only for purpose of its authentication . . . possessed no 'voidable title' . . . and could not pass good title even to subsequent good-faith purchasers for value" because seller did not receive the sculpture 'under a transaction of purchase'"). A transaction of purchase is "limited to those situations in which the party who delivered the goods to the subsequent seller intended . . . that the seller would become the owner of the goods." Zaretsky, 820 F.3d at 525 (quoting Am. Standard Credit, Inc. v. Nat'l Cement Co., 643 F.2d 248, 268 (5th Cir. 1981); see also Bakalar v. Vavra, 819 F. Supp. 2d 293, 299 (S.D.N.Y. 2011) (explaining that "the key to the voidable title concept appears to be that the original transferor voluntarily . . . intended to pass title"), superseded by statute on other grounds.

IPL obtained title to the Painting from Phillips in July 2016. Athena argues that IPL obtained only voidable title "when it procured title from Phillips via an alleged fraud." ECF No. 226 at 5. In the transaction conveying title from Phillips to IPL, Phillips "intended" to transfer title through a "transaction of purchase." Zaretsky, 820 F.3d at 525. If the transaction was fraudulently induced as Athena contends (see ECF No. 226 at 5), IPL obtained voidable title to the Painting through the July 2016 purchase. Green v. Arcadia Fin. Ltd., 174 Misc. 2d 411, 413 (Sup. Ct. Erie Cnty. 1997) ("A person who acquires title by fraud has 'voidable' title.") (citation omitted). But by October 2016, IPL transferred "[f]ull title" to Satfinance, a good faith purchaser for value.[16] ECF No. 177 at 4. Even if IPL had only voidable title after acquiring the Painting from Phillips, Satfinance obtained good title to the Painting in or around October 2016 under the voidable title doctrine. Zaretsky, 820 F.3d at 525 ("Defects in [a] con artist's voidable title [is] cured by a sale to a good faith purchaser for value, and the good faith purchaser . . . obtain[s] clear title."). At that point, Satfinance possessed greater rights to title to the Painting than even Phillips, and IPL ceased to hold either good title or voidable title. Id. (explaining that a good faith purchaser for value holds title "free from any claims of [the initial transferor]"). At no point was there a transaction of purchase through which Satfinance intended to convey title back to IPL, as would be required for the voidable

---

[16] Even though the transaction giving Satfinance full title was fraudulently induced, the transaction was voidable, not void. See, e.g., Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co., 263 F.3d 26, 31 (2d Cir. 2001) ("An allegation of fraud in the inducement is a defense that renders contracts voidable, but not void."). Only the "defrauded party"—here, Satfinance—has the power to rescind a voidable contract. Lumbermens Mut. Cas. Ins. Co. v. Darel Grp. U.S.A. Inc., 253 F. Supp. 2d 578, 582 (S.D.N.Y. 2003). Satfinance has not voided the contract by which it received full title to the Painting.

title doctrine to apply to the transaction between IPL and Boxwood.[17] <u>See</u> N.Y. U.C.C.

§ 2-403(1)(d) (requiring that a party with "voidable title" acquired through a "transaction

of purchase" convey title to a "good faith purchaser for value" for the voidable title

doctrine to apply). Therefore, the voidable title doctrine is inapplicable, and Boxwood

never had either clear title or voidable title to the Painting.

* * *

Athena has not pointed to any evidence in the record demonstrating that Boxwood had

any rights in the Painting, or evidence sufficient to raise an issue of fact on that point. Because

Boxwood did not have any rights in the Painting, Athena's security interest could not attach.

B.  <u>Satfinance and Delahunty are not estopped from disputing any interest Athena has in the Painting.</u>

Athena argues that Satfinance and Delahunty should be estopped from interfering with its

claimed security interest because, in making the loan, Athena relied on Philbrick's

representations concerning the Painting, and Satfinance and Delahunty intentionally concealed

their silent partnerships with Philbrick concerning their alleged ownership interests in the

Painting. <u>See</u> ECF No. 174 at 15-18. Delahunty counters that Athena waived the affirmative

defense of equitable estoppel and, in any case, neither Delahunty nor Satfinance had a duty to

disclose their ownership interest in the Painting to Athena. <u>See</u> ECF No. 197 at 19-24.

Additionally, Satfinance argues that Athena has not shown that Satfinance knew of the true facts

---

[17] Because it is undisputed that Delahunty has no claim to title in the Painting, <u>see, e.g.</u>, Delahunty R. 56.1 ¶ 22; Athena R. 56.1 ¶¶ 30-32, the November 1, 2016 transaction conveying an ownership interest in the Painting to Delahunty is irrelevant to the voidable title doctrine analysis.

or took action to induce Athena's reliance, two elements necessary for equitable estoppel to apply. See ECF No. 204 at 10-16.

Beginning with Delahunty's waiver argument, Athena is not precluded from raising the defense of equitable estoppel now. Equitable estoppel is an affirmative defense. See Fed. R. Civ. P. 8(c)(1). Federal Rule of Civil Procedure 8(c) "requires a defendant to 'affirmatively state any avoidance or affirmative defense,' and affirmative defenses that are not raised in the pleading stage should be dismissed." MBIA Ins. Corp. v. Patriarch Partners VIII, LLC, 842 F. Supp. 2d 682, 710 (S.D.N.Y. 2012) (quoting In re Cross Media Mktg. Corp., 367 B.R. 435, 446 (Bankr. S.D.N.Y. 2007)). While "'[t]he general rule in federal courts is that a failure to plead an affirmative defense results in a waiver,'" MBIA Ins. Corp., 842 F. Supp. 2d at 709 (quoting Travellers Int'l, A.G. v. Trans World Airlines, 41 F.3d 1570, 1580 (2d Cir. 1994)), "it is well-established that courts in this circuit may consider the merits of an affirmative defense raised for the first time in a summary-judgment motion so long as the plaintiff has had an opportunity to respond," Kelly v. A1 Tech., No. 09 Civ. 962 (LAK) (MHD), 2010 WL 1541585, at *17 (S.D.N.Y. Apr. 12, 2010) (internal quotation marks and citations omitted). Even though Athena did not plead equitable estoppel as an affirmative defense in its answer—as Athena acknowledges (see ECF No. 226 at 8-9)—the Court can consider Athena's estoppel defense because Satfinance and Delahunty have had an opportunity to respond to it. See Curry v. City of Syracuse, 316 F.3d 324, 331 (2d Cir. 2003) (allowing consideration of an affirmative defense raised for the first time in a reply memorandum in response to an opposition to summary judgment where the non-movant was granted leave to file a sur-reply).

Athena's estoppel defense nonetheless fails on the merits. "Under New York law, equitable estoppel requires a showing of (1) [a]n act constituting a concealment of facts or a false

misrepresentation; (2) [a]n intention or expectation that such acts will be relied upon; (3) [a]ctual

or constructive knowledge of the true facts by the wrongdoer; [and] (4) [r]eliance upon the

misrepresentations which causes the innocent party to change its position to its substantial

detriment." MBIA Ins. Corp., 842 F. Supp. 2d at 714 (internal quotation marks and citations

omitted). Equitable estoppel "is an 'extraordinary remedy,'" Twersky v. Yeshiva Univ., 993 F.

Supp. 2d 429, 442 (S.D.N.Y. 2014) (quoting Pulver v. Dougherty, 58 A.D.3d 978, 979 (3d Dep't

2009)), which "should be 'invoked sparingly and only under exceptional circumstances.'" Id.

(quoting Abercrombie v. Andrew Coll., 438 F. Supp. 2d 243, 265 (S.D.N.Y. 2006)).

Athena has not pointed to any false misrepresentations by Satfinance or Delahunty, made

while Satfinance or Delahunty were aware of the true facts. Delahunty and Satfinance were

simply silent on their ownership interests in the Painting. "[A] party's silence," however, "does

not give rise to a claim of equitable estoppel when the party has no duty to speak." Gaia House

Mezz LLC v. State St. Bank & Trust Co., 720 F.3d 84, 90 (2d Cir. 2013) (comparing In re

Vebeliunas, 332 F.3d 85, 94 (2d Cir. 2003) (finding defendant's silence could not give rise to

equitable estoppel because defendant had no duty to speak) with Kosakow v. New Rochelle

Radiology Assocs., P.C., 274 F.3d 706, 725-26 (2d Cir. 2001) (finding silence constituted an act

of concealment when employer had legal obligation to provide notice)). Athena has not pointed

to any duty on the part of Delahunty or Satfinance to publicly announce their ownership interest

in the Painting. In fact, Athena's own witnesses testified that there is "nothing unusual" about

private art sales and that confidentiality is "paramount" in the art world. ECF No. 201-1 at 6; see

also ECF No. 201-2 at 10.

Further, and fatal to Athena's estoppel defense, there is no evidence in the record that

Satfinance or Delahunty made a statement, performed an act, or concealed facts with an intent or

expectation that Athena would rely on such conduct. See Summit Health, Inc. v. APS Healthcare Bethesda, Inc., 993 F. Supp. 2d 379, 401-02 (S.D.N.Y. 2014) (explaining that estoppel defense requires concealment or misrepresentation by wrongdoer with intent that innocent party would rely and detrimental reliance by innocent party). Nor is there any evidence that Athena relied on any purported misrepresentations or concealment by Satfinance or Delahunty in executing the LSA with Boxwood. See ECF No. 174 at 16; ECF No. 228 at 5-9. All Athena points to are misrepresentations made by *Philbrick* regarding his or Boxwood's ownership interest in the Painting. For example, Athena highlights the "many" times Philbrick represented to Athena that he had "full and unfettered" rights to pledge and handover the Painting. ECF No. 174 at 17-18. Athena attempts to attribute these misrepresentations to Satfinance and Delahunty by applying principles of partnership law, arguing that Satfinance and Delahunty gave Philbrick exclusive possession of the Painting and Philbrick was acting on behalf of the partnership. See ECF No. 174 at 18 (citing Bank of Com. v. De Santis, 451 N.Y.S.2d 974, 976-77 (Civ. Ct. Kings Cnty. 1982) ("The act of every partner . . . apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership. . . . In essence, an action need not be actually within the scope of the partnership business, so long as it is apparently within the scope of the partnership business.")). But Athena has not pointed to any evidence that Satfinance or Delahunty took steps to convey apparent authority to Philbrick that would bind the partnership. ECF No. 174 at 15-16, 18.

"The existence of apparent authority depends on proof that the third party relied upon conduct of the principal which clothed the agent with the appearance of authority [to act on behalf of his partnership]." Chelsea Nat'l Bank v. Lincoln Plaza Towers Assocs., 93 A.D.2d 216, 219 (1st Dep't 1983) ("[T]he apparent authority of a principal to act on behalf of his partnership

cannot be established by the acts of an agent."). There is no evidence in the record that Satfinance or Delahunty acted or made statements to Athena that would "give rise to the appearance and belief that the agent [(Philbrick)] possesse[d] authority to enter into a transaction on behalf of the principal." Spagnola v. Chubb Corp., 264 F.R.D. 76, 90 (S.D.N.Y. 2010) (quoting Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 486 (S.D.N.Y. 2011)). Indeed, there is no indication in the record that Satfinance or Delahunty were even aware of Philbrick's actions.

The cases Athena relies on (see ECF No. 174 at 18) are all distinguishable because they arose in circumstances where a partner concealed the nature of their authority to bind the partnership, but not the existence of the partnership itself, as occurred here. See Belgian Overseas Sec. Corp. v. Howell Kessler Co., 88 A.D.2d 559 (1st Dep't 1982) ("Plaintiff is [not] bound by any internal limitation on an individual general partner's power to bind the partnership since it had no knowledge of any such limitation."); Bank of Com., N.Y.S.2d at 976 (discussing how the act of every partner binds the partnership in the context of the third party being aware of the partnership). Here, Philbrick concealed his partnerships with Satfinance and Delahunty from Athena, which was the cornerstone of Philbrick's fraud. There is no evidence that Athena was aware of the existence of those partnerships while Philbrick concealed the nature of his authority to act on behalf of the partnerships, as would be necessary for Philbrick's acts to bind Satfinance and Delahunty. See Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc., 241 F. Supp. 2d 246, 265 (S.D.N.Y. 2002) (explaining that "for apparent authority to exist, a third party must believe that an agent is able to act on behalf of a principal") (quoting Restatement (Second) of Agency § 8 cmt. a (1958)).

* * *

In sum, the undisputed evidence shows that Satfinance has full legal title to the Painting. Athena did not obtain a security interest in the Painting because Boxwood had no rights in the Painting to which a security interest could attach. Although the undisputed evidence also shows that Satfinance and Delahunty each have an ownership interest in the Painting, there is a dispute of fact as to each entity's respective ownership percentage.

## CONCLUSION

For the reasons set forth above, I respectfully recommend that Athena's motion for summary judgment (ECF No. 173) be **DENIED**. I further recommend that Satfinance's motion for summary judgment (ECF No. 175) be **GRANTED** and that it be declared to have full legal title to Humidity (1982) by Jean-Michel Basquiat. Additionally, I recommend that Delahunty's motion for summary judgment (ECF No. 170) be **GRANTED**, to the extent Delahunty seeks a declaration that Athena has no rights or interest in the Painting. Finally, I recommend that Delahunty's motion be **DENIED**, to the extent it seeks a declaration that it owns a 12.5% ownership interest in the painting that is not impeded by the rights of Satfinance.

DATED:    New York, New York
          October 2, 2024

                                        Respectfully submitted,

                                        _____
                                        VALERIE FIGUEREDO
                                        United States Magistrate Judge

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable George B. Daniels. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).**